**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-1354

HUMAN RIGHTS DEFENSE CENTER,

      Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS FOR WELD COUNTY, COLORADO;
STEVEN REAMS, Sheriff, in his official and individual capacities;
DONNIE PATCH, Undersheriff, in his individual capacity;
MARCY ROLES-FOOS, Captain, in her individual capacity; and
DOES 1-10, in their individual capacities,

      Defendants.

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

---

### INTRODUCTION

Plaintiff, Human Rights Defense Center ("HRDC" or "Plaintiff"), by and through its undersigned counsel, hereby moves for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, that immediately enjoins the Board of County Commissioners for Weld County, Colorado, Sheriff Steven Reams, Undersheriff Donnie Patch, Captain Marcy Roles-Foos, and Does 1–10 (collectively, the "Defendants") from continuing to unconstitutionally deny HRDC's right to communicate with persons incarcerated in the Weld County Jail (the "Jail") via the U.S. Mail.

HRDC seeks to provide prisoners with reading materials regarding their legal and civil rights and options for accessing education and self-improvement while incarcerated. Between August 2025 and March 2026, Defendants refused to deliver HRDC's books, magazines, and

correspondence sent via the U.S. Mail to prisoners at the Jail, violating HRDC's First Amendment and Colorado Constitutional rights to communicate information to these individuals. In addition, Defendants have failed to provide HRDC adequate notice and an opportunity to challenge their censorship decisions, in violation of the Due Process Clause of the Fourteenth Amendment. Defendants' serious and ongoing violations of the Federal and Colorado Constitutions are causing HRDC irreparable harm. As a settled matter of First Amendment law, the continued deprivation of HRDC's free-speech rights is precisely the type of irreparable harm that justifies preliminary injunctive relief.

HRDC's publications and correspondence pose no threat to the safety and security of the Jail, and in fact, are successfully distributed in jails and prisons all over the United States. HRDC has no alternative means of communicating with persons incarcerated at the Jail. These prisoners likewise have no alternative means of accessing information from HRDC about their legal and civil rights and educational opportunities—information that is crucially important to assisting these individuals in participating in their legal defense and preparing to re-enter society as productive citizens. To the contrary, because of Defendants' arbitrary and capricious enforcement of their published mail policy, most individuals incarcerated in the Jail have extremely limited access to reading and educational materials.

Accordingly, HRDC respectfully requests that this Court enter a preliminary injunction prohibiting Defendants, immediately and throughout this litigation, from (1) continuing to arbitrarily and illegally censor Plaintiff's written materials sent via U.S. Mail to prisoners at the Jail; and (2) continuing to deny Plaintiff its right to Due Process of the Law, by failing to provide HRDC with adequate notice of the reasons for any rejections of its correspondence and a

2

meaningful and expeditious opportunity to appeal any such rejections.

## I.   STATEMENT OF FACTS

### A.  HRDC's Publications and Correspondence

The Human Rights Defense Center is a not-for-profit charitable organization recognized under § 501(c)(3) of the Internal Revenue Code, incorporated in the state of Washington and with principal offices in Boynton Beach, Florida.  For more than 35 years, HRDC has focused its mission on public education, advocacy and outreach on behalf of, and for the purpose of assisting, prisoners who seek legal redress for infringements of their constitutionally guaranteed and other basic human rights.  *See* **Exhibit 1,** Declaration of Paul Wright in Support of Motion for Injunctive Relief ("Wright Decl.") ¶ 2.  HRDC accomplishes this mission through advocacy, litigation, and the publication and/or distribution of books, magazines and other information concerning prisons and the rights of prisoners.  *Id.*

HRDC publishes and distributes an award-winning, 72-page monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights*, which contains news and analysis about prisons, jails, and other detention facilities, prisoners' rights, court opinions, management of prison facilities, prison conditions, and other matters pertaining to the rights and/or interests of incarcerated individuals.  *Id.* ¶ 4.  *Prison Legal News* is published on newsprint bound by two small staples and is 72 pages long.  *Id.*

HRDC also publishes a second monthly magazine, *Criminal Legal News.  Id.* ¶ 5.  This magazine focuses on review and analysis of individual rights, court rulings, and news concerning criminal justice-related issues.  *Id. Criminal Legal News* is also published on newsprint bound by two small staples and is 56 pages long.  *Id.*

3

HRDC's magazines provide prisoners with timely, in-depth coverage of judicial decisions and other recent events concerning our nation's criminal justice system in a way that would be impossible through other means of communication. Wright Decl. ¶ 6. It is essential that the magazines are delivered in a timely manner, as delays in delivery sap the magazines of their news value. *Id.*

HRDC also publishes and/or distributes several different soft-cover books on criminal justice, health, and legal issues that are of interest to prisoners and others. *Id.* ¶ 7. HRDC publishes and distributes the *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* ("*Prisoners' Handbook*"), which provides information on enrolling at accredited higher educational, vocational and training schools. *Id.* HRDC does not publish, but is the sole national distributor of *Protecting Your Health and Safety* ("*PYHS*"), which describes the rights, protections and legal remedies available to persons concerning their health and safety while they are incarcerated. *Id.*

In addition to its publications, HRDC also communicates with prisoners through the United States Postal Service by mailing them: (a) informational brochure packets ("Info Packs"), which contain a brochure and subscription order form, a book list, and a published books brochure (each of which is a single page); (b) copies of judicial opinions of import to prisoners, which are marked "Court Ruling;" and (c) letters that provide pertinent information about HRDC's publications and related topics and subscription renewal letters. Wright Decl. ¶ 8. HRDC encloses a self-addressed, stamped envelope with its informational brochure packets and subscription renewal letters, but does not enclose extra envelopes or stamps with the informational brochure packets, judicial opinions, or other letters that it mails to prisoners. *Id.*

HRDC has thousands of subscribers to its monthly magazine in the United States and abroad, including prisoners, attorneys, journalists, public libraries, judges, and members of the general public. *Id.* ¶ 10.  Since its creation in 1990, HRDC has sent its publications to prisoners and law librarians in more than 3,000 correctional facilities across the United States, including death row units and institutions within the Federal Bureau of Prisons, such as the federal Administrative Maximum Facility ("ADX" or "Supermax") at Florence, Colorado—the most secure prison in the United States. *Id.* ¶ 11.  HRDC's magazines and books are distributed to prisons and jails within the correctional systems of all 50 states, including to dozens of prisoners housed in facilities in the state of Colorado. *Id.*

HRDC has been mailing these important publications to prisoners at the Jail, but Defendants maintain policies and practices that unconstitutionally prevent HRDC's mail from reaching the intended recipients.

**B.  Defendants' Unconstitutional Mail Policies and Practices**

The Weld County Sheriff's Office Detention Policy and Procedure Manual, dated March 3, 2026 ("Detention Manual") is available on the public website of the Weld County Sheriff's Office at https://www.weldsheriff.com/Divisions/Jail (last visited March 17, 2026), which includes a hyperlink to a PDF of the Detention Manual at https://www.weldsheriff.com/files/content/sheriff/v/143/divisions/jail/release_20260303_t135739_weld-county-so-detention-manual.pdf (last visited March 17, 2026).  Defendants' current policy on incoming mail for prisoners at the Jail, Policy 1008 (the "Mail Policy"), is recorded on pages 419 through 422 of the Detention Manual.  The Mail policy provides, in pertinent part:

1008.3 MAIL GENERALLY

5

Inmates may, at their own expense, send and receive mail without restrictions on quantity, provided it does not jeopardize the safety of staff, visitors or other inmates, or pose an unreasonable disruption to the orderly operation of the facility.

 …

1008.6.2 CENSORSHIP OF INCOMING AND OUTGOING NON-CONFIDENTIAL CORRESPONDENCE

In making the determination of whether to censor incoming non-confidential correspondence, consideration shall be given to whether rejecting the material is rationally related to a legitimate government interest, and whether alternate means of communicating with others is available.

The impact the correspondence may have on other inmates and jail staff is also a factor. Reasonable alternatives should be considered and an exaggerated response should be avoided; for example, discontinuing delivery of a magazine because of one article.

Outgoing non-confidential correspondence shall only be censored to further a substantial government interest, and only when it is necessary or essential to address the particular government interest. Government interests that would justify confiscation of outgoing mail include:

   (a) Maintaining facility security.

   (b) Preventing dangerous conduct, such as an escape plan.

   (c) Preventing ongoing criminal activity, such as threats of blackmail or extortion, or other similar conduct.

   (d) Preventing harassment of those who have requested that no mail be sent to them by the inmate.

Correspondence and material identified for censorship require approval of the Detentions Captain or the authorized designee. The request for and decision if such mail will be censored, should be documented in an incident report.

Notices should be sent to the sender of censored publications. A single notification may be sent if the publication is received by multiple inmates.

1008.6.3 DOCUMENTING REJECTED OR CENSORED CORRESPONDENCE

In each case where it is necessary to remove any item, or reject or censor correspondence, a written record must be made of such action, to include:

(a) The inmate name and number.

(b) A description of the mail in question.

(c) A description of the action taken and the reason for such action.

(d) The disposition of the item involved.

(e) Signature of staff.

(f) Notification to the inmate and sender (unless such notification jeopardizes any investigation or the security of the facility).

1008.7 REJECTION OF CONTROLLED MATERIALS

The Office may reject materials that may inhibit the reasonable safety, security and discipline in the daily operation of this facility. Materials that may be rejected include, but are not limited to:

• Materials that advocate violence or a security breach.

• Literature that could incite racial unrest.

• Sexually explicit material, including nude pictures, or pictures or descriptions of sexually explicit activities.

• Obscene publications or writings and mail containing information concerning where or how such matter may be obtained; any material that would have a tendency to incite murder, arson, riot, violent racism or any other form of violence; any material that would have a tendency to incite crimes against children; any material concerning unlawful gambling or an unlawful lottery; any material containing information on the manufacture or use of weapons, narcotics or explosives or any other unlawful activity.

• Material that could lead to sexual aggression or an offensive environment for inmates.

• Material that could create a hostile or offensive work environment.

• Any material with content that could reasonably demonstrate a legitimate government interest in rejecting the material.

Staff shall notify the Shift Sergeant whenever a decision is made to reject books, or other materials. The Detentions Captain or the authorized designee will be responsible for making the final decision as to any specific materials that will be prohibited within this facility.

Religious texts not supplied by facility-authorized entities may be

accepted by the chaplain.

*Id.* ¶ 15.

In addition to the Mail Policy, Defendants have posted restrictions on incoming mail (the "Mail Restrictions") on the public website of the Weld County Sheriff's Office at https://www.weldsheriff.com/Divisions/Jail (last visited March 17, 2026). In pertinent part, the Mail Restrictions provide:

> **Items not accepted in the mail**
>
> All mail is screened before it is delivered digitally to an inmate. Mail without a return address is not opened and returned to the U.S. Post Office. For security reasons, we cannot accept packages of the following items:
>
> • Food or snacks,
>
> • Stamped envelopes or stamps,
>
> • Construction paper, newspapers, magazines, books
>
> • Any items made with glitter, clippings or anything made with glue,
>
> • Cards that have paper inserts or items that pop out
>
> • As of February 2024, The Weld County Sheriff's Office jail is no longer accepting books that are shipped into the facility.
>
> Items not accepted will be returned. Mail that is deemed not legal, nor containing a government issued check, money order or cashier's check as described above will be returned.
>
> Postage-paid envelopes and larger envelopes may be purchased through commissary. Indigent inmates will receive one free envelope per week. Indigent inmates are defined as inmates with a balance of less than the current postage rate on their inmate account for 30 or more consecutive days.

*Id.* ¶ 16.

### C.  Defendants' Censorship of HRDC's Mail

Between August 2025 and March 17, 2026, HRDC sent books, magazines, informational

brochures, and correspondence to individuals confined at the Jail.  Wright Decl. ¶ 17.  During that time period, one hundred and fourteen (114) of those items were returned to HRDC by the Jail. *Id.* The items returned were addressed to individuals confirmed to still be in custody of the Jail on the day HRDC received the returned mail.   *Id.*

The one hundred and fourteen (114) returned items consisted of:  forty (40) issues of *Prison Legal News*; forty-three (43) issues of *Criminal Legal News*; fourteen (14) copies of *Prisoners' Handbook*; three (3) copies of *PYHS*; thirteen (13) Info Packs; and one (1) follow-up letter. *Id.*  ¶ 18.  Many of the rejected items were returned to HRDC marked in various ways, including "RETURN  REJECTED  MAIL,"  "RETURN  TO  SENDER,"  and  "unauthorized Package."  *Id.*  ¶ 19.  The Jail enclosed rejected notices with some of the returned items, which indicated the reason for rejection as: "Newspaper/Magazine clippings – Internet articles/material." *Id.*  One of the rejection notices was modified to include the handwritten word "Books" as a reason for rejection.  *Id.*

Defendants failed to provide HRDC with sufficient notice as to why these items were being rejected.  Wright Decl. ¶ 21.  Defendants also failed to provide an adequate opportunity to appeal these censorship decisions before the items were rejected and returned to HRDC at HRDC's expense.  *Id.* ¶ 22.

By adopting and continuing, to this day, to apply such policies and practices, the Jail is unlawfully interfering with Plaintiff's protected expressive activities, and is denying Plaintiff Due Process  of  the  Law.   HRDC  intends  to  continue  attempting  to  communicate  with  prisoners confined in the Jail via the U.S. Mail. *Id.* ¶ 20. Thus, unless the requested preliminary injunction

is entered, Defendants' policies and practices will continue to violate HRDC's constitutionally-protected rights, causing irreparable harm.

## LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a court may issue a preliminary injunction on notice to the adverse party.  Fed. R. Civ. P. 65.  "In determining whether to grant a preliminary injunction, a court must weigh (1) the likelihood that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the relative weight of the harm alleged by the movant and the harm to the nonmoving party; and (4) the public interest."  *Citizens United v. Gessler*, 773 F.3d 200, 209 (10th Cir. 2014); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013).

## ARGUMENT

The Court should grant HRDC's motion and enter the requested injunctive relief, because: (1) HRDC is likely to succeed on the merits of its claims; (2) HRDC is currently suffering and will continue to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities strongly weighs in HRDC's favor; and (4) the injunction sought herein is in the public interest.

## I.      HRDC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### 1.  *First Amendment and Colorado Constitution Claims*[1]

A publisher's right to send publications and other correspondence to prisoners is clearly

---

[1] Plaintiff's Colorado Constitutional free speech claim follows the same analysis as the federal constitutional claim. Importantly, though, the Colorado Supreme Court has long made clear that "the Colorado Constitution provides broader free speech protections than the Federal Constitution" and the state of Colorado has an "extensive history of affording broader protection under the Colorado Constitution for expressive rights." *Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1054 (Colo. 2002) (citing *Bock v. Westminster Mall Co.*, 819 P.2d 55 (Colo. 1991)).

10

established. "[T]here is no question that publishers who wish to communicate with those who . . . willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (alterations added); *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) (recognizing HRDC's "First Amendment right to communicate with prisoners by mail"); *Cf. Jacklovich v. Simmons*, 392 F.3d 420, 431 (10th Cir. 2004) (finding a First Amendment right for prisoners to *receive* information from *Prison Legal News* while in prison). As the Supreme Court has held, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), nor do they bar others "from exercising *their own constitutional rights* by reaching out to those on the 'inside.'" *Thornburgh*, 490 U.S. at 407 (emphasis added).

Indeed, the interests of senders and their intended recipients are "inextricably meshed," and "censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners." *Procunier v. Martinez*, 416 U.S. 396, 409 (1974), *overruled in part on other grounds by Thornburgh*, 490 U.S. at 413-14. "Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Id*. at 408. Further, HRDC's speech covers topics of great public concern – truthful, topical information about the operations of our nation's penal institutions and the criminal justice system more broadly – and therefore "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); *see also Pell v. Procunier*, 417 U.S. 817, 830 n.7 (1974) ("[T]he conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance").

Accordingly, to withstand First Amendment scrutiny, a prison policy must be "reasonably related to legitimate penological interests" under the four *Turner* factors.  *See Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007). While this case involves the free speech rights of free persons, and not of prisoners, for purposes of this motion, HRDC assumes that the Court will employ the *Turner* test as a means of ensuring that any injunctive relief incorporates due deference for the exigencies of jail operation. *See, e.g., Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004). As further discussed below, HRDC is highly likely to prevail on each of the *Turner* factors with regard to Defendants' censorship.

### (a) Defendants' Mail and Book Policies and Practices Are Not Rationally Related to Any Legitimate Penological Objectives.

The first factor a court considers in determining the validity of a prison regulation is whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 482 U.S. at 89.  This factor is "actually more of an 'element' than a factor in the sense that it is not simply a consideration to be weighed but rather an essential requirement." *Boles*, 486 F.3d at 1181 (quotation omitted); *see also Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003).

Under this prong, "the 'logical connection between the regulation and the asserted goal' must not be 'so remote as to render the policy arbitrary or irrational,' and the governmental objective must be both 'legitimate and neutral.'" *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (*quoting Turner*, 482 U.S. at 89–90).  "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006); *see also Cox v. Denning,* No. 12-2571, 2014 U.S. Dist. LEXIS 137148, at *52 (D. Kan. Sep. 29, 2014) (granting summary judgment on plaintiff's First

12

Amendment claim against defendants' postcard only policy).  When a plaintiff presents evidence to refute a "common-sense connection" between a legitimate objective and a prison policy, the defendant "must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational." *Frost*, 197 F.3d at 357 (internal citation and quotation marks omitted); *see also Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir. 1990) ("Prison authorities cannot rely on general or conclusory assertions to support their policies.  Rather, they must first identify the specific penological interests involved and then *demonstrate* both that those specific interests are *the actual bases* for their policies and that the policies are reasonably related to the furtherance of the identified interests.  An *evidentiary showing* is required as to each point." (Emphasis added)).

While respectful of correctional officials' expertise, *Turner's* "reasonableness standard is not toothless." *Beard*, 548 U.S. at 535 (citing *Thornburgh*, 490 U.S. at 414) (internal quotation marks omitted); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[D]eference does not imply abandonment or abdication of judicial review.").  Rather, "[i]n order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals." *Beerheide v. Suthers*, 286 F.3d 1179, 1189 (10th Cir. 2002) (emphasis in original); *see also Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir. 1989) ("[P]rison officials do not set constitutional standards by fiat." (alteration added)).

In the present case, Defendants' policy of censoring publications fails to advance any legitimate penological objective, rendering it irrational and arbitrary.  In fact, Defendants' censorship of HRDC's magazines and books hampers the important penological objective of rehabilitating prisoners.  The U.S. Supreme Court has recognized that since "most offenders will

eventually return to society, a paramount objective of the corrections system is the rehabilitation of those committed to its custody." *McKune v. Lile*, 536 U.S. 24, 36 (2002) (internal citation and alteration omitted). Further, the "weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation . . . ." *Martinez*, 416 U.S. at 412–13 (alteration added); *see also Cline v. Fox*, 319 F. Supp. 2d 685, 694 (N.D. W.Va. 2004) (access to reading material "may benefit inmates," and "[g]ood books . . . lift the spirit, improve the mind, enrich the human personality, and develop character" (alterations added; internal citation omitted)). As such, it is difficult to see how depriving an incarcerated person of knowledge about the outside world could help prepare this person for his or her eventual return to that world. *See Martinez*, 416 U.S. at 412 n.13.

Because Defendants' mail policies and practices are not rationally related to any legitimate penological objectives, and in fact, hamper the crucial penological objective of rehabilitating prisoners, the first *Turner* factor weighs in HRDC's favor.

> ### (b) There Are No Alternative Avenues for HRDC to Exercise Its First Amendment Right to Communicate Information to Prisoners Incarcerated in the Jail.

The second *Turner* factor concerns whether there exist alternative means to exercising the constitutional right in question. The Supreme Court has made it clear that the absence of such alternative means may be seen as evidence that the prison regulations in question are unreasonable. *Beard*, 548 U.S. at 532 (*citing Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (holding that "no alternative means of communication" is "some evidence" that the prison regulations at bar were "unreasonable.")).

Defendants do not provide HRDC with any alternative means of effectively

14

communicating information to prisoners in the Jail. HRDC cannot reasonably be expected to communicate its written speech to prisoners by telephone or in-person with prisoners in thousands of prisons and jails in America. Even if prisoners have other ways to get information, HRDC's message can only be effectively conveyed through print publications. *Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (even if prisoners can obtain general information from other means, such as television or radio, those avenues "should not be considered a substitute for reading newspapers and magazines"). Under Defendants' current policy and practice, HRDC is left with no practical way to reach its intended audience.

### (c) Accommodating HRDC's Federal and State Free Speech Rights Would Impose No Significant Burden on the Jail's Officials, Other Prisoners, or Defendants' Allocation of Resources.

Under the third *Turner* factor, courts must consider the effect an accommodation of the constitutional right in question will have on prisoners, prison staff, and on prison resource allocation. *Turner*, 482 U.S. at 90. In this context, the Supreme Court has said that "the policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction." *Martinez*, 416 U.S. at 414 n.14 (alteration added). In other words, the fact that numerous other institutions are effectively able to accommodate the constitutional right indicates that a particular restriction is not necessary.

Since its founding in 1990, HRDC has sent its materials to thousands of prisoners nationwide. HRDC distributes its publications to correctional facilities across the United States, including the Federal Bureau of Prisons, which houses almost two hundred thousand inmates, without censorship. Indeed, HRDC sends its publications to the Administrative Maximum Facility ("ADX" or "Supermax") in Florence, Colorado - the most secure prison in the United States.

15

Wright Decl. ¶ 11.  Notably, HRDC is not aware of any correctional facility where HRDC's magazines, books, or other correspondence have created a security problem.  *Id.* ¶ 12.  Even some jails have recognized, after rescinding publication bans, that allowing prisoners to read books and magazines is a "win-win" for everyone involved.  *Prison Legal News v. Northwestern Reg'l Jail Auth.*, 2019 U.S. Dist. LEXIS 168591, at *9-10 (W.D. Va. Sept. 30, 2019).  This is strong evidence that the third *Turner* factor favors HRDC, and an arbitrary barrier to HRDC's communications irrationally interferes with core protected speech.

### (d) Defendants' Mail Policy is an Exaggerated Response to Perceived Security Concerns.

The final *Turner* factor is whether the regulation in question is an exaggerated response to prison concerns.  *Turner*, 482 U.S. at 90.  Here, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable . . . ."  *Id*. (alteration added).  When a court finds that a restriction on an incarcerated person's constitutional rights is an "exaggerated response" to prison concerns, the restriction cannot stand.  *Id*. at 97–99.  As mentioned above, the fact that thousands of correctional facilities nationwide accept HRDC's materials strongly suggests that the Defendants' censorship is an exaggerated response.  *See, e.g.*, *Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (final *Turner* factor favored publisher challenging county jail regulation where it was undisputed that publisher's magazine was already distributed in other California county jails).  There is an easy, obvious alternative to Defendants' censorship: the Defendants can effectuate a mail processing system consistent with those implemented by numerous other detention facilities across the country, including maximum security prisons, where publications are reviewed individually to determine whether they pose a risk to a penological objective.

The above analysis demonstrates that each of the *Turner* factors weighs in Plaintiff's favor.

16

Therefore, Defendants' enforcement/implementation of its posted mail policy is an illegal intrusion on HRDC's First Amendment and Colorado Constitutional rights, and Plaintiff is likely to succeed on this claim.

### 2. *Due Process Claim*

The Supreme Court has long recognized that a publisher's right to communicate with prisoners is rooted not only in the First Amendment, but in the Fourteenth Amendment as well. *See Martinez*, 416 U.S. at 417-18. Each time a correctional institution censors an incoming publication, the Due Process Clause requires the institution to provide both the incarcerated person and the sender with notice and an opportunity to challenge the censorship.

In *Montcalm Publishing Corporation v. Beck*, the Fourth Circuit held that prisons must provide senders of publications with procedural protections, stating that notice and an opportunity to be heard for the incarcerated person alone will not suffice because "[a]n inmate who cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication . . . ." 80 F.3d 105, 109 (4th Cir. 1996) (alterations added); *see also Jacklovich,* 392 F.3d at 433. The *Montcalm* Court stated that "providing a copy of [a rejection notice] to publishers of disapproved publications and allowing the publishers to respond in writing would pose a minimal burden on corrections officials." *Id.* (alteration added). "Without notifying the free citizen of the impending rejection, he would not be able to challenge the decision which may infringe his right to free speech." *Martin v. Kelley*, 803 F.2d 236, 244 (6th Cir. 1986) (alteration added).

Here, there is no question that Defendants have violated HRDC's due process rights. Defendants returned HRDC's publications and correspondence through the Postal Service with

17

various markings including "RETURN REJECTED MAIL," "RETURN TO SENDER," and "unauthorized Package." Wright Decl. ¶ 19. The Defendants also enclosed rejection notices with some of the publications indicating that they were rejected because they were "newspaper clippings," which they are not. *Id.* These cryptic and conclusory pronouncements fall far short of providing legally sufficient notice.

Additionally, Defendants have failed to provide HRDC with an opportunity to challenge their censorship decisions before the mailings were rejected and returned at HRDC's expense. *Id.* ¶ 22. An opportunity to be heard is a crucial, constitutionally-mandated chance to correct errors and challenge censorship decisions. *See Jacklovich*, 392 F.3d at 433-34. Providing notice and an opportunity to be heard is important because it allows publishers to investigate and challenge violations of their First Amendment rights, as well as to assist subscribers in filing challenges to such violations within the correctional grievance system. *See Montcalm*, 80 F.3d at 108–09.

Correctional facilities in other jurisdictions provide due process to publishers and prisoners when refusing to deliver publications and other correspondence. For instance, the Federal Bureau of Prisons has an explicit policy requiring it to notify prisoners and publishers, identifying the specific articles or materials rejected and allowing independent review of a warden's rejection decision. *See Thornburgh*, 490 U.S. at 406; Federal Bureau of Prisons Program Statement P5266.11(2). This policy was upheld by the U.S. Supreme Court and acts as a model for other correctional facilities. *See Thornburgh*, 490 U.S. at 419.

Defendants in this case did not provide HRDC with sufficient notice, and they also failed to provide HRDC with an opportunity to challenge these censorship decisions. Therefore, they violated HRDC's due process rights, and Plaintiff is likely to succeed on this claim.

18

**II.     DEFENDANTS' ONGOING CONSTITUTIONAL VIOLATIONS ARE
CAUSING HRDC TO SUFFER IRREPARABLE HARM.**

It is well established that "the loss of First Amendment freedoms, for even minimal periods

of time, unquestionably constitutes irreparable injury." *Citizens United*, 773 F.3d at 218; *see also*

*Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001); *Elrod v. Burns,* 427 U.S. 347, 373 (1976)

("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury").  The violation of a First Amendment right is presumed to cause

irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those

rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even

if imperceptibly, from exercising those rights in the future." *Cate v. Oldham*, 707 F.2d 1176, 1189

(11th Cir. 1983) (citation omitted).  "Monetary damages are inadequate to compensate for the loss

of First Amendment freedoms." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011);

*see also Independence Inst. v. Gessler*, 936 F.Supp.2d 1256, 1281 (D. Colo. 2013) ("damages

cannot replace the loss of protected First Amendment rights").  Further, "when a party seeks a

preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood

of success on the merits often will be the determinative factor." *ACLU v. Johnson*, 194 F.3d 1149,

1163 (10th Cir. 1999) (upon showing a likelihood of success on the merits in the First Amendment

context, the other factors are satisfied; irreparable injury is deprivation of First Amendment rights;

injury outweighs defendant's inability to enforce unconstitutional statute; public interest in free

expression is protected).

Accordingly, courts have repeatedly found irreparable harm based on the denial of First

Amendment rights in correctional settings. *See, e.g.*, *Jacklovich,* 392 F.3d at 428; *Jones v. Caruso*,

569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of preliminary injunction against prison mail

policy) (*quoting Elrod*, 427 U.S. at 373); *Prison Legal News v. Lehman*, 397 F.3d 692, 699–700 (9th Cir. 2005) (affirming grant of permanent injunction of prison ban on non-subscription bulk mail and catalogs requested by incarcerated person). The irreparable harm suffered by HRDC is concrete, severe, and ongoing. Defendants will continue to censor HRDC's mail to prisoners without due process, thwarting HRDC's core protected speech on government policies, the civil and legal rights of prisoners, jail conditions, and the criminal justice system. This is especially so because both *Prison Legal News* and *Criminal Legal News* report on current newsworthy topics on a monthly basis. Wright Decl. ¶ 6. The passage of time saps the publication of its news value. *Id.* Presumably, other publishers have been or will be censored in the same way. Accordingly, HRDC will continue to suffer irreparable harm without a preliminary injunction.

## III.      THE BALANCE OF EQUITIES STRONGLY WEIGHS IN HRDC'S FAVOR

In ruling on a preliminary injunction motion, "a court must balance the equities to assess the harms facing both parties." *Direct Mktg. Ass'n v. Huber*, 2011 U.S. Dist. LEXIS 9589 at \*18 (D. Colo. 2011). Importantly, in First Amendment cases, when an action "is likely unconstitutional, the interests of those the government represents, such as voters, do not outweigh a plaintiff's interest in having its constitutional rights protected." *Citizens United*, 773 F.3d at 218.

Here, any potential injuries to Defendants are minimal and speculative. No great cost or expenditure of time is required to change the current policies to allow HRDC to deliver its books, magazines, and correspondence to prisoners and afford constitutionally mandated due process; indeed, this is the very process that is used at the Federal Bureau of Prisons and by the majority of jails and prisons across the country. Their experience demonstrates that there would be no

substantial harm to Defendants if they were enjoined from enforcing the mail policy now in effect.

In contrast, as noted above, the irreparable harm suffered by HRDC is concrete, severe, and ongoing. Accordingly, the balance of equities tips in HRDC's favor given the irreparable harm suffered by HRDC in the absence of a preliminary injunction, and the minimal effort required by the Jail to comply with the First and Fourteenth Amendments, as well as the Colorado Constitution.

## IV.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

As the Tenth Circuit has held, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). This principle includes injunctions protecting First Amendment freedoms. *See e.g.*, *Cate,* 707 F.2d at 1190 (noting "[t]he strong public interest in protecting First Amendment values"). As set forth above, there are substantial constitutional violations at issue here, and as such, the public interest is best served by the issuance of a preliminary injunction.

As discussed above, it is also in the public interest to allow prisoners access to reading materials while incarcerated. Reading materials enable detainees to engage in productive activity rather than sitting idle, thus helping to avoid conflicts and incidents of violence in the jail. Wright Decl. ¶ 13. In addition, reading allows detainees to keep their minds sharp, helping them to be productive citizens when released back into society. *Id.* This speaks to the hunger for expressive freedom that Justice Thurgood Marshall described in *Martinez,* 416 U.S. at 428 (Marshall, J., concurring) ("When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions…. It is the role of the First Amendment and this Court to protect those

21

precious personal rights by which we satisfy such basic yearnings of the human spirit.").

## V.        THE BOND REQUIREMENT SHOULD BE WAIVED.

Under Federal Rule of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set no bond or only a nominal bond.  *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (citation omitted); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.") (*quoting Cal. ex. rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)); *Ctr. For Food Safety v. Vilsack*, 753 F. Supp. 2d 1051, 1061–62 (N.D. Cal. 2010) (waiving bond requirement for small non-profit organization suing government entity because bond would effectively deny access to judicial review), *vacated and remanded on other grounds by Ctr. For Food Safety v. Vilsack*, 636 F.3d 1166 (9th Cir. 2011).

Waiving the bond requirement is appropriate here because HRDC is a small non-profit organization of thirteen employees that would be unable to post anything more than a nominal bond.  Wright Decl. ¶ 35.  A bond requirement would effectively deny access to judicial review for HRDC, which is especially harmful because HRDC is alleging violations of its fundamental rights under the Constitution.  *See Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.").

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court enter an order

22

preliminarily enjoining Defendants from continuing to violate Plaintiff's constitutionally protected rights by arbitrarily rejecting its mailed communications to prisoners incarcerated at the Jail and failing to provide HRDC with due process to challenge this ongoing censorship.

Dated: March 31, 2026

Respectfully submitted,

KILLMER LANE, LLP

*s/ Darold W. Killmer*
Darold W. Killmer
Reid Allison
1543 Champa Street, Ste. 400
Denver, CO 80202
303-571-1000
303-571-1001 - fax
dkillmer@killmerlane.com
rallison@killmerlane.com

HUMAN RIGHTS DEFENSE CENTER
Jonathan P. Picard
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
Fax: (561) 828-8166
jpicard@humanrightsdefensecenter.org

*Attorneys for Plaintiff Human Rights Defense Center*