IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

HUMAN RIGHTS DEFENSE CENTER,

Plaintiff,

v.

BOARD OF COUNTY
COMMISSIONERS FOR WELD
COUNTY, COLORADO; STEVEN
REAMS, Sheriff, in his official and
individual capacities; DONNIE PATCH,
Undersheriff, in his individual capacity;
MARCY ROLES-FOOS, Captain, in her
individual capacity; and DOES 1-10, in
their individual capacities,

Defendants.

---

## DECLARATION OF PAUL WRIGHT

---

I, Paul Wright, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.  I make this declaration in support of Human Rights Defense Center's ("HRDC" or "Plaintiff") Motion for Preliminary Injunction.

2.      I am the Executive Director of the Human Rights Defense Center ("HRDC"). HRDC is a non-profit, IRS section 501(c)(3) organization, incorporated in the state of Washington and with principal offices in Boynton Beach, Florida.  The purpose of HRDC, as stated in its Articles of Incorporation, is to educate prisoners and the public about the destructive nature of racism, sexism, and the economic and social costs of prisons to society.  For more than 35 years,

EXHIBIT

1

HRDC has focused its mission on public education, advocacy and outreach on behalf of, and for the purpose of assisting, prisoners who seek legal redress for infringements of their constitutionally guaranteed and other basic human rights. HRDC accomplishes its mission through advocacy, litigation, and publication and/or distribution of books, magazines and other information concerning prisons and the rights of prisoners.

3.      I have received numerous awards for my work with HRDC, including the Petra Foundation Award in 2005, the Washington Coalition for Open Government's James Madison Award in 2007, the National Lawyers Guild's Arthur Kinoy Award in 2008, and the City University of New York Law School's Distinguished Public Service Award in 2011. In 2013, I accepted the First Amendment Award from the Society of Professional Journalists on behalf of Human Rights Defense Center for our work with *Prison Legal News*.

4.      HRDC publishes and distributes a soft-cover monthly magazine titled *Prison Legal News: Dedicated to Protecting Human Rights*, which contains news and analysis about prisons, jails and other detention facilities, the rights of prisoners, court opinions, management of prison facilities, prison conditions, and other matters pertaining to the rights and/or interests of incarcerated individuals. *Prison Legal News* is published on newsprint bound by two small staples, and is 72 pages long.

5.      HRDC also publishes a second monthly magazine, *Criminal Legal News*. This magazine focuses on review and analysis of individual rights, court rulings, and news concerning criminal justice-related issues. *Criminal Legal News* is also published on newsprint bound by two small staples, and is 56 pages long.

6.      HRDC's magazines provide prisoners with timely, in-depth coverage of judicial

2

decisions and other recent events concerning our nation's criminal justice system in a way that would be impossible through other means of communication. It is essential that the magazines are delivered in a timely manner, as delays in delivery sap the magazines of their news value.

7.     HRDC also publishes and/or distributes several different soft-cover books on criminal justice, health, and legal issues that are of interest to prisoners and others. HRDC publishes and distributes the *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* ("*Prisoners' Handbook*"), which provides information on enrolling at accredited higher educational, vocational and training schools. HRDC does not publish, but is the sole national distributor of *Protecting Your Health and Safety* ("*PYHS*"), which describes the rights, protections and legal remedies available to persons concerning their health and safety while they are incarcerated.

8.     In addition to its publications, HRDC also communicates with prisoners through the United States Postal Service by mailing them: (a) informational brochure packets ("Info Packs"), which contain a brochure and subscription order form, a book list, and a published books brochure (each of which is a single page); (b) copies of judicial opinions of import to prisoners, which are marked "Court Ruling;" and (c) letters that provide pertinent information about HRDC's publications and related topics and subscription renewal letters. HRDC encloses a self-addressed, stamped envelope with its informational brochure packets and subscription renewal letters, but does not enclose extra envelopes or stamps with the informational brochure packets, judicial opinions, or other letters that it mails to prisoners.

9.     The items listed in paragraphs 4 through 8 are mailed by HRDC through the United States Postal Service. They are each addressed to a specific person, and are sent with postage fully

paid.

10.     HRDC has sent thousands of its magazines and books via mail (including the distribution of more than a million copies of HRDC's monthly journal) to customers nationwide since its founding in 1990. Currently, *Prison Legal News* has thousands of subscribers in the United States and abroad, including prisoners, attorneys, journalists, libraries, judges, and members of the general public.

11.     Since its creation in 1990, HRDC has sent its publications to prisoners and law librarians in more than 3,000 correctional facilities across the United States, including death row units and institutions within the Federal Bureau of Prisons, such as the federal Administrative Maximum Facility ("ADX" or "Supermax") at Florence, Colorado - the most secure prison in the United States. These magazines and books are distributed to prisons and jails within the correctional systems of all 50 states, including to dozens of prisoners housed in facilities in the State of Colorado.

12.     In more than 35 years of operation, I have never heard of any of HRDC's materials actually interfering with a correctional facility's penological interests, or causing a security problem.

13.     Sending publications through the mail to prisoners is essential to accomplishing the mission of HRDC. The primary aim is to communicate with prisoners about developments in the law and protection of one's health and personal safety while in prison or jail. Importantly, reading materials enable detainees to engage in productive activity rather than sitting idle, thus helping to avoid conflicts and incidents of violence in the jail. In addition, reading allows detainees to keep their minds sharp, helping them prepare to become productive citizens when released back into

society.

14.    To better reach incarcerated individuals with publications, I have developed substantial expertise regarding the mail and correspondence policies of correctional facilities across the country.  Since HRDC began more than 34 years ago, I have carefully monitored all instances in which a jail or prison refused to deliver our mail.  I have first-hand knowledge regarding how mail directed to HRDC is received and processed, including mail returned to HRDC through the "Return to Sender" service of the United States Postal Service.

15.    On information and belief, Defendants have adopted mail policies and practices that prohibit prisoners held at the Weld County Jail (the "Jail") from receiving books, magazines, and letters from HRDC.  Attached as **Exhibit A** is a true and correct copy of the Jail's current policy on incoming mail for prisoners at the Jail, Policy 1008 (the "Mail Policy"), which is recorded on pages 419 through 422 of the Weld County Sheriff's Office Detention Policy and Procedure Manual, dated March 3, 2026 ("Detention Manual").  The Detention Manual is available on the public website of the Weld County Sheriff's Office at https://www.weldsheriff.com/Divisions/Jail (last visited March 17, 2026), which includes a hyperlink to a PDF of the Detention Manual at https://www.weldsheriff.com/files/content/sheriff/v/143/divisions/jail/release_20260303_t13573 9_weld-county-so-detention-manual.pdf (last visited March 17, 2026).  In pertinent part, the Mail Policy states:

> 1008.3 MAIL GENERALLY
>
> Inmates may, at their own expense, send and receive mail without restrictions on quantity, provided it does not jeopardize the safety of staff, visitors or other inmates, or pose an unreasonable disruption to the orderly operation of the facility.

…

## 1008.6.2 CENSORSHIP OF INCOMING AND OUTGOING NON-CONFIDENTIAL CORRESPONDENCE

In making the determination of whether to censor incoming non-confidential correspondence, consideration shall be given to whether rejecting the material is rationally related to a legitimate government interest, and whether alternate means of communicating with others is available.

The impact the correspondence may have on other inmates and jail staff is also a factor. Reasonable alternatives should be considered and an exaggerated response should be avoided; for example, discontinuing delivery of a magazine because of one article.

Outgoing non-confidential correspondence shall only be censored to further a substantial government interest, and only when it is necessary or essential to address the particular government interest. Government interests that would justify confiscation of outgoing mail include:

(a) Maintaining facility security.

(b) Preventing dangerous conduct, such as an escape plan.

(c) Preventing ongoing criminal activity, such as threats of blackmail or extortion, or other similar conduct.

(d) Preventing harassment of those who have requested that no mail be sent to them by the inmate.

Correspondence and material identified for censorship require approval of the Detentions Captain or the authorized designee. The request for and decision if such mail will be censored, should be documented in an incident report.

Notices should be sent to the sender of censored publications. A single notification may be sent if the publication is received by multiple inmates.

## 1008.6.3 DOCUMENTING REJECTED OR CENSORED CORRESPONDENCE

In each case where it is necessary to remove any item, or reject or censor correspondence, a written record must be made of such action, to include:

(a) The inmate name and number.

(b) A description of the mail in question.

6

(c) A description of the action taken and the reason for such action.

(d) The disposition of the item involved.

(e) Signature of staff.

(f) Notification to the inmate and sender (unless such notification jeopardizes any investigation or the security of the facility).

## 1008.7 REJECTION OF CONTROLLED MATERIALS

The Office may reject materials that may inhibit the reasonable safety, security and discipline in the daily operation of this facility. Materials that may be rejected include, but are not limited to:

• Materials that advocate violence or a security breach.

• Literature that could incite racial unrest.

• Sexually explicit material, including nude pictures, or pictures or descriptions of sexually explicit activities.

• Obscene publications or writings and mail containing information concerning where or how such matter may be obtained; any material that would have a tendency to incite murder, arson, riot, violent racism or any other form of violence; any material that would have a tendency to incite crimes against children; any material concerning unlawful gambling or an unlawful lottery; any material containing information on the manufacture or use of weapons, narcotics or explosives or any other unlawful activity.

• Material that could lead to sexual aggression or an offensive environment for inmates.

• Material that could create a hostile or offensive work environment.

• Any material with content that could reasonably demonstrate a legitimate government interest in rejecting the material.

Staff shall notify the Shift Sergeant whenever a decision is made to reject books, or other materials. The Detentions Captain or the authorized designee will be responsible for making the final decision as to any specific materials that will be prohibited within this facility.

Religious texts not supplied by facility-authorized entities may be accepted by the chaplain.

16.     In addition to the Mail Policy, Defendants have posted restrictions on incoming mail (the "Mail Restrictions") on the public website of the Weld County Sheriff's Office at https://www.weldsheriff.com/Divisions/Jail (last visited March 17, 2026). A true and correct copy of the Mail Restrictions is attached hereto as **Exhibit B**. In pertinent part, the Mail Restrictions provide:

> **Items not accepted in the mail**
>
> All mail is screened before it is delivered digitally to an inmate. Mail without a return address is not opened and returned to the U.S. Post Office. For security reasons, we cannot accept packages of the following items:
>
> • Food or snacks,
>
> • Stamped envelopes or stamps,
>
> • Construction paper, newspapers, magazines, books
>
> • Any items made with glitter, clippings or anything made with glue,
>
> • Cards that have paper inserts or items that pop out
>
> • As of February 2024, The Weld County Sheriff's Office jail is no longer accepting books that are shipped into the facility.
>
> Items not accepted will be returned. Mail that is deemed not legal, nor containing a government issued check, money order or cashier's check as described above will be returned.
>
> Postage-paid envelopes and larger envelopes may be purchased through commissary. Indigent inmates will receive one free envelope per week. Indigent inmates are defined as inmates with a balance of less than the current postage rate on their inmate account for 30 or more consecutive days.

17.     Between August 2025 and March 2026, HRDC sent books, magazines, informational brochures, and correspondence to individuals confined at the Jail. During that time period, one hundred and fourteen (114) of those items were returned to HRDC by the Jail. The

8

items returned were addressed to individuals confirmed to still be in custody of the Jail on the day HRDC received the returned mail.

18.    The one hundred and fourteen (114) returned items consisted of: forty (40) issues of *Prison Legal News*; forty-three (43) issues of *Criminal Legal News*; fourteen (14) copies of *Prisoners' Handbook*; three (3) copies of *PYHS*; thirteen (13) Info Packs; and one (1) follow-up letter. Attached as **Exhibit C** are true and correct electronic copies of each of the censored items of mail and the return to sender notifications received by HRDC when the mailings were rejected by the Jail.

19.    Many of the rejected items were returned to HRDC marked in various ways, including "RETURN REJECTED MAIL," "RETURN TO SENDER," and "unauthorized Package." The Jail enclosed rejected notices with some of the returned items, which indicated the reason for rejection as: "Newspaper/Magazine clippings – Internet articles/material." One of the rejection notices was modified to include the handwritten word "Books" as a reason for rejection.

20.    HRDC will continue to mail copies of its books and other publications to subscribers, customers, and other individuals imprisoned in the Jail, despite Defendants' unconstitutional censorship.

21.    The Jail failed to provide HRDC with sufficient notice of the reason for the rejection of the magazines, books, and correspondence mailed by HRDC to prisoners at the Jail.

22.    The Jail also failed to provide HRDC with an opportunity to appeal these censorship decisions before the items were rejected and returned to HRDC at HRDC's expense.

23.    The Jail censored forty (40) copies of *Prison Legal News*, including the January 2025 issue. A true and correct copy of *Prison Legal News* for the month of January 2025 is

9

attached hereto as **Exhibit D.**

24. The Jail censored forty-three (43) copies of *Criminal Legal News*, including the January 2025 issue. A true and correct copy of *Criminal Legal News* for the month of January 2025 is attached hereto as **Exhibit E.**

25. The Jail censored fourteen (14) copies of *Prisoners' Handbook.* A true and correct copy of the cover and table of contents of *Prisoners' Handbook* is attached hereto as **Exhibit F.**

26. The Jail censored three (3) copies of *PYHS.* A true and correct copy of the cover and table of contents of *PYHS* is attached hereto as **Exhibit G.**

27. The Jail censored thirteen (13) Info Packs. A true and correct copy of an informational brochure sent by HRDC is attached hereto as **Exhibit H.**

28. The Jail censored one (1) follow-up letter. A true and correct copy of a follow-up letter sent by HRDC is attached hereto as **Exhibit I.**

29. The records attached hereto as Exhibits C through H are true and accurate copies of the original records maintained by HRDC.

30. The attached records are kept and maintained in the course of the regularly conducted business activity of HRDC and were prepared as a regular practice and custom.

31. The attached records were prepared by the personnel of HRDC in the ordinary course of business at or near the time of the mail having been received by HRDC.

32. The broader ranging consequences of the Jail's mail policy are significant. HRDC's publications provide invaluable information to prisoners to help them navigate the legal system, understand their constitutional rights, and/or educate prisoners on serious health issues related to their incarceration.

33.     Moreover, there is no feasible alternative for HRDC to communicate with prisoners.  HRDC employees cannot disseminate such speech through telephone, email or in-person visits, as it would neither be practical nor cost effective to convey the complex content in these materials in such a manner.

34.     HRDC has challenged the censorship policies of a number of jail and prison facilities through litigation.  As a result of those experiences, I have become very familiar with the policies and practices of mailrooms in a number of correctional facilities.  The key issue from my perspective is that there is nothing about our publications that could be considered in any meaningful way to interfere with the safety and security of any prison or jail.

35.     Our organization operates with very limited resources and on a very tight budget. At present, we have approximately thirteen employees.  As a charitable public interest organization with limited financial resources, we would likely be unable to post a bond, except a bond in a nominal amount.

36.     HRDC's legal department consists of two attorneys and one paralegal.  They handle a heavy caseload with numerous cases, and are therefore not able to respond immediately to every prison or jail that censors HRDC's materials.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct, and that this declaration is executed at Boynton Beach, Florida, this 30th day of March, 2026.

_____
Paul Wright

11

**Policy**
**1008**

## Weld County Sheriff's Office
Weld County SO Detention Policy and Procedure Manual



EXHIBIT

___1-A___

# Inmate Mail

### 1008.1   PURPOSE AND SCOPE
The purpose of this policy is to provide guidelines for the receipt, rejection, inspection and sending of inmate mail.

### 1008.2   POLICY
This office will provide ample opportunity for inmates to send and receive mail, subject to restriction only when there is a legitimate government interest.

### 1008.3   MAIL GENERALLY
Inmates may, at their own expense, send and receive mail without restrictions on quantity, provided it does not jeopardize the safety of staff, visitors or other inmates, or pose an unreasonable disruption to the orderly operation of the facility.

However, inmates are only allowed to store a limited number of letters in their cells. Excess mail will be stored with the inmate's personal property and returned at his/her release.

### 1008.4   CONFIDENTIAL CORRESPONDENCE
Inmates may correspond confidentially with courts, legal counsel, officials of this office, elected officials, government officials or officers of the court.

This facility may also accept and deliver a fax or inter-office mail from these entities.

Facility staff may inspect incoming confidential correspondence for contraband. Facility staff may inspect outgoing confidential correspondence for contraband before it is sealed. In the event that confidential correspondence is inspected, staff shall limit the inspection to a search for physical items that may be included in addition to the correspondence and shall not read the content of the correspondence itself. All inspections are to be completed in the presence of the inmate.

### 1008.5   SUSPENSION/RESTRICTION OF MAIL PRIVILEGES
Mail privileges may be suspended or restricted upon approval of the Detentions Captain whenever staff becomes aware of mail sent by an inmate that involves:

(a)   Threats of violence against any member of the government, judiciary,legal representatives, victims or witnesses.

(b)   Incoming or outgoing mail representing a threat to the security of the facility, staff or the public.

(c)   Inmate mail restriction(s) mean the mail will be forwarded to the Detentions Criminalist Specialist (DCS) first for review, before delivery to the inmate. The review is initiated after a legitimate governmental interest has been identified, reviewed by a Sergeant and approved by the Captain. The restriction may also apply to outgoing mail.

The District Attorney or County Attorney should be consulted in cases where criminal charges are considered against an inmate or there is an apparent liability risk to the Office that relates to suspension or restriction of mail privileges.

Copyright Lexipol, LLC 2026/03/03, All Rights Reserved.
Published with permission by Weld County Sheriff's Office

Weld County Sheriff's Office

Weld County SO Detention Policy and Procedure Manual

*Inmate Mail*

## 1008.6  PROCESSING AND INSPECTION OF MAIL BY STAFF

Staff should process incoming and outgoing mail as expeditiously as reasonably possible. Incoming and outgoing mail should be processed within 24 hours and packages within 48 hours. Mail processing may be suspended on weekends, holidays or during an emergency situation.

Assigned staff should open and inspect all incoming general mail of current inmates. The incoming correspondence may be read as frequently as deemed necessary to maintain security or monitor a particular problem. Mail for inmates no longer in custody should not be opened.

Outgoing general mail may be opened and inspected by staff when authorized by the Detentions Captain or the authorized designee.

Any incoming or outgoing mail that potentially violates a protection order or contains information that may violate the safety and security of the jail should be forwarded to the DCS deputies.

When mail is found to be inappropriate in accordance with the provisions of this policy or when an inmate is sent material that is not prohibited by law but is considered contraband by the facility, the material should be returned to the sender.

Inmates are allowed to correspond with other inmates in other jails or correctional institutions, as long as they pay for the mailing and the mailing is sent and received through the U.S. Postal Service.

Inmates shall be notified in writing whenever their mail is rejected. Mail logs and records, justification of censoring or rejection of mail, and copies of hold or return notices shall be documented and maintained in accordance with established records retention schedules.

Government checks and money orders contained in incoming inmate mail shall be removed and credited to the inmate's account. Personal checks and cash should be rejected and be returned to the sender.

### 1008.6.1  AUTHORIZATION TO READ AND COPY OUTGOING MAIL

Opening, reading and/or copying outgoing inmate mail should occur only to further a substantial government interest, and only when it is necessary or essential to address the particular government interest. Government interests that would justify opening, reading and /or copying outgoing inmate mail include:

- Maintaining facility security.

- Preventing dangerous conduct, such as an escape plan.

- Preventing ongoing criminal activity, such as threats of blackmail or extortion, or other similar conduct.

Opening, reading and/or copying outgoing inmate mail requires approval of the Detentions Captain or the approved designee. The request for and decision if such mail will be opened, read and/or copied should be documented in an incident report.

Copyright Lexipol, LLC 2026/03/03, All Rights Reserved.
Published with permission by Weld County Sheriff's Office

# Weld County Sheriff's Office

## Weld County SO Detention Policy and Procedure Manual

---

*Inmate Mail*

---

Only staff members designated by the Detentions Captain are authorized to read and copy outgoing non-confidential mail. These staff members should receive training on legitimate government interests for reading and censoring mail and related legal requirements.

### 1008.6.2  CENSORSHIP OF INCOMING AND OUTGOING NON-CONFIDENTIAL CORRESPONDENCE

In making the determination of whether to censor incoming non-confidential correspondence, consideration shall be given to whether rejecting the material is rationally related to a legitimate government interest, and whether alternate means of communicating with others is available.

The impact the correspondence may have on other inmates and jail staff is also a factor. Reasonable alternatives should be considered and an exaggerated response should be avoided; for example, discontinuing delivery of a magazine because of one article.

Outgoing non-confidential correspondence shall only be censored to further a substantial government interest, and only when it is necessary or essential to address the particular government interest. Government interests that would justify confiscation of outgoing mail include:

(a)  Maintaining facility security.

(b)  Preventing dangerous conduct, such as an escape plan.

(c)  Preventing ongoing criminal activity, such as threats of blackmail or extortion, or other similar conduct.

(d)  Preventing harassment of those who have requested that no mail be sent to them by the inmate.

Correspondence and material identified for censorship require approval of the Detentions Captain or the authorized designee. The request for and decision if such mail will be censored, should be documented in an incident report.

Notices should be sent to the sender of censored publications. A single notification may be sent if the publication is received by multiple inmates.

### 1008.6.3  DOCUMENTING REJECTED OR CENSORED CORRESPONDENCE

In each case where it is necessary to remove any item, or reject or censor correspondence, a written record must be made of such action, to include:

(a)  The inmate name and number.

(b)  A description of the mail in question.

(c)  A description of the action taken and the reason for such action.

(d)  The disposition of the item involved.

(e)  Signature of staff.

(f)  Notification to the inmate and sender (unless such notification jeopardizes any investigation or the security of the facility).

---

Copyright Lexipol, LLC 2026/03/03, All Rights Reserved.
Published with permission by Weld County Sheriff's Office

## Weld County Sheriff's Office

### Weld County SO Detention Policy and Procedure Manual

*Inmate Mail*

### 1008.7   REJECTION OF CONTROLLED MATERIALS

The Office may reject materials that may inhibit the reasonable safety, security and discipline in the daily operation of this facility. Materials that may be rejected include, but are not limited to:

- Materials that advocate violence or a security breach.

- Literature that could incite racial unrest.

- Sexually explicit material, including nude pictures, or pictures or descriptions of sexually explicit activities.

- Obscene publications or writings and mail containing information concerning where or how such matter may be obtained; any material that would have a tendency to incite murder, arson, riot, violent racism or any other form of violence; any material that would have a tendency to incite crimes against children; any material concerning unlawful gambling or an unlawful lottery; any material containing information on the manufacture or use of weapons, narcotics or explosives or any other unlawful activity.

- Material that could lead to sexual aggression or an offensive environment for inmates.

- Material that could create a hostile or offensive work environment.

- Any material with content that could reasonably demonstrate a legitimate government interest in rejecting the material.

Staff shall notify the Shift Sergeant whenever a decision is made to reject books, or other materals. The Detentions Captain or the authorized designee will be responsible for making the final decision as to any specific materials that will be prohibited within this facility.

Religious texts not supplied by facility-authorized entities may be accepted by the chaplain.

### 1008.8   MAIL RECEIVED AFTER DISCHARGE

Any mail received for a former inmate should be returned to the sender with a notation that the inmate is not in custody.

### 1008.9   INDIGENT INMATE REQUESTS FOR WRITING MATERIALS

Indigent inmates shall receive an amount of free personal and legal envelopes and writing paper sufficient to maintain communication with courts, legal counsel, officials of this office, elected officials, government officials or officers of the court.

Inmates should not be permitted to maintain an excess supply of writing materials without the approval of a supervisor.

Copyright Lexipol, LLC 2026/03/03, All Rights Reserved.
Published with permission by Weld County Sheriff's Office





Home (https://www.weldsheriff.com/Home)   /   Divisions (https://www.weldsheriff.com/Divisions)   /   Jail

# Jail

## Our Mission

*The Jail will accept and lawfully hold prisoners in a safe, humane, wholesome environment that returns people to the community better, or no worse, than they arrived.*



## Weld County Jail

The Weld County Sheriff's Office is concerned about the families and friends of those in our custody. The





**EXHIBIT**

**1-B**
exhibitsticker.com

information below is designed to provide the public with a better understanding about how the jail the works and what day-to-day life is like for those in our custody.

# Detentions Division Policy Manual

Download copy:     Weld County Sheriff's Office Detentions Division Manual <sup>(PDF, 28MB)</sup> (https://www.weldsheriff.com/files/sharedassets/sheriff/v/1/documents/release_20250717_t104206_weld-county-so-detention-manual.pdf)

# For All Emergencies Dial 911

---

# Bail and Bond

## How it works

In most cases, people who are arrested can get out of jail by paying a bail bond that is set by the courts. Sometimes inmates will first have to appear before a judge before their bond amount is set.

Bail is the amount of money a judge believes will be enough to motivate someone come to appear for their future court dates. Bond is how the bail money is guaranteed to the court.

**Legal rights related to posting money bond pursuant to section 16-4-102, Colorado Revised Statutes.**

1. Bond fees, booking fees, and other fees or debts never need to be paid to secure a person's release on money bond. A payor need only pay the bond amount in order to secure release.

2. While never a basis to hold a defendant in jail, the following fees are chargeable as a debt to the defendant after release if the payor chooses not to pay the fees at the time of bonding: a $10 bond fee and a maximum 3.5% credit card payment fee. No other bond-related fees may be charged at any time, including any kiosk fees or fees for payment by cash, check, or money order.

3. Bond payments are to be made out to the holding county and are never to be made out in the name of the incarcerated person.

4. A sheriff must release a defendant within six hours after a personal recognizance bond is set and the defendant has returned to jail or within six hours after a cash bond has been set and the defendant has returned to jail and the defendant or surety notified the jail that bond is prepared to be posted, unless extraordinary circumstances exist. In the event of a delay of more than six hours, a surety and the defendant have a right to know what, if any, extraordinary circumstance is causing the delay. Supervisory conditions of release do not justify a delay in release; except that a sheriff may hold a defendant for up to 24 hours if necessary to ensure a defendant is fitted with required electronic monitoring.

5. Anyone who posts a money bond has the right to receive a copy of the bond paperwork, including documentation of the next upcoming court date.

6. A surety may never be asked to use posted bond money to pay a defendant's debts. Only when defendants have posted their own money bond may they be asked if they would like to voluntarily relinquish bond money to pay their debts. Relinquishment of bond money by a defendant to pay a debt is never required and is entirely a voluntary choice by the defendant.

To file a complaint of a violation of the above subsections

1. Complete a complaint form (available at any WCSO location or from a member in the field) and drop it off or mail it to the Professional Standards Lieutenant, or
2. Complete and submit a complaint form online.

Click here to download a copy of the     Inmate Reception Policy <sup>(PDF, 41KB)</sup>
(https://www.weldsheriff.com/files/sharedassets/sheriff/v/1/divisions/documents/inmate_reception-1.pdf)   <sup>(PDF, 41KB)</sup>
(https://www.weldsheriff.com/files/sharedassets/sheriff/v/1/divisions/documents/inmate_reception-1.pdf)

**Derechos legales relacionados con la publicación de bonos monetarios de conformidad con la sección 16-4-102, colorado revisó los estatutos**

1. Tarifas de bonos, tarifas de reserva y otras tarifas o las deudas nunca necesitan ser pagadas para asegurar la de una persona liberación en fianza de dinero. Un pagador sólo tiene que pagar el monto de la fianza para asegurar la liberación.

2. Aunque nunca es una base para mantener a un acusado en la cárcel, las siguientes tarifas son cobrables como una deuda a la acusado después de la liberación si el pagador    decide no hacerlo pagar los honorarios en el momento de la fianza: una tarifa de fianza  de $ 10 y una tarifa máxima de pago con tarjeta de crédito del 3.5%. Sin otro los honorarios relacionados con los bonos pueden cobrarse en cualquier momento, incluyendo cualquier tarifa de quiosco o tarifas para el pago en efectivo, cheque, o giro postal.

3. Los pagos de las obligaciones se efectuarán a la condado de tenencia y nunca deben ser   hechos hacia fuera en el nombre de la persona encarcelada.

4. Un sheriff debe liberar a un acusado dentro de los seis horas después de que se establezca    una fianza de reconocimiento personal y el acusado ha regresado a la cárcel o dentro de seis horas después de que se haya fijado una fianza en efectivo y el acusado ha vuelto a la cárcel y el acusado o la garantía notificó a la cárcel que la fianza está preparada para ser publicado, a menos que sea extraordinario

En caso de retraso superior a seis horas, a la garantía y el demandado tienen derecho a saber qué, en su caso, circunstancias extraordinarias están causando la demorar. Las condiciones de supervisión de la liberación no

Justificar un retraso en la liberación; excepto que un sheriff puede retener a un acusado por hasta 24 horas si es necesario para asegúrese de que un demandado esté equipado con el electrónico requerido Monitorización.

5. Cualquier persona que publique un bono monetario tiene derecho a recibir una copia de la documentación de la fianza, incluyendo documentación de la próxima fecha de corte.

6. Nunca se le puede pedir a un caución que use publicado dinero de la fianza para pagar las deudas de un acusado. Sólo cuando los acusados han publicado su propia fianza de dinero puede se les preguntará si les gustaría hacerlo voluntariamente renunciar al dinero de los bonos para pagar sus deudas. Renuncia al dinero de la fianza por un acusado para pagar una deuda nunca es necesaria y es totalmente voluntaria elección del demandado.

Para presentar una queja de una violación de las subsecciones anteriores

1. Complete un formulario de queja (disponible en cualquier ubicación de WCSO o de un miembro en el campo) y déchelo o envíelo por correo al Teniente de Estándares Profesionales, o
2. Complete y envíe un formulario de queja en línea.

## Payment Methods

There are different types of bonds with the two most common being cash and surety bonds. You must have cash, or cashier's check to post a cash bond. Cashier's checks and money orders must be payable to the Weld County Sheriff's Office. Tell us if you want your name on a cash bond you post so the money will be returned to you when the court releases the bond. If the person does not go to court when they are supposed to, the court has the authority to seize the cash.

Cash bonds can also be paid online with a credit card. You will need the inmate's name, date of birth, case number and the **FULL BOND AMOUNT**. Use this link to pay by credit card. (https://www.gtlfsonlinepay.com/sites/remote_bond/)

Surety bonds are posted by a third party known as a bondsperson. Google "bail bonds Weld County" to find a local bail bondsperson or search in the Yellow Pages under "bail bonds." Bondspersons charge a fee to post an inmate's bond. Those fees are non-refundable.

Local Bail Bonds Phone List

A Affordable Bail Bonds (970) 392-9959 (tel:9703929959)

A A Jason's Bail Bonds (970) 356-7950 (tel:9703567950)

A-1 Bail Bonds (970) 352-2777 (tel:9703522777)

Alda Pauline's Bail Bonds

Ron's Bail Bonds Company (970) 557-4103 (tel:9705574103) or (970) 445-2126 (tel:9704452126) or (970) 400-7977 (tel:9704007977) or (970) 351-6734 (tel:9703516734)

All American Bail Bonds (970) 356-6776 (tel:9703566776)

All Day All Night Bail Bonds (970) 356-4300 (tel:9703564300) or (970) 356-5353 (tel:9703565353)

A Seasons Bail Bonds (970) 352-8660 (tel:9703528660)

ASAP Bail Bonds (970) 378-7878 (tel:9703787878) or (970) 353-9999 (tel:9703539999)

Bail America (970) 356-2245 (tel:9703562245)

Code 4 Bail Bonds (970) 691-0573 (tel:9706910573) or (970) 352-8660 (tel:9703528660)

Eron INC (970) 352-9411 (tel:9703529411)

Goodfella's Bail Bond LLC (970) 353-9559 (tel:9703539559) or (970) 673-8625 (tel:9706738625)

Judicial Bail Bonds II LLC 303) 725-3587 (tel:3037253587) or (970) 691-9193 (tel:9706919193)

McCarther Bail Bonds (970) 702-2100 (tel:9707022100)

Tami's AA Bail Bonds (970) 282-0591 (tel:9702820591)

Weld County Bail Bonds (970) 356-5353 (tel:9703565353) or (970) 356-4300 (tel:9703564300)

24 Hour Bail Bonds (970) 352-8888 (tel:9703528888)

---

# Inmate Visitations

Personal Visitations (messaging, phone calls, video visits, mail)

# Service Provider-Viapath

The Weld County Jail has transitioned service providers from Securus to Viapath for inmate visitations and mail!

As of March 5, 2024, inmates began using tablets with messaging, phone calling, video visits, mail scanning and much more!

ViaPath provides tablet and phone services. These services include:

- Phone calls
- Messages
- Video visitations
- Mail scanning

# How to Set Up Your Account:

**How do you want to communicate with the inmate?**

- ConnectNetwork.com –  Create an account here for remote visits. This is where the inmate can call only you. You can also fund your AdvancePay account here, that will allow an inmate to only call out of our jail and to call your phone number. This allows you to be in control of your deposits.
- GettingOut.com –  Create an account here to visit an inmate, send messages to an inmate, deposit funds on an inmate's tablet account for visiting and messaging.

---

# VIAPATH INMATE VISITING INSTRUCTIONS

****NOTE:  ACCOUNTS MUST BE MADE ON BOTH OF THE SITES LISTED IN THESE INSTRUCTIONS****

**STEP 1: SET UP ACCOUNT-TO VISIT AN INMATE**

 Go to www.GettingOut.com (https://www.gettingout.com/)  select "visit now" to conduct/connect the visit

- Create your account – your address must match your driver's license (Viapath approves)
- For quick approval: include the last 4 digits of your social security number
- Add a profile photo – no filters, hats-head gear, sunglasses
- Add a photo of your physical driver's license (front and back) –

  - Digital ID's are not allowed
  - Choose the inmate you want to visit – they must accept you into their contacts
  - Check and confirm your emails

- Download the Mobile App- select the, www.GettingOut.com (http://www.gettingout.com/) "visit now" feature to connect to your visit.
  **Viapath Customer Service: 1-866-516-0115**

**STEP 2 –SET UP ACCOUNT – TO SCHEDULE A VISIT**

Go to: www.WeldCo.GtlVisitMe.com (https://weldco.gtlvisitme.com/app) to schedule visits

- Create your account - (jail staff approves your account)
- Add a profile photo – no filters, hats-head gear, sunglasses
- Add a photo of your physical driver's license (front only)

  - PROFESSIONAL VISITORS: include your bar card / work ID's with your driver's license
  - Digital IDs are not allowed
  - Check and confirm your emails

FAMILY AND FRIENDS: You must schedule your visit 24 hours in advance.

PROFESSIONALS: You may schedule a visit the same day – please contact the jail to inform them of your intent to visit an inmate.

Remote visits (minimal fee per minute) = the inmate calls out to you.

On-site visits (free) = check in with the jail staff, log into your www.GettingOut.com (http://www.gettingout.com/) account on the monitor.

---

# Personal Mail to an Inmate

**Mail Scanning –** This is a NEW service that will scan your letter and pictures and deliver them digitally to their tablets. You will need to send all personal mail, letters, pictures, etc. to this NEW address.

**Personal mail to an inmate must now be addressed to:**

Weld County Sheriff – North Jail Complex, CO

Inmate Name, Inmate ID

P.O. Box 247

Phoenix, MD 21131

**Here is an example of how personal mail addressed to an inmate should look:**

Weld County Sheriff - North Jail Complex, CO

John Smith, #111111

P.O. Box 247

Phoenix, MD 21131

---

# MAIL REJECTION

Mail will be rejected for the following reasons:

- Blank stationery, blank greeting cards, postage stamps and envelopes
- Newspaper/Magazine clippings - Internet articles/material
- Security threat group or gang-related material or photos
- Sexually explicit/provocative communication, photographs, or drawings, lipstick, any unknown substance, glitter, glue
- Any contents of threats and/or plans of criminal activity
- Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.
- Entertainment materials–puzzles–fonts–coloring pages–animated character photos-Music lyrics–graphic art photos
- Letter(s) must be for the inmate whose name appears on the envelope

- Anything that could reasonably threaten the safety and security of staff, visitors, inmates, or the facility.
- Screen shots with or without thumbnails
- Social media – is not allowed

---

## PROFESSIONAL MAIL

**Legal Mail (Attorney) mail still gets sent to:**

**INMATE NAME**
**2110 O Street**

**Greeley CO  80631**

---

## ONE MORE THING…

Make sure to download the ConnectNetwork and Gettingout applications so you can set up your accounts and start sending inmate deposits via the mobile apps and at www.GettingOut.com.

**To reach customer service call, (877) 650-4249.**

Web Accessibility Initiative (http://www.w3.org/WAI)

Sending Photos to an Inmate

# Photo fees and acceptable forms of payment

Family and friends may send photos to an inmate for a fee.

The fee to send a photo is: $.50 **per photo.**

Photos must be sent via the Viapath tablet system and separately from the mail or messages.

The fee to send a message is: $.50 **up to 1500 characters**.

---

# Photo Rejections

Photos will be rejected for the following reasons:

- Security threat group or gang-related materials/photos
- Sexually explicit or provocative communication, photographs, or drawings, lipstick, any unknown substance, glitter, glue
- Any contents of threats and/or plans of criminal activity

- Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability
- Entertainment materials–puzzles–fonts–coloring pages–animated character photos-Music lyrics–graphic art photos

- Anything that could reasonably threaten the safety and security of staff, visitors, inmates, or the facility
- Screen shots with or without thumbnails
- Social media – is not allowed

## Professional Visitations

The Weld County Sheriff's Office and the Weld County Jail are recognized as a professional environment. Professional visitors are expected to wear appropriate attire and be well groomed during the performance of their job while conducting business at the Weld County Jail.

The Detentions Division of the Weld County Sheriff's Office has provided the information below as a guide for professional visitors wishing to conduct business at the Weld County Jail.

**If a professional visitor is found to be in violation of the following dress code, the professional visitor may be refused entry and/or asked to leave the Weld County Jail until corrections the attire are made.**

**Appropriate Attire:** Clean, pressed clothing in good repair that is neither bizarre, flamboyant, nor casual, which one would expect to see worn in a professional office setting. Ties are not required.

Examples of appropriate attire:

**Men:** Suits, slacks, with a dress or sport shirt with appropriate footwear and socks. Ties are optional.

**Women:** Dresses or skirts to knee length or longer, slacks with dress blouse, knit or polo shirts with collars, oxford shirts with collars, professional looking collarless shirts, sweaters/cardigans, blazers/jackets, and turtlenecks. Shoes with a closed toe and an enclosed heel or heel strap.

**Inappropriate attire:** Clothing that reveals cleavage, back, chest, stomach or underwear. Clothing that is worn from wear, faded, un-hemmed, frayed, is torn, has holes, is dirty or badly wrinkled. Additionally, shorts, crop or gaucho pants, workout attire, tank tops, sweat suits, all plastic or rubber footwear, canvas flip flops, athletic shoes, skater shoes, blue denim jeans, skirts shorter than knee length, cargo pants, strapless dresses, sweatpants, spandex shorts, leotards, sundresses, halter tops with bare shoulders, and jogging/wind/warm-up suits. T-shirts unless worn under another blouse, shirt, jacket, or dress (included as inappropriate would be t-shirts with slogans, terms, pictures, or cartoons printed on them). Hats are not appropriate in the Weld County Jail.

Professional visitors are encouraged to conceal tattoos with clothing whenever possible.

*It is the responsibility of each professional visitor to dress appropriately and professionally at all times when conducting business in the Weld County Jail.*

## Information Needed to Visit

- Personal visits are set up through the Visitor Web (https://weldco.gtlvisitme.com/app)

Each adult visitor must have their own registration. Each registrant must submit:

1. A clear copy of their valid driver's license, state ID or other valid government picture ID.
2. A profile picture of registering visitor.

- No one else in the photo.
- No use of Snapchat/Photo filters.
- No hats, sunglasses, bandanas or inappropriate attire.

Once a registration is approved, the visitor will set their own visits.

For questions or issues registering an account or setting visits, call Viapath customer service at **877-650- (tel:877-650-4249)4249. (tel:877-650-4249)**

**Onsite visits – No cost**

Inmate is allowed a total of two onsite visits per week.

Visits are capped at 30 minutes.

Only the registered visitor and up to two approved minors are allowed at the visit.

**Remote visits – $0.20 per minute**

Inmates are permitted unlimited remote visits.

Visits are capped at 30 minutes.

Any number of people can participate in a remote visit, so long as the registered visitor is always present.

**Visitation schedule**

Visits must be scheduled at least 24 hours in advance and can be scheduled to up to one week in advance.

**Remote Visiting Hours:**

- **Monday-Saturday 8:00 AM- 9:30 AM, 12:00 PM to 1:30 PM, 3:30 PM to 5:30 PM, 8:00 PM-10:00 PM**
- **Sunday- 8:00 AM-9:30 AM, 12:00-5:30 PM, 8:00 PM-10:00 PM**

**Onsite Visiting Hours:**

- **Monday-Friday 8:00 AM-9:30 AM, 12:00-1:30 PM, 3:30-5:30 PM**

- **Saturday 8:30 AM-9:30 AM, 12:00-1:30 PM, 3:30 PM-4:30 PM**

Except for the noon to 3 p.m. lockdown period, morning, afternoon and evening sessions are available for both onsite and remote visits.

Besides lockdown, remote visits can be scheduled between 8 a.m. and 9 p.m. Sunday through Saturday.

Besides lockdown, onsite visits can be scheduled between 8 a.m. and 7:40 p.m. Monday through Saturday. There are no onsite visits on Sundays.

## Visitation Rules

**Onsite visits**

Rules for onsite visits include, but are not limited to:

1. Valid ID is required at the time of check-in for all onsite visits.  No exceptions. No photocopies allowed. Name and date of birth must match what is on the registration.
2. Only the registered adult and two minors are allowed to participate in an onsite visit. The adult must be a parent or legal guardian of the minors. Proof of guardianship may be requested at any time.
3. Children can't be left unattended at the visitation monitor or in the lobby area at any time.
4. No unauthorized persons at the monitors.
5. No pets allowed in the jail.
6. No inappropriate attire, including:

    1. No spaghetti straps, strapless tops or tanks tops – for both male and female visitors.
    2. No revealing clothing, including low cut and see-through tops (i.e. no cleavage).
    3. No nudity or flashing will be tolerated.
    4. No gang clothing or colors.

    5. No clothing promoting alcohol or drugs.

    6. No food or drinks at the visitation monitors.

    7. No hats or bandanas.

7. No cellphones or cameras allowed at the visitation monitors.

8. On-site visits may be canceled due to inclement weather.

9. No onsite visits on New Year's Day, Independence Day, Thanksgiving Day and Christmas Day.

**Remote visits**

Rules for remote visits include, but are not limited to:

1. Scheduled visitor must be on the visit at all times.

2. Scheduled visitor is responsible for the behavior of all others accompanying them on their visit.

3. Children are not to be left unattended at any time.

4. All visitors must be appropriately dressed, including children.

5. No inappropriate attire, including:

    1. No spaghetti straps, strapless tops or tanks tops – for both male and female visitors.

    2. No revealing clothing, including low cut and see-through tops (i.e. no cleavage).

    3. No nudity or flashing will be tolerated.

    4. No gang clothing or colors.

    5. No clothing promoting alcohol or drugs.

    6. No food or drinks at the visitation monitors.

    7. No hats or bandanas.

6. No use of cellphones to call others while on the visit.

7. No video cameras allowed.

8. No driving during the visit. Driving during your visit is cause for immediate termination.

Any violation of these rules or any form of disruptive behavior could be grounds to terminate a visit early or to ban visitors for six months to one year.

**All visits are monitored and recorded.**

## Minor Visitors

A parent or legal guardian must accompany all visitors under the age of 18. Only one adult visitor and two minor children may visit an inmate during a scheduled appointment.

---

# Procedures

## What Happens First?

New prisoners are questioned and observed right away to find out if they need immediate medical or mental health care. A telephone call is allowed as soon as possible unless the prisoner is violent.

A nurse and a counselor will talk with a new prisoner within a short time. The nurse finds out if they need to see a doctor, take prescriptions or have other medical problems. The counselor finds out if they are thinking of hurting themselves or need some other help with their mental health.

Counselors "classify" prisoners who don't get out of jail within 24 hours to find out where they should be housed. A prisoner's current charges, past history, behavior and other factors are checked so only prisoners with similar backgrounds are housed together. That helps keep everyone safe and secure. Even then, anyone who feels afraid of someone else needs to tell staff.

Mail

**All mail is scanned and delivered digitally by a third party. To send mail to an inmate at the Weld County Jail it should be addressed as shown below:**

**Weld County Jail- North Jail Complex, CO**

**Inmate Name, Inmate ID**

**P.O. Box 247**
**Phoenix, MD 21131**

---

# Legal Mail, Money, Notarizations, Inmate Signature

Legal (attorney) mail and personal mail for inmates containing money orders, cashier's checks, government issued checks, paperwork to be notarized, or needs an inmate signature should be addressed like example below.

The back of the envelope for personal mail for inmates containing these items must be clearly labeled, **"documents to be notarized/signed" or "money order enclosed."**

**Example:**

**Inmate's Name**

**Weld County Jail**
**2110 O Street**
**Greeley, CO 80631**

# Items not accepted in the mail

 All mail is screened before it is delivered digitally to an inmate. Mail without a return address is not opened and returned to the U.S. Post Office. For security reasons, we **canno**t accept packages of the following items:

- Food or snacks,
- Stamped envelopes or stamps,
- Construction paper, newspapers, magazines, books
- Any items made with glitter, clippings or anything made with glue,
- Cards that have paper inserts or items that pop out
- **As of February 2024, The Weld County Sheriff's Office jail is no longer accepting books that are shipped into the facility.**

Items not accepted will be returned. Mail that is deemed not legal, nor containing a government issued check, money order or cashier's check as described above will be returned.

Postage-paid envelopes and larger envelopes may be purchased through commissary. Indigent inmates will receive one free envelope per week. Indigent inmates are defined as inmates with a balance of less than the current postage rate on their inmate account for 30 or more consecutive days.

## Inmate Money Account

An account is opened for an inmate at the time they arrive at the jail. Money in this account is used by the inmate to pay for medical visits and buy commissary. Commissary includes things the jail does not issue like playing cards, snacks, portable radios, deodorant, etc.

To put money in an inmate's account, you can mail a money order or make a deposit to Access SecureDeposits via a lobby kiosk, the phone, and the Internet. There is a $4 fee to use Access SecureDeposits. Jail employees cannot accept cash or personal checks to deposit into an inmate's account.

- Money orders must be made out to the Weld County Sheriff's Office and can be sent to 2110 O St., Greeley, CO 80631. Make sure the inmate's name is written in the "for" or "remarks" section of the money order. Cash or personal checks are not accepted.
- A Lobby Kiosk is available 24 hours a day, 7 days a week, and accepts cash only. Bills larger than $1 are accepted.
- Phone deposits are available 24 hours a day, 7 days a week. Contact a bi-lingual Customer Service Representative at 1-866-345-1884 (tel:8663451884) who accepts deposits from debit cards and credit cards.
- Online deposits are available 24 hours a day, 7 days a week at https://www.accesscorrections.com (https://www.accesscorrections.com/) Money can be transferred to an inmate's account online using a debit or credit card.

Access SecureDeposits provides the most affordable and reliable way to deposit funds into an inmate's account. Please keep your receipt once a deposit is made. For all questions or problems concerning the kiosk, phone, or internet services contact customer support at 1-866-345-1884 (tel:8663451884). Have your receipt ready when you call.

**Friends/Family Funded Tablet Accounts**

Please contact Viapath's Customer Service Department at (866-516-0115) to request a refund.

Refunds are processed back to the payment method with which they were made by Friends/Family:

1. If credit / debit card was used, then funds will be refunded back to that card.
2. If cash, Money Order or MoneyGram was used, refunds will be made in form of a check.

# Messages

Staff cannot give messages to inmates. If you have an emergency message, telephone the jail and ask for an on-duty commander. Even emergency messages have to be verified before being given to an inmate.

# Telephones

There are two options for speaking with inmates at the Weld County Jail.

• **Prepaid AdvancePay® Account:** When you create an AdvancePay account, you're creating a prepaid collect calling service that allows an inmate to call your phone number using deposited funds. After you set up an AdvancePay account, you can start adding money and receiving phone calls. As long as you have a balance for at least a one-minute call in your account, you can receive a call at any time. To create your AdvancePay account and deposit funds please visit Connect Network (https://web.connectnetwork.com/).

• **Collect calls:** Collect calls can be billed to your telephone bill if you have a landline phone that can accept collect calls and the account is in good standing with the provider. The majority of customers do not qualify for this type of account, including customers with VOIP accounts, cell phones, or collect call blocks on their account.

**Customer Service Information**

Hours of operation: 24/7

AdvancePay Accounts: (800) 483-8314

Customer Service: (877) 650-4249

Only collect call telephones are available to inmates. All personal telephone calls are recorded. A fee is billed to the person called for every call accepted.

Talk time is limited to 15 minutes per call. Calls cannot be made to international numbers and will disconnect if a computer believes you are trying to forward a call to someone else or have a portable phone.

If you accept a lot of calls, the cost will quickly add up on your phone bill. We encourage you to write letters and visit in person, so you don't spend a lot of money.

You can have your telephone number blocked so it cannot be called from jail by asking an on-duty supervisor. The block will stay until you call the on-duty supervisor to have it removed.

---

# Day to Day Activities

## Inmate Life

Housing units, called "pods," are made up of several individual rooms connected to a large room. A correctional officer works inside each housing unit 24 hours a day. Individual rooms can have one bed or more. A housing unit may hold as many as 80 inmates.



Inmates have to stay in their room or cell with the door closed or locked several times a day. This is called a "lock down" period. Even with lock downs, inmates are still outside their individual room or cell about 10 hours every day.

A nurse is always in the building. Clinics with the jail physician and dentist are available several times each week. Co-payments are charged for appointments not required by a nurse. If you have important information about an inmate's medical or mental health, call the jail and ask to speak to the medical unit.

Three nutritionally balanced meals are served every day and recreation time is scheduled several times each week. There are both indoor and outdoor gyms.

An in-house library is available. Inmates are allowed to check out up to two books each week.

All basic hygiene supplies and clothing are issued by the jail. Some inmates have to wash their own underclothing, but uniforms and bedding are washed and regularly exchanged by the jail. Inmates are expected to shower at least twice weekly and may ask for a razor to shave. Haircuts may be available at cost.

Programs are offered for self-improvement. An inmate needs to talk with a counselor to find out what might be available.

A grievance procedure is available to inmates if they have a complaint or a problem. The grievance procedure is described in The Inmate Handbook available in each housing unit.

## Contact Us

## Phone

(970) 356-4015 (tel:9703564015)

# Alternate Phone

800-436-9276 (tel:8004369276)

# Location

Weld County Sheriff's Office

1950 O Street

Greeley, CO

80631

View Map (https://maps.google.com/?
q=Weld%20County%20Sheriff%27s%20Office%201950%20O%20Street%20%20Greeley,%20CO%2080631)

# Other Contacts

**Captain Matthew Elbe**

melbe@weld.gov (mailto:melbe@weld.gov)

---

**Lieutenant Jerry Aguirre Jr.**

jaaguirre@weld.gov (mailto:jaaguirre@weld.gov)

---

**Lieutenant Mark Pollard**

mpollard@weld (mailto:mpollard@weld.gov).gov (mailto:mpollard@weld.gov)

---

**Lieutenant Josh Noonan**

jnoonan@weld.gov (mailto:jnoonan@weld.gov)

---

**Bond Desk Information**

(970) 400-3921 (tel:9704003921)

---

**Dispatch Non-Emergency**

(970) 350-9600 (tel:9703509600)

**Work Release**

[(970) 400-2975 (tel:9704002975)](tel:9704002975)

**Master Control**

[(970) 400-3960 (tel:9704003960)](tel:9704003960)



US POSTAGE — PITNEY BOWES

ZIP 80631   $ 015.25⁰
02 4W
0000335769 FEB 20 2026

WELD COUNTY JAIL

2110 O ST

GREELEY CO 80631

RECEIVED

MAR 0 4 2026

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

EXHIBIT

1-C



## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

P-1  P72

**WELD COUNTY JAIL**     MAIL REJECTION NOTICE

DATE: 2/19/26          JID # 214934

INMATE: Espinoza, Charles          POD: 1

Your correspondence from:
Criminal Legal News
PO BOX 1151
Lake Worth Beach, FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☒ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
　　　　　Inmate Name, Inmate ID #
　　　　　PO Box 247
　　　　　Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2476        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/03/2025 / MAILREJFRM

---

2/26—Subscri
The above maili
issues remain o
just above the r
on the subscript
LAST ISSUE. Plea
ends to avoid m

ess
erred, please
le so your is-
new address!
ility for send-
provided at

Criminal Lega
by the Human
features as PL

- Crimin
- Prosec
- Ineffec
- Militar
- Junk Sc
- False C
- Witnes
- Post-Re
- Due Pro

B

Subscriptions to
Criminal



**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

---

### WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: 2/19/26    JID # 202407060

INMATE: Emler, Mace    POD: 4

Your correspondence from:

Criminal Legal News
PO Box 1151
Lake Worth Beach FL, 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☒ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
    Inmate Name, Inmate ID #
    PO Box 247
    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2476    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/03/2025 / MAILREJFRM

---

**2/26 — Subs**
The above mai
remain on the
mailing addres
before it expire
at least 2 month

**dress**
red, please n
our issues ca
CLN only acc
sue to the add
is mailed!

P-1

**C**

Full

In a

upd

info

info

Visi



## Criminal Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No.

---

### WELD COUNTY JAIL     MAIL REJECTION NOTICE

DATE: 2/19/26     JID # 20251677

INMATE: Fuller, Adrian     POD: 6

Your correspondence from:

Prison Legal News
PO Box 1151
Lake Worth Beach, FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces'- Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☒ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☒ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
     Inmate Name, Inmate ID #
     PO Box 247
     Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2476     White–Inmate     Yellow–Return to Sender     Pink–Inmate file

09/03/2025 / MAIL.REJFRM



---

2/26 — Subscri

The above mailing
remain on the subs
mailing address, th
before it expires. IF
at least 2 months b

Cr

Full iss

In addi

update

inform

inform

Visit u

# Criminal Legal News
PO Box 1151
Lake Worth Beach FL 33460

Non-Profit Org.
U.S. Postage
PAID
Portland
Permit No.

CHANGE SERVICE REQUESTED

## WELD COUNTY JAIL          MAIL REJECTION NOTICE

DATE: 2/19/26          JID # 100567

INMATE: Alles, Barry          POD: 19

Your correspondence from:

Criminal Legal News
PO Box 1151
Lake Worth Beach FL, 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☒ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2476          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/03/2025 / MAIL.REJFRM

2/26 — Subsc
The above maili
remain on the s
mailing address,
before it expires.
at least 2 month



OFFICE OF THE SHERIFF
STEVE REAMS

1950 O STREET - GREELEY CO 80631

**RETURN REJECTED MAIL**

DENVER CO 802

30 SEP 2025 PM 8 L

US POSTAGE PITNEY BOWES

ZIP 80631 $ 001.03⁰
02 4W
0000335769 SEP 29 2025

RECEIVED

OCT 03 2025

HUMAN RIGHTS DEFENSE CENTER
P.O.BOX 1151
LAKE WORTH BEACH FL 33460

33460-115151



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 334

23 SEP 2025   AM 2

$0.05 0
US POSTAGE IMI
FIRST-CLASS
FROM 33460

$0.73 0
US POSTAGE IMI
FIRST-CLASS
FROM 33460

Barry Alles, #IN202507773
Weld County North Jail
2110 "0" Street
Greeley, CO  80631

80631-953710

## ELP COUNTY JAIL                    MAIL REJECTION N

DAT _71x6/2025_        JID # _19056_

INMATE: _Alles, Barry_                    POD: _19_

**Your correspondence from:**

_Human Rights Defense center_

_Po Box 1151 Lake Worth Beach FL 33460_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc… _____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: _2396_          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 334    **$0.05** 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
23 SEP 2025 AM 3 L    FROM 33460

**$0.73** 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460



Brother Gonzales, #IN202506915
Weld County North Jail
2110 "0" Street
Greeley, CO  80631

80631-953710

**WELD COUNTY JAIL**          MAIL REJECTION NOTICE

DATE: 9/26/2025          JID # 202406168

INMATE: Brother Gonzales          POD: 2

**Your correspondence from:**
Human Rights Defense Center
PO Box 1151 Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate     Yellow–Return to Sender     Pink–Inmate file

09/24/2024 / MAILREJFRM



OFFICE OF THE SHERIFF
STEVE REAMS

**RETURN REJECTED MAIL**

DENVER CO 802

30 SEP 2025 PM 9 L

US POSTAGE ᴬⁿᵈ PITNEY BOWES

ZIP 80631 $ 001.03⁰
02 4W
0000335769 SEP 29 2025

RECEIVED

OCT 03 2025

HUMAN RIGHTS DEFENSE CENTER
P.O. BOX 1151
LAKE WORTH BEACH FL 33460

33460-115151

# WELD COUNTY JAIL

## MAIL REJECTION NOTICE

DATE: 9/12  ‚25     JID # 2024 ( ○ ⸝⸝○

INMATE: Gamez-Briseno, Stevan   POD: C

**Your correspondence from:**

Human Rights Defense center

PO Box 1151 Lake Worth Beach FL 33460

is being rejected and returned to sender with the notice for the following reason(s):

□ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

□ Blank stationery, blank greeting cards, postage stamps and envelopes

□ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

□ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

□ not LEGAL mail

☒ Newspaper/Magazine clippings - Internet articles/material

□ Sexually explicit/provocative communication, photographs or drawings

□ STG related material /photos or contents of threats and/or plans of criminal activity

□ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

□ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

□ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

□ Letters with no return address (These letters will be returned to the Post Office)

□ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

□ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
               Inmate Name, Inmate ID #
               PO Box 247
               Phoenix  MD 21131

□ Other:_____

Mail Tech: 2396 _____  White – Inmate    Yellow – Return to Sender    Pink – Inmate file

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 334

23 SEP 2025 AM 2 L

$0.05 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

$0.73 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

Steven Gamez-Briseno, #IN202506848
Weld County North Jail
2110 "0" Street
Greeley, CO  80631

80631-953710

**WELD COUNTY JAIL**          MAIL REJECTION NOTICE

DATE: 9/26/2025     JID # 2024070060

INMATE: Emler, Mace          POD: 4

**Your correspondence from:**

Human Rights Defense center
PO Box 1151 Lake Worth Beach FL 33160

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials-- puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc... _____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                          Inmate Name, Inmate ID #
                          PO Box 247
                          Phoenix  MD 21131

☐ Other: _____

Mail Tech: 2396          White–Inmate     Yellow–Return to Sender     Pink–Inmate file

09/24/2024 / MAILREJFRM



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 3

23 SEP 2025 AM 3

Mace Emler, #IN202506727



OFFICE OF THE SHERIFF
STEVE REAMS

DENVER CO 802

30 SEP 2025 PM 5 L

**RETURN REJECTED MAIL**

US POSTAGE PITNEY BOWES

ZIP 80631 $001.03⁰
02 4W
0000335769 SEP 29 2025

RECEIVED

OCT 03 2025

1950 O STREET - GREELEY CO 80631

HUMAN RIGHTS DEFENSE CENTER
P.O. BOX 1151
LAKE WORTH BEACH FL 33460



33460-115151

## WELD COUNTY JAIL                MAIL REJECTION NOTICE

DATE: 9/2(braces)    JID # 202511677

INMATE: Fuller, Adrian                POD: A

**Your correspondence from:**

Human Rights Defense center

PO Box 1151 Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

□ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

□ Blank stationery, blank greeting cards, postage stamps and envelopes

□ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

□ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

□ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

□ Sexually explicit/provocative communication, photographs or drawings

□ STG related material / photos or contents of threats and/or plans of criminal activity

□ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

□ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

□ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

□ Letters with no return address (These letters will be returned to the Post Office)

□ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

□ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                                Inmate Name, Inmate ID #
                                PO Box 247
                                Phoenix  MD 21131

□ Other:_____

Mail Tech: 2396        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 334
23 SEP 2025 AM 2 L

$0.05 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460



$0.73 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

Adrian Fuller, #IN202508021
Weld County North Jail
2110 "0" Street
Greeley, CO  80631

80631-953710

**WELD COUNTY JAIL**          MAIL REJECTION NOTICE

DATE: 9/26/2025          JID # 74539

INMATE: Clark, Joshua                    POD: 1

**Your correspondence from:**

Human Rights Defense Center
Po Box 1151 Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 334

23 SEP 2025    AM 2

$0.05    US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

$0.73    US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

Joshua Clark, #IN202506629
Weld County North Jail
2110 "0" Street
Greeley, CO  80631

80631-953710



OFFICE OF THE SHERIFF
STEVE REAMS

1950 O STREET - GREELEY CO 80631

RETURN REJECTED MAIL

DENVER CO 802

30 SEP 2025 PM 9 L

US POSTAGE PITNEY BOWES

ZIP 80631 $001.03
02 4W
0000335769 SEP 29 2025

Prison Legal News

OCT 0 3 2025

ENTERED

HUMAN RIGHTS DEFENSE CENTER
P.O. BOX 1151
LAKE WORTH BEACH FL 33460

33460-1151191

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 334    **$0.05 0**

23 SEP 2025 AM 3 L

US POSTAGE IMI
**FIRST-CLASS**
063S0012833388
FROM 33460

**$0.73 0**

US POSTAGE IMI
**FIRST-CLASS**
063S0012833388
FROM 33460

Benny Lucero, #IN202507521
Weld County North Jail
2110 "0" Street
Greeley, CO  80631

80631-953710

**WELD COUNTY JAIL**          MAIL REJECTION NOTICE

DATE: 9/26/2025     JID # 7749

INMATE: Lucero, Benny          POD: A

**Your correspondence from:**

Human Rights Defense center

Po Box 1151 Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of. but not limited to gender, sexual preference, race, ethnicity, religion. national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc..._____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                                 Inmate Name, Inmate ID #
                                 PO Box 247
                                 Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate     Yellow–Return to Sender     Pink–Inmate file

09/24/2024 / MAILREJFRM

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 334    $0.05 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
23 SEP 2025 AM 2 L    FROM 33460

$0.73 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

Charles Espinoza, #IN202506516
Weld County North Jail
2110 "O" Street
Greeley, CO  80631

80631-953710

**⎺⎺⎺TY JAIL**          MAIL REJECTION NOTICE

DATE: 9/26/2025 ⎺    JID # 214934

INMATE: Espinoza, Charles          POD: 1

**Your correspondence from:**

Human Rights Defense center

Po Box 1151 Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate    Yellow–Return to Sender    Pink–Inmate file



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL

23 SEP 2025

## RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

Juana Espino, #IN202503300

RECEIVED

OCT 13 2025

NIXIE          850   5C 1          0210/05/25
RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD
BC: 33460115151        *1879-05895-04-32

UTF



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460



WEST PALM BCH FL

23 SEP 2025

**RETURN TO SENDER**
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

RECEIVED

OCT 13 2025

Ricki Craven, #IN202507091



NIXIE          850    SC 1          0210/05/25

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

UTF      BC: 33460115151      *1879-05894-04-32



**UNITED STATES POSTAL SERVICE**

**FORM 3547 fee due $0.93**

*Restricted Data*

First-Class Mail
Postage and Fees Paid
**USPS Permit No. G10**

---

Criminal Legal News
PO Box 1151
Lake Worth Beach FL 33460

**CHANGE SERVICE REQUESTED**

RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package

JUANA ESPINO IN20250300

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

**Change of Address**
If you move or are transferred, please notify PLN as soon as possible so your issues can be mailed to your new address. PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

**9/25—Subscription Renewal**
The above mailing address for PLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of PLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT, THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

# Criminal Legal News

Criminal Legal News is the sister publication of Prison Legal News. Both are published monthly by the Human Rights Defense Center. In Some timely, relevant, and practical legal news and features as PLN, BUT CLN provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

**"STOP RESISTING" and subscribe today!**

TO THE POSTMASTER OF
33460

**OLD:** 80631

**Reason:** UNABLE TO FORWARD

10/27/25 13:35 img: 006005975502 proc: 20251027 st: 006 u: 5005 s: 29 cl: 4

NOV 0 3 2025



**UNITED STATES POSTAL SERVICE**

# FORM 3547D fee due $0.93

*Restricted Data*

First-Class Mail
Postage and Fees Paid
USPS
Permit No. G10

*Not Deliverable As Addressed*

**TO THE POSTMASTER OF**



PO BOX 1151
LAKE WORTH BEACH FL 33460-9998

10/13/25 17:18 3900150000887 cl:3 proc:20251010 eff.



**UNITED STATES POSTAL SERVICE**

# FORM 3547D fee due $0.93

*Restricted Data*

First-Class Mail
Postage and Fees Paid
USPS
Permit No. G10



*Not Deliverable As Addressed*

**TO THE POSTMASTER OF**

PO BOX 1151
LAKE WORTH BEACH FL 33460-9998

10/20/25 17:21 4100170000992 cl:3 proc:20251018 eff:



# FORM 3547D fee due $0.93

*Restricted Data*

First-Class Mail
Postage and Fees Paid
USPS
Permit No. G10



Criminal Legal News is online!



**TO THE POSTMASTER OF**

PO BOX 1151
LAKE WORTH BEACH FL 33460-9998

*Not Deliverable As Addressed*

10/09/25 17:19 3800120000358 cl:3 proc:20251004 eff:


## FORM 3547D fee due $0.93

*Restricted Data*

*First-Class Mail*
*Postage and Fees Paid*
*USPS*
*Permit No. G10*



Prison Legal News

NOV 2 4 2025

ENTERED

**TO THE POSTMASTER OF**

*Not Deliverable As Addressed*

1028 N FEDERAL HWY
LAKE WORTH BEACH FL 33460-9998



10/09/25 17:19 3800120000359 cl:3 proc:20251005 eff:

# FORM 3547D fee due $0.93

*Restricted Data*

*First-Class Mail*
*Postage and Fees Paid*
*USPS*
*Permit No. G10*





Prison Legal News

NOV 2 4 2025

ENTERED

## TO THE POSTMASTER OF

*Not Deliverable As Addressed*

PO BOX 1151
LAKE WORTH BEACH FL 33460-9998



10/09/25 17:19 3800120000356 cl:3 proc:20251005 eff:

OFFICE OF THE SHERIFF
STEVE REAMS

RETURN REJECTED MAIL



1950 O STREET - GREELEY CO 80631





DENVER CO 802

28 OCT 2025PM 6 L

US POSTAGE ᴮᴵᴳ PITNEY BOWES

ZIP 80631  $ 000.74⁰
02 4W
0000335769 OCT 27 2025

HUMAN RIGHTS DEFENSE CENTER
PRISON LEGAL NEWS PUBLISHING
1028 N FEDERAL HWY
LAKE WORTH BEACH FL 33460

RECEIVED

DEC 17 2025

33460-235228

## WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: ___10/6/2025___    JID # ___814934___

INMATE: ___Charles Espinoza___    POD: _1_

**Your correspondence from:**

___Prison Legal News Publishing 1028___
___N. Federal Hwy Lake Worth Beach FL___
___33460___

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards. postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☑ Not LEGAL mail

☐ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics –graphic art photos– etc... _____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☑ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
          Inmate Name, Inmate ID #
          PO Box 247
          Phoenix  MD 21131

☐ Other:_____

Mail Tech: ___2025___    White–Inmate    Yellow–Return to Sender    Pink–Inmate file



Jonathan Picard, Attorney at Law
Human Rights Defense Center
PO Box 1151, Lake Worth Beach, FL 33460
Telephone: 561-360-2523

WEST PALM BCH FL 334   **$0.05** 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

3 OCT 2025 AM 3 L

**$0.73** 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460



## SPECIAL MAIL LEGAL MAIL

**CONFIDENTIAL ATTORNEY CORRESPONDENCE**
**TO BE OPENED ONLY IN THE PRESENCE OF ADDRESSEE**

Charles Espinoza, IN202506516
Weld County North Jail
2110 "0" Street
Greeley, CO  80631

80631-953710



WELD COUNTY SHERIFFS OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Human Rights Defense Center inc.

PO Box 1151

Lake Worth Beach FL 33460

Prison Legal News

SEP 2 4 2025

ENTERED

Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



Joshua Clark, IN202506629





H
P
Lake \

BC: 3346011515                2104N277212-00931

UNABLE TO FORWARD
NOT DELIVERABLE AS ADDRESSED
RETURN TO SENDER
NIXIE        851   48 1        0110/05/25

RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

Benny Lucero, #IN202507521



Prison Legal News

OCT 1 4 2025

ENTERED

Human Rights Defense Center
PO Box 1151
Lake Worth Beach, FL 33460





NIXIE          851   SC   1          0119/05/25
          RETURN TO SENDER
     NOT DELIVERABLE AS ADDRESSED
          UNABLE TO FORWARD
BC: 33460115151     2104N277212-00915

...er, #IN202506727

RECEIVED

OCT 16 2025



## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

RECEIVED
OCT 16 2025

**RETURN TO SENDER**
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

CHARLES ESPINOZA IN202506516

Non-Profit Org.
U.S. Postage
PAID
Portland OR

0110/05/25    2104N277212-00855
4C 1
851    RETURN TO SENDER
      NOT DELIVERABLE AS ADDRESSED
NIXIE  UNABLE TO FORWARD
BC: 33460115151

### 9/25—Subscription Renewal
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Ad
If you move or are tran notify *PLN* as soon as pos sues can be mailed to yo *PLN* only accepts respon ing an issue to the addr the time an issue is mai

---

# Criminal Legal News

*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org





BC: 3346011151     2184N277212-00899

UNABLE TO FORWARD
NOT DELIVERABLE AS ADDRESSED
RETURN TO SENDER

NIXIE    851 SC 1    1    0110/05/25



**RETURN TO SENDER**
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____



Steven Gamez-Briseno, #IN202506848

RECEIVED

OCT 16 2025



H
P.
Lake

NIXIE        851    SC 1        0110/05/25

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 33460115151        2104N277212-09911

RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____



Steven Gamez-Briseno, #IN202506848
Weld County North Jail

Greeley, CO

RECEIVED
OCT 16 2025
_____





Lake

NIXIE 851 48 1 0110/05/25

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 55460115151 2104N277212-00923

RETURN TO SENDER

- [ ] No Longer In Custody
- [x] Unauthorized Package
- [ ] ______________

Adrian Fuller, #IN202508021
[redacted]

RECEIVED
OCT 16 2025

RETURN TO SENDER

☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

Barry Alles, #IN202507773

RECEIVED

OCT 16 2025

Human Rights Defense Center
PO Box 1151
Lake Worth Beach, FL 33460



RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

Ricki Craven, #IN202507091



RECEIVED

OCT 20 2025

_____

NIXIE        851    4C 18CU        0110/08/25
RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD
MANUAL PROC REQ      2104N281164-00765



H
P

Prison Legal News Publishing
1028 N Federal HWY
Lake Worth Beach FL 33460



RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

Charles Espinoza, #IN202506516





NIXIE        851   CC 1            0110/05/25
RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 33460235228    2104N277212-00731



Prison Legal News Publishing
1088 N Federal HWY
Lake Worth Beach FL 33460






$0.73 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

$0.24 0
US POSTAGE
FIRST-CLASS
062S0012833388
FROM 33460

RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

Juana Espino, #IN202503300





NIXIE        851   CC 1            0110/05/25
RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 33460235228    2104N277212-00723



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460

RECEIVED

NOV 04 2025

RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

NIXIE      851   4C 18CU      0110/10/25
RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

MANUAL PROC REQ    2104N283100-00589



Prison Legal News Publishing
1028 N Federal HWY
Lake Worth Beach FL 33460

$0.73 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

$0.73 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

$0.73 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

$0.24 0
US POSTAGE
FIRST-CLASS
062S0012833388
FROM 33460

$0.24 0
US POSTAGE
FIRST-CLASS
062S0012833388
FROM 33460

RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____

Barry Alles, #IN202507773

Prison Legal News

NOV 0 7 2025

ENTERED

-R-T-S-   806315014-1N          11/01/25

RETURN TO SENDER
UNABLE TO FORWARD
UNABLE TO FORWARD
RETURN TO SENDER

BC: 33460235228   2104N277212-00727

WELD COUNTY JAIL

2110 O ST

GREELEY CO 80631

RETURN REJECTED MAIL

RECEIVED

JAN 07 2026

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: _8/30/25_ JID # _80941X6168_

INMATE: _Gonzales Brother_ POD: _2_

**Your correspondence from:**

_Criminal Legal News_

_1098 N Federal HWY_

_Lake Worth Beach FL 33460_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☐ Newspaper/Magazine/Subscriptions-- Internet articles/material/clippings

☐ Newspaper/Magazine/Books -- not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials-- puzzles--fonts--coloring pages--animated character photos Music lyrics--graphic art photos-- etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix MD 21131

☐ Other:_____

Mail Tech: _A510_     White--Inmate     Yellow--Return to Sender     Pink--Inmate file



Criminal Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org
U.S. Postage
PAID
Portland O
Permit No. 31

BROTHER GONZALES IN202506915

P-1 P30

**12/25 — Subscription Renewal**
The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

**Change of Address**
If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

**WELD COUNTY JAIL** MAIL REJECTION NOTICE

DATE: 12/30/25          JID # 0005116TT

INMATE: Fuller, Adrian                          POD: 6

**Your correspondence from:**

Criminal Legal News

1098 N Federal HWY

Laine Worth Beach FL 33410

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☐ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☑ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
　　　　　　　　　　Inmate Name, Inmate ID #
　　　　　　　　　　PO Box 247
　　　　　　　　　　Phoenix  MD 21131

☐ Other:_____

Mail Tech: 0510          White–Inmate    Yellow–Return to Sender    Pink–Inmate file



Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

CHANGE SERVICE REQUESTED



19735 3 LEFT
ADRIAN FULLER IN202508021

P-1  P30

## 12/25 — Subscription Renewal

The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

WELD COUNTY SHERIFF'S OFFICE
**2110 O STREET**
**GREELEY CO 80631**

RETURN REJECTED MAIL

Paul Wright
Prison Legal News Publishing
PO BOX 1151
Lk Worth BCH FL 33460-1151

RECEIVED

OCT 09 2025

## WELD COUNTY JAIL                    MAIL REJECTION NOTICE

DATE: _9/27/25_            JID # _AK1934_

INMATE: _Espinoza, Charles_                    POD: _1_

**Your correspondence from:**

_Paul Wright_

_Prison Legal News Publishing PO Box 1151_

_Lk Worth RCH FL 33460-1151_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☐ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos-- etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: _2510_        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM



WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Paul Wright
Prison Legal News Publishing
PO Box 1151
LK Worth BCH FL 33460-1151

**WELD COUNTY JAIL**                    MAIL REJECTION NOTICE

DATE: _9/27/85_          JID # _80851677_

INMATE: _Fuller, Adrian_                          POD: _A_

**Your correspondence from:**
_Paul Wright_
_Prison Legal News Publishing PO Box 151_
_Lk Worth BCH FL 33460-1151_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: _8510_          White–Inmate     Yellow–Return to Sender     Pink–Inmate file

09/24/2024 / MAILREJFRM



LD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Poul Wright
Prison Legal News Publishing
PO Box 1151
LK Worth BCHFL 33460-1151

## WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: _9/27/25_    JID # _8084107000_

INMATE: _Ember, Mace_    POD: _4_

**Your correspondence from:**

_Paul Wright_

_Prison Legal News Publishing PO Box 1151_

_LK Worth BCH FL 33460-1151_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☐ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix MD 21131

☐ Other:_____

Mail Tech: _8510_    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM



## WELD COUNTY JAIL

MAIL REJECTION NOTICE

DATE: _9/8/1/85_  JID # _8085 11879_

INMATE: _Espino, Juana_  POD: _81_

**Your correspondence from:**

_Paul Wright_

_Prison Legal News Publishing PO Box 1151_

_Ch Worth BCH FL 33461(6087-116)_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☐ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
        Inmate Name, Inmate ID #
        PO Box 247
        Phoenix  MD 21131

☐ Other:_____

Mail Tech: _____   White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM

D COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Paul Wright
Prison Legal News Publishing
PO Box 1151
Lk Worth BCH FL 33460-1151



US POSTAGE & FEES PAID IMI    Stamps.com
2 LB MEDIA MAIL RATE
ZONE 7
083S00 4950418
7577267
FROM 33426

09-19-2025

## USPS MEDIA MAIL

PAUL WRIGHT
PRISON LEGAL NEWS PUBLISHING
PO BOX 1151
LK WORTH BCH FL 33460-1151

0001

SHIP TO:
JUANA ESPINO, #IN202503300
WELD COUNTY NORTH JAIL
2110 "O" STREET
GREELEY CO 80631

**USPS TRACKING #**

9449 0501 0549 5002 4517 02

## WELD COUNTY JAIL                    MAIL REJECTION NOTICE

DATE: _9/27/25_                    JID # _80240c909_

INMATE: _Gamez-Brreno, Steven_                    POD: _C_

**Your correspondence from:**

_Paul Wright_
_Prison Legal News Publishing PO BOX 1151_
_Uk Worth PGH FT 334160-1151_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix MD 21131

☐ Other:_____

Mail Tech: _2510_          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

D COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

"RETURN REJECTED MAIL

Paul Wright
Prison Legal News Publishing
PO Box 1151
LK Worth BCH FL 33460-1151



## WELD COUNTY JAIL          MAIL REJECTION NOTICE

DATE: _9/27/25_          JID # _7749_

INMATE: _Lucero, Benny_          POD: _A_

**Your correspondence from:**

_Paul Wright   Prison Legal News Publishing_
_PO Box 1151_
_LK Worth BCH FL 33460-1151_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
        Inmate Name, Inmate ID #
        PO Box 247
        Phoenix  MD 21131

☐ Other:_____

Mail Tech: _8010_          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Paul Wright
Prison Legal News Publishing
PO BOX 1151
LK Worth BCH FL 33460-1151



D COUNTY SHERIFF'S OFFICE
**2110 O STREET**
**GREELEY CO 80631**

RETURN REJECTED MAIL

Paul Wright

Prison Legal News Publishing

P O Box 1151

Lk Worth Bch FL 33460-1151

**WELD COUNTY JAIL**          MAIL REJECTION NOTICE

DATE: 9/26/2025          JID # 190567

INMATE: Alles, Barry          POD: 19

**Your correspondence from**:

Paul Wright Prison Legal News Publishing
Po Box 1151 Lk worth BcH FL 33460-1151

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☒ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc... Books

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
          Inmate Name, Inmate ID #
          PO Box 247
          Phoenix MD 21131

☐ Other:

Mail Tech: 23916          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM



D COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Paul Wright
Prison Legal News Publishing
PO BOX 1151
LK Worth BCH FL 33460-1151

## WELD COUNTY JAIL                MAIL REJECTION NOTICE

DATE: _9/07/25_                JID # _402156_

INMATE: _Craven, Ricki_                POD: _C_

**Your correspondence from:**
_Paul Wright_
_Prison Legal News Publishing PO Box 1151_
_Lk Worth BCH Fl 33460_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
　　　　　　　　　　　　　Inmate Name, Inmate ID #
　　　　　　　　　　　　　PO Box 247
　　　　　　　　　　　　　Phoenix  MD 21131

☐ Other:_____

Mail Tech: _8010_        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAIL.REJFRM



ELD COUNTY SHERIFF'S OFFICE
**2110 O STREET**
**GREELEY CO 80631**

RETURN REJECTED MAIL

Paul Wright

Prison Legal News Publishing

P O Box 1151

Lk Worth BCH FL 33460-1151

RECEIVED

OCT ‍19 2025

**WELD COUNTY JAIL**          MAIL REJECTION NOTICE

DATE: 9/26/2025    JID # 202406168

INMATE: Brother Gonzales          POD: 2

**Your correspondence from:**

Paul wright Prison Legal News Publishing
PO Box 1151 LK worth Beach FL 33460-1151

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☒ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…   Books

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM



# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10/22/25    JID # 2025 11272

INMATE: Espino Juana    POD: 21

**Your correspondence from:**

Human Rights Defense Center Inc

PO Box 1151 - 1088 N Fed Hwy

Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
　　　　　　　　　　Inmate Name, Inmate ID #
　　　　　　　　　　PO Box 247
　　　　　　　　　　Phoenix MD 21131

☐ Other:_____

Mail Tech: 1221    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

# WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: 10/23/25    JID # 8024 06909

INMATE: Gomez-Briseno Steven    POD: C

**Your correspondence from:**

Human Rights Defense Center
PO Box 1151    1025 N Federal Hwy
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                                          Inmate Name, Inmate ID #
                                          PO Box 247
                                          Phoenix  MD 21131

☐ Other:_____

Mail Tech: 1201    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

# WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: _10/20/05_    JID # _2024 02165_

INMATE: _Gonzales, Brother_    POD: _2_

**Your correspondence from:**

_Human Rights Defense Center_

_PO Box 1151   1028 N Fed HWY_

_Lakeworth Beach   FL   33460_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail                    X 2 envelopes

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: _1201_    White–Inmate   Yellow–Return to Sender   Pink–Inmate file

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: 10/22/25   JID # 2024070060

INMATE: Emler, Mace   POD: 4

**Your correspondence from:**

Human Rights Defense Center Inc
PO Box 1151, 1028 N Fed Hwy
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail   X 2 envelopes

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other: _____

Mail Tech: 1201   White–Inmate   Yellow–Return to Sender   Pink–Inmate file

06/02/2025 / MAILREJFRM

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10/23/2025   JID # 7749

INMATE: Lucero, Benny   POD: A

**Your correspondence from:**

Human Rights Defense Center

PO Box 1151    1028 N Fed Hwy

Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail    X 2 envelopes

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                Inmate Name, Inmate ID #
                PO Box 247
                Phoenix  MD 21131

☐ Other:_____

Mail Tech: 1201    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAILREJFRM

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10/22/25          JID #: 2035116077

INMATE: Fuller Adrian          POD: A

**Your correspondence from:**

Human Rights Defense Center

PO Box 1151          1029 N Fed Hwy

Lake Worth Breach    FL    33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail          X 2 envelopes

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                Inmate Name, Inmate ID #
                PO Box 247
                Phoenix  MD 21131

☐ Other:_____

Mail Tech: 1201          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAILREJFRM

# WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: 10/22/25    JID # 214934

INMATE: Espinoza Charles    POD: 1

**Your correspondence from**:

Human Rights Defense Center
PO Box 1151    1028 N Fed Hwy
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail    X 2 Envelopes w/ Magazine

☐ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
        Inmate Name, Inmate ID #
        PO Box 247
        Phoenix  MD 21131

☐ Other:_____

Mail Tech: 1801    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: 10/22/2025    JID # 190567

INMATE: Alles, Barry    POD: 19

Your correspondence from:

Human Rights Defense Center    Hwy
POBox 1151    1022 N Fed
Lake Worth Beach Florida 33460

is being rejected and returned to sender with the notice for the following reason(s):

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail    X 2 magazines Envelopes w/

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 1201    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAIL.REJFRM

D COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

US POSTAGE

ZIP 80631 $ 019.25⁰
02 4W
0000335769 OCT 23 2025

RETURN REJECTED MAIL

RECEIVED

OCT 29 2025

Human Rights Defense Center
Prison Legal News Publishin
1028 N Federal Hwy
Lake Worth Beach FL
33460

WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Human Rights Defense Center
Prison Legal News Publishi
1028 N Federal HWY.
Lake Worth Beach. FL
33460

WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Human Rights Defense Center
Prison Legal News Publishing
1028 N Federal HWY
Lake Worth Beach FL
33460

Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460

RETURN REJECTED MAIL





Juana Espino, #IN202503300
Weld County North Jail
2110 "O" Street
Greeley, CO 80631

DENIED



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

RETURN REJECTED MAIL



Steven Gamez-Briseno, #IN202506848
Weld County North Jail
2110 "0" Street
Greeley, CO 80631



DENIED

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

RETURN REJECTED MAIL



Brother Gonzales, #
Weld County
2110 "O" Street
Greeley, CO 80631







Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



RETURN REJECTED MAIL

Brother Gonzales, #IN20?506915
Weld County North Jail
Greeley, CO 80631





Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



RETURN REJECTED MAIL

Mace Emler, #IN202506727
Weld County North Jail
2110 "0" Street
Greeley, CO  80631



DENIED



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

RETURN REJECTED MAIL

Mace Emler, #IN202506727
Weld County North Jail
2110 "O" Street
Greeley, CO  80631



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460



RETURN REJECTED MAIL

Benny Lucero, #_____
Weld County North Jail
2110 "O" Street
Greeley, CO  80631



DENIED

Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



RETURN REJECTED MAIL

Benny Lucero, #IN202507521
Weld County North Jail
2110 "O" Street
Greeley, CO 80631





DENIED



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460



RETURN REJECTED MAIL



Adrian Fuller, #
Weld County North Jail
Street
CO  80631



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460

RETURN REJECTED MAIL



Adrian Fuller #

Weld County North

Greeley, CO  80631



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

RETURN REJECTED MAIL





Charles Espinoza, #
Weld County North Jail
110 "0" Street
Greeley, CO  80631

DENIED



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



RETURN REJECTED MAIL



Charles Espinoza  #IN202506516
Weld County North Jail
2110 O Street
Greeley, CO  80631



DENIED

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

RETURN REJECTED MAIL



Barry Alles, ~~WIN202507773~~
~~Weld County Jail~~
~~2110 O Street~~
~~Greeley, CO  80631~~



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460

RETURN REJECTED MAIL





Barry Alles,

DENIED

**WELD COUNTY JAIL**  MAIL REJECTION NOTICE

DATE: 12/1/2025    JID # 2024076062

INMATE: Emler, Mace    POD: 4

Your correspondence from:

Criminal Legal News  Po Box 1151
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

☒ not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication. photographs or drawings

☐ STG related material /photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of. but not limited to gender, sexual preference, race, ethnicity. religion. national origin, creed or disability.

☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex. CO
                           Inmate Name. Inmate ID #
                           PO Box 247
                           Phoenix  MD 21131

☐ Other:

Mail Tech: 2396    White – Inmate    Yellow – Return to Sender    Pink – Inmate file

09/03/2025 / MAILREJFRM



**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

Ilı·l·l·ll·ıl'il·ırıll'·rll'll·ll'ıil·ı·l·l·l·l·l'l·ıl·l·l·l·lıl·ırı
****************************ALL FOR ADC 800

19678 3 LEFT
MACE EMLER IN202506727
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631

P-1  P34

## 11/25 — Subscription Renewal

The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

← → C  www.criminallegalnews.org      ☆  ≡

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: 12/1/2025                JID = 2149341

INMATE: Espinoza, Charles              POD: 1

**Your correspondence from:**

Criminal Legal News  Po Box 1151
Lake Worth Beach FL 33460

---

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

☑ not LEGAL mail

☑ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material /photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
      Inmate Name, Inmate ID #
      PO Box 247
      Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396    White – Inmate    Yellow – Return to Sender    Pink – Inmate file

09/03/2025 / MAILREJFRM



**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

**ALL FOR ADC 800

19679 3 LEFT
CHARLES ESPINOZA IN202506516
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631

P-1  P34

## 1/25 — Subscription Renewal

The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

WELD COUNTY JAIL

2110 O ST    RETURN REJECTED MAIL

GREELEY CO 80631

RECEIVED

DEC 1 0 2025

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL 33460



WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Paul Wright

Prison Legal News Publishing
PO BOX 1151
LK Worth BCH FL 33460-1151

**WELD COUNTY JAIL**          MAIL REJECTION NOTICE

DATE: 9/5/2025          JID # 202406909

INMATE: Gamez-Briseno, Steven          POD: C

Your correspondence from:

Paul wright Prison Legal News Publishing
Po Box 1151 Lk worth BCH FL 33460 - 1151

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM

US POSTAGE & FEES PAID IMI    Stamps.com
2 LB MEDIA MAIL RATE    003S000 1413337
ZONE 7    7577267
FROM 33426

08 23 2025

# USPS MEDIA MAIL

PAUL WRIGHT
PRISON LEGAL NEWS PUBLISHING
PO BOX 1151
LK WORTH BCH FL 33460-1151

**0001**



SHIP
TO:    STEVEN GAMEZ-BRISENO, #IN202506848
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631

## USPS TRACKING #



9449 0501 0579 7001 7663 52

WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Paul Wright

Prison Legal News Publishing

PO Box 1151

LK Worth BcH FL 33460-1151

**WELD COUNTY JAIL**        MAIL REJECTION NOTICE

DATE: 9/5/2025        JID # 214934

INMATE: Charles Espinoza        POD: 3

**Your correspondence from:**
Paul wright  Prism Legal News Publishing
PO BOX 1151 LK Worth BCH FL 33460 -1151

**is being rejected and returned to sender with the notice for the following reason(s):**

□ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

□ Blank stationery, blank greeting cards, postage stamps and envelopes

□ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

□ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

□ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

□ Sexually explicit/provocative communication, photographs or drawings

□ STG related material / photos or contents of threats and/or plans of criminal activity

□ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

□ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc..._____

□ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

□ Letters with no return address (These letters will be returned to the Post Office)

□ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

□ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                                 Inmate Name, Inmate ID #
                                 PO Box 247
                                 Phoenix  MD 21131

□ Other:_____

Mail Tech: 23 96        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM



ELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Paul Wright

Prison Legal News Publishing

PO Box 1151

Lk Worth BCH FL 33460-1151

**WELD COUNTY JAIL**        MAIL REJECTION NOTICE

DATE: 9/5/2025        JID # 74539

INMATE: Clark, Joshua        POD: 1

**Your correspondence from:**

Paul Wright Prison Legal News Publishing
PO Box 1151 Lk Worth BCH FL 33460-1151

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                Inmate Name, Inmate ID #
                PO Box 247
                Phoenix MD 21131

☐ Other:_____

Mail Tech: 2396        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM



COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Paul Wright

Prison Legal News Publishing

PO Box 1151

LK Worth BCH FL 33460-1151

**WELD COUNTY JAIL**        MAIL REJECTION NOTICE

DATE: 9/5/2025        JID # 402150

INMATE: Craven, Ricki        POD: C

**Your correspondence from**:

Paul wright Prison Legal News publishing
Po Box 1151 Lk worth Bch FL 33460-1151

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc..._____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix MD 21131

☐ Other:_____

Mail Tech: 2396        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM

US POSTAGE & FEES PAID IMI    Stamps.com
2 LB MEDIA MAIL RATE    083S0001413191
ZONE 7    7577267
FROM 33426

# USPS MEDIA MAIL

PAUL WRIGHT    0001
PRISON LEGAL NEWS PUBLISHING
PO BOX 1151
LK WORTH BCH FL 33460-1151

SHIP
TO:    RICKI CRAVEN, #IN202507091
WELD COUNTY NORTH JAIL
2110 "O" STREET
GREELEY CO 80631

**USPS TRACKING #**



9449 0501 0579 7001 7618 76

ELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

Paul Wright

Prison Legal News Publishing.
Po Box 1151
Lk Worth BcH FL 33460-1151

**WELD COUNTY JAIL**        MAIL REJECTION NOTICE

DATE: 9/5/2025        JID # 202406168

INMATE: Gonzales, Brother        POD: 2

Your correspondence from:

Paul Wright Prism Legal News Publishing
PO Box 1151 Lk Worth BCH FL 33460-1151

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc..._____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM



US POSTAGE & FEES PAID IM
PER MEDIA MAIL RATE

# USPS MEDIA MAIL

PAUL WRIGHT
PRISON LEGAL NEWS PUBLISHING
PO BOX 1151
LK WORTH BCH FL 33460-1151

**0001**

SHIP
TO:    BROTHER GONSALES, #IN202506915
       WELD COUNTY NORTH JAIL
       2110 "O" STREET.
       GREELEY CO 80631

## USPS TRACKING #

9449 0501 0579 7001 7660 86

WELD COUNTY JAIL

2110 O ST

GREELEY CO 80631

RETURN REJECTED MAIL

RECEIVED

DEC 19 2025

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

## WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: 12/5/25    JID # 202406909

INMATE: Gamez-Briseno, Steven POD: O

**Your correspondence from:**

Criminal Legal News-Human Rights Defense Center

1028 N. Federal Hwy

Lake Worth Beach, FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery. blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

☐ not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material /photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference. race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc..._____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2476    White – Inmate    Yellow – Return to Sender    Pink – Inmate file



## Criminal Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142



*******************ALL FOR ADC 800

19683 3 LEFT
STEVEN GAMEZ-BRISENO IN202506848

P-1  P34



---

### 11/25 — Subscription Renewal
The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address
If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

---

www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

ZIP 80631  $ 002.44⁰
02 4W
0000335769 DEC 18 2025

WELD COUNTY JAIL

2110 O ST

GREELEY CO 80631

RETURN REJECTED MAIL

RECEIVED

DEC 24 2025

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: **12/3/2025**    JID # **202406168**

INMATE: **Gonzales, Brother**    POD: **2**

**Your correspondence from:**

**Prison Legal News Po Box 1151 Lake Worth Beach FL 33460**

---

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

☒ not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material /photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                       Inmate Name, Inmate ID #
                       PO Box 247
                       Phoenix  MD 21131

☐ Other:_____

Mail Tech: **2396**    White – Inmate    Yellow – Return to Sender    Pink – Inmate file



**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142



******************************ALL FOR ADC 800

19682 3 LEFT
BROTHER GONZALES IN202506915

P-1  P34

## 11/25 — Subscription Renewal

The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

 www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!



US POSTAGE ᴘᴏᴡᴇs

ZIP 80631  $ 003.28⁰
02 4W
0000335769 DEC 29 2025

WELD COUNTY JAIL

2110 O ST    RETURN REJECTED MAIL

GREELEY CO 80631

RECEIVED

JAN 0 7 2026

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 12/24/2025          JID # 190567

INMATE: Alles, Barry                    POD: 19

**Your correspondence from:**

Criminal Legal News Po Box 1151
Lake Worth Beach FL 33460

---

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☒ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials-- puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
    Inmate Name, Inmate ID #
    PO Box 247
    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAILREJFRM



**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED





BARRY ALLES

P-1  P30

**12/25 — Subscription Renewal**
The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

**Change of Address**
If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

 www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 12/24/2025          JID # 202511272

INMATE: Espino, Juana          . POD: M

**Your correspondence from:**

Criminal Legal News  Po Box 1151
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐  Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☒ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                               Inmate Name, Inmate ID #
                               PO Box 247
                               Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate    Yellow–Return to Sender    Pink–Inmate file



**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED





JUANA ESPINO

P-1  P30

## 12/25 — Subscription Renewal

The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

---

www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

RECEIVED

JAN 3 0 2026

Human Rights Defense
Center INC.

1901 S. Congress Ave. Suit 200

Boynton Beach, Fl 33426

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: **1-23-2026**    JID # **214934**

INMATE: **Charles Espinoza**    POD: **1**

**Your correspondence from:**

**Prison Legal News**

**PO Box 1151**

**Lake Worth Beach FL 33460**

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix MD 21131

☐ Other:_____

Mail Tech: **2568**    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/03/2025 / MAILREJFRM



## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

ALL FOR ADC 800

145688 1 LEFT
CHARLES ESPINOZA IN202506516
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631

P-1 P72

### 1/26—Subscription Renewal
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address
If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

# ▲Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631



US POSTAGE MPITNEY BOWES

ZIP 80631   $ 011.05⁰
02 4W
0000335769 JAN 23 2026

RETURN REJECTED MAIL

RECEIVED

JAN 30 2026

Human Rights Deffense
Center INC.

1901 S. Congress Ave Suite 200

Boynton Beach, FL 33426

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: **1/22/2026**   JID # **2024060909**

INMATE: **Steven Gamez-Briseno** POD: **O**

**Your correspondence from:**

**Prison Legal News**

**PO Box 1151**

**Lake Worth Beach FL 33460**

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☑ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
  Inmate Name, Inmate ID #
  PO Box 247
  Phoenix MD 21131

☐ Other:_____

Mail Tech: **2568**   White–Inmate   Yellow–Return to Sender   Pink–Inmate file



# Prison Legal News

PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

*******************************ALL FOR ADC 800

145692 1 LEFT
STEVEN GAMEZ-BRISENO IN202506848
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631

P-1  P72

## 1/26—Subscription Renewal

The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING"* and subscribe today!

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: **1-22-2026**    JID # **H05167**

INMATE: **Barry Alles**    POD: **19**

Your correspondence from:

**Prison Legal News**

**Po Box 1151**

**Lake Worth Beach FL 33460**

## is being rejected and returned to sender with the notice for the following reason(s):

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☐ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
  Inmate Name, Inmate ID #
  PO Box 247
  Phoenix MD 21131

☐ Other:_____

Mail Tech: **25168**    White–Inmate    Yellow –Return to Sender    Pink–Inmate file



## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

||·||||||||||·||·||·||·||||||·||||||||||||||·||·||||·||·||||||·||·||

************************************ALL FOR ADC 800

145808 2 LEFT
BARRY ALLES IN202507773
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631

P-1  P72
###       //

---

**1/26—Subscription Renewal**
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT,"THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

**Change of Address**
If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

---

# Criminal Legal News

*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America



Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING"* and subscribe today!

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to: Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

**WELD COUNTY JAIL** MAIL REJECTION NOTICE

DATE: 1/22/2026        JID # 20240701060

INMATE: Mace Emler        POD: 4

Your correspondence from:

Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix MD 21131

☐ Other:_____

Mail Tech: 2S108     White–Inmate     Yellow–Return to Sender     Pink–Inmate file

09/03/2025 / MAIL.REJFRM



## Prison Legal News

PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

\\

I||IIₙₚₗᵈᴵᵘᴵᵢₗₗₚₗₗᴵᵘᴵᴵᴵₗₗₚₚₗᴵₚᴵᵢᴵₕᴵᴵᵢᴵᴵₚₚₗᵢₙᵢᴵᵒᵒᴵᴵᴵₙᴵₚᴵₚᴵ

****************************ALL FOR ADC 800

145687 1 LEFT
MACE EMLER IN202506727
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631

P-1  P72

//

### 1/26—Subscription Renewal

The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address

If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

## Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING"* and subscribe today!

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: __1/22/2026__    JID # __2025116077__

INMATE: __Adrian Fuller__    POD: __5__

**Your correspondence from:**

__Prison Legal News__

__PO Box 1151__

__Lake Worth Beach FL 33460__

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☐ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☒ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: __2568__        White–Inmate    Yellow–Return to Sender    Pink–Inmate file



# Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

### CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

\\

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*ALL FOR ADC 800**

145807 2 LEFT
ADRIAN FULLER IN202508021
WELD COUNTY NORTH JAIL
2110 "O" STREET
GREELEY CO 80631

P-1 P72

//

---

## 1/26—Subscription Renewal
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address
If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

---

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

### *"STOP RESISTING"* and subscribe today!

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

:LD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

RECEIVED

FEB 0 4 2026

Criminal Legal News
Human Rights Defense Center
Prison Legal News Publishing
1028 N Federal HWY
Lake Worth Beach, FL 33460

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: __1/27/2026__     JID # __2025 11272__

INMATE: __ESPINO, Juana__     POD: __M__

**Your correspondence from:**

__Prison Legal News__

__PO Box 1151__

__Lake Worth Beach FL 33460__

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
　　　　　　　　　　　　　　Inmate Name, Inmate ID #
　　　　　　　　　　　　　　PO Box 247
　　　　　　　　　　　　　　Phoenix  MD 21131

☐ Other:_____

Mail Tech: __25608__     White–Inmate     Yellow–Return to Sender     Pink–Inmate file



## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142



JUANA ESPINO IN202503300

P-1  P72

---

### 1/26—Subscription Renewal
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address
If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

---

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING"* and subscribe today!

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

US POSTAGE

ZIP 80631   $011.55
02 4W
0000335769 OCT 24 2025

WELD COUNTY JAIL

2110 O ST

GREELEY CO 80631

RETURN REJECTED MAIL'

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

## WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10-23-25          JID # 202 511677

INMATE: ADRIAN FULLER          POD: B

**Your correspondence from:**

Human Rights Defense Center / Prison Legal News, Publishing
1028 N FEDERAL HWY
LAKE WORTH BEACH FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐  Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards
   /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached
   items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to
   gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos
   Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors,
   inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                                 Inmate Name, Inmate ID #
                                 PO Box 247
                                 Phoenix  MD 21131

☐ Other:_____

Mail Tech: 257 /          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10-23-25          JID # 202406909

INMATE: STEVEN GAMEZ-BRIGENO   POD: C

**Your correspondence from:**

Human Rights DEFENSE CENTER/PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
    Inmate Name, Inmate ID #
    PO Box 247
    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2571          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAILREJFRM

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10-23-25      JID # 202511272

INMATE: JLANA ESPINO      POD: 2 1

**Your correspondence from:**

HUMAN RIGHTS DEFENSE CENTER PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings -- Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials-- puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
               Inmate Name, Inmate ID #
               PO Box 247
               Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2571      White–Inmate    Yellow–Return to Sender    Pink–Inmate file

## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142



**********************************ALL FOR ADC 800

145807 5 LEFT
ADRIAN FULLER IN202508021
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631

### 10/25—Subscription Renewal
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address
If you move or are transferred, notify *PLN* as soon as possible so sues can be mailed to your new a *PLN* only accepts responsibility fq ing an issue to the address prov the time an issue is mailed!

# Criminal Legal News

*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org



**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

Juana Espino, #IN202503300
Weld County North Jail
2110 "0" Street
Greeley, CO  80631

Human Rights Defense Center, Inc./ PRISON LEGAL NEWS PUBLISHING
1028 N FEDERAL HWY
Lake Worth Beach, FL 33460



$0.73 US POSTAGE FIRST-CLASS 063S0012833388 FROM 33460

$0.73 US POSTAGE FIRST-CLASS 063S0012833388 FROM 33460

$0.73 US POSTAGE FIRST-CLASS 063S0012833388 FROM 33460

$0.05 US POSTAGE FIRST-CLASS 063S0012833388 FROM 33460

$0.05 US POSTAGE FIRST-CLASS 063S0012833388 FROM 33460

$0.05 US POSTAGE FIRST-CLASS 063S0012833388 FROM 33460

Steven Gamez-Briseno, #IN202506848
Weld County North Jail
2110 "0" Street
Greeley, CO  80631



WELD COUNTY JAIL

2110 O ST

GREELEY CO 80631

RETURN REJECTED MAIL

RECEIVED

DEC 17 2025

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 11-26-25                    JID # 7749

INMATE: Benny Lucero                    POD: A

**Your correspondence from**:

Criminal legal News Human Rights Defense Center
Prison Legal News Publishing
1028 N Federal HWY Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☒ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material /photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2571 _____    White – Inmate    Yellow – Return to Sender    Pink – Inmate file

09/03/2025 / MAIL REJFRM

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: **11-26-25**  JID #: **202406168**

INMATE: **Brother Gonzales**  POD: **2**

**Your correspondence from:**

Criminal legal News Human Rights Defense Center
Prison legal News Publishing
1028 N Federal Hwy Lake Worth Beach Fl 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

□ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

□ Blank stationery, blank greeting cards, postage stamps and envelopes

□ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

□ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

□ not LEGAL mail

☑ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☑ Newspaper/Magazine/Books – not accepted

□ Sexually explicit/provocative communication, photographs or drawings

□ STG related material /photos or contents of threats and/or plans of criminal activity

□ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

□ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

□ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

□ Letters with no return address (These letters will be returned to the Post Office)

□ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

□ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
  Inmate Name, Inmate ID #
  PO Box 247
  Phoenix  MD 21131

□ Other:_____

Mail Tech: **2571**  White – Inmate   Yellow – Return to Sender   Pink – Inmate file

09/03/2025 / MAIL.RE.JFRM

# WELD COUNTY JAIL

**MAIL REJECTION NOTICE**

DATE: 11-26-25          JID # 202406909

INMATE: Steven Gamez-Briseno          POD: O

**Your correspondence from:**

Criminal Legal News Human Right Defense Center
Prison Legal News Publishing
1028 N Federal HWY Lake Worth Beach Fl 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

- ☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

- ☐ Blank stationery, blank greeting cards, postage stamps and envelopes

- ☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

- ☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

- ☐ not LEGAL mail

- ☒ Newspaper/Magazine/Subscriptions-- Internet articles/material/clippings

- ☒ Newspaper/Magazine/Books – not accepted

- ☐ Sexually explicit/provocative communication, photographs or drawings

- ☐ STG related material /photos or contents of threats and/or plans of criminal activity

- ☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

- ☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

- ☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

- ☐ Letters with no return address (These letters will be returned to the Post Office)

- ☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

- ☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
         Inmate Name, Inmate ID #
         PO Box 247
         Phoenix  MD 21131

- ☐ Other:_____

Mail Tech 2577          White – Inmate    Yellow – Return to Sender    Pink – Inmate file



**Prison Legal News**



Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH FL 33460



BROTHER GONZALES
WELD COUNTY NORTH JAIL

P-1  P83

---

**11/25—Subscription Renewal**
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

**Change of Address**
If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

---

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN,* BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org



**Prison Legal News**

CRIMINAL LEGAL NEWS
HUMAN RIGHTS DEFENSE CENTER
PRISON LEGAL NEWS PUBLISHING
1028 N FEDERAL HWY
LAKE WORTH BEACH FL 33460

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 12

BENNY LUCERO

## 11/25—Subscription Renewal

The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, notify *PLN* as soon as possible so issues can be mailed to your new... *PLN* only accepts responsibility... ing an issue to the address provided the time an issue is mailed!

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org



## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460
   CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH FL 33460




STEVEN GAMEZ-BRISENO

---

### 11/25—Subscription Renewal
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address
If you move or are transferred, notify *PLN* as soon as possible so sues can be mailed to your new a *PLN* only accepts responsibility fo ing an issue to the address provi the time an issue is mailed!

---

# Criminal Legal News

*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America



Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

US POSTAGE
ZIP 80631 $ 011.55⁰
02 4W
0000335769DEC 01 2025

WELD CO

2110 O ST

GREELEY CO 80631
RETURN REJECTED MAIL

RECEIVED

DEC 17 2025

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: **11-26-25**                JID # **202407060**

INMATE: **Mace Emler**                          POD: **4**

**Your correspondence from:**

Criminal legal News Human Rights Defense Center
Prison legal news Publishing
1028 N Federal Hwy  Lake Worth Fl 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

☐ not LEGAL mail

☑ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☑ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material /photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                          Inmate Name, Inmate ID #
                          PO Box 247
                          Phoenix  MD 21131

☐ Other:_____

Mail Tech: **2571**        White – Inmate    Yellow – Return to Sender    Pink – Inmate file

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: __11-26-25__    JID # __1905567__

INMATE: __Barry Alles__    POD: __19__

Your correspondence from:

Criminal legal News   Human Rights Defense Center
Prison Legal News Publishing
1028 N Federal HWY   Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

- ☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

- ☐ Blank stationery, blank greeting cards, postage stamps and envelopes

- ☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

- ☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

- ☐ not LEGAL mail

- ☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

- ☒ Newspaper/Magazine/Books – not accepted

- ☐ Sexually explicit/provocative communication, photographs or drawings

- ☐ STG related material /photos or contents of threats and/or plans of criminal activity

- ☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

- ☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

- ☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

- ☐ Letters with no return address (These letters will be returned to the Post Office)

- ☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

- ☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
  Inmate Name, Inmate ID #
  PO Box 247
  Phoenix  MD 21131

☐ Other:_____

Mail Tech: __A571_____ White – Inmate    Yellow – Return to Sender    Pink – Inmate file

09/03/2025 / MAILREJFRM

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: 11-26-25     JID # 202511272

INMATE: Juana Espino     POD: M

**Your correspondence from:**

Criminal Legal News Human Rights Defense Center
Prison Legal News Publishing
1028 N Federal HWY Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

- ☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

- ☐ Blank stationery, blank greeting cards, postage stamps and envelopes

- ☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

- ☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

- ☐ not LEGAL mail

- ☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

- ☒ Newspaper/Magazine/Books – not accepted

- ☐ Sexually explicit/provocative communication, photographs or drawings

- ☐ STG related material /photos or contents of threats and/or plans of criminal activity

- ☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

- ☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

- ☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

- ☐ Letters with no return address (These letters will be returned to the Post Office)

- ☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

- ☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
  Inmate Name, Inmate ID #
  PO Box 247
  Phoenix MD 21131

- ☐ Other:_____

Mail Tech: 2571     White – Inmate     Yellow – Return to Sender     Pink – Inmate file



## Criminal Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH FL 33460



19680 3 LEFT
JUANA ESPINO
WELL
2110
GREE

P-1  P34

### 11/25 — Subscription Renewal
The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address
If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

---

www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!



**Prison Legal News**

Non-Profit Org.
U.S. Postage
PAID
Po............
Perm............42

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH FL  33460

145687 3 LEFT
MACE EMLER

## 11/25—**Subscription Renewal**
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## **Change of Address**
If you move or are transferred, notify *PLN* as soon as possible so ...
sues can be mailed to your new a...
*PLN* only accepts responsibility fo...
ing an issue to the address provi...
the time an issue is mailed!

# ◤ Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING"* and subscribe today!

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH FL  33460

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142



145808 4 LEFT
BARRY ALLES

P-1



**11/25—Subscription Renewal**
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT,"THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

**Change of Address**
If you move or are transferred, ple notify *PLN* as soon as possible so yo sues can be mailed to your new add *PLN* only accepts responsibility for se ing an issue to the address provide the time an issue is mailed!

# ⚡ Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org



## Criminal Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH FL 33460



BARRY ALLES

P-1  P34
###

11/25 — **Subscription Renewal**
The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

**Change of Address**
If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

US POSTAGE

ZIP 80631   $ 002.72⁰
02 4W
0000335780 DEC 01 2025

WELD COUNTY JAIL

2110 O ST

GREELEY CO 80631



RECEIVED

**DEC 17 2025**

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

## WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: 11/27/2025        JID # 2025112-72

INMATE: Espino, Juana        POD M

**Your correspondence from:**

Prism Legal News Publishing. Po Box
1151 Lake Worth Beach FL 33460

---

### is being rejected and returned to sender with the notice for the following reason(s):

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery. blank greeting cards. postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

☒ not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☐ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material /photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender. sexual preference. race, ethnicity. religion, national origin, creed or disability.

☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                 Inmate Name. Inmate ID #
                 PO Box 247
                 Phoenix MD 21131

☐ Other:_____

Mail Tech: 2396    White – Inmate    Yellow – Return to Sender    Pink – Inmate file



## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

RETURN REJECTED MAIL

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

RETURN TO SENDER
☐ No Longer In Custody
☒ Unauthorized Package
☐ _____



********************************ALL FOR ADC 800
145689 3 LEFT
JUANA ESPIN

P-1  P83

### 11/25—Subscription Renewal
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address
If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org



US POSTAGE
ZIP 80631  $ 005.04
02 4W
0000335769 DEC 01 2025

WELD COUNTY JAIL

2110 O ST

GREELEY CO 80631

RETURN REJECTED MAIL



RECEIVED

DEC 17 2025

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

# WELD COUNTY JAIL                    MAIL REJECTION NOTICE

DATE: __11/28/25__     JID # __2K1934__

INMATE: __Espinoza, Charles__     POD: __1__

Your correspondence from:

__Criminal legal News Human Right Defense Center__
__Prison legal news Publishing 1055 N Federal HWY__
__Lake Worth Beach FL 33460__

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

☐ not LEGAL mail

☒ Newspaper/Magazine/Subscriptions-- Internet articles/material/clippings

☒ Newspaper/Magazine/Books -- not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material /photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials--puzzles--fonts--coloring pages--animated character photos Music lyrics--graphic art photos-- etc..._____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
          Inmate Name, Inmate ID #
          PO Box 247
          Phoenix  MD 21131

☐ Other:_____

Mail Tech: _____     White -- Inmate    Yellow -- Return to Sender    Pink -- Inmate file

09/03/2025 / MAILREJFRM

## WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: _11/28/25_    JID # _5085 1677_

INMATE: _Fuller, Adrian_    POD: _S_

**Your correspondence from:** _Criminal Legal News Humans rights Defence_
_Prison Legal news Publishing 1085 N Federal Hwy_
_Lake Worth Beach FL 33460_    _X2_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/ perfume on letter or envelope/ Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any Attached items or glued on parts or pieces  -  Unknown substance on the paper/envelope

☐ not LEGAL mail

☒ Newspaper/Magazine/Subscriptions– Internet articles/material/clippings

☒ Newspaper/Magazine/Books – not accepted

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material /photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials–puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc… _____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
         Inmate Name, Inmate ID #
         PO Box 247
         Phoenix  MD 21131

☐ Other:_____

Mail Tech: _8510_    White – Inmate    Yellow – Return to Sender    Pink – Inmate file



## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*ALL FOR ADC 800

CHARLES ESPINOZA IN202506516

P-1

### 11/25—Subscription Renewal
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address
If you move or are transferred, notify *PLN* as soon as possible so y sues can be mailed to your new ad *PLN* only accepts responsibility for ing an issue to the address provid the time an issue is mailed!

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN,* BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING"* and subscribe today!

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org



**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Posta
PAID
Portland (
Permit No. 3





ADRIAN FULLER IN202508021

P-1  P

## 11/25 — Subscription Renewal

The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please n
CLN as soon as possible so your issues ca
mailed to your new address! CLN only acc
responsibility for sending an issue to the ad
provided at the time an issue is mailed!

---

www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!



## Prison Legal News
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142





ADRIAN FULLER IN202508021

P-1

**1/25—Subscription Renewal**
The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

**Change of Address**
If you move or are transferred, ple[ase] notify *PLN* as soon as possible so you[r is]sues can be mailed to your new addr[ess] *PLN* only accepts responsibility for se[nd]ing an issue to the address provide[d] the time an issue is mailed!

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News*. Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN*, BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

$010.45

WELD COUNTY JAIL

2110 O ST　　RETURN REJECTED MAIL

GREELEY CO 80631

RECEIVED

DEC 17 2025

CRIMINAL LEGAL NEWS

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH　FL 33460

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10/27/2025          JID # 214934

INMATE: Espinoza, Charles          POD: 1

**Your correspondence from:**

Criminal Legal News Po Box 1151
Lake Worth Beach FL 33460

---

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
        Inmate Name, Inmate ID #
        PO Box 247
        Phoenix MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10/27/2025    JID # 202511272

INMATE: Espino, Juana    POD: 21

**Your correspondence from:**

Criminal Legal News PO Box 1151
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

**WELD COUNTY JAIL** MAIL REJECTION NOTICE

DATE: 10/27/2025     JID # 202511677

INMATE: Fuller, Adrian                POD: B

**Your correspondence from**:

Criminal Legal News PO Box 1151
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐  Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards
/use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached
items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to
gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos
Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors,
inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396     White–Inmate    Yellow–Return to Sender    Pink–Inmate file

**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜⁜AU FOR ADC 800

19735 5 LEFT
ADRIAN FULLER IN202508021
WELD COUNTY NORTH JAIL
2110 "O" STREET
GREELEY CO 80631

P-1

## 10/25 — Subscription Renewal

The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please CLN as soon as possible so your issues mailed to your new address! CLN only a responsibility for sending an issue to the a provided at the time an issue is mailed!



www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!



**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

CHANGE SERVICE REQUESTED

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

**************************************ALL FOR ADC 800

19680 4 LEFT
JUANA ESPINO IN202503300
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631

P-1  P



## 10/25 — Subscription Renewal

The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please CLN as soon as possible so your issues mailed to your new address! CLN only a responsibility for sending an issue to the a provided at the time an issue is mailed!

www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!



**Criminal Legal News**
PO Box 1151
Lake Worth Beach FL 33460

**CHANGE SERVICE REQUESTED**

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

*****************************ALL FOR ADC 800

19679 4 LEFT
CHARLES ESPINOZA IN202506516
WELD COUNTY NORTH JAIL
2110 "0" STREET
GREELEY CO 80631                                      P-1

## 10/25 — Subscription Renewal

The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please CLN as soon as possible so your issues c mailed to your new address! CLN only ac responsibility for sending an issue to the ac provided at the time an issue is mailed!


www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

WELD COUNTY JAIL

2110 O ST

GREELEY CO 80631

RETURN REJECTED MAIL



US POSTAGE
$ 014.90

RECEIVED

DEC 17 2025

HUMAN RIGHTS DEFENSE CENTER

PRISON LEGAL NEWS PUBLISHING

1028 N FEDERAL HWY

LAKE WORTH BEACH   FL  33460

RECEIVED

DEC 17 2025

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10-24-25 _____ JID # 190567 _____

INMATE: BARRY ALLES _____ POD: 19

Your correspondence from:

HumanRightsDefenseCenter/PrisonLegalNews Publishing

1028 N Federal HWY

Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☐ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix MD 21131

☐ Other:_____

Mail Tech: 2571 _____ White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAIL.REJFRM

## WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10-24-25                    JID # 202407060

INMATE: Mace Emler                            POD: 4

**Your correspondence from:**

Human Rights Defense Center/Prison legal News Publishing
1028 N Federal HWY
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                        Inmate Name, Inmate ID #
                        PO Box 247
                        Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2571          White–Inmate     Yellow–Return to Sender     Pink–Inmate file

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: Steven Gamez    JID # 202406909

INMATE: 10-24-25    POD: 23

**Your correspondence from:**

Human Rights DefenseCenter /PrisonLegal NewsPublishing
1028 N Federal Hwy
Lake Worth Beach FL 33160

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
    Inmate Name, Inmate ID #
    PO Box 247
    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2571    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAILREJFRM

# WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: 10-24-25          JID # 7749

INMATE: Benny Lucero          POD: A

**Your correspondence from:**

Human Rights Defense Center / Prison Legal News Publishing

1028 N Federal Hwy

Lake Worth Beach / FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☐ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other: _____

Mail Tech: 2571          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10-24-25          JID # 2024O6168

INMATE: BROTHER GONZALES    POD: 2

**Your correspondence from:**
Human Rights Defense Center / Prison legal news Publishing
1028 N Federal Hwy
Lake Worth Beach Fl 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2571    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAIL.REJFRM

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 10-24-25     JID # 214934

INMATE: Charles Espinoza     POD: 1

Your correspondence from:

Human Rights Defense Center/PrisonLegalNews Publishing
1028 N Federal Hwy
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
           Inmate Name, Inmate ID #
           PO Box 247
           Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2571     White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAIL.REJFRM

# WELD COUNTY JAIL — MAIL REJECTION NOTICE

DATE: 10-24-25             JID # 202511272

INMATE: Juana Espino                                    POD: 21

**Your correspondence from**:

Human Rights Defense Center/Prison Legal News Publishing
1028 N Federal Hwy
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
      Inmate Name, Inmate ID #
      PO Box 247
      Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2571        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

## WELD COUNTY JAIL          MAIL REJECTION NOTICE

DATE: 9/2/25                    JID # 202506367

INMATE: Benovidez, James                    POD: 1

**Your correspondence from:** Paul Wright

Prison Legal News Publishing

PO Box 1151

Lk Worth BCH, FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☒ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc… BOOKS

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix MD 21131

☐ Other:_____

Mail Tech: 2476          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM





WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

RECEIVED
SEP 10 2025

RECEIVED
SEP 1 0 2025

Paul Wright
Prison Legal News Publishing
PO BOX 1151
Lk Worth BCH, FL 33460

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 9/3/2025          JID # 202511272

INMATE: ESpino, Juana          POD: 21

**Your correspondence from**:

Paul wright Prism legal news Publishing
Po Box 1151 LK WORTH BCH FL 33460-1151

**is being rejected and returned to sender with the notice for the following reason(s):**

☐  Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc… _____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                               Inmate Name, Inmate ID #
                               PO Box 247
                               Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate     Yellow–Return to Sender     Pink–Inmate file



VELD COUNTY SHERIFF'S OFFICE

2110 O STREET

GREELEY CO 80631

**RETURN**
**REJECTED MAIL**



US POSTAGE

ZIP 80631  $ 0
02 4W
0000335769 SEP

Paul Wright

Prison legal news Publishing

PO BOX 1151

LK WORTH BCH FL 33460-1151

RECEIVED

SEP 10 2025

## WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: 9/3/2025           JID # 202407060

INMATE: Emler, Mace                        POD: 4

Your correspondence from:

Paul Wright Prison legal news Publishing
PO Box 1151 LK Worth BCH FL 33460-1151

_____

**is being rejected and returned to sender with the notice for the following reason(s):**

☐  Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc …_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                 Inmate Name, Inmate ID #
                 PO Box 247
                 Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396        White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAIL.REJFRM



## USPS MEDIA MAIL

PAUL WRIGHT
PRISON LEGAL NEWS PUBLISHING
PO BOX 1151
LK WORTH BCH FL 33460-1151

0001

08 26 2025

SHIP
TO:    MACE ELMER. #IN202506727

WELD COUNTY SHERIFF'S OFFICE

2110 O STREET

GREELEY CO 80631

US POSTAGE

ZIP 80631     $
02 4W
0000335769 SE

**RETURN
REJECTED MAIL**

Paul Wright
Prison legal news Publishing
PO Box 1151
LK Worth BCH FL 33460 - 1151

RECEIVED

SEP 10 2025

**WELD COUNTY JAIL**          MAIL REJECTION NOTICE

DATE: 9/3/2035          JID # 202407066

INMATE: Emler Mace          POD: 4

**Your correspondence from:**
Human Rights Defense Center
PO Box 451
Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material    2 pieces of mail

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 1201          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 334

28 AUG 2025AM 1 L

$0.05 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460

$0.73 0
US POSTAGE IMI
FIRST-CLASS
063S0012833388
FROM 33460



Mace Emler, IN202506727
Weld County Jail
2110 "0" Street
Greeley, CO  80631



Human Rights Defense Center, Inc.
PO
Lake Worth Beach, FL 33460

 



Mace Emler, IN202506727
Weld County Jail
2110 "0" Street
Greeley, CO  80631

**WELD COUNTY SHERIFF'S OFFICE**
**2110 O STREET**
**GREELEY CO 80631**

RETURN REJECTED MAIL

US POSTA

ZIP 80631
02 4W
0000335761

RECEIVED

SEP 1 0 2025

Human Rights Defense Center
PO Box 1151
Lake Worth Beach Fl
33460

**WELD COUNTY JAIL**                    MAIL REJECTION NOTICE

DATE: 9/3/35                    JID # 214934

INMATE: Espinoza, Charles    POD: 3

**Your correspondence from:**

Human Rights Defense Center

PO Box 1151

Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material          X-3 pieces of mail

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                Inmate Name, Inmate ID #
                PO Box 247
                Phoenix  MD 21131

☐ Other:_____

Mail Tech: 1201          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

09/24/2024 / MAILREJFRM

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460



WEST PALM BCH FL 334 $0.05 US POSTAGE IMI FIRST-CLASS 063S0012833388 FROM 33460

$0.73 US POSTAGE IMI FIRST-CLASS 063S0012833388 FROM 33460

28 AUG 2025 AM 1

Charles Espinoza, IN202506516
Weld County Jail
2110 "0" Street
Greeley, CO 80631



80631-953710

Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



Charles Espinoza, IN202506516
Weld County Jail
2110 "0" Street
Greeley, CO  80631



Human Rights Defense Center
PO Box
Lake Worth Beach, FL 33460





Charles Espinoza, IN202506516
Weld County Jail
2110 "O" Street
Greeley, CO  80631





US POSTA

ZIP 80631
02 4W
0000335786

WELD COUNTY SHERIFF'S OFFICE
2110 O STREET
GREELEY CO 80631

RETURN REJECTED MAIL

RECEIVED

SEP 10 2025

RECEIVED

SEP 10 2025

Human Rights Defense Center
PO Box 1151
Lake Worth Beach FL
33460

## WELD COUNTY JAIL                    MAIL REJECTION NOTICE

DATE: _4/3/85_                    JID # _202400161o5_

INMATE: _Gonzales, Brother_          POD: _2_

**Your correspondence from:**
_Human Rights Defense Center_
_PO Box 1151_
_Lake Worth Beach FL 33460_

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces

☐ Unknown substance on the paper/envelope

☒ Newspaper/Magazine clippings – Internet articles/material   _X 2 envelopes_

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc… _____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                    Inmate Name, Inmate ID #
                    PO Box 247
                    Phoenix  MD 21131

☐ Other:_____

Mail Tech: _1201_          White–Inmate   Yellow–Return to Sender   Pink–Inmate file

09/24/2024 / MAILREJFRM

**Human Rights Defense Center**
P.O. Box 1151
Lake Worth Beach, FL 33460

WEST PALM BCH FL 334
28 AUG 2025AM 1 L

$0.05 0
$0.73 0

Brother Gonzales, IN202506915
Weld County Jail
2110 "0" Street
Greeley, CO  80631



PO

Lake Worth Beach, FL 33460

Brother Gonzales, IN202506915
Weld County Jail
2110 "O" Street
Greeley, CO  80631

US POSTAGE

**WELD COUNTY SHERIFF'S OFFICE**
**2110 O STREET**
**GREELEY CO 80631**

RETURN REJECTED MAIL

RECEIVED

SEP 10 2025

Human Rights Defense Center
PO Box 1151
Lake Worth Beach, FL
33460

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 9/3/2025          JID # 202407060

INMATE: Emler, Mace          POD: 4

**Your correspondence from:**

Human Rights Defense center Inc
PO Box 1151 Lake Worth Beach FL 33460

---

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAILREJFRM

Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



Mace Emler, IN202506727



**WELD COUNTY SHERIFF'S OFFICE**

**2110 O STREET**

**RETURN**

**GREELEY CO 80631**     **REJECTED MAIL**

Human Rights Defense center Mc

Po Box 1151

Lake Worth Beach FL 33460

RECEIVED

SEP 10 2025

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 9/3/2025      JID # 402150

INMATE: Craven, Ricki          POD: C

**Your correspondence from:**

Human Rights Defense center inc

Po Box 1151 Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
    Inmate Name, Inmate ID #
    PO Box 247
    Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

06/02/2025 / MAILREJFRM



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460





Ricki Craven, IN202507091



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



Ricki Craven, IN202507091

WELD COUNTY

2110 O STREET

GREELEY CO 80631

RETURN
REJECTED MAIL



Human Rights Defense center inc

PO Box 1151

Lakeworth Beach FL 33460

RECEIVED

SEP 10 2025

## WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 9/3/2025                    JID # 74539

INMATE: Clark, Joshua                    POD: C

**Your correspondence from:**

Human Rights Defense Center inc
PO Box 1151 Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                       Inmate Name, Inmate ID #
                       PO Box 247
                       Phoenix MD 21131

☐ Other:_____

Mail Tech: 23 96          White–Inmate    Yellow–Return to Sender    Pink–Inmate file

Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460

Joshua Clark, IN202506629

WELD COUN

2110 O STREET

GREELEY CO 80631

**RETURN
REJECTED MAIL**

Human Rights Defense center inc

PO BOX 1151

Lake Worth Beach FL 33460

RECEIVED

SEP 10 2025

**WELD COUNTY JAIL** MAIL REJECTION NOTICE

DATE: 9/3/2025     JID # 202511272

INMATE: Espino, Juana     POD: 21

**Your correspondence from**:

Human Rights Defense center inc
Po Box 1151 Lake Worth Beach FL 33460

---

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material     *2 envelopes included*

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
        Inmate Name, Inmate ID #
        PO Box 247
        Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396     White–Inmate     Yellow–Return to Sender     Pink–Inmate file



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



Juana Espino, IN202503300




Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460





Juana Espino, IN202503300



WELD COUNT~

**2110 O STREET**

**GREELEY CO 80631**

RETURN
REJECTED MAIL

Human Rights Defense center inc

Po Box 1151

Lake worth Beach FL 33460

RECEIVED

SEP 10 2025

# WELD COUNTY JAIL MAIL REJECTION NOTICE

DATE: 9/3/2025 _____ JID # 34367 _____

INMATE: Benavidez, James _____ POD: 1 ___

**Your correspondence from:**

Human Rights Defense center inc

PO Box 1151 Lake Worth Beach FL 33460

---

**is being rejected and returned to sender with the notice for the following reason(s):**

☐  Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☑ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
　　　　　　　　　　　　　　　Inmate Name, Inmate ID #
　　　　　　　　　　　　　　　PO Box 247
　　　　　　　　　　　　　　　Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396 _____    White–Inmate    Yellow–Return to Sender    Pink–Inmate file



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



James Benavidez, IN202506367



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460



James Benavidez, IN202506367

WELD COUNTY SHERIFF'S OFFICE

2110 O STREET

GREELEY CO 80631

**RETURN
REJECTED MAIL**

Human Rights Defense center inc
· Po Box 1151
Lake Worth Beach FL 33460

RECEIVED

SEP 10 2025

# WELD COUNTY JAIL    MAIL REJECTION NOTICE

DATE: 9/4/2025    JID # 202406168

INMATE: Gonzales, Brother    POD: 2

**Your correspondence from**:

Human Rights Defense Center inc
PO Box 1151 Lake Worth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

□ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

□ Blank stationery, blank greeting cards, postage stamps and envelopes

□ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

□ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

□ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

□ Sexually explicit/provocative communication, photographs or drawings

□ STG related material / photos or contents of threats and/or plans of criminal activity

□ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

□ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

□ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

□ Letters with no return address (These letters will be returned to the Post Office)

□ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

□ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
Inmate Name, Inmate ID #
PO Box 247
Phoenix  MD 21131

□ Other:_____

Mail Tech: 2396    White–Inmate    Yellow–Return to Sender    Pink–Inmate file

Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460

Brother Gonzales, IN202506915



WELD COUNTY SHERIFF'S OFFICE

2110 O STREET

GREELEY CO 80631

RETURN REJECTED MAIL

Human Rights Defense Center inc

P o Box 1151

Lake Worth Beach FL 33460

RECEIVED

SEP 10 2025

**WELD COUNTY JAIL** MAIL REJECTION NOTICE

DATE: 9/3/2025     JID # 202406969

INMATE: Gamez-Briseno, Steven POD: C

**Your correspondence from:**
Human Rights Defense Center, inc
PO Box 1151 Lakeworth Beach FL 33460

**is being rejected and returned to sender with the notice for the following reason(s):**

☐ Money order/Cashier check(Must be payable to: **Weld County Sheriff's Office**)

☐ Blank stationery, blank greeting cards, postage stamps and envelopes

☐ Stickers/Lipstick/Ink pad stamps/Perfume on letter or envelope/Laminated cards /use of paints or paint pens/construction paper

☐ Greeting cards w/ Excessive glitter/Electronic devices-Ribbon/Cord-Any attached items or glued on parts or pieces - Unknown substance on the paper/envelope

☐ Not LEGAL mail

☒ Newspaper/Magazine clippings – Internet articles/material

☐ Sexually explicit/provocative communication, photographs or drawings

☐ STG related material / photos or contents of threats and/or plans of criminal activity

☐ Material advocating or inciting violence against anyone because of, but not limited to gender, sexual preference, race, ethnicity, religion, national origin, creed or disability.

☐ Entertainment materials– puzzles–fonts–coloring pages–animated character photos Music lyrics–graphic art photos– etc…_____

☐ Letter(s) enclosed must be for the inmate whose name appears on the envelope.

☐ Letters with no return address (These letters will be returned to the Post Office)

☐ Anything that could reasonably threaten the safety and security of staff, visitors, inmates or the facility.

☐ Inmate personal mail address: Weld County Sheriff-North Jail Complex, CO
                                Inmate Name, Inmate ID #
                                PO Box 247
                                Phoenix  MD 21131

☐ Other:_____

Mail Tech: 2396     White–Inmate    Yellow–Return to Sender    Pink–Inmate file



Human Rights Defense Center, Inc.
PO Box 1151
Lake Worth Beach, FL 33460





Steven Gamez-Briseno, IN202506848



Human Rights Defense Center
PO Box 1151
Lake Worth Beach, FL 33460







Steven Gamez-Briseno, IN202506848



**WELD COUN**

**2110 O STREET**

**GREELEY CO 80631**

**RETURN
REJECTED MAIL**

Human Rights Defense center

PO Box 1151

Lakeworth Beach FL 33460

RECEIVED

SEP 10 2025

SEP 10 2025

# Prison Legal News

## PUBLISHED BY THE HUMAN RIGHTS DEFENSE CENTER

**VOL. 36 No 1**
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

**January 2025**

# Fines and Fees Destroy the Impoverished and Perpetuate Mass Incarceration

*by Douglas Ankney*

EXHIBIT

1-D

exhibitsticker.com

*"I was young. I couldn't pay for my ankle monitor. I went to jail because I couldn't pay for my ankle monitor. And then they let me back out again on my ankle monitor that I couldn't pay for."*—Dante Bristow, 23, who was arrested in Kansas at age 13 for stealing groceries after his family's food stamps ran out.

In America, justice-impacted individuals and their families are often caught in a vicious cycle when they are released with conditions requiring payment of fines, along with fees for probation and electronic monitoring (EM), only to be reincarcerated for failure to pay those charges—and then re-released with the burden of additional fines and fees they cannot pay.

While fines and fees are imposed upon both civil and criminal defendants, there is a distinction. Fines imposed upon a criminal conviction are intended for deterrence and/or punishment, whereas civil fees are generally intended to raise revenue.

A particularly pernicious "pay to stay" legislation allows Florida courts to charge prisoners up to $50 per day for their incarceration—based on the length of the sentence, not how much of it is served. That's how former prisoner Shelby Hoffman ended up owing $127,500 for a 10-year sentence despite getting an early release in 2015 after just 10 months behind bars.

"I was completely shocked that a judge could modify every term in my [sentencing] packet, in my court case, but you charge me for a cell I didn't occupy?" Hoffman said. "I felt so tricked. And so fooled."

Elected officials who campaign on "tough-on-crime" measures while simultaneously promising tax cuts fuel the criminal justice system's growth and simultaneously starve it of resources. As a result, the list and amount of fees charged for such things as court processing, public defenders, prosecution, jail and probation/parole supervision continue to grow.

"Offender" or "user" fees supporting the punishment system have ballooned over the last four decades. Often these fees are used by cash-strapped communities to support functions unrelated to the justice system. After the fatal 2014 shooting of Michael Brown in Ferguson, Missouri, the U.S. Department of Justice (DOJ) investigated the city police department and found that officials pushed fee increases to boost revenue. Tony Messenger, a *St. Louis Post-Dispatch* columnist, won a Pulitzer Prize in 2019 for exposing "the injustice of forcing poor rural Missourians charged with misdemeanor crimes to pay unaffordable fines or be sent to jail"—including a woman who amassed nearly $16,000 in legal financial obligations from a stay in prison for stealing an $8 tube of mascara from a Walmart.

Perhaps most egregiously, these fees are often partially diverted to profit private firms contracted to provide the services. Private-prison operator GEO Group, Inc. markets an extensive array of services under its "alternatives to detention" program, including $337.8 million in 2023 revenues from its "Intensive Supervision Appearance Program"—an exclusive, five-year, $2.2 billion contract to provide federal Immigration and Customs Enforcement (ICE) with monitoring of immigrants using GPS trackers and a connected mobile app known as SmartLINK.

## Fines and Fees Everywhere

Florida's Department of Corrections (DOC) is only one of 43 state prison systems that charge prisoners for their own incarceration. Rutgers University sociologist Brittany Friedman broke down these fees into two broad groups in a 2020 study for the *Journal of Contemporary Criminal Justice* (JCCJ)— one consisting of fees for room and board, and another for specific service fees, like medical visit copays. Franz Kafka could not have imagined a more sinister world, one in which a prisoner is charged a per diem

## INSIDE

| | |
|---|---|
| From the Editor | 9 |
| Biden Commutes Fed. Death Sentences | 16 |
| Va. Prisoners Set Themselves on Fire | 19 |
| $400,000 for Ala. Prisoner's Lost Toes | 29 |
| Wellpath Declares Bankruptcy | 31 |
| PTS Driver's Conviction Upheld | 36 |
| 4-mo. Wait for Psych. Eval. In S.C. Jails | 38 |
| 150 Sue Over Abuse in NYC Juv. Det. | 41 |
| $1.5m for Ore. Prisoner's Untreated TBI | 43 |
| $12m for Exonerated Ind. Prisoner | 46 |
| Ky. Sheriff Charged in Judge's Murder | 51 |
| Jailed Rappers Stabbed During Atlanta Trial | 53 |
| News In Brief | 62 |



### *The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act*

**John Boston**          ☐ **Prisoners $84.95**    ☐ **Lawyers/Entities $224.95**

ISBN-13: 979-8-9854138-0-9 • Paperback, 576 pages

The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act is the best and most thorough guide to the PLRA provides a roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims.



### *Prison Education Guide*                                        *$24.95*

**Christopher Zoukis**

ISBN: 978-0-9819385-3-0 • Paperback, 269 pages

Prison Education Guide is the most comprehensive guide to correspondence programs for prisoners available today. This exceptional book provides the reader with step by step instructions to find the right educational program, enroll in courses, and complete classes to meet their academic goals. This book is an invaluable reentry tool for prisoners who seek to further their education while incarcerated and to help them prepare for life and work following their release.



### *The Habeas Citebook: Ineffective Assistance of Counsel, Second Edition*        *$49.95*

**Brandon Sample & Alissa Hull**

ISBN: 978-0-9819385-4-7 • Paperback, 275 pages

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



### *Disciplinary Self-Help Litigation Manual, Second Edition*        *$49.95*

**Dan Manville**

ISBN: 978-0-9819385-2-3 • Paperback, 355 pages

The Disciplinary Self-Help Litigation Manual, Second Edition, by Dan Manville, is the third in a series of books by Prison Legal News Publishing. It is designed to inform prisoners of their rights when faced with the consequences of a disciplinary hearing. This authoritative and comprehensive work educates prisoners about their rights throughout this process and helps guide them at all stages, from administrative hearing through litigation. The Manual is an invaluable how-to guide that offers step-by-step information for both state and federal prisoners, and includes a 50-state analysis of relevant case law and an extensive case law citation index.



### *The Habeas Citebook: Prosecutorial Misconduct*        *$59.95*

**Alissa Hull**

ISBN-13: 978-0-9819385-5-4 • Paperback, 300 pages

The Habeas Citebook: Prosecutorial Misconduct is the second in PLN Publishing's citebook series. It's designed to help pro se prisoner litigants identify and raise viable claims for potential habeas corpus relief based on prosecutorial misconduct in their cases. This invaluable title contains several hundred case citations from all 50 states and on the federal level, saving readers many hours of research in identifying winning arguments to successfully challenge their convictions.

---

☐ The PLRA Handbook

☐ Prison Education Guide

☐ The Habeas Citebook

☐ Disciplinary Self-Help Litigation Manual

☐ The Habeas Citebook: Prosecutorial Misconduct

Order by mail, phone, or online.    Amount enclosed _____

By: ☐ check  ☐ credit card  ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

**Prison Legal News**

*a publication of the*
*Human Rights Defense Center*
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Chuck Sharman

**STAFF WRITER**
Samuel Rutherford

**COLUMNISTS**
Michael Cohen, Mumia Abu-Jamal

**CONTRIBUTING WRITERS**
Anthony W. Accurso, Douglas Ankney,
Casey Bastian, Matthew Clarke,
Jo Ellen Nott

**ADVERTISING COORDINATOR**
Cornelia Smith

**HRDC LITIGATION PROJECT**
Jonathan Picard—*Litigation Director*
Andrew Free—*Staff Attorney*

***PLN* is a monthly publication.**

A one year subscription is $36 for prisoners and individuals, and $96 for lawyers, institutions and foreign subscribers. Prisoner donations of less than $36 will be pro-rated at $3.00/issue. Do not send less than $20.00 at a time. *PLN* accepts credit card orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. *PLN* is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News**
**PO Box 1151**
**Lake Worth Beach, FL 33460**
**561-360-2523**
**info@prisonlegalnews.org**
**www.prisonlegalnews.org**

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## FINES AND FEES cont'd

for a "room" that is actually a thin plastic mat inside a hard plastic "boat" docked in a hallway; or for "board" that consists of garbage food past its expiration date which has been repackaged to avoid health department scrutiny, in what is known as the "secondary food market," as *PLN* reported. [See: *PLN*, Feb. 2023, p.26.]

Beyond the low level of medical care that courts have deemed constitutionally sufficient for prisoners, those in at least 35 states are charged copays for medical visits that average $2 to $8 per visit—a princely sum for prisoners paid pennies an hour for their labor while incarcerated, if at all. In Texas, state prisoners are paid exactly nothing for jobs they are forced to do while each medical visit costs them a $13.55 copay.

Adding other specific service fees for some programming, Friedman argued, plus even more fees for phone calls, strands prisoners and detainees in a legal limbo where they are guilty of "criminal conduct" while also causing "civil damages"—which survive their deaths to become obligations passed on to their heirs. That's how tax refunds can be seized for unpaid "pay to stay" fees in Illinois; how retiree pensions can be garnished in Michigan; and how even disability benefits can be snatched by Missouri's DOC. Unsurprisingly, Friedman found in 2019 that 10 million people owed a total of $50 billion in accrued incarceration debt. *See: Unveiling the Necrocapitalist Dimensions of the Shadow Carceral State: On Pay-to-Stay to Recoup the Cost of Incarceration*, JCCJ (Oct. 21, 2020).

Electronic monitoring and associated fees have also become both ingrained and ubiquitous within the U.S. criminal justice and civil immigration systems. But tracking data is not abundant on the number of people on electronic monitoring. "Unlike jail and prison data, there's no federal effort to track even partial information on electronic monitoring," said Jacob Kang-Brown, a senior research fellow at the nonprofit Vera Institute of Justice. Over a five-year period, VERA researchers contacted all 50 states and about 800 counties, collecting data from more than 500 of them, along with federal courts, the federal Bureau of Prisons (BOP) and ICE.

As VERA then reported in January 2024, data extrapolated from that research showed that from 2005 to 2021 the number of people on EM increased almost 500%, from around 53,000 in 2005 to more than 250,000 in 2021. Just one year later, in 2022, the number of people subject to EM rose to nearly half a million—a 1,000% increase over the number in 2005. Immigration accounted for roughly 67% (360,000) of that EM population, monitored for ICE under its Intensive Supervision Appearance Program (ISAP), with the remaining 140,000 in the criminal justice system. *See: People on Electronic Monitoring*, VERA (Jan. 2024).

Due to what is often described as an "explosion" in the number of immigrants entering the U.S. and corresponding pressure on the Presidential administration to track every immigrant not confined in a detention center, ICE became responsible for the overwhelming majority of the EM industry's growth. Naureen Shah, deputy director of government affairs at the Equity Division of the American Civil Liberties Union (ACLU), observed that these EM "alternatives to detention" have simply made it easier than ever for ICE to conduct "24-hour suspicionless surveillance" of people who would likely have been released on their own recognizance. Shah said, "The problem always was that [electronic monitoring] wasn't really functioning as an alternative to detention. It was just enlarging the subset of people that ICE was keeping tabs on."

According to the VERA report, EM in its "most well-known form" consists of wearable monitors—often attached to ankles or wrists—which provide tracking via Global Positioning System (GPS), radio frequency (RF) or Secure Continuous Remote Alcohol Monitoring (SCRAM). Although a government agency could buy the equipment and administer an EM program, it usually contracts with a private vendor to supply the technology and also notify the agency of potential violations. On top of that, recent years have seen development of new supervision technologies that don't require wearing any physical device at all; these include cellphone apps with location tracking, facial recognition and voice-verification.

### Only Seven States Lack Laws to Impose EM Fees

In another report released on September 14, 2022, the nonprofit Fines and Fees Justice Center (FFJC) found that 43 states have statutes or rules authorizing EM fees,

## FINES AND FEES cont'd

including 29 that impose the charges during both pretrial and post sentencing phases. Of the rest, 13 states authorize EM fees during the post-sentencing but not pretrial phase; New Jersey is the only state that authorizes EM fees at the pretrial stage but does not have a statute authorizing electronic monitoring fees at post-sentencing phase. Only 2 states prohibit EM fees, including California, where they are expressly prohibited, and Rhode Island, whose prohibition includes an exception for EM fees imposed as part of a criminal sentence.

The District of Columbia and six states—Hawaii, New Hampshire, New Mexico, New York, Oregon and Vermont—do not have statutory authority for EM fees, though this does not mean EM fees are not collected in those jurisdictions. For example, New York case law holds that an "implicit authorization exists, absent legislation to the contrary." At least 26 states have statutes or rules that impose fees to cover the costs of an EM program but are vague as to specific amounts (e.g., authorizing "rea-sonable fees"). Only in Illinois, Kentucky, Missouri and Nevada do statutes mandate consideration of a person's ability to pay be-fore imposing EM fees both in the pretrial and post-sentencing phases; in 23 states, disturbingly, there is no statutorily required ability-to-pay assessment before imposing EM fees. *See: Electronic Monitoring Fees: A 50-State Survey of the Costs Assessed to People on E-Supervision*, FFJC (Sep. 2022).

Introduced as an "alternative to incar-ceration," EM is often "not accompanied by a reduction in physical detention," VERA reported. Rather, "EM often serves to expand surveillance and control over people who would otherwise be free." In this way, EM has created a class of prison-ers "confined and surveilled" without walls and fences, with "onerous restrictions" placed on their lives. They report "vague and overlapping rules" and a difficulty obtaining approval for ordinary tasks like going gro-cery shopping or to religious services—even dropping their children off at school.

In many cases, EM programs are completely participant-funded, charging high fees to those monitored that ends up saddling them with long term debt. Because of this, people on EM have described how the technology presents barriers to employ-ment—most often with damaged credit reports—and thus negatively impacts their self-perception and personal relationships, even as their financial security diminishes.

"Finally, EM compromises people's pri-vacy and presents a threat of incarceration," the VERA report noted. More Orwellian monitoring devices have two-way commu-nication capabilities, permitting supervising parole and probation officials to eavesdrop on their clients' private lives. EM programs can also require Fourth Amendment waivers for participants, who thus provide consent to frequent warrantless searches of their home and property. Violations of any EM conditions—from failure to timely pay fees to simply forgetting to charge the battery— can be punished with incarcera-tion, "making EM a tripwire back into jail."

### A Texas Prisoner's Release Plans Run Off the Road

Like most prisoners nearing release, Craig Caudill had a plan for his life. While incarcerated by the Texas Department of Criminal Justice (TDCJ), he put his time to

# Great Self-Help Books



Encyclopedia of Everyday Law
$34.99



Criminal Law A Desk Reference
$44.99



Represent Yourself in Court
$39.99



Win Your Personal Injury Claim
$34.99

**Order from Prison Legal News**
Add $6 shipping for orders under $50

**Prison Legal News**
PO Box 1151
Lake Worth Beach, FL 33460
Phone: 561-360-2523
www.prisonlegalnews.org



Criminal Law Handbook
$49.99



Legal Research
$49.99



Deposition Handbook
$34.99

**NOLO** YOUR LEGAL COMPANION

good use by completing a commercial truck driver's licensing program in Huntsville and was eventually entrusted to drive trucks for TDCJ after completing the program. He was excited about entering the field of commercial trucking with its a high job demand, plus it paid well. But four days prior to his parole, Caudill discovered he would be confined to his home for 18 months, with only a few exceptions, none of which permitted him the travel necessary to hold the trucking job.

His truck-driving plans scrapped, Caudill had to come up with a new plan. But that would be no easy task for someone required to wear a GPS ankle monitor that tracked his location and movements by the minute. Other stipulations placed on Caudill while he was subject to EM included: (1) submitting a proposed schedule of his whereabouts to his parole officer every two weeks; (2) getting permission to grocery shop, but not for more than one hour once per week; and (3) having his attendance at doctor's appointments and job interviews conditioned upon requesting and receiving prior approval at least a week in advance.

"If a job calls you and says, 'We would like to see you tomorrow, come in and talk to us,' you can't," Caudill said. "If they give me one hour to go to the grocery store, and I get stuck in traffic and can't move, it doesn't matter." In fact, if he arrived home one minute past that hour, his parole officer was automatically notified. The overly restrictive requirements caused Caudill to feel as if he had less freedom than he did while imprisoned; at least TDCJ permitted him to drive its trucks across Texas. The EM caused him to live in a constant state of anxiety, fearing that an unforeseen situation would trigger an alarm that would land him back in prison.

Caudill's fears were not unwarranted. EM devices often malfunction, and in many cases cause the person monitored to be reincarcerated. According to the ACLU, these malfunctions include "audio defects, faulty batteries, and/or an inability to connect to Wi-Fi." One former prisoner in Michigan was returned to a cell after his ankle monitor failed to maintain a charge. Ankle monitors are also reported to cause long-term health impacts, including pain and discomfort, swelling, numbness, bruising, blistering, sores. Some even report electronic shocks.

Owing to device malfunctions, Caudill often received calls in the night from the EM company or TDCJ, inquiring where he was because the device had sent an alert indicating he had tampered with it or that he was not home. Kang-Brown aptly stated the obvious: "People coming home from prison and jails need support, not threatening restrictions. Policymakers should not let private companies profit from unproven new technologies at the cost of people's freedom."

### When Ability to Pay a Fee Determines Success or Failure

FFJC also noted in its report: "Broad language in state statutes and rules often gives local governments considerable latitude in determining how much to charge." Its review of 31 jurisdictions with EM programs found fees ranging up to $40 per day. Even within states, EM daily fees varied widely; Minnesota's Ramsey County, for example, did not charge participants a fee related a fee, while 75 miles away in Steele County, the charge was $20 per day. A report from the Brennan Center for Justice put EM fees anywhere from $150 to $900 per month—with some as high $1,200 per month.

Some EM promoters claim that shifting the bill from the government to individuals is a feature, not a bug. One EM provider's website bragged of saving West Virginia $25,000 per year per offender by such cost-shifting. In Virginia's Fairfax County—among the country's wealthiest—the Office of Sheriff Stacey A. Kincaid reported in 2019 that its work-release program using EM "saved the county over $600,000 in incarceration costs" while spending none of it on program participants; instead, they ponied up $60,000 for their own monitoring.

As FFJC pointed out: "The vast majority of people arrested and prosecuted are those least likely to be able to afford these fees." Adults with incomes at or below the poverty line are three times more likely to be arrested than others. Even expanding the range to 150% of the federal poverty level means they are "15 times more likely to be charged with a felony." People on probation are also typically low-income, with 60% earning less than $20,000 a year and 38% less than $10,000 a year. For these people, such fees "require choices between such necessities like food and rent for their families or paying the fees to avoid incarceration

or other continued involvement with the criminal justice system."

In LaPorte County, Indiana, an EM participant got drunk and turned himself into the jail because he could not afford his probation fees. Another Indiana woman from Lawrence County was ordered to pay $20 monthly on a bill of $8,363—a payment schedule that will require her to make payments for 35 years. In this way, EM fees don't reduce but instead perpetuate the carceral state

The FFJC succinctly sums up this dynamic: "At the back end of the system, people may be placed in EM programs as a condition of a sentence that includes probation, parole, or some other form of community release," FFJC noted. But associated fees "can lead to revocation of probation, parole, or release, either because the fees themselves are a condition of the sentence or because failure to pay leads to noncompliance with the court-ordered program." However, when the ability to pay a fee determines success or failure on probation or parole, "we have a justice system that effectively reinforces economic and social inequity and conditions liberty, not on behavior, but on finances."

"Ultimately," the group reported, "those with limited financial means can be incarcerated while those with resources can pay to go free."



**SALE**

900+ pages
$84.95
s/h included
**PRICE DROP!!**

**The Colossal Book of Criminal Citations
(7th Edition) By: Richard Davis**

- 6600+ Supreme, Circuit, District, and State Court Citations
- 200+ Topics Covering Pretrial through Post-Conviction Events
- 500+ Legal Definitions, W/Sample Motions, Juror Questions, Trial Strategies, and MORE!
- 8.5 x 11 Soft Cover

**FREE!!** PCR, IAC, and Habeas Checklists only on our website.

**NEW**

560+ pages
$84.95
s/h included

**The Colossal Book of Civil Citations
(3rd Edition) By: Richard Davis**

- 2700+ Supreme, Circuit, District, and State Court Citations
- 140+ Topics
- 500+ Legal Definitions
- 30+Sample Motions
- Select Federal Statutes
- 8.5 x 11 Soft Cover

Send Check or M.O. to Barkan Research
PO Box 352, Rapid River, MI 49878
(906) 420-1380
Credit Cards accepted
Website: www.barkanresearch.com

---

**FINES AND FEES cont'd**

### The Illustrative Case of Thomas Barrett

Georgia resident Thomas Barrett became addicted to the drugs he dispensed as a pharmacist, costing him his job, his family and leaving him homeless. By April 2012, he had attained a subsidized $25-a-month apartment in Augusta. With food stamps his only regular source of income, he regularly sold his blood plasma to pay the rent. But after Barrett stole a $2 can of beer from a convenience store, he represented himself on the charge in court because indigent defendants in the county were assessed a $50 fee for the services of a public defender. That was $50 he did not have. Barrett was fined $200 and sentenced to 12 months probation with EM under the supervision of the private probation company Sentinel Offender Services.

Despite his probated sentence, Barrett spent two months in jail because he could not afford Sentinel's $80 startup fee. He was released from jail after persuading his Alcoholics Anonymous sponsor to pay it. Subsequent EM fees cost Barrett $12 per day in addition to $39 per month that he paid to a private probation provider— a total nearly $400 per month. While that's a hefty sum for most people, it was completely unmanageable for a man selling his blood plasma to pay his monthly $25 rent. Barrett explained, "Basically, what I did was, I'd donate as much blood plasma as I could and I took that money

and I threw it on the leg monitor. Still, it wasn't enough."

To save money, Barrett skipped meals and did without essentials such as laundry detergent and toilet paper. But missing meals left him too weak to sell blood plasma. By February 2013, he had fallen $1,000 behind on his fees—five times the amount of his $200 court fine. Sentinel filed a technical violation against Barrett for failing to keep up with the fine and fees, and his judge sentenced him to a year in jail for the violation. "I should not have taken that beer," Barrett later allowed to *NPR News*. "I was dead wrong. [But] to spend 12 months in jail for stealing one can of beer? It just didn't seem right."

### Multiplying Fees, Expanding the Carceral State

It's important to note that while EM fees are often exorbitant they are not the only such fees driving mass incarceration. As of September 2023, probation and parole departments in 48 states charge clients for their own supervision while 49 states allow or require EM costs to be passed on to participants. Parole supervision for those convicted of misdemeanors in over 1,000 courts were assigned to private, for-profit companies—a nationwide caseload that runs to hundreds of thousands. A 2014 Human Rights Watch (HRW) report found that "the day-to-day reality of privatized probation sees many courts delegate a great deal of responsibility, discretion and coercive power—sometimes inappropriately—to their probation companies."

*See: Profiting from Probation—America's "Offender-Funded" Probation Industry*, HRW (Sep. 2014).

In 2014, in Barrett's home state of Georgia alone, approximately 80% of misdemeanor convicts sentenced to probation were supervised by private probation companies. Those companies collected $40 million in fees from people convicted of petty offenses like illegal lane changes, drunk driving, running stop signs and trespassing. But private companies have profit motives to expand probation conditions, lengthen terms of probation and incarcerate their "clients" in order to extort money from them and their families. Instead of seeking the probationer's rehabilitation and safe presence in the community, the goal for these private probation officers turns to prolonging probation and collecting fees.

Former DOJ Attorney Phil Telfeyan, who is now the executive director of the nonprofit Equal Justice Under Law, has filed numerous class-action lawsuits since 2015, accusing local officials and the companies with whom they work of extorting probationers and pretrial arrestees. Telfeyan reported that the vast majority of his clients faced misdemeanors and had their cases dismissed—only then to be left in dire financial straits due to EM fees. Some of his clients pled guilty simply to get from beneath the burden of the fees. Other clients testified they've been driven from their homes after being unable to pay both rent and EM fees. Telfeyan said it's "a myth" that everyone on EM would otherwise be in jail: "I don't see it as reducing the jail

## ★ THE KANSAS CITY STAR ★

### MO PAYS MILLIONS TO WOMEN RAPED BY CHILLICOTHE PRISON GUARD

KW Attorneys Susan McGraugh and Brendan Roediger have successfully secured $20 million for 4 female prison inmates abused by a corrections officer.

If you're a victim of correction officer sexual assault, we're here to fight for your civil rights!



KHAZAELI WYRSCH

314.288.0777 | intake@kwlawstl.com
911 Washington Ave., Suite 211, St. Louis, MO 63101

The choice of a lawyer is an important decision and should not be based solely upon advertisements.

population," he said. "I see it as simply applying to people who were very likely to have been released in a prior world [before EM became ever-present], but now are just released with this expensive ankle monitor."

While it is true that the growing use of EM in America coincided with an overall downtick in incarceration, there is evidence to support the view held by Telfeyan, Shah and others. In 2021, VERA researchers found that the majority of counties with EM rates higher than the median also had jail populations above the median. Between 2020 and 2021 in Detroit, for example, the number of people on EM increased by 41%, even as the number of people sitting in jail on any given day increased by 60%. Though the technology is framed by its proponents as a tool for criminal justice reform, VERA's research suggests it's simply used instead as a means to expand the carceral state.

### Pay to Stay Fees
### Efforts to Rein in Fees

Amid all of this, there is a hopeful and growing movement to eliminate EM and associated fees and fines to make the justice system more equitable for all. As VERA reported, "Advocacy and movement-based policy demands against EM had been circulating long before the coronavirus pandemic," going back at least to 2014, when a coalition gathered to protest the Wisconsin DOC's EM program—"an event that was likely the earliest major protest against EM in the United States," according to tracking by another nonprofit, MediaJustice. Around the same time, prominent activist and researcher James Kilgore published a critical assessment of EM, which provided the foundation for "Challenging E-Carceration," a national initiative he cofounded with Emmett Sanders to fight EM and other forms of criminal legal system surveillance.

As *PLN* reported, a landmark 2015 ruling by the Supreme Court of the U.S. established that attaching a monitor to released North Carolina prisoner Torrey Dale Grady could qualify as an unreasonable search and seizure under the Fourth Amendment if it was used to track his movements simply because he was a convicted sex offender. [See: *PLN*, June 2015, p.51.]

In Wisconsin, people ordered to wear a GPS monitor for the rest of their lives after being released from prison argued that the sentence violated their constitutional rights. In several other states, including Arizona and California, plaintiffs challenged the fairness of fines and fees imposed by publicly and privately administered EM programs. More recently, as ICE has expanded EM, advocates have filed lawsuits citing privacy concerns with the program.

In several states, legislative reform efforts accompanied anti-EM litigation—in Indiana in 2018 and New York in 2019, where bail reform also banned the use of government funds to pay private EM providers. That effectively shut down expansion of EM in New York. Illinois's 2021 Pretrial Fairness Act made it the nation's first state to require data collection on post-prison EM. The law also contained important provisions to guarantee a minimum level of mobility for completing essential tasks, require judges to review EM sentences for applying less restrictive conditions and making sure that pretrial EM days were credited toward a prison sentence. VERA credited these and similar efforts with mitigating GPS monitoring growth.



### REQUIRED TO REGISTER?
### YOU NEED THIS BOOK!!

## $24.95

**FORMER LAWYER BREAKS DOWN THE REGISTRY OF EVERY STATE:**
- STATE BY STATE ANALYSIS
- FIND YOUR TIER IN EACH STATE
- ADDITIONAL VALUABLE INFORMATION FOR EACH STATE
- DISCRETE BOOK TITLE AND COVER!

"It helped me decide where to live after my conviction"
- Jon
Registrant

"I was finally able to figure out my tier in every state!"
- C.C.
Federal Inmate

"So much information, I highly recommend this book"
- Miguel Tovar, Esq.
Attorney

**Order online at:**
https://tinyurl.com/MFPLN2024
**(links to Amazon)**

**OR**

**Mail check/money order to:**
Your PA, LLC
Attn: Orders - PLN
30 N Gould St., Suite 34451
Sheridan, WY 82801
**(*Include Shipping info and $5 for S&H)**



All New Catalog Vol. 4. Our full color catalog has product listings of our prisoner publications: books, photo services, high quality gifts and holiday selections too! Catalog includes complete detailed ordering information, forms and more. All pages featured in detailed full color photographs on 5.5" x 8.5", 92 pages with full descriptions & prices. **$5.00**

**Freebird Publishers**
**221 Pearl St. Ste. 541 N. Dighton MA 02764**

---

### FINES AND FEES cont'd

A 2023 DOJ report called on states to scrap fines and fees charged to parents when their kids are convicted of crimes. Far fewer well-off parents are held to account by such laws than the number of low-income families saddled with "weighty financial burdens" that leave them trapped "in a cycle of poverty and punishment that can be nearly impossible to escape." Among the fees that DOJ targeted were those for court-appointed attorneys, ankle monitors, probation supervision and the cost of time spent in juvenile hall, which are disproportionately charged the Black and brown families and can amount to thousands of dollars per case. Wrote Associate Attorney General Vanita Gupta:

"Eliminating the unjust imposition of fines and fees is one of the most effective ways for jurisdictions to support the success of youth and low-income individuals, honor constitutional and statutory obligations, and reduce racial disparities in the administration of justice." *See: Fines and Fees Letter from AAG Gupta*, DOJ (Dec. 2023).

---

**Are Phone Companies Taking Money from You and Your Loved ones?**

HRDC and PLN are gathering information about the business practices of telephone companies that connect prisoners with their friends and family members on the outside.

Does the phone company at a jail or prison at which you have been incarcerated overcharge by disconnecting calls? Do they charge excessive fees to fund accounts? Do they take money left over in the account if it is not used within a certain period of time?

We want details on the ways in which prison and jail phone companies take money from customers. Please contact us, or have the person whose money was taken contact us, by email or postal mail:

**HRDCLEGAL@HUMANRIGHTSDEFENSECENTER.ORG**



**Human Rights Defense Center**
Attn: Legal Team
PO Box 1151
Lake Worth Beach, Florida 33460

---

### Taking Aim at Juvenile Fines and Fees

Gupta's directive followed an earlier DOJ letter outlining constitutional and public policy concerns related to low-income adult and juvenile offenders saddled with court system-related debt that crippled their futures: "When fines and fees are assessed against juveniles, the consequences to youth and their families can be particularly acute, with the potential to push young people further into the criminal justice system, drive children and their parents into debt, and put considerable strain on familial relationships. In many cases, unaffordable fines and fees only undermine public safety by impeding successful reentry, increasing recidivism, and weakening community trust in government."

As of November 2024, the nonprofit Debt Free Justice counted Delaware, Illinois, Maryland, Montana, New Jersey, New Mexico, New York, Oregon and Washington where juvenile fines and fees have never been charged or have been abolished. The "Families Over Fees Act," passed in California in 2020, eliminated 23 categories of criminal justice system fees, including those charged for public defenders, arrests and bookings, parole and probation supervision, home detention, EM and work furlough programs. A growing number of other states are passing similar reforms. State Sen. Wendy DeBoer of Nebraska, where lawmakers are nonpartisan, introduced a bill that would presume all children up through age 18 are indigent and exempt them from fees resulting from criminal justice involvement. The bill failed in April 2024, but not before she told colleagues: "Our justice system— particularly our juvenile justice system—should operate to promote safety, rehabilitation, and meaningful accountability without regard to an individual or family's wealth or lack thereof."

A recent Brennan Center for Justice report also proposed some solutions applicable to fees charged to both adults and juveniles— the clearest and most sensible being the requirement that local governments, not the people being supervised, pay associated fees. Some localities, including California's San Francisco County and Maryland's Baltimore County, have already taken this step. Since successful completion of probation and/or reentry from prison benefits the entire community, such a policy is only fair.

---

### The Path Going Forward

FFJC has created a movement to rid the criminal justice system of fines and fees and the devastation imposed upon those incarcerated and their families. With campaigns in Florida, Nevada, New York and New Mexico, it has "developed broad-based coalitions from across the political spectrum including grassroots organizations, judges, public defenders, prosecutors, legislators, law enforcement, and faith-based and advocacy organizations."

In California, state juvenile detention fees were abolished. Los Angeles County got rid of $90 million in debt owed for those fees. Illinois imposed uniformity in fees across the state and expanded fee waivers for the impoverished. Additionally, the newly created Illinois Office of Statewide Pretrial Services began overseeing EM in participating counties and paying the associated costs for those defendants ordered to wear GPS tracking devices.

VERA has also made several recommendations related to EM, including creating a national reporting requirement to the federal government and maintaining standardized data at local, state and federal agencies. VERA further recommended that private companies should not run EM programs; that the government should provide greater oversight of EM technologies, especially smartphone apps and wristwatch devices with biometrics; that EM conditions should be the least restrictive as possible; that agencies administering EM programs should eliminate user fees; that time served on EM pretrial should count toward any future sentence; and that use of detention should be restricted as a punishment for violating EM conditions.

But much work is yet to be done. In 2022, the National Center for Access to Justice at Fordham Law School developed a Fines and Fees Index, which assigned each state a score on a scale of 0 to 100 related to the justice of the state's fines and fees legislation. No state received a passing score.

It's easy to become disheartened with the present system, which will persist in some form well into the foreseeable future. But how that future system appears depends in large measure on how we fight today. ◪

Additional sources: *Fast Company, Indianapolis Star, WFTS*

---

# From the Editor

*by Paul Wright*

Since our inception in 1990 the Human Rights Defense Center has focused on the financial exploitation of prisoners and their families in particular and poor people in general by the American criminal justice system. A sad commentary on the state of political affairs in the USA today is that what was an outrage back then can only be thought of as the "good old days" today in terms of financially exploiting people enmeshed in the criminal justice system.

A lot of our news coverage and advocacy focuses around prison slave labor, the cost of phone calls, video calls, commissary items and similar issues. This month's cover story takes a look at fines and fees imposed on criminal defendants at the front end of the criminal justice system. This trend started in the 1980s as a Libertarian idea which was basically to shift the cost of the police state onto the backs of the policed. One criminologist noted that mass incarceration is the most thoroughly implemented social experiment in American history. The big question with massive social experiments is who is going to pay for them? In an era of tax cutting for the wealthy and corporations, we knew who wasn't going to pay for it.

Making the poorest people in America pay for the privilege of being surveilled, policed, arrested, prosecuted, caged and even killed by the government was the solution to this. Given the immense cost of running the biggest police state in world history it is unlikely that fines and fees alone would pay for the massive expenditures required to have millions of cops, judges, prosecutors and guards policing and caging several million people each year. But what it has done, very well, is it further impoverishes and immiserates an already poor population and provides the excuse to surveil and criminalize people because of their poverty.

Recent years have seen some modest efforts at challenging these fines and fees, debtors' prisons and other forms of financial exploitation but while some progress has been made, much more remains to be done.

Other factors driving up the cost of running the police state range from un/underfunded pension funds, rising costs of living that make it increasingly difficult to hire and retain prison and jail guards on low wages, increasing medical costs, bloated and inefficient policing and staffing models and much more. All of which calls into question the long-term stability of the American police state. What happens if you build a police state but can't hire enough people to run it? Or can't afford to hire enough people to run it?

I would like to thank everyone who donated to our annual fundraiser, it is greatly appreciated and goes a long way towards supporting the work and advocacy we do on behalf of prisoners and their families. It is not too late to donate if you have not done so already.

We are working on a number of exciting projects here at HRDC ranging from new books to podcasts and will be rolling them out in the coming year so stay tuned!

---

# Prison Education Guide

## by Christopher Zoukis

This exceptional book is the most comprehensive guide to correspondence programs for prisoners available today. *Prison Education Guide* provides the reader with step-by-step instructions to find the right educational program, enroll in courses, and complete classes to meet their academic goals.

This guide is the latest and best resource on the market for the incarcerated nontraditional student. It includes a detailed analysis of the quality, cost, and course offerings of all correspondence programs available to prisoners.

*"Education is always important but it is even more so for the more than two million Americans who live behind bars. When one's body is locked up, the freedom and development of one's mind becomes a powerful form of resistance and self-preservation. This book is an invaluable tool in the struggle for knowledge behind bars."*

— Christian Parenti



**Price: $24.95**
*(shipping included)*

**280 pages**

*Order by mail, phone, or online.*

Amount enclosed for *PEG* _____ By: ☐ check  ☐ credit card  ☐ money order

Name: _____ DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____ State: _____ Zip: _____

**Human Rights Defense Center** PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
**Dedicated to Protecting Human Rights** WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

---

# After Florida Appellate Court Holds Crimes of 'Attempt' Eligible for Incentive Gain Time, Supreme Court Refuses Review

*by Kevin W. Bliss*

On November 14, 2024, Florida's Supreme Court dismissed an appeal by officials with the state Department of Corrections (DOC) to an appellate court ruling that exempted crimes of "attempt" from those that ban prisoners from being considered for incentive "gain time" sentence credits.

At issue was a ruling by the state's First District Court of Appeal (DCA) on June 10, 2022, which rejected long-standing legal precedent to affirm that state prisoner McMillan Gould should have an opportunity to be considered for incentive "gain time" despite his conviction for attempted sexual battery on a child. In its ruling, DCA said that the statutory definition of "attempt" makes the conviction a completely separate offense from sexual battery on a child for which state law bars "gain time."

Gould's 2016 no-contest plea resulted in a 25-year sentence to which DOC refused to consider granting any gain-time credit. He then filed a mandamus action, which a trial court approved before DOC filed for a writ of certiorari from DCA to hear its appeal. That court then began by ruling DOC's motion could not be treated as one for certiorari, since Gould's mandamus action questioned DOC's discretion to consider him for incentive gain time and not his entitlement to receive it. The subtle distinction allowed for the certiorari petition to be treated as a direct appeal. Reviewing the proceedings anew, DCA gathered its full 15-judge panel *en banc* because the issue was "necessary to maintain uniformity in the court's decisions."

In rulings from 1996 to 2001, DCA held that attempt crimes under Florida law are crimes under the substantive criminal statute. But Judge Adam Tanenbaum, writing for the majority agreeing with Gould, said it was necessary for DCA to recede from its earlier position. The state's "gain time" statute, F. S. § 944.275, grants consideration for any prisoner not in "violation of" certain statutes such as sexual battery (F. S. § 794). But the "attempt" statute specifically calls it a "failure" to perpetrate that crime. Therefore, by definition, it is not a violation of that crime; rather, it is an "offense separate from the offense attempted," the majority said.

Judge Scott Maker, writing for himself and two other judges in the minority, called the majority's decision "an unprompted cannonball dive into a long-placid wading pool." Fellow dissenting judge Ross Bilbrey also pointed to the long lapse since the 2001 precedent that the Court was upending. Had state lawmakers disapproved of that decision, he asked, why hadn't they done anything to change the law since then?

The majority countered that if the Legislature wished to include attempt convictions among those ineligible for incentive gain time, it could have done so; the statute criminalizing sexual battery (F. S. § 794.011), for example, specifically includes attempted sexual battery (F. S. § 774.04) resulting in injury to the sex organs. Thus, the lower court's decision was affirmed by DCA. Gould was represented in his appeal by Orlando attorney Terrence E. Kehoe. *See: Fla. Dep't of Corr. v. Gould*, 344 So. 3d 496 (Fla. 1st DCA 2022).

That is the ruling that was then left to stand by the Florida Supreme Court. After accepting the case for review in December 2022, it then took nearly two years to decide simply to discharge jurisdiction and dismiss the state's appeal—over the objection of dissenting Justice Jamie R. Gorsshans, with whom Justice John D. Couriel concurred. *See: Fla. Dep't of Corr. v. Gould*, 49 Fla. L. Weekly 275 (2024). 🖋

Additional source: *ALM Media*

# Eighth Circuit: Evidentiary Admissibility Is a "Red Herring" At Class Certification of St. Louis Jail Conditions Challenge

*by Douglas Ankney*

On June 3, 2024, the United States Court of Appeals for the Eighth Circuit declined to join most sister circuits, which admit evidentiary challenges to class certification of a lawsuit. The Court called admissibility a "red herring" at such an early stage—before proceeding to find other reasons to revoke class certification in a challenge to conditions of confinement at a now-shuttered St. Louis jail. Plaintiffs James Cody, Jasmine Borden, Michael Mosley, Diedre Wortham and Eddie Williams filed a complaint for damages against the City of St. Louis for alleged inhumane conditions they experienced while confined at the City's Medium Security Institution (MSI)—"a facility with a checkered past," the Court noted, which was colloquially known as the "Workhouse" before it was shut down in 2021 by then-newly elected Mayor Tishaura Jones (D).

Originally filed in federal court for the Eastern District of Missouri, Plaintiffs' complaint sought to certify four classes of detainees under FRCP 23(b)(3). Two classes were defined as "all pretrial" and "all postconviction" detainees "who were or will be released from MSI on or after November 13, 2012." The other two classes were "heat" subclasses defined as all members of the first two classes, "who were assigned to a dorm, pod, or other area at MSI in which the internal temperature equaled or exceeded 88 degrees Fahrenheit."

The district court denied class certification because of the "open-ended class periods" and also because "it was undisputed that the City improved the conditions at MSI over that time, for example, by in-

stalling air conditioning and substantially reducing the prison population." The district court further objected that the proposed classes combined complaints about poor conditions with complaints about use of excessive force—though different legal standards governed each type of complaint.

Plaintiffs filed a renewed motion for class certification, proposing four new classes. The pretrial and postconviction classes were renamed as two "conditions" classes and eliminated the excessive force claims. The two "heat" subclasses were narrowed to include only those held in dormitories and "on days where the ambient air temperature" in St. Louis "equaled or exceeded 88 degrees Fahrenheit." Additionally, Plaintiffs set an end date for the two "conditions" classes of July 1, 2018, and for the two heat subclasses an end date of July 24, 2017.

The district court then certified the four classes under Fed. Rule of Civ. Procedure 23(b)(3), citing *Hargrove v. Sleepy's LLC*, 974 F.3d 467 (3d Cir. 2020), as supporting authority to consider the renewed motion. The City cried foul because the evidentiary record had not changed, nor had the underlying law, and sought permission to appeal. The Eighth Circuit granted permission.

As a threshold matter, the Court rejected the City's arguments that Rule 23(c)(1)(C) requires a party to prove a change in the law or provide new evidence in order to succeed on a renewed motion for class certification. In reaching the opposite conclusion, the Court split with most other federal circuits; only the Sixth Circuit also permits class certification without a determination that the underlying evidence first be found admissible.

Citing *In Re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995 (8th Cir. 2019), the Court said that it had already held that granting a motion to reconsider class certification is "a matter within the court's broad discretion," one that "extends to requests, as here, to reconsider a prior class certification denial." However, as in that case, the Court found no abuse of discretion in reconsidering a prior class certification unless the district court relied on "erroneous factual findings or if its decision relies on erroneous legal conclusions," as that earlier case held.

Rather, citing *Hargrove*, the district court had held that Rule 23(c)(1)(C) "allows multiple bites at the apple" of evidence that may be admissible and "does not impose an additional requirement on parties to prove a change in law or show new evidence to succeed on a renewed motion for certification." The Eighth Circuit refused to find error in this, calling *Hargrove* "consistent with the law in our circuit."

But the Court then reversed class certification on other grounds.

First, the classes failed to show commonality required by Rule 23(b)(3)—"that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." For example, while Plaintiffs complained of unsanitary conditions, not all members of the class were held at MSI for the same length of time. Yet determining whether an unsanitary condition of confinement violates the constitution turns on both the nature of the condition and the length of exposure to it, the Court said, citing *Owens v. Scott County Jail*, 328 F.3d 1026 (8th Cir. 2003).

Furthermore, the City could be held liable for its policies or customs under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), but the district court failed to undertake the required "rigorous analysis" to determine which theory of liability was in play; there are several theories, each with differing elements whose commonality must be pleaded before certifying classes, the Court said, pointing to *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775 (8th Cir. 2016) and *Woodall v. Wayne Cty.*, 2021 U.S. App. LEXIS 34149 (6th Cir.).

Accordingly, the Court reversed the district court order certifying the classes and remanded the case. *See: Cody v. City of St. Louis*, 103 F.4th 523 (8th Cir. 2024). The case then returned to the district court, which turned away the City's objections to letting Plaintiffs refile their motion for class certification on October 31, 2024. *See: Cody v. City of St. Louis*, 2024 U.S. Dist. LEXIS 198628 (E.D. Mo.). *PLN* will update developments as they are available. Plaintiffs are represented by attorneys with Arch City Defenders in St. Louis; Arnold & Porter LLP in Chicago; and DLA Piper LLP in Boston, New York, Phoenix, San Diego and Seattle. *See: Cody v. City of St. Louis*, USDC (E.D. Mo.), Case No. 4:17-cv-02707.

Meanwhile, demolition of most of the former MSI complex was set to begin on December 16, 2024. A memorial is planned on part of the site for detainees who suffered in poor conditions at the "Workhouse" during the 55 years it was in operation after its 1963 opening. ◪

Additional source: *KDSK*



# PenPals.Buzz

A SNAPTURA COMPANY

## Ready to join America's fastest-growing prison pen pal site?

☑ **Best Customer Service**
☑ **Pay Via Check or Online**
☑ **Your Own TikTok Video**
☑ **Join Our Podcast**

**All orders processed within 48 hours**

Institutional email?
**help@penpals.buzz**

## Write for our FREE Brochure
**PenPals.Buzz**
**PO Box 456, Anderson, CA  96007**

# Senate Votes to Increase Penalties for BOP Contraband Cellphone Smuggling

On September 28, 2024, the U.S. Senate passed legislation enhancing penalties for contraband cellphone possession in federal Bureau of Prisons (BOP) lockups. Named after BOP Lt. Osvaldo Albarati, who was killed in a 2013 ambush arranged with contraband cellphones by prisoners at BOP's Metropolitan Detention Center in Guaynabo, Puerto Rico, the measure was introduced by Sens. Jon Ossoff (D-Ga.) and Chuck Grassley (R-Iowa) just three days earlier. Fellow senators reacted in near-record time to pass S.5284.

In a report published on June 7, 2024, journalist Walter Pavlo recalled a time not long ago when a federal prisoner caught with a cellphone was placed in a special housing unit (SHU)—BOP's term for isolation—and sanctioned with loss of Good Conduct Time (GCT) sentence credits. Now, he said, there are so many cellphones that an unnamed guard pointed to a stack that had been confiscated at a prison Pavlo visited and said, "In the old days we would have looked at those confiscated phones as evidence, but some corrupt correction officers look at them as inventory to resell to inmates."

Disconnection from family, friends and the information highway creates high demand for contraband cell phones. BOP restricts prisoners to 500 minutes of phone calls a month, none longer than 15 minutes. Prison-issued tablets have no internet access, providing only preloaded games, movies, programming and reading material. Amid this isolation, the U.S. Penitentiary (USP) in Atlanta confiscated 800 cellphones in 2021; since the prison holds only 1,500, literally every other prisoner had one. The unrelenting demand is met with drone drops, corrupt guards and smuggling by visitors. Black-market value reaches $3,000 for a cellphone to purchase, $100 to $200 hourly for rental.

But BOP's options are limited by a chronic shortage of guards, leaving too few to effectively interdict so many illegal phones. SHU placement and sentences extended by lost GCT simply create the need for more guard hours that the agency can't cover. The 41-day maximum GCT sanction for possessing an illegal cellphone adds at least $4,920 of incarceration costs per prisoner. Any overtime taken up by existing guard staff also translates into additional expense, as does deploying cellphone signal-jamming technology. All of this discourages crackdowns on prisoner cellphone use like the one the Senate legislation was designed to spur.

After that vote, U.S. Rep. Laurel Lee (R-Fla.) introduced a companion bill, H.R. 10161, to the U.S. House on November 18, 2024—not leaving her colleagues long to act before the Congressional session adjourned for good on January 3, 2025. *PLN* will update developments as they are available. 🖋

Additional source: *Forbes*

# Hep-C Treatment Needed in Los Angeles County Jails to Save Lives and Money

Over a five-year stint working in Los Angeles County's jail system, Dr. Mark Bunin Benor saw hundreds of detainees with Hepatitis-C who were not being treated. In an article published by the *Los Angeles Times* on April 2, 2024, Benor said

## CALL FOR SUBMISSIONS

Zo Media Productions is currently accepting submissions from incarcerated writers. We accept: Manuscripts, Short stories, Poems, Essays, Screenplays, Theatrical works, and Articles

Submissions will be considered for publication, or film shorts. Royalties and payment for work is negotiable.

Submit to:
Zo Media Productions
P.O. Box 862
Bristow, OK 74010
Submissions@ZoMediaProductions.com

MEDIA PRODUCTIONS

that jail officials were still not doing enough to prevent the spread of the potentially fatal disease.

Benor has worked for almost two decades as a physician to marginalized and disadvantaged patients. While working for the Los Angeles County Department of Health Services (DHS)—the nation's second largest municipal health system, which provides healthcare to County jail detainees—Benor discovered that Hep-C is alarmingly prevalent. Over a third of detainees tested positive.

Despite its identification in the 1980s and the development of effective medication treatments, Hep-C still claims about 14,000 American lives annually, surpassing the toll of HIV. A major hurdle that the County Sheriff's Department (LASD) faces in its jails is a lack of routine screening for Hep-C, which is recommended by the federal Centers for Disease Control and Prevention (CDC). County jails have programs to monitor and manage other contagious diseases, including tuberculosis and COVID-19, for which all detainees are screened at intake.

But not Hep-C.

As recently as 2018, when Benor began working in the jail system, Hep-C screening was rare, and most known cases were never treated unless advanced liver fibrosis developed. Even then, a special police escort was necessary to transport infected detainees to and from hospital appointments. Delivery of antiviral medication often took weeks, further discouraging treatment.

In 2019, Dr. Lauren Wolchok traced the poor delivery of Hep-C treatment in jails to the short length of the average detainee's stay. That high turnover rate and unpredictable release dates magnified dif-

ficulties in identifying and tracking infected detainees—difficulties exacerbated by a lack of treatment funding, especially accessing reduced-price treatments through the federal Health Resources and Services Administration's 340b Program.

Meanwhile, intravenous drug use and unsterile tattooing among detainees contributed to the virus' spread, perpetuating the epidemic within County jails. A concerted effort to test and treat Hep-C in the jail system could significantly reduce infection rates in the surrounding county, as well, yet such efforts are not being made, Benor said. He concluded that treating Hep-C is "cost-effective given the resulting reduction in cirrhosis, liver cancer, heart disease, kidney disease, arthritis, and diabetes."

"In the long run," the doctor added, "decreasing the spread of infection will save both dollars and lives." ◥

Source: *Los Angeles Times*

## Mourning Our Losses

**MOURNING OUR LOSSES (MOL) IS SEEKING MEMORIALS, WRITING, AND ART**

MOL was launched by a group of educators, artists, and organizers committed to the release of incarcerated people. In 2020, we began publishing memorials to honor the lives of our siblings dying from COVID-19 in jails, prisons, and detention centers. We continue to grow this platform for grief, healing, and reflection for all those affected by the death of a loved one due to poor conditions, negligence, violence, and mental health crises inside - the byproducts of mass incarceration.

We are driven by our prison experiences. Our crowd-sourced memorial site depends on our ties to you, our siblings inside. Our goal is to inform conversations about the dangers of mass incarceration by sharing stories of those we've lost. We teach the public that we're people – not numbers or "inmates." We don't use dehumanizing language in memorials, nor do we talk about the crime for which a person was convicted.

You can help by submitting a memorial for a loved one who died while incarcerated or related writing/photos/artwork (which we may not be able to return safely). When you submit, please include the name the person went by and your name (or if you want to be anonymous). Let us know if it's ok to edit errors, and if we can contact you to follow up. Write us at:

Mourning Our Losses
P.O. Box 162690
Atlanta, GA 30321

# With Eleventh Circuit Okay, Alabama Executes Third Prisoner by Nitrogen Hypoxia

Getting a green light from the United States Court of Appeals in the Eleventh Circuit, Alabama used nitrogen gas to kill prisoner Carey Dale Grayson, 50, on November 21, 2024. He told William C. Holman Correctional Facility Warden Terry Raybon to "fuck off" before the gas started flowing, using the middle fingers of both strapped-down hands to continue protesting during a 10-minute-long ordeal until he appeared to stop breathing.

In its ruling, the Court discounted eyewitness testimony that prisoners suffered such lengthy painful deaths during the state's previous nitrogen hypoxia executions. But as *PLN* reported, Kenneth Eugene Smith writhed in agony for 10 minutes as he suffocated in January 2024. [See: *PLN* Mar. 2024, p.24.] During the second killing on September 26, 2024, Alan Eugene Miller, 59, stopped shaking and trembling two minutes after the gas started flowing—though he continued to gulp for breath another six minutes, witnesses said. State Department of Corrections Commissioner John Q. Hamm insisted after the executions that witnesses saw only "involuntary body movements."

But Grayson challenged the state's plan to kill him the same way. The federal court for the Middle District of Alabama refused to issue an injunction, finding "that the evidence did not establish a substantial risk that the nitrogen hypoxia protocol would cause severe pain and suffocation," as the Eleventh Circuit recalled. In its ruling on November 18, 2024, the appellate Court agreed with Defendant state officials that the Eighth Amendment "does not demand the avoidance of all risk of pain in carrying out executions," quoting *Baze v. Rees*, 553 U.S. 35 (2008)—a decision in which the U.S. Supreme Court also refused to "transform courts into boards of inquiry charged with determining 'best practices' for executions."

Yet the Eleventh Circuit then took time to dismiss Grayson's claims that the gas mask wouldn't fit, also dismissing as "speculative" his expert's opinion that a pre-execution examination of the prisoner's airway was needed. The Court allowed that the district court erred in determining that "conscious suffocation" would not necessarily violate the Eighth Amendment. But it called that error harmless because it refused to find that Grayson faced such a risk. Despite reports of Smith and Miller's suffering, the Court agreed that those "inferences taken from hearsay eyewitness accounts" were "of highly questionable value."

The Court also declared its credulous belief that Defendants "do not intend 'to add pain, let alone super-added pain, in developing and implementing the nitrogen hypoxia protocol'"—as if the state's indifference to suffering weren't the point. Accordingly, the district court order was affirmed. Grayson was represented before the Court by Federal Defender Program of Montgomery attorneys Eric C. Brown, Spencer J. Hahn, Kacey L. Keeton, John A. Palombi and Matt D. Schulz. *See: Grayson v. Comm'r*, 2024 U.S. App. LEXIS 29278 (11th Cir.).

Grayson and three fellow teens were convicted of kidnapping, murdering and mutilating the body of hitchhiker Vickie Deblieux, 37, in 1994. His fellow murderers, Kenneth Loggins, Trace Royal Duncan and Louis Christopher Mangione, were all under 18 at the time, so they were sentenced to life in prison. After Grayson's execution, Deblieux's surviving daughter, Jodi Haley, said that "[m]urdering inmates under the guise of justice needs to stop." ◥

Additional source: *BBC News*, *Montgomery Advertiser*

# Washington Prisoners Prep for Firefighting Career After Release

A new program is preparing some Washington state prisoners to become wildland firefighters after release. Though launched only recently, ARC 20 traces its roots to "honor camps" that state lawmakers established in 1939 to clear and maintain land owned by the state or counties.

ARC 20, based in Spokane, recruits prisoners from existing firefighting prison camps, training them to form an "elite" force preventing and combating forest fires. The initiative is a collaboration between the state Department of Natural Resources (DNR) and Department of Corrections (DOC), focused on providing prisoners with training for civilian firefighting jobs post-release. To ensure that graduates can succeed, the program emphasizes crucial teamwork, communication and accountability.

Unlike other state prison firefighting crews, Washington's ARC 20 transitions prisoners from full confinement to a reentry center, where they continue skill-building while preparing for life after prison. Notably, the pay scale in ARC 20 runs up to $60,000 annually, far above the $11,000 average for regular camp crew members. Participants live at the Brownstone Reentry Center in Spokane, enjoying freedoms such as having a cellphone and wearing civilian clothes.

ARC 20's success is evident, with four members securing jobs with the state firefighting agency. Kenyatta Bridges, 34, joined ARC 20 while serving a 10-year sentence for manslaughter. After receiving extensive training in fire containment, prescribed burns and handling dangerous equipment, she was released from DOC in June 2024 and now works as a leader on Arcadia Engine 7405 crew in one of Washington's most wildfire-prone areas.

The program fights recidivism while addressing critical firefighting needs in region. It also has gotten publicity from *Fire Country*, a drama series broadcast on CBS and Paramount+ whose California firefighting crew includes prisoners. ◼

Sources: *Reuters, The Direct, US Magazine*

# Pennsylvania Prisoner Released from Solitary After 15 Years

On March 5, 2024, the federal court for the Western District of Pennsylvania agreed to dismiss the complaint of a state prisoner held in solitary confinement for 15 years after the state Department of Corrections (DOC) reportedly agreed to a settlement. Under its terms, Caine Pelzer, 45, returned to the general population of the State Correctional Institution (SCI) at Albion. The DOC also agreed to pay him $85,000, defraying his legal costs and fees tom secure release from isolation.

Ironically, SCI-Albion is the site of the DOC's Neurodevelopmental Residential Treatment Unit (NRTU), established in March 2021 to help state prisoners with autism and intellectual disabilities avoid disciplinary infractions and punishment in solitary by teaching strategies to cope with stress or anger.

It came along too late for Pelzer, who was tossed in solitary confinement at the prison in March 2009. For the next 15 years, his world was a 91-square-foot cell—really 56 square feet clear of the toilet and other fixtures. During every 168-hour week, he was allowed out to exercise by himself in a 75-square-foot cage cell for just six hours.

Pelzer filed suit *pro se* in 2020, accusing DOC officials of violating his Eighth Amendment guarantee of freedom from cruel and unusual punishment. After securing counsel in 2021 from Erie attorney John F. Mizner, his case was headed to trial, when Defendants—tellingly—moved to prevent use of the words "solitary confinement" before jurors. That motion was shot down on February 27, 2024, and the following day, Defendants failed to prove that their grievance system was available to Pelzer. His non-exhaustion of those remedies was excused. The parties then proceeded to reach their settlement agreement. *See: Pelzer v. Pa. Dep't of Corr.*, 2024 U.S. Dist. LEXIS 37168 (W.D. Pa.); and 2024 U.S. Dist. LEXIS 34011 (W.D. Pa.).

The need for NRTU to protect prisoners like Pelzer was soon made strikingly clear, when Curtis Waugaman II, 56, was found unresponsive in his cell with a self-inflicted cut on March 20, 2024. He bled out at the prison infirmary, and his death was ruled a suicide.

The United States Bureau of Justice Statistics recognizes a 4% rate of autism among prisoners and a nearly 25% rate of cognitive impairments—twice the rate for each group in the overall population. Prison reform advocates believe the numbers are even higher because of underdiagnosis before incarceration and absent or ineffective screening in most prisons and jails.

Specialized units like NRTU focus on prisoner integration versus segregation, which is a key idea promoted by the Americans with Disabilities Act, 42 U.S.C. ch. 126 § 12101 et seq. Yet many prisoners with intellectual disabilities are isolated to protect them from harm—only to face further risks in solitary. "What we've seen is, after solitary, the ways they have learned to interact all reverse," said Brian Kelmar of Decriminalize Developmental Disabilities.

NRTU utilizes "transitional cells," prisoners regain self-control before rejoining their unit. Staffer Randy Kulesza called the cells a huge help, especially since placement in one does not threaten a prisoner's chance for parole the way that placement in solitary would. ◼

Additional sources: *AP News, Erie Times-News, Meadville Tribune*



**The Best 500+ Non-Profit Organizations for Prisoners & Their Families (7th edition)**

Only $19.99

Order from: **Prison Legal News, POB 1151**
**Lake Worth Beach, FL 33460**
561-360-2523

*Add $6 shipping for all book orders under $50.*

# Suits Filed Over Dehydration Deaths at Two Texas Jails

*by Matt Clarke*

On July 9, 2024, the grandmother of a mentally ill detainee who died of dehydration at Texas' Denton County Jail (DCJ) filed a federal civil rights lawsuit, accusing jail staff of deliberate indifference in allowing Heath Aaron Vandeventer to suffer severe dehydration and malnutrition before he perished just two months after his arrest.

Vandeventer, 27, was residing with his grandmother, Lanette Silvey, at her in Argyle home when she called 911 to report that he was experiencing a mental health crisis. Law enforcement officers arrested him for assault against an elderly person and booked him into DCJ on July 7, 2023.

According to court documents, jail staff was made aware during booking—as well as in multiple phone calls from Silvey—that Vandeventer had a history of mental illness, including schizoaffective disorder, schizophrenia, and suicidal ideation. His mental illness rendered him incapable of signing booking documents. Jailers also knew that he had been involuntarily committed for inpatient treatment multiple times and treated by Denton County Mental Health and Mental Retardation (MHMR).

Nevertheless, they placed him in a "single cell," a 6' x 12' isolation cell with 24/7 lighting. There he remained until his lifeless corpse was removed on September 13, 2023. According to the complaint, he had lost 105 pounds during that time; the official cause of death was listed as dehydration with malnutrition as a contributing cause.

Denton attorneys Chris Raesz, Sarah Roland and George Roland assisted Silvey in filing a 42 U.S.C. § 1983 complaint against the county, Sheriff Tracy Murphee, Public Health Administrator Barry Carver and various jail personnel. *See: Silvey v. Denton Cty.*, USDC (E.D. Tex.), Case No. 4:24-cv-00627.

### More Dehydration Deaths in Fort Worth

Just 35 miles away, at Tarrant County's Lon Evans Correction Center in Fort Worth, three more mentally ill pretrial detainees died of complications caused by dehydration in a 20-month span from June 2020 until February 2022.

The first, Abdullahi Mohamed, was arrested for allegedly threatening a relative with a knife and booked into the jail in June 2020. He had a history of serious mental illness, including bipolar disorder, and had spent time in a state mental hospital; he was also manic at the time of his arrest. Nine days later, on June 25, 2020, jailers collected his nude body from his cell floor and took him for medical evaluation in a wheelchair, where he urinated on himself and died. The cause of death was dehydration, though he had access to water in his cell.

Then in April 2021, Georgia Baldwin telephoned Arlington police and left bizarre messages containing profanity and indications that she wanted someone to die, stating that "[t]he Governor of Mississippi needs to blow you away." An Arlington police detective discovered that Baldwin's address on her driver's license was the address of a homeless shelter. Reports of previous encounters with police indicated that she was "not mentally sound and/or coherent." The detective concluded that Baldwin had a mental health disorder. Nonetheless, she was arrested for making terroristic threats to a peace officer and booked into the jail.

A psychiatric examination was scheduled for the next month and a "no bond" order issued pending its outcome. Baldwin was found incompetent to stand trial, and the court ordered her incarceration for a "competency restoration program for no more than 60 days of a 120-day commitment." But during her confinement, she repeatedly refused to take medications or participate in the program. Jail staff saw many signs of severe mental illness that was untreated. She was found unresponsive in her tiny isolation cell on September 14, 2021. An autopsy determined the cause of death to be severe hypernatremia, a high concentration of sodium in the blood usually caused by dehydration.

Edgar Villatoro Alvarez was a month out of hospitalization for bipolar disorder when he was arrested for a DWI and booked into the jail in December 2021. Staffers repeatedly noted his "strange behavior"—stripping nude, talking incoherently. When he died two months later in February 2022, a medical examiner noted that he "recently ceased eating, drinking and taking his medications for [] the last several days."

How did County Sheriff Bill E. Weybourn and his staff feel after three detainees died of thirst in less than two years? Chief Deputy Charles Eckert testified in a deposition that "all three inmates had 24/7 access to water … so it's not a concern as long as we provide water to them."

Studies have shown that mental illness can inhibit the natural thirst response to dehydration. But other depositions have shown that jailers are not trained to recognize the signs. On June 6, 2023, aided by Dallas attorneys T. Dean Malone, Michael T. O'Connor, Jennifer Kingaard and Alexandera W. Payne, Baldwin's son filed a federal civil rights suit against the county, blaming her death on its policies and practices—such as short staffing the jail and encouraging guards' false electronic entries of cell-check logs. *See: Mattix v. Tarrant Cty.*, USDC (N.D. Tex.), Case No. 4:23-cv-00635.

Both cases remain pending, and *PLN* will update developments as they are available. The problem is not confined to Texas either. A Wisconsin jail dehydration death resulted in a $6.75 million settlement in 2019, as *PLN* reported. [See: *PLN*, Dec. 2024, p.51.] ◾

Additional sources: *KERA, Reason*



## MPD
### MICHAEL P. DENEA
#### ATTORNEY AT LAW

## Arizona Trials and Appeals

Arizona Criminal Trials | Arizona Direct Appeals (State and Federal)
Arizona Rule 33/32 Petitions | Arizona Sex Offender Probation | Arizona Parole Petitions pursuant to 28 U.S.C. §§ 2254 and 2255—Federal Habeas Corpus

Serving the Arizona inmate community with quality trial, appellate, and post-conviction representation.

3200 North Central Avenue, Suite 1500, Phoenix, Arizona 85012
Phone (602) 794-4480 • Fax (602) 794-4481

# Biden Commutes Sentences of Most Federal Prisoners on Death Row

On December 23, 2024, outgoing Pres. Joseph R. Biden, Jr. (D) commuted the sentences of all but three federal prisoners facing execution. The 37 prisoners receiving commutations will now serve life in custody of the federal Bureau of Prisons (BOP) without possibility of parole, which was abolished decades ago for all federal crimes committed after November 1, 1987.

Biden called the commutations "consistent with the moratorium my Administration has imposed on federal executions, in cases other than terrorism and hate-motivated mass murder." Left to face execution were Dzhokhar Tsarnaev, 31, who set off pressure-cooker bombs near the finish line of the Boston Marathon in 2013, killing three and injuring another 264; Dylann Roof, 30, a white supremacist who gunned down nine Black worshipers in 2015 at a South Carolina church; and Robert Bowers, 52, who fatally shot 11 worshippers and wounded another six in an antisemitic attack at Pittsburgh's Tree of Life Synagogue in 2018.

It was the first exercise of a president's power to take a federal prisoner off death row since 2017, when outgoing Pres. Barrack Obama (D) commuted the sentence of former U.S. Army Pvt. Dwight Jeffrey Loving, who had been condemned for robbing and killing two fellow soldiers moonlighting as taxi drivers.

Biden's journey to granting the commutations was remarkable, given his vocal support for the death penalty earlier in his career. After co-authoring 1994's Violent Crime Control and Law Enforcement Act, which expanded the range of crimes eligible for a death sentence, he bragged that "I am the guy who put these death penalties in this bill." Notably, nearly every one of the prisoners he spared was on death row because of the bill that Biden wrote.

The move also preceded the return to the White House of Pres.-elect Donald J. Trump (R), who raced to carry out 13 executions of federal prisoners in the last months before his first term ended in January 2021; the dubious circumstances of those killings included paying private executioners in cash, as *PLN* reported. [See: *PLN*, Mar. 2021, p.1.] During his upcoming term, Trump has promised to end Biden's execution moratorium and expand the list of crimes eligible for the death penalty.

Almost one-third of those granted commutations were already imprisoned when they committed the crimes for which they were condemned. They included Anthony George Battle, 61, a prisoner sentenced in 1997 for killing a guard at a Georgia prison; Shannon Wayne Agofsky, 50, convicted in 2004 of killing a fellow prisoner at lockup in Texas; Carlos David Caro, 53, sentenced in 2007 for killing a fellow prisoner at another lockup in Virginia; Edgar Baltazar Garcia, 44, and Mark Isaac Snarr, 48, sentenced in 2010 for fatally stabbing a fellow prisoner, also in Texas; Wesley Paul Coonce Jr., 44, and Charles Michael Hall, 53, sentenced in 2014 for killing a fellow prisoner in Missouri; Christopher Emory Cramer, 42, and Ricky Allen Fackrell, 40, sentenced in 2018 for killing another Texas prisoner; Joseph Ebron, 45, sentenced in 2019 for killing still another prisoner in Texas; as well as Brandon Leon Basham, 44, and Chadrick Evan Fulks, 48, both sentenced in 2004 for kidnapping and murdering two women during a 17-day crime spree after the men escaped from a Kentucky prison. ◾

Sources: *The Independent, Washington Post*

## DID YOU HAVE A HIP, KNEE, OR OTHER JOINT REPLACEMENT?

*If your implant/replacement involved Exactech products – including Optetrak, Optetrak Logic, Truliant, Vantage, Connexion GXL, and Equinoxe, your attention to this notice is important.*

**WHAT IS THIS ABOUT?**

Exactech, Inc. designs, manufactures and markets joint replacement implants and other related surgical instruments. Exactech, Inc. and its affiliates have filed voluntary petitions for Chapter 11 relief in the United States Bankruptcy Court for the District of Delaware. As a part of the proceedings, the Debtors will sell all, or nearly all, of their assets.

If you received an implant, replacement, or other device from Exactech, your rights may be affected by this bankruptcy. You can file a Proof of Claim and/or object to the sale of assets using the instructions below.

**WHICH DEVICES ARE INCLUDED?**

Exactech manufactures and distributes knee, hip, ankle and shoulder implants, including Optetrak, Optetrak Logic, Truliant, Vantage, Connexion GXL and Equinoxe. A complete list is available at **EXTclaims.com**.

**FILE A PROOF OF CLAIM**

You can file your Proof of Claim, along with supporting documentation, online at **EXTclaims.com**. You may also file your Proof of Claim via US Mail by First-Class Exactech, Inc. Claims Processing Center, c/o Kroll Restructuring Administration LLC, Grand Central Station, PO Box 4850, New York, NY 10163-4850 or by hand delivery or overnight courier to Exactech, Inc. Claims Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232.

You must file a Proof of Claim to get payment or other compensation. **The deadline to submit a Proof of Claim is February 7, 2025, at 4:00 p.m. ET**. You must file a Proof of Claim so it is actually received by the bar date. If you do not submit your Proof of Claim by the deadline, you will lose any rights you may have had to seek payment or other compensation. All claims will be treated as highly confidential to prevent unintentional disclosure.

**OBJECT TO ASSET SALE**

As part of the Chapter 11 process, Exactech plans to sell all of its assets. If you received an implant, replacement, or other device from Exactech, you may have the right to object to the Asset Sale. Details about the Asset Sale are available on **EXTclaims.com**.

Objections must be received on or before **Tuesday, March 18, 2025 at 4:00 p.m. ET**. Objections must: (a) be in writing; (b) comply with the Bankruptcy Rules and Local Rules; (c) provide the reason for the Objection; (d) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801; and (e) file proof of service with the Court that the objection was sent to the appropriate parties. Details on how to file an objection and a list of the Objection Notice Parties are available on **EXTclaims.com**.

**WHEN IS THE HEARING?**

The Bankruptcy Court will hold the hearing to approve the Asset Sale **on or before Thursday, March 27, 2025, at 10:00 a.m. ET** to decide to approve the Asset Sale ("Sale Hearing"). The Sale Hearing will take place before the Honorable Judge Silverstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 6th Floor, Courtroom 2, Wilmington, DE 19801.

**THIS IS ONLY A SUMMARY OF THE INFORMATION.**

## EXTCLAIMS.COM

**833.918.0986**
(US/Canada Toll-Free)

**+1.646.781.8728**
(International)

**+61 (2) 72.094.837**
(Australia)

# *Blood in the Water* Author Wins Censorship Challenges Against Illinois, New York Prison Systems

*by Douglas Ankney*

In 2016, University of Michigan Professor Heather Ann Thompson published *Blood in the Water*, a book about the 1971 uprising at New York's Attica State Prison that claimed the lives of 33 prisoners and 10 guards. The book received numerous awards, including the 2016 Bancroft Prize and the 2017 Pulitzer Prize in History. But when Thompson sent a copy to Illinois state prisoner Percell Dansberry in February 2018, Pontiac Correctional Center Publication Review Officer David Meredith confiscated it for violating Department of Corrections (DOC) policy. Thompson's book was also banned by the New York Department of Corrections and Community Services (DOCCS), which operates the Attica prison.

Thompson filed a civil rights challenge to the bans in federal courts for the Central District of Illinois and the Southern District of New York. But things didn't go well in Illinois. Count 1 of Thompson's complaint alleged that Defendant DOC officials violated her "right to communicate with inmates without arbitrary governmental invasion." She challenged both the thoroughness of the Defendant's review and the reasonableness of their ultimate decision, based on evidence showing that DOC read only "40 to 50 pages" of the 720-page book before determining it met DOC criteria for disapproval.

Dansberry grieved denial of Thompson's book, but prison Warden Teri Kennedy—via Assistant Warden Emily Ruskin—concurred with Meredith, though neither ever even read the book. In Count II of her suit, Thompson argued that her Fourteenth Amendment due-process rights were violated because she received neither notice of the censorship nor opportunity to challenge it. Defendants moved for summary judgment on both counts, claiming qualified immunity (QI). On October 11, 2022, the district court granted the motion.

First, the district court held, Thompson failed to overcome Defendants' claim that their censorship decision was "reasonably related to legitimate penological interests," as permitted by *Turner v. Safley*, 482 U.S. 78 (1987). As to Count II, the district court found no support for Thompson's claim that an author has a clearly established right to notice of censorship or to appeal the censorship. Moreover, her claim as a sender failed because the book was mailed from Amazon; since Defendants were unaware that Thompson sent it to Dansberry, they were entitled to QI. *See: Thompson v. Baldwin*, 2022 U.S. Dist. LEXIS 185470 (C.D. Ill.).

Meanwhile, DOCCS reached a settlement with Thompson in June 2023, agreeing to lift the ban in New York prisons, provided that a two-page image of Attica's layout could be cut from any copy before delivery to a prisoner. DOCCS also agreed to place two copies of the book in each of its 44 prisons, also paying $75,000 in costs and fees to Thompson's attorneys from the American Civil Liberties Union of New York. *See: Thompson v. Annucci*, USDC (S.D.N.Y.), Case No. 1:22-cv-02632.

Six months after that, Thompson agreed to drop her challenge to the Illinois ruling at the U.S. Court of Appeals for the Seventh Circuit on December 11, 2023, after DOC reportedly agreed to lift the ban, pay an $8,500 settlement and place a copy of the book in every state prison. She was represented in that case by attorneys with the Uptown People's Law Center in Chicago. *See: Thompson v. Baldwin*, 2023 U.S. App. LEXIS 34254 (7th Cir.).

Though she was "thrilled" with the settlement, Thompson warned that "[d]espite earlier civil rights victories to ensure people could read inside, prisons have become ground zero for book banning."

Additional sources: *New York Focus, WBEZ*



**AWAYOUTPENPALS**
Match, Connect, Discover!

New Profile: **$99.95 per year** | Renewal: **$79.95 per year**

**A Way Out Pen Pals, LLC**
P.O. Box 1804, Wenatchee, WA 98807
support@awayoutpenpals.com

**awayoutpenpals.com**

### WHY CHOOSE US

- We are a **Premium Pen Pal** site.
- **Matching service** - We match you with compatible pen pals based on your interests and preferences indicated on your personality assessment.
- **Guaranteed to Match!!!** We guarantee that you will match with at least one person!*
- Pen pals can like or favorite your profile which automatically sends them a notification anytime your profile is updated.
- FREE courtesy update or change to your profile once per year!

- We don't ask about or post your convictions or release date to promote equality and to ensure that everyone, regardless of convictions or length of sentence, has the same opportunity to match and connect with compatible pen pals!
- Dedicated Social Media Marketing to ensure our site is properly promoted and designed to increase and maximize exposure to our site.
- **Cash Referral Program!***

*Some conditions and restrictions apply. Please contact us or read our brochure for more details.

**ALL PROFILES INCLUDE:**
- Your choice of up to 3 photos or artworks - any combination up to 3!
- Up to a 350 word profile statement.
- FREE placement in the newly listed section of our site for one month.
- FREE address changes and e-mail service provider changes!

| ADD-ONS: | |
|---|---|
| **Featured Placement** places your profile in our featured profile section for better exposure! | **$14.99 per month** |
| **Premium Placement** places your profile on the front page and in the featured profile section of the site for maximum exposure! | **$24.99 per month** |
| For each additional 100 words over 350 words | **$9.95** |
| Additional photo or artwork | **$9.95 each** |

**HOW IT WORKS**

**1** Complete an application including the personality assessment and submit online or by mail with your payment. You may request an application by mail, e-mail or online!

**2** Match with compatible pen pals based on personality assessment.

**3** Connect with compatible pen pals, discover new friendships and perspectives.

**CASH REFERRAL BONUS**
Earn $10 cash or $15 in credit for each person you refer!!* We give you the choice of how you want to use it.*

## Video of Autistic Ohio Teen's Jail Death Undercuts Sheriff's Report Calling It Suicide

Surveillance video from Ohio's Montgomery County Jail surfaced from an unidentified source in early June 2024, showing the last hours before 19-year-old Isaiah Trammell died in custody in March 2023. As *PLN* reported, he died three days after transport to a hospital with what Sheriff Rob Streck called a self-inflicted "blunt force head trauma," one of seven deaths at the jail in just seven months. [See: *PLN*, Nov. 2023, p.50.]

Trammell, who was autistic, was arrested when a neighbor called 911, misinterpreting the teen's loud and angry phone call to a family member expressing anxiety over an upcoming job interview. Unknown to him or his family because of shoddy police record-keeping, there was an outstanding misdemeanor warrant from a previous incident. Instead of being taken to a hospital, he was placed in jail.

There surveillance video captured deputies taunting and belittling Trammell, calling him "ridiculous" and "embarrassing." They strapped him into a restraint chair, threatening worse if he didn't calm down. His pleas for medication, a phone call—even a blanket—went ignored. After that, according to Montgomery County Jail Coalition (MCJC) co-chair Joel R. Puce, Trammell "was suffering so badly that he threw his own body against the wall repeatedly, right until suffering a head trauma."

After learning that her son's death was prompted by mistreatment from jail guards, Brandy Abner appeared before a County Commissioners meeting on June 25, 2024, asking: "How much longer will these tragic events be swept under the rug? He begged for mercy. He begged for someone to listen. He begged for a phone call. He begged for medicine. He begged for a simple drink of water. […] His pleas and clear signs and symptoms went ignored."

Commissioners, however, offered the grieving mom little more than sympathy, noting they have no authority over the Sheriff in jail operations. Streck acknowledged that Trammell should not have been brought to jail given his mental health issues. Yet he insisted that jail staff acted appropriately and refused to issue any sanctions.

In response to a petition filed by MCJC, the state Bureau of Adult Detention (BAD) reported in July 2024 that it had found the County in violation of state jail standards—something not previously made public. However, BAD also said that Streck's staff had submitted remediation plans and was working on additional areas of improvement, lauding the Sheriff and his department for having no overdose deaths since July 2023.

Sources: *Columbus Dispatch, WKEF*

---

# Is someone skimming money
## or otherwise charging you and your loved ones high fees to deposit money into your account?

*Prison Legal News* (PLN) is collecting information about the ways that family members of incarcerated people get cheated by the high cost of sending money to fund inmate accounts.

Please write to *PLN*, and **have your people on the outside contact us as well**, to let us know specific details about the way that the system is ripping them off, including:

- Fees to deposit money on prisoners' accounts or delays in receiving no-fee money orders
- Costly fees to use pre-paid debit cards upon release from custody
- Fees charged to submit payment for parole supervision, etc.

This effort is part of the Human Rights Defense Center's *Stop Prison Profiteering* campaign, aimed at exposing business practices that result in money being diverted away from the friends and family members of prisoners.



*Friends and families of prisoners can follow this effort, which is part of the Nation Inside network, at*
**WWW.STOPPRISONPROFITEERS.ORG**

Please direct all related correspondence to HRDCLegal@humanrightsdefensecenter.org
Call (561) 360-2523, or send mail to PLN



**Human Rights Defense Center**
Attn: Legal Team
PO Box 1151
Lake Worth Beach, FL 33460

---

## Six Set Themselves on Fire at Virginia Prison in 2024

**V**irginia Department of Corrections (DOC) prisoners Ekong Eshiet, 28, and Trevaun Brown, 23, lit themselves on fire at Red Onion State Prison on September 15, 2024, demanding an end to deprivations including lengthy solitary confinement. Both were transferred to the University of Virginia hospital and treated for extensive third-degree burns.

Another prisoner, Demetrius Wallace, 27, set fire to his leg on August 23, 2024. He required a 14-day hospitalization and a skin graft. Two more unnamed prisoners were hospitalized following attempted self-immolation after that. A sixth, who was also unidentified, made a similar attempt in January 2024.

Guards withheld medications from Eshiet and Brown, confiscated their tablets and religious texts and even spit in their food, according to fellow prisoner and incarcerated journalist Kevin Rashid Johnson, 52. Eshiet's mother said that guards hurled epithets, too, calling him "monkey" or "n****r" and "twist[ing] his name, 'Eshiet,' into 'eat sh–t.'"

"I don't mind setting myself on fire again," Eshiet said. "This time, I would set my whole body on fire before I have to stay [in solitary confinement] and do the rest of my time up here."

"To be clear, these inmates did not set themselves on fire or self-immolate," the DOC countered in a statement. "They were treated for electrical burns at the Department's secure medical facility at the [Virginia Commonwealth University] Medical Center and cleared to return to the facility." Including the Red Onion prisoner who attempted self-immolation in January 2024, the DOC said that "[a]ll six inmates have been referred to mental health staff for treatment."

At Buckingham Correctional Center, prisoner Michael Jerman, 44, swallowed a Sharpie pen in early November 2024 to force a transfer to a hospital, where "they report to DOC in Richmond, and they usually come and see you." He said anything less would be ignored by guards, who have spread lies to incite other prisoners to attack him.

Sources: *The Appeal,* Solitary Watch*, Virginia Defender, WVTF*

## Two-Week Lockdown at BOP Women's Prison in Minnesota After Nine Overdoses, Two Deaths

**T**he Federal Correctional Institution (FCI) in Waseca, a women's prison on the former campus of a University of Minnesota technical school, was locked down for over two weeks after a mass drug overdose sent prisoners to a local hospital on September 4, 2024. The low-security prison was already under scrutiny following two prisoner deaths over a nine-month period, one that also saw a less-than-glowing report from the Office of the Inspector General (OIG) of the federal Department of Justice, the parent agency of the federal Bureau of Prisons (BOP).

The most recent death occurred on February 4, 2024, when Jessica Wallowingbull, 29, was discovered unresponsive in her cell. She was serving a 45-month sentence for drunkenly stabbing and seriously injuring the man she lived with in Wyoming in 2022. BOP called her death an apparent suicide. Fellow prisoner Starsha Silva, 36, died at a hospital after being found unresponsive on May 24, 2023, with what BOP called a "medical emergency." Her 168-month term was being served for drug crimes in Hawaii.

The OIG conducted an unannounced inspection of the prison in 2023, reporting significant problems with infrastructure, staffing shortages and the flow of contraband in October of that year. Inspectors found leaky roofs, insufficient security cameras and prisoners housed in basements with exposed pipes. Due to short staffing, the prison was heavily reliant on overtime for existing guard staff, filling some shifts with "augmentation" of duties of non-guard staff—including janitors and teachers.

The report further faulted BOP for letting waiting lists gather up to 300 prisoners needing programming authorized under the First Step Act of 2018 to help them reintegrate post-release, even as contraband synthetic drugs and suboxone flowed into the prison. Contraband drugs were suspected in the September 2024 hospitalization of nine prisoners who were "exhibiting signs of drug use," along with two staffers who feared "potential exposure." No one involved was named.

The OIG investigation had been prompted by a series of sexual assaults by staff, including the former warden, at FIC-Dublin in California—earning it the nickname "Rape Club," as *PLN* reported. [See: *PLN*, July 2024, p.13.] At FCI-Waseka, OIG also reviewed 11 allegations of sexual abuse in the year before its early 2023 inspection; BOP claimed it investigated and acted upon all. *See: Inspection of the BOP's FCI-Waseca*, Dep't of Justice OIG (Oct. 2023). Several abuse victims from California were relocated to the Minnesota lockup.

Additional sources: *KSTP, Mankato Free Press, Southern Minnesota News*

**GO HOME TO YOUR LOVED ONES!**

The Law Offices of Julia Bella
Parole - Post-conviction - Appeals

Call or Write or Email:
(832) 757-9799
503 FM 359, Ste. 130 Box 228
Richmond, Texas 77406
julia@jbellalaw.com

Working zealously for you
and your family!

# Fifth Circuit Leaves Louisiana Prisoner Waiting for Reinstated Parole

*by Douglas Ankney*

On June 6, 2024, the U.S. Court of Appeals for the Fifth Circuit released a mandate it earlier withheld, which in turn ordered the release of Louisiana prisoner Samuel K. Galbraith—nearly eight years after he was originally granted parole. However, the Court had subsequently withdrawn the opinion that he should be released, leaving Galbraith, 55, still waiting in Elayn Hunt Correctional Center for a new opinion to be substituted.

In February 2000, Galbraith was convicted of the brutal murder of Karen Hill. Then enlisted in the U.S. Army and stationed at Fort Polk—now Fort Johnson—in Vernon Parish, Galbraith kidnapped Hill, tied her to a tree and shot her in the head. He cut a deal and pleaded guilty to manslaughter and attempted aggravated rape in exchange for a 71-year prison term.

Galbraith's first parole eligibility date was April 23, 2017, and the state Parole Board set an October 2016 parole hearing that was postponed to November 3, 2016, after a notification letter to one of Hill's relatives was mailed to Albany, New York, rather than her home in Albany, Illinois. Despite objections by Hill's family, the Board voted unanimously to grant parole and scheduled release for April 23, 2017.

Vernon Parish District Attorney Asa Skinner requested reconsideration, which the Board denied. But Hill's mother, Jessie McWilliams, heard about the earlier mailing error and went public with her complaint that parole was improperly granted. Skinner also went to the media with his suspicions that Galbraith was responsible for two cold-case murders in Vernon Parish. In an email exchange, Board members and staffers of then-Gov. John Bel Edwards (D) fretted about the negative impact of Galbraith's parole on criminal justice reform legislation supported by Edwards.

On April 21, 2017—the same date as the email exchange—Board member Jim Wise filled in a "Parole Board Action Sheet," checking the box marked "Other" and rescinding Galbraith's parole because "[t]here may have been technical irregularity to victim notice." Galbraith was not released. A letter dated May 1, 2017, advised him that he would be "scheduled for another hearing on 08/03/2017." But there was no evidence that the Board took any official action to rescind parole other than Wise's signature on the form.

Galbraith filed a civil rights complaint in federal court for the Middle District of Louisiana, which granted summary judgment to Defendant officials with the state Department of Public Safety and Corrections (DPSC), agreeing that Galbraith's only remedy was in habeas corpus. He filed for a writ under 28 U.S.C. § 2241, which the Court granted in March 2022. The State appealed, and Galbraith's release order was stayed pending resolution of the appeal.

In its decision on October 23, 2023, the Fifth Circuit first determined that § 2241 was the appropriate vehicle for Galbraith to pursue relief, noting that he was not seeking a new parole hearing—unlike two Ohio prisoners who therefore had to file under 42 U.S.C. § 1983, according to *Wilkinson v. Dotson*, 544 U.S. 74 (2005).

Moreover, § 2241 was the appropriate vehicle, rather than § 2254, because Galbraith's claim concerned "the manner in which his sentence was carried out" or the "execution of his sentence" and did not challenge the validity of the judgment giving rise to the sentence. Absent that, the Court said, § 2254 is inappropriate per *Richie v. Scott*, 70 F.3d 1269 (5th Cir. 1995)— an unpublished decision that is binding in the Fifth Circuit because it was dated before January 1, 1996, per Local Rule 47.5.3. That also meant that the one-year limitations period under § 2254 did not apply to Galbraith's claim.

However, the Court noted, federal habeas relief for state prisoners requires them first to exhaust state-court remedies. Did Galbraith do that? He couldn't, the Court continued; in Louisiana, the only way to challenge a parole decision is after the Board has *not* granted a revocation hearing, which in turn must show that the parolee violated his conditions of release. Since Galbraith was never released, and he never had a revocation hearing, the Fifth Circuit concluded that he had no state remedy to exhaust.

In fact, after the Board granted parole, its discretion to rescind parole before his release was limited to a finding that he either "(1) violated the terms of his work release, or (2) engaged in misconduct," under La. Admin. Code, tit. 22, Pt XI, section 504(K). Since neither condition was present, the Fifth Circuit affirmed the judgment of the District Court and remanded the case with instructions to release Galbraith subject to the conditions of his earlier-granted parole. *See: Galbraith v. Hooper*, No. 22-30159 (5th Cir. 2023).

But Galbraith still wasn't in the clear; the Court issued another order on February 6, 2024, withholding the mandate, withdrawing its opinion then on March 19, 2024. *See: Galbraith v. Hooper*, 2024 U.S. App. LEXIS 6763 (5th Cir.). Just over three months later, the Court vacated the order withholding the mandate. *PLN* will update the Court's substituting opinion whenever it finally arrives. Galbraith was represented before the Court by New Orleans attorney Nicholas J. Trenticosta, Esq. of Herrero & Trenticosta. *See: Galbraith v. Hooper*, USCA (5th Cir), Case No. 22-30159 (2024).



<u>John F. Mizner, Esq.</u>

311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889
jfm@miznerfirm.com

MIZNER
—LAW FIRM—

<u>Representing Pennsylvania Inmates</u>
Medical mistakes
Inadequate care
Delay in treatment

**RECLAIM**
*Your* **FUTURE**
**azexpunge.org**

# EVER BUSTED FOR MARIJUANA IN ARIZONA?

## YOUR CONVICTION COULD BE KEEPING YOU IN PRISON
# LONGER THAN YOU HAVE TO BE.

Now that recreational use of marijuana is legal in Arizona, the qualified attorneys from the Reclaim Your Future campaign can help you expunge certain past marijuana convictions* for **FREE.**

### *WHAT DOES EXPUNGEMENT MEAN?*
It means that qualifying marijuana-related records are sealed and no longer available to the public. Expungement also eliminates some of the consequences of a marijuana offense. For example, the offense can **no longer be used as a prior offense to enhance a sentence** or to prove someone is a **repeat offender.**

### What offenses qualify?*

*Possessing, consuming or transporting:*
- 2.5 ounces (70 grams) or less of marijuana

*Possessing, transporting or cultivating:*
- 6 marijuana plants or less at the individual's primary residence for personal use

*Possessing, using or transporting:*
Paraphernalia related to the consumption of marijuana

### ¿Qué delitos cumplen los requitos?

*Poseer, consumir o transportar:*
- 2.5 onzas (70 gramos) o menos de marihuana

*Poseer, transportar o cultivar:*
- 6 plantas o menos en la residencia principal del individuo con fines de uso personal

*Poseer, usar o transportar:*
- Parafernalia relacionada con el de marihuana consumo

*Federal and tribal offenses are not eligible for expungement. *Los delitos federales y tribales no son elegibles para eliminación.*

### *Write Us or Call!*
**RECLAIM YOUR FUTURE / RECLAMA TU FUTURO**
**4001 N. 3RD ST., SUITE 401**
**PHOENIX, AZ 85012**
**info@azexpunge.org | (800) 722-4026**

Legal services provided by the Arizona Justice Project, DNA People's Legal Services, and their partners.
Reclaim Your Future is funded by the Arizona Department of Health Services.

SE HABLA ESPAÑOL. SERVICIOS LEGALES GRATUITOS.

# Maryland Cancels Debt Owed by 6,715 Parolees

On October 4, 2024, Maryland Gov. Wes Moore (D) announced that the state Department of Public Safety and Correctional Services (DPSCS) was canceling nearly $13 million in debt owed for unpaid supervision and drug-testing fees by 6,715 former state prisoners currently on parole.

The move came just days after a new law took effect on October 1, 2024, eliminating those fees. Signed by Moore in May 2024, House Bill 531 removed a supervision fee for which DPSCS was charging parolees $40-50 monthly. The new law also stopped the state Parole Commission from requiring former prisoners still under supervision to pay drug and alcohol testing fees, except under certain circumstances.

State Attorney General Anthony G. Brown (D) called the new law a step toward "eliminating mass incarceration." State Del. Elizabeth M. Embry (D-Baltimore), who sponsored the legislation, couched it in terms of fairness.

"These are people that either don't have a job or will struggle to gain employment, and we're taking money out of their paycheck," she said. "Even if someone is able to come up with it, it's probably at the expense of another need that they have."

Brown also noted that fees disproportionately impacted lower income prisoners, most of them Black, a group overrepresented in state prisons; though just 30% of the state population, Blacks account for 71% of its prisoners. ◾

Additional source: *Baltimore Banner, US News*

# Nebraska Pioneers Diversion Program to Help Arrested Veterans Avoid Jail

With a law signed by Gov. Jim Pillen (R) in April 2024, Nebraska became the first state to adopt a model program for diverting military veterans from jail into programs offering treatment for the issues underlying their arrest.

When LB253 takes effect on July 1, 2025, it will expand programs currently offered in four counties and allow district judges statewide to use diversion for non-violent felonies if a veteran defendant can show his or her service contributed to the charged crime.

The model, created by the Veterans Justice Commission (VJC), offers veterans a chance to clear criminal records and heal from service-related conditions like post-traumatic stress disorder (PTSD) and traumatic brain injury (TBI). Treatment happens through underutilized Veterans Administration (VA) programs, further reducing strain on state resources.

VJC estimates nearly 200,000 veterans are incarcerated nationwide, often due to issues stemming from combat deployments; in a report released in 2023, the Commission reported that up to one in three of the nation's 19 million military veterans has been arrested at least once.

But pretrial diversion programs for arrested veterans vary from state to state. Louisiana limits enrollment to veterans suffering PTSD. Massachusetts leaves it up to district attorneys to establish such programs. Minnesota, New Jersey and California are also among 28 states with diversion programs or treatment courts geared to the needs of veterans or active military personnel, according to the National Conference for State Legislatures.

For veterans like Robert Jackson, a pretrial diversion program was a lifeline. He blamed multiple DUIs on a drinking problem traced to his service as a Marine in Operation Desert Storm during the Gulf War. Traditional treatment didn't work, but connecting with other veterans in diversion was a game-changer; Jackson not only received help that kept him out of jail but found a support network that keeps him engaged in his recovery.

The goal of VJC's model is to standardize how veterans will be identified for help, what range of diversion alternatives they will be offered and how the results will be tracked and studied to identify best practices. ◾

Sources: Council on Criminal Justice, *Military Times*



## GONGORA & SCHULTZ
PLLC



**Mikhal Gongora**
Partner - Se habla español



**Natalie Schultz**
Partner

Representing Texas Inmates in Parole Hearings, Parole Revocations, and TDCJ Disciplinary Appeals. No Pro Bono.

### We fight for your freedom!

2500 E. TC Jester Blvd, Suite 290 Houston, Texas 77008

info@gsparole.com          www.gsparole.com          713.868.7508

# California Prisoner Awarded Over $1.26 Million in Suit Challenging Withheld Legal Mail Which Resulted in Habeas Loss

*by David M. Reutter*

On November 12, 2024, the federal court for the Eastern District of California entered judgment in favor of state prisoner Anthony Penton, adding $788,744.97 to an earlier $475,000 jury award on his claim that a guard violated his civil rights by withholding his mail without notice for eight months. During that time, Penton missed deadlines that resulted in denial of his habeas petition.

The case dates to November 8, 2007, when Penton was seven years into a 54-year sentence for hostage-taking and attempted robbery at a La Jolla business in 1999. Penton was litigating a state habeas corpus petition to challenge his conviction when he was placed in the custody of U.S. Marshals for transport to Kentucky to testify as a prosecution witness in another proceeding. He filed an administrative appeal to have his mail forwarded, which California State Prison-Sacramento (CSPS) mailroom guard Layton Johnson granted on December 21, 2007.

But from the time he left CSPS until his return on June 19, 2008, none of Penton's mail was forwarded. In fact, the mail received while he was out-of-state wasn't finally delivered to him until July 29, 2008. The mailroom log reflected that between November 9, 2007, and April 28, 2008, nine separate items of legal mail were received for Penton. Several concerned his state habeas petition, which a court denied on December 20, 2007, citing missed deadlines to respond or appeal that had expired by the time he received notice.

Penton sued and alleged First and Fourteenth Amendment violations for allowing the mail to accumulate for over eight months without notice. Johnson moved for summary judgment, claiming qualified immunity (QI). The guard argued that there was no notice that he personally handled Penton's mail, and no one had Penton's forwarding address anyway. The district court denied the motion, and Johnson appealed.

In an unpublished opinion on October 30, 2023, the U.S. Court of Appeals for the Ninth Circuit sustained Penton's claims. As to the claim that Johnson denied the prisoner access to courts, the appellate panel said that Johnson was on notice that

holding Penton's mail for over seven months violated Penton's constitutional rights, pointing to *Simkins v. Bruce*, 406 F.3d 1239 (10th Cir. 2005), and *Gremegna v. Johnson*, 846 F.2d 675 (11th Cir. 1988). Likewise, a right-to-mail claim for the delay in forwarding mail "for an inordinate amount of time" was clear, the Court said, relying on *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), and *Bryan v. Werner*, 516 F.2d 233 (3d Cir. 1975).

Finally, *Procunier v. Martinez*, 416 U.S. 396 (1974), required (1) that prisoners be provided notice when their mail creates a liberty interest in receiving it and (2) notice of any mail that is withheld to allow an opportunity to protest. Cal. Code Regs. tit. 15, § 3133(f), (h) also require forwarding of mail for prisoners out-to-court longer than a week, the Court added, affirming the district court's order. Before the Court, Penton was represented by Palo Alto attorneys Justin J. Calderon of Baker McKenzie, LLP, and Harrison Frahn and Pierce MacConaghy of Simpson Thacher & Bartlett, LLP. *See: Penton v. Johnson*, 2023 U.S. App. LEXIS 28734 (9th Cir.).

Meanwhile, on September 13, 2023, Johnson lost a bid at the Court to stay a trial on Penton's claims. *See: Penton v. Johnson*, 2023 U.S. App. LEXIS 24329 (9th Cir.). A week later, at the conclusion of a three-day trial on September 20, 2023, the jury agreed that Johnson was liable for all three violations, awarding Penton $475,000. He filed a motion for costs and fees for his attorneys. Johnson filed a motion for a new trial. But the district court denied

that motion on July 12, 2024. *See: Penton v. Johnson*, 2024 U.S. Dist. LEXIS 123082 (E.D. Cal.).

That paved the way for its latest decision, awarding Penton $712,500 in attorney's fees, representing 150% of his judgment, though he was responsible to pay a portion of those fees equal to 25% of the judgment, or $118,750—both as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Another $34,202.25 was awarded for attorney's fees spent to defend the judgment during Johnson's appeal to the Ninth Circuit and motion for a new trial. In addition, costs of $160,792.72 were awarded to Plaintiff. With his jury verdict, Penton's total recovery was 1,263,744.90. It is a remarkable outcome for Penton's perseverance through nearly 13 years of litigation. *See: Penton v. Johnson*, USDC (E.D. Cal.), Case No. 2:11-cv-00518. 🖎



## Blackstone Career Institute

# Change your life
### *Learn The Law!*

Earn your paralegal certificate! Blackstone's Independent Study Paralegal Program offers you the opportunity to be productive while serving time.

— As low as —
# $30 Per Month

- • Affordable Tuition, Easy Payment Plan
- • Includes Civil Litigation & Criminal Law
- • 125 Years of Legal Training Experience
- • Potential earned time for education training

☐ **Yes!** I'd like to learn more. Please rush me **FREE** course information.

Name _____ Doc# _____

Address _____

_____

City_____ State _____ Zip _____

Your tuition cost covers your entire program including all textbooks, study guides, exam and homework evaluation services, and your certificate.   **PLN**

P.O. Box 3717 | Allentown, PA 18106

# Texas Executioners Playing Fast and Furious to Obtain Lethal Drugs

The Texas Department of Criminal Justice (TDCJ) has been buying a drug used to execute condemned prisoners from a compounding pharmacy with a history of safety violations, according to an investigation reported by *NPR News* on July 10, 2024.

After major pharmaceutical companies refused to participate in executions, TDCJ turned to Rite-Away Pharmacy and Medical Supply, located near San Antonio, to supply pentobarbital for executions from 2019 to at least late 2023. But state inspectors uncovered a troubling record at Rite-Away, with more than a dozen violations documented over the past decade, including unclean facilities, improper record-keeping and mishandling medications.

For allegedly fueling the opioid epidemic, the U.S. government in 2021 sued another location in San Antonio, Rite-Away Pharmacy & Medical Supply #2, the business operating name of Zarzamora Healthcare LLC, which was accused of distributing powerful painkillers to fill prescriptions that were evidently "not for any legitimate medical use," according to a statement by the federal Department of Justice. Under a consent decree entered in federal court for the Western District of Texas on October 12, 2023, the firm and its pharmacist, Jitendra Chaudary, paid a $275,000 civil fine and were permanently enjoined "from dispensing certain opioid prescriptions, including combination opioid and benzodiazepine prescriptions," and required to "undergo periodic comprehensive reviews of their dispensing practices." *See: United States v. Zarzamora Healthcare LLC*, USDC (W.D. Tex.), Case No. 5:22-cv-00047.

Although TDCJ declined comment, Rohit Chaudary, co-owner of the other Rite-Away branch, confirmed his involvement in selling injectable pentobarbital to the prison agency. The former pharmacist employed to compound it declined to be named for fear of reprisal but said that state employees arrived in unmarked cars to hand-deliver the active ingredient in a bag with a photocopied label, which he guessed came off a container bought from a "chemical company."

"I don't remember any of them ever coming in a DOC vehicle," said the former Rite-Away pharmacist, "because, again, that would attract attention."

Compounding pharmacies custom-create medications rather than selling standard drugs commercially available from pharmaceutical manufacturing firms. Although the federal Food and Drug Administration approves individual ingredients used, it does not approve compounded drugs in their finished form, not least because the process shortens drug shelf life. TDCJ has retested some old doses of pentobarbital before relabeling them with new "beyond-use" dates, which are much like expiration dates.

Texas was set to execute Ruben Gutierrez with pentobarbital on July 16, 2024, before a last-minute stay granted by the Supreme Court of the United States, which agreed to hear his challenge to the state's refusal to conduct DNA testing on evidence used to convict him. *See: Gutierrez v. Saenz,* 144 S. Ct. 2718 (2024). TDCJ has scheduled four more executions in 2025. ◾

Additional source: *NPR News*

# Ninth Circuit Greenlights Muslim Hawaii Prisoner's Challenge to Early-Served Ramadan Meals

*by Douglas Ankney*

On February 5, 2024, the U.S. Court of Appeals for the Ninth Circuit reversed a grant of summary judgment to Defendant Hawaii Department of Corrections and Rehabilitation (DCR) officials accused by prisoner Dewitt Lamar Long of violating his First Amendment right to free exercise of his Muslim religion when they served his evening meal four hours before he break his daily fast at sundown during Ramadan.

Long was imprisoned at the high security Halawa Correctional Facility (HCF) in Aiea in 2017 when a guard named Sgt. Lee delivered his evening meals around 3:30 p.m. long before sundown arrived around 7:30 p.m. Since it was during the month of Ramadan, Long's faith prohibited breaking his fast earlier; but by then "the food was often inedible and potentially unsafe, and, if eaten, exacerbated his stomach ulcers," the Court later recalled.

In the 42 U.S.C. § 1983 complaint he filed *pro se* in federal court for the District of Hawaii, Lee also asked "that staff reassess their policy and procedures, and be properly trained so as the religious rights of all are respected equally … as well as during Ramadan evening meals be served hot and or the microwave be made available."

The district court granted summary judgment to Lee, citing *LeMaire v. Maas*, 12 F.3d 1444 (9th Cir. 1993), in which the Ninth Circuit held that unappetizing but nutritious "Nutraloaf" did not constitute cruel and unusual punishment under the Eighth Amendment and that "food served cold, while unpleasant, does not amount to a constitutional grievance." The lower court also granted summary judgment to Defendant Security Chief Lyle Antonio on Long's claim that a temporary transfer to a higher-security DCR prison was retaliatory. Summary judgment was also granted to another Defendant guard, kitchen chief Sgt. Sugai, whom Long claimed singled him out for smaller servings at mealtimes, many of which he was also forced to eat in his cell.

Long appealed, and the Ninth Circuit affirmed dismissal of Long's claims against Antonio—finding no evidence of retaliatory intent—and Sugai; his testimony was credited over Long's, and the Court found no error in that. Turning to the First Amendment claim against Lee, the Court said it must first determine whether Long's free exercise of his religion was "substan-

tially burdened," as held in *Jones v. Williams*, 791 F.3d 1023 (9th Cir. 2015).

Here, a sister circuit's ruling in *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205 (10th Cir. 1999) was directly on point: A Muslim prisoner in punitive segregation and unable to eat his evening meal when delivered had to save crackers and dry food from lunch and breakfast in order to eat after sundown; "the prison's actions infringed on the inmate's right to free exercise of his religion," the Court recalled, and defendants had not offered "any legitimate penological interests to justify that infringement," as laid out in *Turner v. Safley*, 482 U.S. 78 (1987).

The Court explained that a "substantial burden exists when the state places substantial pressure on an adherent to modify his behavior and to violate his beliefs," citing *Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022). Judicial notice was taken that "some food cannot safely sit at room temperature for four hours," citing *Food Facts: Serving Up Safe Buffets*, F.D.A. (2017). Plus, the Court had "consistently held that the failure to provide food consistent with a prisoner's sincerely held religious beliefs constitutes a substantial burden on a prisoner's free exercise," as recorded in *Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008). Clearly, delivery of Long's evening meal at 3:30 p.m. during Ramadan substantially burdened free exercise of his religion, the Court continued, and the district court should have evaluated the factors laid out in *Turner* to determine whether the burden was justified.

Accordingly, summary judgment was vacated as to Lee and the case remanded. Before the Court, Long was represented by California attorneys Curt Cutting and Rebecca G. Powell of Horvitz & Levy LLP, Burbank, as well as Maxwell Lyster and Macy Merritt, Certified Law Students from Pepperdine University Caruso School of Law's Ninth Circuit Appellate Advocacy Clinic in Malibu. *See: Long v. Sugai*, 91 F.4th 1331 (9th Cir. 2024).

Back at the district court, a confidential settlement was reached on October 4, 2024. *PLN* has requested documentation, since it's unclear why the settlement terms were kept off the docket. It is possible that DCR simply wants to avoid bad publicity like that generated for the city of Honolulu, when it paid $35,000 in 2013 to settle Long's claims that city cops beat him up during a traffic stop—while he was also awaiting sentencing for raping a 15-year-old. Charges from the traffic stop were eventually dropped. ◾

Additional source: *Honolulu Civil Beat*

# Details Vague on Spending from San Diego Jail Detainee Welfare Fund

The commissary operated in San Diego County jails collected enough revenue from detainee purchases to pump up the balance in its Incarcerated Persons' Welfare Fund (IPWF) to $11.1 million by June 30, 2024. But the office of Sheriff Kelly A. Martinez provided few details about fund spending, which state Penal Code § 4025e says "shall be used solely for the benefit and welfare of" those incarcerated.

Rather, county commissioners received a one-page report announcing that $5.7 million was spent from the fund in the previous fiscal year. An accompanying pie chart noted that 75% went to educational programs, without providing any specifics. Bus passes and other goods and services for indigent detainees consumed another 11% of that total. About $700,000 more went to cover supplies, operations, equipment and other services. In years past, this included vehicle fuel and maintenance, as well as employee cellphones and even out-of-county travel. But again, no detail was provided. The report showed that the lion's share of IPWF spending—75%—went to "educational services," which the law allows the Sheriff to use for salaries of employees who provide them. But again, no details were provided.

County resident Paul Henkin complained in an email, "To call an annotated pie chart an itemized report as called for in Penal Code 4025e is a bit of a stretch."

Nick Shepack, Nevada Director for the nonprofit Fines and Fees Justice Center, said that the language of the law "allows for what we are seeing in San Diego to be very common," with IPWF raided "to pay visitation staff or anyone working in the commissary."

San Diego County's IPWF has also paid for detainee phone calls, since commissioners voted to make them free in 2021. A grand jury convened to examine evidence of fund mismanagement recommended on June 1, 2023, that the Incarcerated Person's Welfare Committee, which oversees the fund, "[c]reate and maintain ongoing detailed multiyear spending plans" as well as requiring those in "positions funded in whole or in part by the IPWF" to complete "periodic time studies to avoid overcharges to the fund." *See: Incarcerated Person's Welfare Fund*, San Diego Cty. Grand Jury Report (2023).

In its response on July 25, 2023, the Sheriff's Department largely disagreed with the grand jury findings and refused to implement its recommendations. The lack of transparency about how money collected from detainees is spent is one way to avoid criticism, of course. As *PLN* reported, the Sacramento County Sheriff's Office was harshly chastised in 2021 when it came to light that its IPWF had been raided to pay for employee trips and salaries as well as expenses, including parking lot improvements. [See: *PLN*, Oct. 2021, p.40.] ◾

Additional source: *San Diego Union-Tribune*



# Lawsuit Over Death or Severe Injury of 29 Houston Jail Detainees Survives Motion to Dismiss

*by Matt Clarke*

On October 7, 2024, the federal court for the Southern District of Texas refused a motion by Defendant Harris County Jail officials in Houston to fully dismiss claims made by two Plaintiffs who intervened in a massive suit filed after 27 jail detainees died or were severely injured.

The now-29 Plaintiffs—former detainees or family members of those who died in the jail between late-2021 and mid-2023—include five proceeding *pro se*: Tramell Morelle, Bernard Lockhart, Deborah Smith, Judith Jones and Jackie Luna. The rest are represented by attorneys Benjamin L. Crump and Paul A. Grinke from Ben Crump Law Office in Tallahassee, Florida and Frisco, Texas. Crump is known for representing victims of law enforcement abuse, including the family of George Floyd.

The suit was filed on August 7, 2022, making civil rights claims for unconstitutional conditions of confinement and failure to train or supervise staff, as well as violations of the Americans with Disabilities Act (ADA), 42 U.S.C. ch.126 § 12101, et seq., and the Rehabilitation Act (RA), 29 U.S.C. § 701, et seq. The allegations are gruesome: detainees beaten nearly to death by guards or other prisoners, then simply allowed to languish for hours in pain until they expired. Other detainees were allegedly denied mental health medication and left to decompensate until their untreated psy-chosis so irritated guards or other detainees that they were beaten to death. Still, other detainees claimed that life-threatening medical emergencies went ignored while defendants failed to intervene or even encouraged violence between detainees.

In their unconstitutional conditions of confinement claim, Plaintiffs blamed five problematic jail policies or practices: (1) overcrowding and understaffing; (2) failure to properly observe and monitor detainees; (3) denial of medical care; (4) institutionalized use of excessive force by guards against detainees; and (5) a culture of violence encouraged by jailers.

On April 15, 2024, the Court rebuffed a motion by Defendants to sever the original case into 27 separate lawsuits, also allowing the two new intervenors: Ana Garcia, whose son, Kevin Alexander Sanchez-Trejo, died after complaining of severe abdominal pain for 80 days without receiving medical care, she claimed; and Chandra Jenkins, whose son, Dequon Buford, alleged repeated sexual assaults by other detainees because Defendants failed to protect him from abuse and then denied medical care after he was injured. The Court held that both had issues and questions of law and fact in common with the other Plaintiffs sufficient to permit intervention. *See: Wagner v. Harris Cty.*, 2024 U.S. Dist. LEXIS 68793 (S.D. Tex.).

ADA and RA claims by the original 27 Plaintiffs were dismissed on June 4, 2024, but not the unconstitutional conditions of confinement claim nor the claim for failure to train and supervise jail staff. *See: Wagner v. Harris Cty.*, 2024 U.S. Dist. LEXIS 98779 (S.D. Tex.). The Court's most recent ruling extended that same decision to Intervenors Garcia and Jenkins. *See: Wagner v. Harris Cty.*, 2024 U.S. Dist. LEXIS 182546 (S.D. Tex.).

As *PLN* reported, the jail has repeatedly failed inspections by the Texas Commission on Jail Standards. [See, e.g.: *PLN*, June 2024, p.47.] At the request of Sheriff Ed Gonzalez, the FBI opened an investigation in February 2023 into jail deaths, including one the month before of detainee Jacoby Pillow, whose estate is lead Plaintiff in this suit. Prior to its filing, there were at least 51 lawsuits in state and federal court challenging conditions of confinement at the jail.

"We've all experienced the same loss, and we're all seeking the same thing. We're all seeking justice," said Jacilet Griffin-Lee, whose son, Evan, died in the jail in March 2022 after being beaten by another detainee and allegedly denied adequate medical care. The case remains open. *PLN* will update developments as they are available. *See: Wagner v. Harris Cty.*, USDC (S.D. Tex.), Case No. 4:23-cv-02886. ◪

Additional source: *ABC News*



# Great lawyers get results.

## A History of Success in Wisconsin

Matthew Pinix

| Appeals: | Homicide overturned, 2014 |
| Postconviction: | 37.5-year sentence vacated, 2015 |
| Habeas: | Homicide overturned, 2020 |
| Civil Rights: | $2.4 mil on guard's sex assault, 2019 |

**Pinix Law, LLC** | 1200 East Capitol Drive, Suite 360 | Milwaukee, WI 53211 | (414) 963-6164 | info@pinixlaw.com

# Mentally Incompetent Maine Defendants Sent to South Carolina Wellpath Lockup Called "Essentially Prison"

Pre-trial detainees found not criminally responsible in Maine are being quietly transferred from the state's Riverview Psychiatric Center in Augusta to Columbia Regional Care Center, a South Carolina psychiatric lockup owned by Wellpath, Inc. Wellpath has filed for federal bankruptcy court protection, as reported elsewhere in this issue. [See: *PLN*, Jan. 2025, p.1.]

In the fiscal year ending on June 30, 2024, the Maine Department of Health and Human Services (DHHS) spent $53.8 million to run Riverview and another $1.2 million on six treatment beds at Columbia. Just a month earlier, 29 of 92 licensed beds at Riverview were empty.

DHHS spokesperson Lindsay Hammes said that those sent south had "demonstrated a high level of violence" or assaulted other staff and patients. But transferees reported harsher conditions at Columbia than at Riverview: more isolation and less privacy from omnipresent guards, as well as increased use of restraints and limited access to treatment and activities.

Anthony Reed, the first Maine defendant sent to the South Carolina lockup in 2015, died there in December 2023; DHHS has released no information about the death, except that Reed was 48. His transfer had already raised the eyebrows of an Augusta judge, as well as his father, who begged state lawmakers in 2019 to investigate Columbia. Another Maine detainee, James Staples, 67, died at Columbia in 2018, a year after he pried out an eyeball at Maine State Prison, prompting the transfer.

Malcolm Moore, 50, who was found not guilty of fatally stabbing a neighbor by reason of insanity, spent 10 years confined at Riverview before he was shipped to Columbia in 2022 for refusing his medication for paranoid schizophrenia. Said his court-appointed attorney, Hank Hainke, "These people are essentially in prison."

But detainees like Reed, Staples and Moore have no say in their transfers and limited communication with attorneys, raising due-process concerns. "They haven't been sentenced [to the South Carolina lockup]," Hainke pointed out. "It's illegal to just put someone in a prison." ◼

Source: *Portland Press Herald*

# Muslim New York Prisoner's Free Exercise of Religion Claim Reinstated

*by David M. Reutter*

On May 15, 2024, the United States Court of Appeals for the Second Circuit reversed summary judgment on a New York prisoner's First Amendment free exercise claim while also affirming a jury's verdict finding continuous lighting in his cell did not constitute cruel and unusual punishment.

Chamma K. Brandon filed his *pro se* civil rights suit in federal court for the Southern District of New York, bringing two claims against state Department of Corrections and Community Services (DOCCS) officials over events while he was incarcerated at Sing Sing Correctional Facility. The first claim alleged that he was denied a special meal in celebration of Eid al-Adha, to which he was entitled under the First Amendment because it was necessary for the free exercise of his Muslim religious faith. The second claim accused DOCCS of violating his Eighth Amendment guarantee of freedom from cruel and unusual punishment by keeping his housing block lighted constantly.

In the first claim, Brandon recalled that Sing Sing officials said too many prisoners were signed up for the Eid-al-Adha event so the meal was offered in cell to encourage takers to withdraw and allow the event to occur. Brandon was one of those who voluntarily withdrew from the Eid al-Adha celebration in exchange for having the meal for the event brought to his cell. But the meal was not delivered after a prison employee ordered the meals destroyed as unauthorized. Brandon alleged this violated of his First Amendment rights, but the district court granted Defendant DOCCS officials summary judgment on the claim in 2021, concluding that they had a legitimate penological interest in denying the in-cell meal and that Brandon had alternative means of exercising his right by attending the event.

However, the Second Circuit did not agree. Brandon claimed that the whole reason for offering the meal in his cell to begin with was because there were too many prisoners signed up to receive it in the dining hall so that was not legitimately an "alternative means" of exercising his religious rights. The appellate Court said this created a disputed material fact for a jury to decide, so summary judgment on this claim was reversed.

The second claim had proceeded to a five-day jury trial at the district court in September 2021, when a verdict was returned for Defendants. But jurors never heard Brandon's expert testimony from Dr. Steven Lockley, who would have explained the extremely negative effects of 24/7 lighting on his health. The district court excluded this testimony because it wasn't offered during discovery, and it refused to reopen discovery because of prejudice and additional expense that Defendants would suffer as a result. On appeal, Brandon argued that this also was an error. But the Second Circuit disagreed, affirming the judgment entered after the jury verdict. Before the Court, Brandon was represented pro bono by attorney Alessandra DeBlasio in Manhattan. *See: Brandon v. Royce*, 102 F.4th 47 (2nd Cir. 2024). ◼



# America's Largest Gift Shop for Inmates.
"Express Love to Your Family & Friends With Thoughtful Gift Surprises."

Premium Jewelry
Gucci
Louis Vuitton
Versace
Electronics

Designer Gift Baskets
Stuffed Animals
Scented Candles
Kids Smart Toys & More
Over 250 Gift Choices!
Website: www.timezonegifts.shop

Write for your FREE Gift Catalog TODAY!
TimeZone Gifts, LLC
P.O. Box 1974, Dept PLN
Cypress, TX 77410
Email: shop@timezonegifts.shop
Phn. 1-800-731-6726

# $400,000 Jury Verdict for Medical Neglect Resulting in Amputation of Alabama Prisoner's Toes

On May 20, 2024, a federal jury in Alabama returned a verdict against a doctor employed by Wexford Health Sources, Inc., the private medical provider contracted by the state Department of Corrections (DOC). It was part of a civil rights action brought by a prisoner who suffered medical neglect that eventually led to the amputation of his toes.

When Canyon Duff Moye arrived at Kilby Correctional Facility in August 2019, he had an injury to his left foot. But the foot's condition was "stable, with no open sores or need for medical treatment," as recalled in the complaint he later filed. Less than a week later, however, he had developed blisters due to the low-quality shoes he was issued.

Moye received a "no-work" slip from the medical department, but prison officials required him to continue working anyway. He was transferred to Fountain Correctional Facility a few months later, and the blisters on his foot worsened and developed into open sores. By late 2019, "there was a stench from the wounds on [his] foot" and "holes in the pad of [his] foot below the big toe and below the middle toe area," all of which was documented in a photo taken by another prisoner.

Despite this serious injury, and even though it became infected, he was not referred to a wound care specialist. Instead, Wexford staff gave him only ointment. His requests for treatment went ignored, and by the time he finally saw a general surgeon in January 2020, all the toes on his left foot had to be amputated.

Following that surgical procedure, Moye was returned to Fountain and his injury again worsened, causing a "significant hole" to develop in his left foot. Yet medical staff again failed to provide adequate care, including "not properly packing the wounds, not properly wrapping the wound, and not allowing necessary treatment modalities." As a result, his injury "continu[ed] to

Fester" for another year until he was released from prison.

Moye filed suit in federal court for the Southern District of Alabama in 2022, raising claims of unconstitutional deliberate indifference to his serious medical needs as well as violations of state law related to the poor conditions of his confinement. He named Wexford, its medical director at Fountain, Dr. Manuel Pouparina, along with Warden Mary Cooks and Warden Reosha Butler as Defendants.

The district court granted summary judgment to Wexford and both wardens on March 5, 2024, granting partial summary judgment to Dr. Pouparina regarding the conditions-of-confinement claim. The case proceeded to trial in May 2024, where the doctor accused his former patient of failing to follow after-care instructions. Two experts testified that he provided "excellent care" and suggested that other factors caused Moye's infection to spiral out of control.

The jury wasn't buying that, however, and returned a verdict against Dr. Pouparina on the medical neglect claim. Moye was awarded $400,000 in compensatory damages for his injury. He was represented by attorneys Edward P. Rowan and Tiffany Ray with Taylor Martino, PC in Mobile. *See: Moye v. Butler*, USDC (S.D. Ala.), Case No. 1:22-cv-00026.

The DOC did not renew its contract with Wexford when it expired in July 2022, opting to hire YesCare, as *PLN* reported; the new provider is a Frankenstein cobbled together from profitable pieces of what used to be Corizon Health, whose money-losing parts were shunted into another entity called Tehum Care Services, which has filed for bankruptcy. [See: *PLN*, Oct. 2022, p.22; and Nov. 2024, p.29.] ◢

# Wisconsin DOC Under Fire for Hiring Censured Doctors

The Wisconsin Department of Corrections (DOC) was on the hot seat after an investigation published in the *New York Times* on July 2, 2024, revealed that nearly a third of physicians hired by the prison system over the past decade had faced censure before their employment for medical errors or ethical breaches.

Dr. Joan Hannula, for example, surrendered her medical license in California and pleaded guilty to drug possession and prescription forgery, yet she was hired anyway by the DOC. It's not an uncommon career move for physicians after facing disciplinary actions; as the vacancy rate for prison doctors climbed from 13% in early 2016 to 37% by October 2023, the DOC couldn't afford to be choosy. Spokeswoman Beth Hardtke said that doctors need only hold an unrestricted state medical license and complete any required rehabilitation programming.

But former state Medical Examining Board Chair Dr. Sheldon Wasserman reviewed the DOC hires and concluded, "A lot of these people are unemployable." Among them was Dr. Rey Palop, who had been convicted of obtaining controlled substances by fraud; and Dr. Kevin Krembs, who'd been investigated by the DEA for illegally prescribing controlled substances and deemed "unfit to practice" by Indiana's medical board.

One of Hannula's patients, state prisoner Darnell Price, watched a lump on his thigh grow abnormally large as she refused to order a biopsy. When Price eventually got a new doctor, he was diagnosed with Stage 4 cancer and granted compassionate release. With the aid of Waunakee attorney Jeff Scott Olson, he filed suit under 42 U.S.C. § 1983 in federal court for the Western District of Wisconsin. The parties announced they'd reached a settlement on September 4, 2024; *PLN* has requested copies of the documents and will update details as they are available. *See: Price v. Hannula*, USDC (W.D. Wisc.), Case No. 3:24-cv-00009. ◢

Additional source: *New York Times*



## Wellpath Declares Bankruptcy

On November 11, 2024, Wellpath Holdings, Inc., and its affiliated corporate entities filed for bankruptcy protection in United States Bankruptcy Court for the Southern District of Texas. Wellpath is a private, for-profit medical and mental health care provider at approximately 420 detention facilities in 39 states; as *PLN* readers know, the company is also often sued for providing substandard and even fatal care to prisoner-patients. [See, e.g.: *PLN*, July 2024, p.53.]

Wellpath's filing cites "escalating operating and labor costs, a transitory increase in professional liability insurance expenses, and underperformance on several significant contracts" as the primary reasons for seeking bankruptcy protection. The company asked the bankruptcy court for protection while it restructures its debt so it may remain in business.

In the way a typical bankruptcy case unfolds, creditors form a committee and provide the court an estimate of the bankrupt company's outstanding obligations. The court then orders the company to set aside funds to partially settle some—or more often, just a part—of these obligations and then enters an order discharging the unpaid balance. Any litigation pending against the company is typically stayed pending final resolution of the bankruptcy proceeding.

So how does this impact prisoners with cases involving Wellpath? To begin with, any pending case in which Wellpath is a defendant that has not been reduced to judgement will likely be stayed until the bankruptcy proceeding is final.

For example, the family of Maurice Monk, a prisoner who died in California's Alameda County Jail, sued various county officials and Wellpath for his wrongful death, allegedly from medical neglect. The county settled its share of the case for $7 million dollars, as PLN reported. [See: *PLN*, June 2024, p.44.] But that did not resolve the estate's claims against Wellpath. After it filed bankruptcy, Wellpath sought to stay proceedings in the Monk case, but the estate's attorneys objected. The bankruptcy court has not yet resolved the dispute. *See: Est. of Monk v. Cty. of Alameda,* USDC (N.D. Cal.), Case No. 3:22-cv-04037.

Monk's estate is represented by counsel so therefore better positioned than many prisoners with claims or judgments against Wellpath because those attorneys have the ability to participate in the bankruptcy proceeding trying to protect the estate's interests. But what about prisoners who represented themselves and obtained as yet unpaid judgements against Wellpath? They have no way of participating in any creditors committee to secure at least a portion of the money Wellpath owes them. As has been seen when other private correctional medical contractors file bankruptcy, such prisoners are often left out of the process entirely and their claims go unpaid.

*PLN* will continue to monitor proceedings and update developments as they become available. Any *pro se* litigants with claims or judgments against the company are advised to pay close attention to the case and seek legal representation if possible. *See: In re Wellpath Holdings, Inc.*, USBC (S.D. Tex.), Case No. 24-90533. 🖋

## Minnesota Prisoners Getting Scanned Mail, Kept Waiting 18 Months for Tablets

Starting November 1, 2024, prisoners held by the Minnesota Department of Corrections (DOC) stopped getting physical mail, which is now diverted to Baltimore for electronic scanning by private contractor TextBehind. Printed copies of the scans—complete with all the errors that go along with the technology—are then shipped to prisons for distribution through mailrooms. Or senders can avoid that delay by sending electronic documents to TextBehind and paying for their delivery to prisoner tablets.

However, when DOC switched tablet providers in May 2023, prisoners could no longer get a device from former contractor JPay. They also couldn't get one from new contractor ViaPath, formerly Global Tel*Link (GT*L); in fact, those tablets were not set for distribution until December 2024 in one state prison—and 2025 for the rest.

Meanwhile, many prisoners were left with JPay tablets that died—locking them out of downloaded music, movies, podcasts, books, games, messages and even photos. Worse, that content, even the part they paid for, cannot be restored.

Those with operable tablets have still been able to buy new downloads during the year and half that ViaPath/GT*L has taken to ready its tablets for distribution—a delay that DOC Spokesperson Aaron Swanum blamed on satisfying requirements of the Americans with Disabilities Act of 1990, 42 U.S.C. ch.126, § 12101, et seq.

Because apparently neither the DOC nor ViaPath/GT*L could anticipate the requirements of a law passed 35 years ago.

The DOC blamed the ban on physical mail, and the resulting switch to TextBehind's service, on a September 2024 incident when nine employees at the state prison in Stillwater were sent to the hospital after suspected exposure to drug-soaked letters. However, that suspicion has not been confirmed, and the incident remains under investigation.

Tellingly, when the state made phone calls free for its 8,000 prisoners in July 2023, the DOC was deprived of about $1.3 million in kickbacks collected in 2022. Kickbacks from tablet-delivered services in 2023 fell short of that, totaling just $274,365—not least because the law that made calls free also banned the DOC from collecting kickbacks on calls, video calls or messages. But other downloads—along with associated money-transfer services—are fair game. Under its new contract with Viapath/GT*L, the DOC's kickbacks on these will rise from 5% to 20%.

For now, prisoners without tablet access—and money to use tablet services—must stand in line to make free calls or use paid kiosk time for messaging, on top of waiting for their scanned mail to wind its way to their prison mailroom and then to their cell.

In 2025, that is what the prison-industrial complex calls progress. 🖋

Sources: *KSTP, Minneapolis Star-Tribune, Minnesota Reformer*

# Fourth Circuit Revives West Virginia Prisoner's RLUIPA Claim Over Religious Diet with Soy He Can't Digest

On March 20, 2024, the United States Court of Appeals for the Fourth Circuit reversed dismissal of an Islamic prisoner's federal civil rights lawsuit accusing West Virginia Department of Corrections and Rehabilitation (DCR) officials of violating his rights under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. ch. 21C § 2000cc et seq, by forcing him to eat a special religious diet consisting of mostly soy—to which he is allergic. Ricky Pendleton prevailed under a clever argument that the gastrointestinal problems he suffered as a result rendered the food "Haram," or forbidden by his religion.

How? His complaint said that the "Sufi Original Traditions" of Islam which he follows, require a diet that "aids in the purification of the mind, body and the reparation of [the] mental/inner self" while promoting "compassion and harmlessness to living creatures." But DCR's one-size-fits-all "religious special diet" relies on soy to replace protein calories missing from meat. Though Pendleton's faith does not prohibit soy, it causes him vomiting, abdominal pain, constipation and other digestive issues. Since that clearly does not "aid[] in the purification of the mind [and] body," he argued that the food was "Haram," forbidden by Islamic law, and sought a special religious accommodation, filing a series of grievances that were all denied.

Proceeding *pro se*, Pendleton then filed suit in the U.S. District Court for the Southern District of West Virginia, accusing DCR officials of violating his religious rights under the First Amendment and RLUIPA. He also filed a request, which the district court construed as a motion for preliminary injunction, to be served food consistent with his religious dietary belief. The district court denied Pendleton's request and granted DCR's motion to dismiss, ruling that he had not adequately alleged that he was being forced to consume food forbidden by his religion. After securing representation from attorney Helen E. White of Munger, Tolles & Olson, LLP in Washington, D.C., Pendleton appealed to the Fourth Circuit.

The first issue the Court confronted involved precisely which documents Pendleton had filed in the district court; Pendleton's complaint used a standardized form, to which he attached a "memorandum of law" setting forth his claims under RLU-IPA. The Court decided that was fine—even attorneys may "incorporate" other documents "into the complaint by reference," the Court said, citing *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159 (4th Cir. 2016). Moreover, as a *pro se* prisoner, Pendleton's filings were entitled to "a liberal construction," per *Allen v. Atlas Box & Crating Co.*, 59 F.4th 145 (4th Cir. 2023).

The Court then turned to the core issue: whether prison officials violated Pendleton's rights. RLUIPA forbids imposing a "substantial burden" on a prisoner's religious exercise, absent a showing that it furthers "compelling government interest" and is "the least restrictive means" of doing so. The law does not define what constitutes a "substantial burden," but the Fourth Circuit had previously found it resulted "when a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs," as held in *Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006).

Putting someone "between a rock and a hard place" by "forcing [him] to choose between a government-provided benefit and [his] religious convictions" is how a government imposes a substantial burden on religious practice, the Court declared, quoting *Incumaa v. Stirling*, 791 F.3d 517 (4th Cir. 2015). Pendleton's complaint said that he faced "exactly that predicament." The Court agreed that "[t]he rock against which Pendleton says the defendants have put him, then, is the prospect of going without adequate food.".

Prison officials nonetheless contended that they had not substantially burdened Pendleton's religious practice because his complaint did not allege that "returning to the regular diet and avoiding meat would leave him malnourished." Moreover, they argued, Pendleton's RLUIPA claim must fail because he could get nutritionally complete meals by "supplementing his diet by purchasing items from the prison commissary."

The Court "firmly" rejected these arguments for two reasons.

First, RLUIPA guarantees prisoners the right to an adequate diet consistent with their religious beliefs, as the Court



# DIRECTORY OF FEDERAL PRISONS

## The Unofficial Guide to Bureau of Prisons Institutions

### BY CHRISTOPHER ZOUKIS

The Directory of Federal Prisons is the most comprehensive guidebook to Federal Bureau of Prisons facilities on the market. Not simply a directory of information about each facility, this book delves into the shadowy world of American federal prisoners and their experiences at each prison, whether governmental or private. What sets the Directory of Federal Prisons apart from other prison guidebooks is the first-hand validation of information.

**Price: $99.95** *(shipping included)*

Name _____ DOC/BOP # _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Prison Legal News • PO Box 1151, Lake Worth Beach, FL 33460
Tel. 561-360-2523 • www.prisonlegalnews.org**

declared in *Carter v. Fleming*, 879 F.3d 132 (4th Cir. 2018). By incarcerating Pendleton, West Virginia deprived him of the ability to provide that diet for himself and made him "dependent on the" prison system "for food," the Court said, quoting *Brown v. Plata*, 563 U.S. 493 (2011). Pendleton's complaint sufficiently alleged that the special diet consists of soy "95% of the time" and meat is served with nearly every standard meal (neither of which he can eat). This plausibly established that "subtracting a major component from a diet designed to be nutritionally sound would render that diet no longer nutritionally sound," the Court said.

Second, although RLUIPA does not require states to pay for a prisoner's "devotional accessories" such as holy books or prayer oils, per *Cutter v. Wilkinson*, 544 U.S. 709 (2005), "food is no accessory, and providing a religiously compliant diet is not optional," the Court said. As several other circuits have recognized, prison officials may not shift their obligation under RLUIPA to provide adequate meals consistent with a prisoner's religion by showing that the prisoner may obtain supplemental nutrition through commissary purchases, as held for example in *Jones v. Carter*, 915 F.3d 1147 (7th Cir. 2019), and *Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781 (5th. Cir. 2012).

DCR's final argument was that Pendleton refused to submit to medical testing to prove his soy allergy. Because they brought their motion to dismiss before discovery, Pendleton was not required to produce such evidence. Yet the Court said, "Instead, it is enough that he has plausibly alleged that he cannot digest soy and that he suffered gastrointestinal distress after switching to the religious special diet." Moreover, he never asserted that his religion prohibits him from eating food to which he is medically allergic, but rather food that he has trouble digesting "regardless of whether any resulting distress is medically significant or would be enough for a doctor to tell him he should avoid soy for health reasons," the Court pointed out.

For these reasons, the Fourth Circuit found error in the district court's dismissal of Pendleton's RLUIPA claim and reversed it. Since that was also the predicate for dismissing his First Amendment claim and request for injunctive relief, those rulings were also vacated and the case remanded. *See: Pendleton v. Jividen*, 96 F.4th 652 (4th Cir. 2024).

Back at the district court, where Pendleton once again proceeded *pro se*, the parties announced a settlement was reached, stipulating to dismissal on July 19, 2024. *PLN* has requested a copy of the agreement and will update details as they are available. *See: Pendleton v. Jividen*, USDC (S.D. W.Va.), Case No. 2:22-cv-00178. ◼

# No Charges in Alabama Prisoner's Torture, Rape and Murder

Terry Williams, the father of a murdered Alabama prisoner, was reportedly left "speechless" in late October 2024 after an Elmore County grand jury refused to indict his son's alleged attacker, another prisoner identified as "X." Just a year earlier, Daniel Terry Williams, 22, was brutally tortured and raped over several days at Staton Correctional Facility, his body even "rented out" to other prisoners to rape, too; he died at a hospital a week later, on November 9, 2023, as *PLN* reported. [See: *PLN*, Jan. 2024, p.12.]

Williams was nearing release from a one-year sentence for theft when his unconscious body was found on the bed in "X's" cell. In a fiery December 2023 address to state lawmakers, Alabama Appleseed Center for Law and Justice Executive Director Carla Crowder noted that "X," 38, had been involved in nine other attacks over the previous six years in which fellow prisoners were sexually assaulted and stabbed. But there was no documentation of any disciplinary action by the state Department of Corrections (DOC).

In fact, Crowder noted, "X" had "a five-year clear record of institutional violence, which resulted in a perfect score of zero in risk assessment conducted in October [2023], and a total score low enough for him to be placed in medium security in an open bay dorm. The psych associates signed off on this and the warden signed off on this."

Instead, guards wrote up "X" and his victims on an "Enemies Report"—effectively assuming that any sexual activity had been consensual, at least to start. What no one will say is why DOC staffers repeatedly turned a blind eye when allegations of abuse by "X" persisted. However, that sort of deference is often reserved for incarcerated informants.

Williams' family has hired Washington, D.C. attorney Andrew Menefee, who said he plans to file a civil rights suit on their behalf. The federal Department of Justice has also sued the state and its DOC for running prisons "riddled with prisoner-on-prisoner and guard-on-prisoner violence," as *PLN* also reported. [See: *PLN*, Apr. 2021, p.34.] That suit is headed to trial.

Meanwhile, the state is pressing forward with construction of a new "mega-prison," which will be named in honor of Gov. Kay Ivey (R). Making that announcement on November 13, 2024, spokeswoman Gina Maiola said that there was "no governor in Alabama's history who has done more to improve the state's corrections system."

Incredibly, Maiola apparently managed to keep a straight face, too. ◼

Sources: *Alabama Reflector, Birmingham News, Moth to Flame*



**NOBLE KNIGHT GAMES**
*Complete Your Quest!*

We have the world's largest selection of RPGs, CCGs, board games, war games, miniatures, and collectibles!

A free copy of our most popular books and games catalog is available for first time customers!

Orders can be placed through mail, phone, and directly through our website!

We accept institutional checks, money orders, credit cards, forever stamps (at 75% of the stamp's value), and payments through friends and family.

Before placing your order, we recommend that you review the policies of your institution regarding what you are allowed to receive, and any restrictions on what payment methods are allowed.

Questions? Contact us via mail, email, or phone.

608-758-9901
nobleknight@
nobleknight.com

Noble Knight Games
2835 Commerce Park Dr
Fitchburg, WI 53545

# Guard Pleads Guilty to Using Excessive Force at Indiana Jail Sued Nine Times in Two Years

Entering a guilty plea in federal court for the Southern District of Indiana on October 15, 2024, former Henry County Jail guard Curtis Lavon Doughty, 27, admitted using excessive force against a compliant detainee in an incident the previous year.

Doughty was guarding detainees that were herded in the jail recreation yard during a cell search on February 13, 2024. He ordered them to face a wall, but one detainee, Matthew Flick, 27, reportedly turned his head, prompting Doughty to yell, "Face the fucking wall!" Flick yelled back that he was "facing the fucking wall." Without warning, Doughty then shot the detainee in the back at point-blank range with a pepper ball gun, leaving a bruise on his spine.

After reviewing surveillance video of the incident the next day, Sheriff John Sproles fired Doughty. County Prosecutor Michael Mahoney charged him with misdemeanor battery. The status of that charge was unclear. Curiously, Sproles cited not the guard's abuse for firing him but his language: "I do not accept dropping f-bombs," he said. The plea agreement did not include a recommended sentence, so Doughty could go to federal prison for up to 10 years. *See: United States v. Doughty*, USDC (S.D. Ind.), Case No. 1:24-cr-00187.

It was the second time in months that a jail detainee was shot with "less lethal" ammunition. Former detainee Marquette Neal was kicking a cell door, he admitted, when Sproles shot him with beanbag rounds at close range behind both knees in July 2023. Neal filed a tort claim in state court for his injuries on November 2, 2023, one of at least nine legal claims filed against the Sheriff's office since Sproles assumed it in January 2023.

Also that day, another tort claim was filed by Shirley Police Dep't Off. Roger Humphries, accusing Sproles of trying to get him fired after a disagreement over handling a disabled bus. Sproles was on his way back from church when he stopped at the broken-down bus to announce his suspicion that the group aboard was engaged in human trafficking; in fact, it was a Milwaukee dance group, whose leader named Winston filed yet another tort claim for Sproles' interference.

Two more claims against the Sheriff were filed in federal court on May 6, 2024; one by the family of Nicholus Woolums, 25, after he died in a car crash while being chased by a first-year deputy, who had not yet attended the state law enforcement academy. The lawsuit alleged that the pursuit was conducted without proper supervision. Plaintiff is represented by attorneys Shannon B. Mize and Jason A. Schartzer of Schartzer Law Firm LLC in Indianapolis. *See: Woolums v. Henry Cty. Sheriff's Dep't*, USDC (S.D. Ind.), Case No. 1:24-cv-01554

That same day, former jail detainee Sam Shipley filed suit alleging sexual abuse by former Deputy Director Jason Bertram. Shipley claimed that jail officials failed to prevent the abuse or adequately respond to his complaints before Bertram committed suicide in January 2023. He is represented by attorneys Annemarie Alonzo and Jonathan C. Little of Saeed & Little LLP in Indianapolis. *See: Shipley v. Williams*, USDC (S.D. Ind.), Case No. 1:24-cv-00766

In another suit filed on January 31, 2024, Stacy Smith said that jailers kept her strapped in a restraint chair for four days after an arrest during a February 2023 mental health crisis with minimal breaks to eat and use the bathroom. When finally allowed to sleep in a padded cell, she awoke to overhear guards boasting of "a new one for the spank bank"—images of her vagina captured from surveillance video that they had kept for their masturbatory pleasure, she said. She is represented by attorneys with the state chapter of the American Civil Liberties Union (ACLU). *See: Smith v. Armstrong*, USDC (S.D. Ind.), Case No. 1:24-cv-00213.

Two additional tort claims filed on January 12, 2024, accused Sproles of abusing his power. In one, Kory Atwood claimed that the Sheriff ran a criminal background check without justification, wrongly calling Atwood a "known gang member" who was attempting to infiltrate the Sheriff's department. In the other claim, Diane Baker said Sproles searched her name in a criminal justice database three times after she left critical comments on Sproles' official Facebook page.

More comments on that Facebook page allegedly provoked Sproles to block local political commentator and podcast host Kristopher Bilbrey. He filed suit on July 20, 2023, also with the ACLU's help. *See: Bilbrey v. Sproles*, *Bilbrey v. Sproles*, No. 1:23-cv-01259

Flick has threatened another suit for Doughty's abuse. "There's been no judgments against me," Sproles insisted. "No claims paid out. These will all see their day in court." Travelers Insurance Co. dropped the County's liability coverage in December 2023. ◾

Additional sources: *Muncie Star Press, WXIN*

---

## Stop Prison Profiteering:
### Seeking Debit Card Plaintiffs

The Human Rights Defense Center is currently suing NUMI in U.S. District Court in Portland, Oregon over its release debit card practices in that state. We are interested in litigating other cases against NUMI and other debit card companies, including JPay, Keefe, EZ Card, Futura Card Services, Access Corrections, Release Pay and TouchPay, that exploit prisoners and arrestees in this manner. If you have been charged fees to access your own funds on a debit card after being released from prison or jail within the last 18 months, we want to hear from you.

Please contact HRDC Legal Team at HRDCLegal@humanrightsdefensecenter.org
Call (561) 360-2523
Write to: HRDC, SPP Debit Cards,
PO Box 1151, Lake Worth Beach, FL 33460

# Pigeonly Flies Into Telecom Turbulence, Declares Bankruptcy

Pigeonly, Inc., a prison communication startup founded by former prisoner Frederick Hutson, filed for Chapter 11 bankruptcy protection on January 26, 2024, in United States Bankruptcy Court for the District of Nevada in Las Vegas.

Pigeonly contracts with jails and prisons to provide mail services for prisoners for a fee. Essentially, the company receives photos intended for prisoners and photocopies them before guards distribute the copies to individual prisoners—with the goal of preventing introduction of contraband through the mail, especially controlled substances such as fentanyl. The service is called Fotopigeon, and it costs prisoners 50 cents per photo.

Pigeonly also provides voice-over-internet (VoIP) phone numbers to prisoners' family members that are local to the facility in which the prisoner is confined. The prisoner is then notified about the number via the mail, and when dialing the local number, the call is forwarded to the family member's phone, reducing the cost of calls. Hutson called this service Telepigeon.

Hutson started Pigeonly with seed money from investors in 2013 after completing a 51-month federal prison sentence for distributing marijuana through the U.S. Mail and FedEx. The company grew exponentially and was highly successful until Spring 2022, when it ran into financial trouble.

First, Stripe, a credit card payment processing company, stopped processing credit card payments Pigeonly received due to a high number of charge backs. Second, Pigeonly experienced a rapid and drastic decrease in revenue during the fourth quarter of 2022 that only got worse in 2023. This is likely due to the convergence of two factors—the national trend of reducing the cost of prisoner phone calls, thereby rendering Telepigeon obsolete, and simultaneous pressure on Fotopigeon from larger companies such as Securus Technologies and Global Tel*Link (now ViaPath) as they entered the prisoner mail-scanning marketplace and offered to send letters and pictures directly to a prisoner's tablet.

Once it fell over this revenue cliff, Pigeonly tried to make up the cashflow shortfall by obtaining merchant cash advances from what Hutson described as "predatory lenders"; it then was unable to make good on the debt, forcing the company into bankruptcy. The company's bankruptcy filings do not clearly indicate whether any of its creditors include prisoners or their family members. The case remains active, and *PLN* will update developments as they are available. *See: In re Pigeonly, Inc.*, USBC (D. Nev.), Case No. 24-10355. ◾

## Federal Post-Conviction and Habeas

- Resentencing
- Motions for new trial
- Rule 35

Pro Bono not accepted. Serious financial inquiries only. Send financial info and inquiries to:

**The Law Offices of Patrick F. McCann**
700 Louisiana, Ste 3950
Houston, Texas 77002
713-223-3805
writlawyer@outlook.com

*Not board certified by the Texas Board of Legal Specialization

# BOP Prisoners in Alabama Strike to Protest Release Date Confusion

On September 11, 2024, several prisoners began a hunger strike at the Federal Prison Camp (FPC) in Montgomery, Alabama, protesting a frustrating lack of clarity about their release dates fully six years after the First Step Act of 2018 laid out procedures for calculation. It is unknown exactly how long the prisoners chose to stay in their cells during scheduled mealtimes, but sources suggested the strike lasted one week.

BOP said the lockup was placed on "modified operations"—meaning it was largely locked down—while staffers were "actively reviewing the circumstances to better understand the incarcerated individuals' decision." It was all especially unusual at the prison, where prisoners are usually able to do "easier time."

Historically, federal prisoners could estimate their release based on serving 85% of their sentences after receiving Good Conduct Time (GCT) credit—up to 54 days per year served—for good behavior. FSA, however, allows eligible low-risk prisoners to earn up to 365 days off their sentences each year by participating in various programming. BOP Director Colette Peters informed the United States House Judiciary Subcommittee in July 2024 that a new forward-looking calculator for FSA credits had been developed but not fully rolled out, leading to widespread confusion among prisoners regarding their release dates.

Prisoners are being provided a Projected Release Date, reflecting GCT credits, as well as a Conditional Release Date, which accounts for projected future credits. With this, a prisoner with a 21-month sentence could serve only 12 months with all FSA credits properly accounted for. However, case managers remain confused about which date should guide planning, leading to inconsistencies in release timelines.

At FPC-Montgomery, tensions rose as prisoners lined up outside case managers' offices, looking for answers about their release dates without receiving satisfactory responses. In retaliation, BOP staff reportedly restricted access to amenities like television and visitation. One prisoner explained that many believe they are being unlawfully detained due to BOP's failure to apply FSA credits appropriately, a claim echoed by family members, too.

As frustrations grew, some prisoners reportedly pulled fire alarms and prompted repeated emergency responses. BOP stated that the situation is being monitored, but concerns have persisted about staff shortages as well as a critical lack of halfway house space, which PLN reported. [See: *PLN*, June 2024, p.18.] ◾

Source: *Forbes*

# Tenth Circuit Affirms PTS Driver's Conviction for Torturous Detainee Transport

On June 18, 2024, the United States Court of Appeals for the Tenth Circuit upheld the conviction of a private prison transport driver for violating the civil rights of detainees. Anthony Buntyn, 56, a former driver for private prison transport firm Prisoner Transportation Services (PTS) of America, was convicted by a jury in federal court for the District of New Mexico in September 2022 and sentenced the following February to two years in federal prison for debasing and degrading detainees in a van that he drove through the state in March 2017.

The jury agreed that Buntyn violated the detainees' Fourteenth Amendment due-process rights when he retaliated against those who complained by chaining them inside a van segregation cage for hours without breaks for food or water. Cranking up the heat in the already hot van when they protested, he refused to stop for bathroom breaks—leaving them to make do with empty plastic bottles.

Officials at the jail in Shawnee County, Kansas, alerted federal authorities in Topeka to the abuse, leading to an FBI investigation and charges against Buntyn. After his trial and conviction, he appealed to the Tenth Circuit arguing that the evidence against him was insufficient; that the district court erred when it instructed his attorney in his closing argument not to substitute the word "malice" for "willfulness," the term used in the jury's instruction; and that the jury was coerced to reach a verdict. But the Court rejected each of those arguments. It appeared that Buntyn wished to challenge the jury instruction but had failed to preserve the issue for appeal, resulting in the backdoor attempt to address it through his counsel's word choice at summation. The Court didn't buy it and affirmed his conviction. *See: United States v. Buntyn,* 2024 U.S. App. LEXIS 14728 (10th Cir.).

As *PLN* reported, PTS was sued for another 2017 transport, a "horrific" 2,000-mile journey during which detainee William Karn was allegedly kept shackled to a metal bench the whole time. [See: PLN, Sep. 2023, p.57.] That suit settled in March 2023. ◾

Additional source: *KSNT*

# Pennsylvania Jail Guards Accused of Ripping Surgical Pin from Detainee's Shoulder

On August 27, 2024, the federal court for the Western District of Pennsylvania closed a suit against Fayette County Prison (FCP) officials after they reported reaching a resolution with former detainee Chad St. Clair. That followed a year after the Court adopted a magistrate's report and recommendation (R&R) on August 9, 2023, denying Defendants' motion to dismiss the suit.



## COLLEGE DEGREES FROM PRISON

**Earn an Associate's, Bachelor's, Masters, or Doctoral Degree in Christian Counseling. Ordination services also available**

### Tuition as Low as $12.95 per month

**Scholarships available. To see if you qualify, send a self-addressed, stamped envelope to P.O. Box 530212 Debary, FL 32753.**

## INTERNATIONAL CHRISTIAN COLLEGE & SEMINARY

**ICCSCAMPUS.ORG**

Prior to arrest, St. Clair suffered a shoulder injury and had a surgical screw implanted to reattach his clavicle to his collarbone. Arriving at FCP with his arm in a brace on February 24, 2021, he was placed in medical segregation to protect his shoulder while it healed. But 10 days later, in response to an unspecified "medical issue," a guard named Akerman allegedly dragged St. Clair from his cell "face down by his feet, catching [his] right arm in the door," before "yanking [his] feet until the arm broke free." A nurse employed by the jail's private healthcare contractor, PrimeCare Medical, ordered St. Clair returned to his cell because it was close to her shift change. Ackerman and a fellow guard named Rutherford allegedly "yanked him from the floor" and "tossed" him back in his cell while he screamed in pain.

Though the surgical screw in his shoulder was visibly pushing through the skin, St. Clair's pain medication was discontinued the next day. He alerted guards and medical staff, but he was not seen by a doctor for four days. An appointment then scheduled with an orthopedic surgeon did not occur for six weeks. St. Clair filed grievances, which were denied, and he was placed on grievance restriction. Meanwhile, the one hour out-of-cell he was allowed happened so late that the phones were cut off, so he couldn't contact his family.

When finally seen by an outside doctor on April 29, 2021, St. Clair was told "too much time had elapsed since the injury," his complaint recalled, therefore "the damage to his shoulder could not be corrected with surgery." He began physical therapy but obtained only a 118-degree range of motion in his shoulder, well shy of the normal 180 degrees.

St. Clair filed suit *pro se* against FCP, PrimeCare Medical and various staffers, raising Eighth and Fourteenth Amendment claims, plus claims for negligence and failure to train or supervise against Warden John Lenkey. Defendants moved to dismiss under Fed.R.Civ.P. 12(b)(6), resulting in the magistrate's R&R on June 15, 2023.

The magistrate first determined that St. Clair met both elements necessary for a

medical deliberate indifference claim: 1) He had a serious medical need, and 2) Defendants were allegedly deliberately indifferent to that need. Even though "non-medical prison officials cannot be deliberately indifferent for failing to intervene" in the provision of medical care, guards Akerman and Rutherford could be held liable for not taking action when the nurse ordered St. Clair returned to his cell without treating him. Also, Warden Lenkey was aware—

through grievances—of the lengthy delay in St. Clair's medical treatment, so he could be found deliberately indifferent, too.

St. Clair made an equal protection/class-of-one claim against Lenkey, which was allowed to proceed because unlike other FCP detainees his out-of-cell time was changed to a period when he could not use the phones, meaning he may have been singled out for disparate treatment. Dismissal of the failure-to-train-or-supervise claim was also denied, since St. Clair had alleged "a pattern of similar violations by FCP employees that would have placed Warden Lenkey on notice that the current employee training program at FCP was deficient."

State-law negligence claims against Akerman and Rutherford could also proceed, the R&R continued, based on the Pennsylvania Political Subdivision Tort Claims Act because dragging St. Clair out of his cell and injuring his arm constituted "willful misconduct." As there is no constitutional right to a grievance procedure,

however, St. Clair's claim regarding his grievance restriction should be dismissed. Additionally, FCP should be dismissed as a defendant since it was not a proper party. Lastly, St. Clair's request for injunctive relief should be denied as moot since he had been moved to a state prison. The R&R was then adopted in full by the Court. *See: St. Clair v. Fayette Cty. Prison*, 2023 U.S. Dist. LEXIS 104254 (W.D. Pa. June 15, 2023); and *Chad E. St. Clair v. Fayette Cty. Prison*, 2023 U.S. Dist. LEXIS 138533 (W.D. Pa.).

The Court provided St. Clair a chance to amend his complaint to flesh out his negligence claim against the warden with more factual detail. But he declined, so the claim was dismissed on October 25, 2023. The parties went to mediation, reporting the case resolved on May 13, 2024. However, no further information was docketed, and multiple requests by *PLN* for any agreement or other resolution documentation were ignored. *See: St. Clair v. Fayette Cty. Prison*, USDC (W.D. Pa.), Case No. 2:22-cv-00049. ◀



## www.ConvictPenPals.com



Personal, Legal & Art/Business profiles, personal email, blogs & more! 50,000+ Hits Daily! Checks, money orders, credit cards, & Cash App accepted!

WRITE & DISCOVER ALL WE OFFER! (Send SASE or stamp for fast reply) 465 NE 181st Ave. #308 Dept. PLN Portland, OR 97230

EMAIL INQUIRIES, CORRLINKS, JPAY, Help@Conpals.com

ONLINE SIGNUP Signup.Convictpenpals.com

¡Hablamos Español! Since 2002

*Huge compliments to all of you @ Conpals. When I first rec'd my CARES Act $, I treated myself to four PenPal Sites – yours is the only one I've rec'd letters from, and all from very nice individuals. – FEDERAL INMATE*



# Illinois Sheriff Resigns After Deputy Fatally Shoots 911 Caller

Sheriff Jack Campbell (R) retired from his duties for Illinois' Sangamon County on August 31, 2024, following pressure from Gov. J.B. Pritzker (D) over a fatal shooting involving Sheriff's Deputy Sean Grayson, 30, who was charged with murder for killing Sonya Massey, 36.

The incident occurred on July 6, 2024, when Massey called 911 to report an intruder in her home. Grayson, who was previously discharged from the Army following a DUI conviction, responded to the call and ended up shooting Massey, claiming he feared she was about to throw a pot of boiling water on him.

But a review of footage from his body-worn camera revealed that Massey posed no immediate threat. Massey, who had begged a 911 operator to send "no combative policemen that are prejudiced," kept several feet from Grayson and fellow responding deputies, twice telling them, "I rebuke you in the name of Jesus." Grayson warned she'd "better not" before threatening to shoot her and then making good on that threat.

Release of the footage sparked widespread condemnation both of Grayson and Sheriff Campbell for hiring Grayson despite his unstable past; after the Army got rid of him, Grayson had worked for six central Illinois police departments in just four years.

Pritzker joined the chorus calling for Campbell's resignation, also criticizing the Sheriff for failing to meet with Massey's family and mishandling the investigation into her fatal shooting. In his resignation statement, Campbell defended his decision to hire Grayson. But he added that the "current political climate" made it impossible to continue, noting death threats received by him, his family and his deputies.

Meanwhile, a circuit court ordered Grayson held without bond. But the state Fourth District Appellate Court overturned that decision on November 27, 2024. *See: People v. Grayson,* 2024 IL App (4th). ◀

Additional sources: *AP News, CBS News, Illinois Times*

# Arizona DCRR Ordered to Fill Prison Medical Staff Vacancies—Again

*by Matt Clarke*

On June 3, 2024, the Arizona Department of Corrections, Rehabilitation and Reentry (DCRR) was ordered to implement a pilot program that would immediately bring two state prison complexes up to medical staffing levels recommended by experts appointed by the federal court for the District of Arizona. It was the latest salvo from Senior United States District Judge Roslyn O. Silver since finding DCRR's provision of medical and mental health services to its prisoners "plainly, grossly inadequate," as *PLN* reported. [See: *PLN*, Nov. 2022, p.l.]

The trial that followed that 2022 ruling resulted in a permanent injunction (PI) in April 2023, ordering DCRR to establish and maintain minimum staffing levels—though the Court noted that these were simply the lowest possible staffing levels needed to facilitate a study that could well require significantly higher final staffing levels.

However, the Court found in its most recent ruling on the case that DCRR "did not hire sufficient additional staff"; its privately contracted medical provider, Wexford Health Sources, also "had not come close to hiring required staff." Because of these delays, the Court ordered staffing experts to go ahead and try to determine what staffing levels would be sufficient without waiting for DCRR to achieve the levels ordered in the PI.

When that staffing plan was then submitted on April 16, 2024, it called for increased staffing over PI levels. DCRR objected, pointing to the lack of funding in its budget. But in its ruling two months later, the Court brushed those objections aside, noting that the PI "does not excuse noncompliance based on a lack of funds" because "federal courts have concluded prisoners' constitutional rights do not evaporate when a state opts not to adequately fund prison services."

Judge Silver accused Defendants of engaging in numerous delaying tactics, including filing "objections that are preposterous." However, requiring DCCR and its contractors to fully staff the entire prison system at the levels recommended by the experts might cause disruptions, she allowed. To minimize this risk, the Court ordered a pilot program with full staffing at two prison complexes which together house 8% of DCRR's prisoner population.

That June 2024 order included a requirement for the pilot program to begin within two weeks and to be fully staffed within two months. The Court also required interim status reports starting at the two-month mark, noting its "concern" that "much of the briefing regarding the staffing plan reflected Defendants' continued resistance to meaningful efforts" to provide constitutionally sufficient levels of care and "avoid catastrophic outcomes."

"At this point, Defendants have admitted more staff is necessary and it is difficult to view their behavior as anything other than attempts to delay issuance of a statewide staffing plan," Judge Silver declared, adding: "The Court's patience has run out."

*See: Jensen v. Thornell*, USDC (D. Ariz.), Cause No. 2:12-cv-00601.

State lawmakers are not just starving DCRR of funds for needed staff; many in the GOP-dominated legislature mounted objections that have slowed roll-out of air conditioning in state prisons—apparently unconcerned or unable to imagine that qualified staff candidates refuse to work in oven-like temperatures made barely tolerable by "swamp coolers."

"It's very counterproductive … that some of my colleagues do not see this as a priority," said state Rep. Analise Ortiz (D-Dist. 24). "When somebody is sentenced to prison, their punishment is the fact that they're being removed by society and isolated to serve out the sentence—not to be tortured in a prison cell with 115 to 120 degree temperatures." ◼

Additional source: *Politico*

# Four-Month Wait for 40 Percent of South Carolina Jail Detainees Needing Psychiatric Evaluation

A backlog in court-ordered psychological evaluations had stranded 136 South Carolina detainees in jail by the end of September 2024, nearly 40% of them held over 120 days. Waiting on admission to the state's forensic psychiatric hospital, some had spent as long as eight months in jail, making their mental health conditions only worse.

The backlog was driven by a surge in the number of court-ordered mental competency evaluations from 964 in 2021 to 1,340 by 2023. The state Department of Mental Health (DMH) has struggled to keep pace, transitioning beds to handle short-term admissions, leaving fewer available for long-term restoration care. But according to Dr. Kelly Gothard, DMH Director of Forensic Services, prolonged jail stays worsen psychiatric conditions and make treatment more challenging and costly.

Capacity issues have plagued the system for over two decades, despite converting civil hospital beds for forensic patients and establishing jail-based restoration programs. DMH Director of Executive Projects Mark Binkley warned that demand for forensic beds is reducing capacity for indigent civil patients, as funds are diverted to meet forensic demands.

DMH has requested nearly $14 million in fixed yearly funds to expand forensic services, including more jail-based competency restoration programs and additional inpatient beds. Gov. Henry McMaster (R) has also acknowledged the need for more funding, putting the ball squarely before state lawmakers to ensure that mentally ill pretrial detainees don't lose their minds while wasting away in jail cells. ◼

Source: *Charleston Post and Courier*

# Oregon Supreme Court: Governor Can't Revoke Commutation After Sentence Expires

In a bizarre case of Orwellian government overreach, the Oregon Department of Corrections (DOC) reincarcerated former state prisoner Terri Lee Brown for a parole violation after her parole ended. But on May 8, 2024, the Oregon Supreme Court slapped the state's hand and ordered her release. The Court held that the governor had no authority to revoke commutation of a sentence once it was completed.

Brown's commutation was one of almost 1,000 granted during the COVID-19 pandemic by then-Gov. Kate Brown (D)—who is not related to the prisoner—to reduce the population held by DOC. As a result, Brown was released in December 2020, eight months before the end of her five-year sentence. She then completed a term of post-prison supervision (PPS) in 2023 and rebuilt her life.

Until, that is, police knocked on her door and arrested her a year later in early 2024. Brown learned the state's current governor, Tina Kotek (D), had revoked her commutation. Why? In 2021, while on PPS, Brown had pleaded no contest to violating the conditions of her supervised release and served 30 days in jail. Nevertheless, she had received a Certificate of Supervision Expiration in February 2023 once her PPS ended. Only after that was she rearrested and returned to prison.

"This isn't a small mistake," said an understandably upset Brown. "Maybe I'm a number to them, but I am a person, and you destroyed me for no reason."

Attorneys with the Oregon Justice Resource Center took up her case and filed a petition for a writ of habeas corpus, asking the state Supreme Court to exercise original jurisdiction under Or. Const. Art. VII, §2. The Court did so and heard arguments from both parties. The state noted that Brown's commutation was conditional and could be revoked if she committed other crimes or violated the terms and conditions of her PPS. So, state officials argued, Gov. Kotek had the authority to revoke a previously granted commutation, even after a sentence had expired.

The state further said Brown had no legal right to challenge this, pointing to language in the commutation agreement specifying that she waived "any legal challenges to future revocation of the commutation and to being returned to prison, including through a petition for a writ of habeas corpus." That also rendered her constitutional claims without merit, the state added.

But the Supreme Court disagreed. Although the governor has sole authority to grant commutations, that "does not exempt the Governor's actions from judicial review," the Court said. In fact, under the state's interpretation, a commutation revocation "could occur 50 years after plaintiff's sentence had expired." Yet that was clearly inconsistent with the terms of Brown's placement on PPS, which had an expiration date.

"Thus," the Court wrote, "the PPS framework imposes a temporal limit on the authority to sanction or revoke an offender's post-prison supervision for a violation of a condition." Any revocation is "time-limited" and "must be initiated before the offender's PPS terminates," the Court explained—"while the offender remains subject to a sentence." After Brown's PPS expired in February 2023 though, Gov. Kotek lacked authority to revoke her commutation.

The Supreme Court also addressed the waiver provision in the commutation agreement and whether it was valid. Rejecting the state's arguments, the Court found that Brown's acceptance of provisions prohibiting her from filing legal challenges applied only to a revocation that "was initiated before the expiration of her sentence." Otherwise, she could run the risk of having her commutation revoked and being returned to prison "for the remainder of her life." Finding she was therefore being held unlawfully, the Court ordered her immediate release and waived "otherwise applicable appellate rules" to expedite that process. *See: Brown v. Kotek*, 372 Ore. 260 (Ore. 2024).

According to Brown, she has never received an apology from Gov. Kotek or any other state official for her illegal imprisonment. "I've heard from not one person," she said. "Nobody's contacted me to say they're sorry." Does she need an official apology? "It would mean a lot," she said. "Admit you're wrong. Say you're sorry. That goes a long way. It helps."

Additional source: *Oregon Capital Chronicle*

---

## A Jailhouse Lawyer's Manual
Twelfth Edition (Fall 2020)

First published in 1978, *A Jailhouse Lawyer's Manual (JLM)* is a practical legal resource that provides incarcerated people with the information they need to exercise their rights across a range of issue areas. The *JLM* has over 40 chapters on topics ranging from challenging unlawful convictions to securing medical care while in prison.

To order by mail, send a letter with your shipping information, shipping restrictions, and what you are ordering with a check or money order to:
Columbia Jailhouse Lawyer's Manual
Attn: JLM Order
435 West 116th Street
New York, NY 10027

You can order the *JLM* online at: https://jlm.law.columbia.edu/order-the-jlm/

The cost for incarcerated people, and their family/friends is:
A Jailhouse Lawyer's Manual (2020): $30
Louisiana State Supplement (2018): $25
Texas State Supplement (2013): $20
Immigration & Consular Access Supplement (2018): $15

**Please note we do not accept stamps as payment. Do not send us stamps in the mail requesting the *JLM*.**

Resources for Indigent People: if you are indigent and cannot afford a manual, please send us a letter letting us know you are requesting a free manual. We have limited resources to send free manuals to people who cannot afford them, so cannot guarantee a copy, but please ask.

For more information on A Jailhouse Lawyer's Manual, please contact us at:

*A Jailhouse Lawyer's Manual*
435 West 116th Street
New York, NY 10027
Email: JLM.board.mail@gmail.com

# Eighth Circuit Affirms Denial of Qualified Immunity to Missouri Guards in Transgender Prisoner's Suit Alleging Retaliation and Unreasonable Search

*by Douglas Ankney*

On April 4, 2024, the U.S. Court of Appeals for the Eighth Circuit affirmed denial of qualified immunity (QI) to defendant Missouri Department of Corrections (DOC) guards in a transgender prisoner's claims that they subjected her to retaliation and unreasonable search in violation of her First and Fourth Amendment rights.

Sease Michael Beard was diagnosed with gender dysphoria and identifies as a transgender woman. She filed several complaints while housed inside High Security Unit 8 (HSU 8) at the Jefferson City Correctional Center (JCCC)—the prison's highest security unit. As she awaited an appointment with an investigator, guard Jeremy Epps took issue with Beard's home-made miniskirt and ordered her to change out of it. When she refused, he allegedly slammed Beard to the ground. Guards Nathan Falter and Dennis Carignan joined Epps to hold Beard down, pepper-spraying her and applying restraints. Six additional JCCC guards joined the fray—Tuckur Matherly and five "John Does."

The guards cut off Beard's "shirt, skirt, bra, and socks," leaving her clad only in underwear. They then carried her through the hallways, exposing her undressed to other prisoners en route to the "Rubber Room" suicide watch call, where she was secured in a "Wrap" restraint device. After leaving her there for an "extended period of time," the guards returned and wheeled Beard to a cell, finally releasing her from the Wrap and providing a T-shirt.

Beard filed suit under 42 U.S.C. § 1983 against those involved in the incident as well as JCCC Warden Doris Falkenrath and other DOC staffers. While the suit was pending, Falter allegedly vowed to keep Beard's promotion out of HSU 8 from being approved; shortly thereafter, a review panel denied the promotion. About a week after Beard filed suit, Falter and Epps cut off Beard's access to showers. Other guards named Sonne, Mauler and Dobbins removed "legal documents, personal mail, religious materials, stamps, personal hygiene items, and photographs" from Beard's cell and refused to return them, she said. Beard amended the complaint to include claims of retaliation in violation of the First Amendment. Defendants moved to dismiss under Federal Rule of Evidence 12(b)(6), claiming QI. The federal court for the Western District of Missouri denied the motion, and Defendants appealed.

The Eighth Circuit observed that the question of QI turned on two questions: whether the alleged behavior rose to a constitutional violation and, if so, whether the right was clearly established at the time—both as laid out in *Morgan v. Robinson*, 920 F.3d 521 (8th Cir. 2019) (en banc). Though prisoners are entitled to "a far lower expectation of privacy," the Court allowed, but the Fourth Amendment still protects them from "unreasonable searches of their bodies," according to *LeVine v. Roebuck*, 550 F.3d 684 (8th Cir. 2008). What matters is the "scope, manner, and location" of the search, per *United States v. Williams*, 477 F.3d 974 (8th Cir. 2007). "Strip searches raise special considerations," the Court said, pointing to *Robinson v. Hawkins*, 937 F.3d 1128 (8th Cir. 2019), which held that touching, prodding or use of force "are important considerations in weighing the level of insult to personal privacy." Two factors in determining the reasonableness of a search are (1) the need for it and (2) the level of "invasion which the search entailed," per *Smothers v. Gibson*, 778 F.2d 470 (8th Cir. 1985).

In this case, the need for the search was obviated when guards admitted that they were not searching Beard for contraband but cut off her clothes to force her to change them. As to the level of invasion, the Court concluded that the search "plausibly crossed the line" due to "numerous guards, the use of pepper spray, the placement of a knee directly into Beard's back, and the forceful removal of Beard's clothes." Two years prior to Beard's ordeal, the Court had held in *Robinson* that a "degrading, humiliating, or abusive strip search of an arrestee violated the Fourth Amendment." As in *Kisela v. Hughes*, 584 U.S. 100 (2018), the Court concluded that Defendants reasonably should have understood that they were violating' Beard's Fourth Amendment rights.

Regarding Beard's retaliation claim, the Court said that filing grievances and a lawsuit were "protected First Amendment activit[ies]," under *Haynes v. Stephenson*, 588 F.3d 1152 (8th Cir. 2009). But a

## CENTURION
### seeking freedom for the innocent in prison

**Centurion is an investigative and advocacy organization that considers rape or murder cases of factual innocence nationwide.**

Centurion does not take on accidental death or self-defense cases or any cases where the defendant had any involvement whatsoever in the crime. In cases involving sexual assault, a forensic component is required.

For cases of factual innocence, send a 2-4 page summary letter outlining:

- the crime you were convicted of
- the evidence against you
- why you were arrested

**SEND TO**
Centurion
1000 Herrontown Road
Clock Building 2nd Floor
Princeton, NJ 08540

You will receive a return letter of acknowledgment. If you meet our initial criteria, we will provide instructions for further review.

Plaintiff bringing a retaliation claim must also point to an adverse action "that would chill a person of ordinary firmness from continuing" and was "a but-for cause of the injury," quoting *Molina v. City of St. Louis,* 59 F.4th 334 (8th Cir. 2022).

Given the harsh conditions of HSU 8—no phone, no eating in the dining hall, no congregating with other prisoners, limited property, no cellmate, etc.—denial of promotion for 90 days "would chill a person of ordinary firmness," the Court said. Moreover, Falter's threat "plausibly suggest[ed] that Beard's lawsuit was the but-for cause" of the denial anticipated by *Santiago v. Blair*, 707 F.3d 984 (8th Cir. 2013). This and other cases put "prison officials on notice that responding to constitutionally protected activities with a retaliatory housing assignment violated the First Amendment,"

the Court said, point to *Nelson v. Shuffman*, 603 F.3d 439 (8th Cir. 2010).

The same was true when Falter and Epps denied Beard showers just a week after she reported the two guards for the Rubber Room incident. The "temporal proximity alone may establish causation," the Court said, especially when the time lapse is two months or less, as in *Charleston v. McCarthy*, 8 F.4th 772 (8th Cir. 2021). Furthermore, neither guard offered a non-retaliatory reason for denying the showers or for refusing to return Beard's legal documents.

"Taking items like religious materials and personal mail is not 'trivial,'" the Court said, quoting *Gonzalez v. Bendt*, 971 F.3d 742 (8th Cir. 2020). In fact, taking legal documents supported an inference of retaliatory motive and but-for causation, a point highlighted in *Auer v. City of Minot*,

896 F.3d 854 (8th Cir. 2018), because it would make it harder for Beard to litigate the instant case.

Accordingly, the district court's judgment was affirmed in these respects to the above-named defendants and claims, though otherwise reversed. Before the Court, Beard was represented by attorneys Jean P. Bradshaw II and Rhett M. Buchmiller of Lathrop GPM LLP in Kansas City. *See: Beard v. Falkenrath*, 97 F.4th 1109 (8th Cir. 2024).

Back at the district court, those attorneys announced a settlement between the parties, who stipulated to dismissal of the case on October 21, 2024. *PLN* has requested a copy of the agreement and will update details as they are available. *See: Beard v. Falkenrath*, USDC (W.D. Mo.), Case No. 2:21-cv-04211.  ◪

# 150 People Sue Over Past Abuse at New York City Juvenile Facilities

In 2022, the City of New York passed a law opening a two-year "lookback window" for victims of gender-motivated violence, including sexual abuse, to file lawsuits over incidents that were no longer within the statute of limitations. In April 2024, some 150 people sued for abuse they suffered at juvenile facilities operated by the city.

The complaints alleged physical and sexual abuse that occurred from the 1970s through the 2010s. Defendants include the city's Administration for Children's Services and its Department of Correction. Plaintiff victims, 80% of whom are men, were juveniles when they were abused. The alleged abuse took place at Horizon Juvenile Center, Crossroads Juvenile Center, Spofford Juvenile Detention Center (later known as Bridges), and the Rikers Island jail complex. "Overall, I think these cases show a broken juvenile justice system in the City of New York, a juvenile justice system that inflicts sexual trauma on children," said Jerome Block, one of the attorneys representing Plaintiffs.

One of the suits, filed under the city' Victims of Gender-Motivated Violence Protection (VGMVP) Law, N.Y.C. Admin. Code § 10-1101, et seq., was brought by Amanda Talavera and Mary Soto, who were held at Horizon and Crossroads from 2004 to 2008, where they alleged "rampant sexual abuse of juvenile detainees" that "has haunted [them] for their entire lives." *See:*

*Talavera v. City of N.Y.*, N.Y. Sup. (Cty. of Bronx), Case No. 807051/2024E.

Talavera and Soto claimed that children held in city juvenile facilities have long suffered sexual abuse by guards, counselors and other staff, and that Defendants "had knowledge of, and turned a blind eye to, this culture of abuse." That culture included inappropriate strip searches, voyeurism, fondling, oral sex and forcible rape. Juveniles were groomed by employees who gave them candy, cigarettes, drugs, alcohol and other contraband in exchange for sexual favors, they said, but few incidents were reported due to fear of retaliation—including physical assaults.

Talavera said she was sexually abused by "Ace," a staff member at both Horizon and Crossroads, starting when she was around 14 years old. She alleged that Ace would bring her food and cigarettes, and in exchange he had her expose her breasts and forced her to perform oral sex on him, raping her repeatedly.

Soto also said she was abused at Horizon by Ace when she was about 13. He would come to her room "around three times each week and would kiss [her] on the mouth and fondle her breasts, buttocks, and genitals beneath her clothes," the complaint said. He also performed oral sex on her multiple times, and continued to prey on her even after she was released. Soto said that she was also targeted by Natalie Medford,

an employee who had other detainees assault or attempt to assault her.

Five lawsuits have been filed alleging sexual abuse by Medford. Talavera and Soto's complaint raises claims that include state law violations; negligence; negligent hiring, supervision, retention and training; as well as breach of statutory duty to report abuse. Plaintiffs seek compensatory and punitive damages. The approximately 150 plaintiffs who have sued are all represented by attorneys with Levy Konigsberg, LLP in Manhattan.

In April 2023, Horizon employee Natasha Robinson was charged with sexual abuse of a teen detainee; three months later, two supervisors at the facility were charged in federal court with beating, stomping and dragging a 16-year-old boy, then filing false reports in an attempted cover-up. Federal investigations were conducted in 2012 and 2018 into sexual abuse, excessive use of force and failure to protect children held in New York juvenile facilities.

The two-year lookback window for claims under the city's VGMVP law expires on February 28, 2025. Those who have suffered physical or sexual abuse at a city juvenile facility have until then to sue their abusers and/or institutions that enabled, directed or participated in the abuse, even if it occurred decades ago.  ◪

Additional source: *New York Times*



# $1.5 Million Settlement Reached for Oregon Prisoner's Untreated Traumatic Brain Injury

A report published by *Oregon Capital Chronicle* on November 11, 2024, noted that former state prisoner Jacqueline Orr, 57, still suffers the effects of a brain injury incurred during her incarceration—walking "gingerly" while "clutching a cane" through a home in which the lighting has been dimmed because it "can hurt her eyes."

In 2018, Orr was a prisoner at Coffee Creek Correctional Facility just eight months away from her release date and healthy enough to participate in 5-kilometer races with other prisoners. She was assigned to work in the prison's "Viola Project," growing violets to protect an endangered butterfly species. Coffee Creek staff transported Orr and other prisoner workers to and from the site in the back of a box truck, "generously" leaving its rear door open while also forcing them to stand inside with no seats, seatbelts or windows. When the truck stopped, they were also forced to climb in and out without handrails or step stools, often helping each other down three feet to the ground. This system was not without problems; at least one other prisoner had fallen from the truck and injured her back and shoulder, but the prison failed to implement safety measures.

On December 20, 2018, Orr exited the box truck and stepped onto the bumper. It was pouring rain that day. Her foot slipped on the slick metal bumper, and she fell face forward from the rear of the truck, hitting the ground so hard that several teeth were knocked out. Coffee Creek staff transported her to a local hospital, where emergency room doctors recommended Orr see a neurologist and immediately begin physical therapy. Once discharged though, Coffee Creek didn't take Orr to a neurologist and offered her only one physical therapy appointment.

But Coffee Creek medical staff noted a host of problems related to Orr's traumatic brain injury: light and noise sensitivity, impaired balance, headaches, burning eye pain, dizziness, sadness, an unsteady gait and difficulty speaking. Orr was required first to use a walker and then a cane; she remains unable to perform simple tasks, like showering without assistance.

Orr was supposed to be released from prison in early August 2019, but her release date was pushed back because she was unable to secure housing to accommodate her disability. When she was finally released on September 26, 2019, Orr sued numerous DOC staffers at Coffee Creek in federal court for the District of Oregon, alleging a variety of civil rights violations.

In September 2023, the DOC agreed to settle the suit with a payment of $1.5 million, though refusing to acknowledge any wrongdoing. The agreement also included costs and fees for her attorney, R. Brendan Dummigan of Pickett, Dummigan Weingart, LLP in Portland. *See: Orr v. Burns*, USDC (D. Ore.), Case No. 3:20-cv-02201.

Orr now lives on Social Security disability and cannot work or even drive a car. Crowds make her uncomfortable. She suffers from light and noise sensitivity and still walks with a cane. She also struggles with fury knowing she would be in better shape if the DOC had provided prompt treatment for her injury.

"I have a lot of anger for those people that make the decisions to not help you," Orr said. "I never was an angry person before. It's a new emotion."

Orr said she met with DOC attorneys during settlement negotiations, but they refused to do the one thing she wanted them to do: apologize. "They never said, 'We're sorry, Jacqueline,'" she recalled.

DOC was slow to improve conditions after Orr's injury. A week after she fell from the box truck, another prisoner slipped on the bumper and injured her back. Several more months passed after that third prisoner injury before DOC finally added an anti-slip step to the bumper and grab bars on each side of the truck—simple, inexpensive measures that could have prevented three serious injuries and saved the state millions in attorney fees and payouts.

For the amount that Oregon spent on Orr's case alone, it could have purchased a fleet of passenger vans with actual seats and seatbelts to transport prisoners to and from worksites, rather than forcing them to stand in the open back of a box truck.

Additional source: *Oregon Capital Chronicle*

# Former Tacoma Reentry Center Severs Washington DOC Contract

Progress House Association (PHA), the sole reentry center in Washington's Pierce County, ended its contract with the Washington Department of Corrections (DOC) on June 30, 2024. Founded by the late Rev. Leo C. Brown Jr., PHA served the formerly incarcerated for over 50 years before CEO Cynthia Fedrick (Brown's daughter) decided that limitations in the DOC contract distracted the nonprofit from its mission to provide community-based programs.

Along with the state's $1.7 million contract, PHA could accept only prisoners released by DOC who met certain criteria. Fedrick said without those limitations, facility monitors would be retrained as life coaches and mentors. The new Pala-ver House, as PHA is now known, is a transitional housing program for Black and Indigenous people returning from incarceration. It offers life skills training, education, trauma treatment and relapse prevention, plus housing and employment assistance. The name comes from the West African tradition of bringing a community together to listen to all voices while talking through a problem.

A DOC spokesperson said that 80 PHA residents were transferred to reentry centers in four other counties while the agency searches for another option in Pierce County.

Source: *News Tribune*

# Fourth Circuit: Baltimore County Prisoners May Qualify as Employees under FLSA

*by David M. Reutter*

On May 8, 2024, the U.S. Court of Appeals for the Fourth Circuit clarified the standards to determine whether Baltimore County prisoners are considered employees under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203, when working in a recycling facility overseen by the County Department of Public Works (DPW).

Until 2020, prisoners were sent to the facility from the Baltimore County Detention Center (BCDC) to sort "scrap metal, cardboard, mixed paper," "tin," "aluminum" and "four types" of plastic, the Court recalled; bales of the material were then sold at auction to "commercial purchasers." DPW used two types of workers at the plant: (1) temporary workers from a staffing agency, who were paid not less than federal minimum wage, $7.25 hourly, plus overtime; and (2) prisoners from BCDC's community corrections program, who were paid $20 per day for nine-to-ten-hour shifts—in other words, as little as $2 hourly with no overtime.

Michael Scott filed a class-action lawsuit accusing the County of violating FLSA and analogous Maryland laws, seeking "liquidated and statutory damages" for "unpaid minimum wages and overtime compensation" for his work and that of fellow class members. When the U.S. District Court for the District of Maryland granted the County's motion for summary judgment, Scott appealed.

The Fourth Circuit began by noting that its precedents, like those of other circuits, are "generally skeptical" of FLSA claims "brought by incarcerated workers." Yet there exists "no categorical rule" that prisoners cannot fall under FLSA "when they work outside the detention facil-ity's walls for someone other than their immediate detainer," the Court allowed. Since FLSA requires minimum wage and overtime pay for all covered employees, the question Scott presented therefore was whether he and other class members were recycling center "employees" under the law.

As a matter of first impression, the Fourth Circuit initially had to decide whether FLSA applied to "off-site inmate work." The "circular definition" of "employee" in 29 U.S.C. § 203(e)(1)—"any individual employed by an employer"—was "unhelpful," the Court said. So it must "look to the economic realities of the relationship between the worker and the putative employer" when deciding whether a particular worker is a covered employee.

The County acknowledged that prisoners participating in work release fall under

# PLN & CLN Subscription Bundles
## STAY INFORMED AND SAVE MONEY
*Pricing Effective as of 6/30/2023*

☐ 1 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $74.00 ($10.00 Savings), Professionals/Entities - $170.00 ($22.00 Savings)

☐ 2 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $148.00 ($20.00 Savings), Professionals/Entities - $338.00 ($46.00 Savings)

☐ 3 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $222.00 ($30.00 Savings), Professionals/Entities - $508.00 ($68.00 Savings)

☐ 4 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $296.00 ($40.00 Savings), Professionals/Entities - $676.00 ($92.00 Savings)

Name: _____  Amount enclosed: _____

DOC/BOP Number: _____  Facility: _____

Address: _____

City: _____  State: _____  Zip_____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

FLSA when performing work for companies. The Court found the three factors in *Harker v. State Use Industries*, 990 F.2d 131 (4th Cir. 1993) applied: first, "whether the relationship between the workers and their putative employer had the hallmarks of 'a true employer-employee relationship'"; second, "whether the purposes of the [FLSA] call for its application"; and finally, "whether the putative employer had 'a rehabilitative, rather than pecuniary, interest' in the worker's labor."

In answer to the first question, the Fourth Circuit found the evidence suggested "that the recycling center exercised the kind of control typical to an employment relationship." As to the second question, the Court noted that FLSA aims to protect the general well-being of all workers by "preventing unfair competition in commerce," which happens when employers who "pay the minimum wage" are forced to compete against those who do not. Here the record contained evidence that the County sought to "decrease costs" by "get[ting] rid of temp workers" and replacing them with prisoners to sort its recycling. The best proof that the County used low-paid prisoners to keep non-incarcerated workers from getting the jobs—at a higher statutory minimum wage—was reflected in what happened at the onset of the COVID-19 pandemic in early 2020. BCDC locked down and the pool of prisoner works dried up, after which DPW was forced to hire more temporary workers at minimum wage.

The final question, the Court said, was one for the district court to resolve on remand: whether DPW's primary purpose for using incarcerated workers at the recycling center was to contribute to their "rehabilitation and job training" or simply to save the County money. Thus, the district court's order was vacated, and the case returned to the district court, where *PLN* will update developments as they are available. Plaintiffs are represented by attorneys Howard B. Hoffman and Jordan Song En Liew with Hoffman Employment Law, LLC in Rockville; attorney Bradford W. Warbasse in Brooklandville; and attorney Stephen J. Springer in Philadelphia. *See: Scott v. Balt. Cty.*, 101 F.4th 336 (4th Cir. 2024). ◾

# Childhood Trauma Incidence Higher Among Those Incarcerated

### *by Anthony W. Accurso*

A study released in March 2024 by the Minnesota Department of Corrections (DOC) found that incidence of childhood trauma was higher among state prisoners than those not incarcerated. The rate rose even further when limited to prisoners subjected to discipline. For women prisoners, it was higher still.

The DOC surveyed 2,100 individuals incarcerated in 10 men's state prisons and another prison for women to determine their exposure to "adverse childhood events" (ACEs)— verbal, physical or sexual abuse; emotional or physical neglect; parental divorce; family incarceration; as well as mental illness, substance abuse or domestic violence in the home. This data was then cataloged along with how quickly a prisoner received a disciplinary conviction (DC), plus how many DCs they received during their incarceration. Since the diversity of prisoners in the DOC system was represented, results can be generalized to the whole DOC population.

The study noted that "a large body of research" has established that exposure to multiple ACEs may result in "some combination of limited cognitive functioning, poor emotional regulation, and hyper- or hypo-active stress response systems." Among DOC prisoners, the data showed that "past exposure to ACEs is associated with higher levels of psychological distress."

Comparing survey results with the most recent data study of the United States population—performed by the federal Centers for Disease Control and Prevention (CDC) and Kaiser Permanente Health in 2016—the authors found that a higher prevalence of ACEs was a predictor of incarceration. Incarcerated men and women reported each type of ACE more often than their counterparts in the population at large. Also, a higher percentage of females than males experienced each form of ACE except for two—parental divorce and parental incarceration. For those the differences were called "minimal."

Among incarcerated men, 46% reported four or more ACEs, versus 9% of men in the CDC/Kaiser study. For women, 57% of those incarcerated reported four or more ACEs, compared to 15% of women in the CDC/Kaiser data. The average number of ACEs was highest for incarcerated Black women (4.7), followed by white/non-hispanic women (4.6) and American Indian or Alaskan Native women (4.4).

Though 65% of male prisoners "incurred at least one DC during their entire incarceration time," those with four or more ACEs were 30% more likely to get a DC. That group also "received a DC more quickly after admission to prison." However, this effect was not observed among women prisoners, for whom "any level of past exposure to ACEs did not significantly affect any DCs or aggravated DCs." The researchers speculated that women "may be impacted by ACEs in ways that were not measured in this research." A previous study, they noted, found that ACE exposure "impedes the development of self-control in both juvenile males and females, but only affects impulsivity for males and not females."

One conclusion from the study applied to DOC policy: "Given the known associations between ACEs and diminished mental health, restrictive housing is not an ideal environment for an incarcerated person with an extensive history of ACEs," researchers noted. In fact, prisoners with multiple ACEs "may be most adversely affected by placement in restrictive housing."

Unsurprisingly, perhaps, the researchers also called for more research, to help prison systems "deliver more effective services and programming that are tailored to the strengths, abilities and experiences of people in prison or under supervision." *See: Sex Differences in the Effects of Adverse Childhood Experiences on Institutional Misconduct among Adults in Prison*, DOC (Mar. 2024). ◾

# Nearly $12 Million Paid to Mentally Disabled Indiana Prisoner Wrongly Convicted of Murder

*by Douglas Ankney*

On December 8, 2023, the Indiana city of Elkhart agreed to pay former state prisoner Andrew Royer, then 44, nearly $12 million to settle a lawsuit filed over his wrongful murder conviction and subsequent 17 years of unjustified imprisonment.

In October 2023, Royer filed a 42 U.S.C. § 1983 complaint against the city and officers with its police department (EPD)—including Carlton Conway, Mark Daggy, Paul Converse, Peggy Snider, Todd Thayer, Michael Sigsbee, Joel Bourdon and Brett Coppins—along with Elkhart County Sheriff's Department (ECSD) and Deputy Dennis Chapman, plus County Prosecutor Vicki Becker.

According to the Complaint, Royer, who is mentally disabled, resided at Waterfall High-Rise, an apartment complex for the elderly and disabled in Elkhart. On November 29, 2002, the body of another Waterfall tenant, 94-year-old Helen Sailor, was discovered in her room. Initially, EPD zeroed in on two suspects for Sailor's murder: Larry Wood and Tony Thomas.

Wood also lived at the Waterfall and was responsible for delivering Sailor's prescription medication; a red residue found in his apartment was discovered on her body. Thomas was a homeless convicted murderer with a key to his grandmother's apartment at the Waterfall. Witnesses reported seeing him acting belligerently and apparently high on drugs in an elevator on the day of the murder.

But by summer 2003, Daggy was convinced that Lana Canen was involved in Sailor's murder. He had previously investigated Canen for a string of Waterfall burglaries, but Daggy never developed probable cause to arrest her. In September 2003, Canen was a passenger in a car driven by parolee Nina Porter when it was stopped by EPD cops. Canen was arrested for Sailor's murder. Porter was cited and permitted to go home.

However, Conway arrested Porter the next day, allegedly on an outstanding warrant—a ruse to interrogate her about the murder for hours. Porter denied any knowledge and maintained that Canen had never spoken with her about it. But Conway fed details of the murder and threatened trouble if she did not cooperate, including having her children taken away. The detective then fabricated a statement for Porter, implicating Canen and Royer in the murder, and Conway promised to pay her $2,000 for making it. Daggy and Sigsbee later confirmed that Porter was paid $2,000 for testimony consistent with her statement.

None of this misconduct was disclosed to Royer's defense attorneys. Meanwhile, even though fully cognizant that Royer had "the mind of a child" and was under psychiatric care and taking psychiatric medications, Defendants took no measures to accommodate his disabilities prior to or during interrogation. No lawyer, social worker, doctor or family member was present. In less than a minute, Defendants read Royer his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and he waived them.

Over two days of ensuing interrogation, Conway fed details of the crime while Royer denied any involvement and steadfastly maintained his innocence. Near the end, Conway observed that Royer was "very mentally fatigued and having a hard time maintaining concentration," and describing him as "drifting, disabled, defeated, emotional, broken down, tired, and fatigued." Instead of terminating the interrogation, Conway then took Royer's false confession.

Daggy and Snider observed the interrogation via closed-circuit monitoring. Daggy later admitted it was "super leading" and among the worst he had ever seen. Snider expressed that Royer was the only person in her entire career whom she felt was charged with a crime he did not commit. But neither expressed their views to Defense attorneys prior to Royer's trial. Becker, then an assistant prosecutor, aided in the interrogation but failed to disclose this to Royer's attorneys prior to trial. Records showed that Defendants were concerned that Royer's initial false confession was inconsistent with the evidence, so the interrogation resumed a second day, when Conway coerced Royer into changing his story to match a scripted statement.

Prior to trial, Conway was removed from homicide investigations because of sustained allegations of misconduct in an unrelated case. Converse feared that Conway would jeopardize future investigations. But again, his removal was not disclosed to Defense counsel.

The state then enlisted Chapman to falsely testify that a fingerprint from a medicine container at the crime scene matched Canen's prints. The state crime lab rebutted that testimony post-trial. In fact, the print belonged to Hoffer. However, at the time, Chapman also falsely testified that he had worked as an FBI latent print examiner. Based on all this bogus evidence, Canen and Royer were convicted at a joint 2004 trial.

In 2012, state police proved that the print wasn't Canen's, and she was exonerated. A four-day 2019 hearing led to ruling in March 2020, vacating Royer's conviction and granting a new trial. The following month, he was released from prison after serving more than 17 years for a crime he did not commit. When the decision vacating his conviction was affirmed on appeal, the State moved to dismiss the charges against him on June 30, 2021.

Per the settlement, $10,050,000 is aid to Royer and his attorneys with Loevy & Loevy in Chicago, plus an additional $1,675,000 for Royer alone, to be paid in monthly installments. The agreement did not resolve claims against County Defendants, which remain pending; *PLN* will update developments as they are available. *See: Royer v. City of Elkhart*, USDC (N.D. Ind.), Case No. 3:22-cv-00254.

In affirming the grant to Royer of a new trial, the state Court of Appeals had withering criticism for Conway, who "withheld the truth when he attempted to bolster the reliability of Royer's confessions by saying Royer knew details about the murder which were not known to the public." The Court found Conway's perjury "particularly galling" given his position "overseeing the juvenile bureau and the special victims unit" of EPD. *See: State v. Royer*, 166 N.E.3d 380 (Ind. Ct. App. 2021).

Conway was fired in September 2021, but he resigned before his termination hearing. ◾

# HRDC 2024 ANNUAL FUNDRAISER



## *Please Help Support the Human Rights Defense Center!*



The Human Rights Defense Center (HRDC), which publishes Prison Legal News and Criminal Legal News, cannot fund its operations through subscriptions and book sales alone. We rely on donations from supporters!

HRDC conducts only one annual fundraiser; we don't bombard our readers with donation requests, we only ask that if you are able to contribute something to our vital work, then please do so. Every dollar counts and is greatly appreciated and will be put to good use. No donation is too small (or too big)!

Where does your donation go? Here's some of what we have done in the past year:

- Thanks to HRDC's decades of advocacy the FCC has lowered prison and jail phone rates.
- We won censorship lawsuits against jails in California and Indiana ensuring prisoners can receive books and magazines in the mail.
- We filed lawsuits against the prison systems in New Mexico and continue litigating lawsuits against prison systems in Missouri and Illinois and won a landmark censorship lawsuits against the North Carolina prison system which had censored HRDC publications.
- We won public record lawsuits against private prison company, Centurion and various other state and federal agencies including the Drug Enforcement Agency (DEA).
- We advocated for lower prison phone rates before the Federal Communications Commission and the California Public Utilities Commission. We are also litigating an anti-trust lawsuit against Global Tel Link and Securus.
- We continue litigating three national class action lawsuits around fee laden debit cards in the criminal justice system. We have also advocated on this issue with various regulatory agencies. We won a major lawsuit against one debit card company.
- We need your help to keep doing this and a lot more!

## We need your help to keep doing this and a lot more! Please send your donation to:

### Human Rights Defense Center, PO Box 1151, Lake Worth Beach, FL 33460

*Or* call HRDC's Office at 561-360-2523 and use your credit card to donate

*Or* visit our websites at prisonlegalnews.org or criminallegalnews.org and click on the "Donate" link.

## HRDC Support Gifts

All contributions to HRDC are greatly appreciated! For those who make a donation of $75 or more, we are pleased to offer the following gifts as a way of thanking you for your generosity!

All donations, regardless of amount will help further our criminal justice reform and prisoners' rights efforts.

### Gift Option 2

To show our appreciation for your support we are providing the following selection of books for you to choose from when making a donation of $100. Donations of $100 or more can choose one free title. Each $100 donation entitles you to another free title; i.e., donate $500 and you get five books! $1,000 and you get everything on the page! Please circle the books you want and send the corresponding donation amount.







### Gift Option 1



In recognition of your support, we are providing the PLN hemp tote bag when making a donation of at least $75. Carry books and groceries stylishly and help end the war on drugs!

### Gift Option 3

As a thank you for your support, we are providing the entire PLN anthology of critically acclaimed books on mass imprisonment signed by editor Paul Wright! (The Celling of America, Prison Nation and Prison Profiteers) plus the PLN hemp tote bag to carry the books in when making a donation of $250 or more.





# "Locked In, Priced Out": Markups and Kickbacks in Prison Commissaries

Drawing from a research database of commissary pricing and markups culled from 26 state prison systems, a report published by *The Appeal* on April 17, 2024, found commissary prices "up to five times higher than in the community," with markups reaching 600%.

To supplement paltry and unappetizing chow hall meals, prisoners use commissaries that typically stock a variety of snacks, candy and soft drinks, as well as staples such as peanut butter and condiments. Other common food items include meat and fish pouches; tuna and mackerel are especially popular. But in Tennessee prisons, a serving of roast beef costs $7.60, while a pouch of seasoned pork is almost $8.00. The most popular commissary food, ramen soup, illustrates how widely prices may vary, from as little as $.42 for a serving in Tennessee's prison system up to $1.06 in the Florida Department of Corrections (DOC). Outside of prison, ramen is $.30 or less when bought in bulk.

"Some of the highest-priced ramen in the country was sold at commissaries run by Keefe Group, which is controlled by the private equity firm HIG Capital," the report noted.

## Pricy Personal Necessities

While prison systems supply free hygiene items to indigent prisoners, quality is often poor. Prisoners who want lotion, conditioner, better soap and shampoo or non-generic deodorant and toothpaste must buy it.

They also have to purchase over-the-counter medications and other health-related items. In the Tennessee DOC, generic Prilosec, used to treat severe gastric reflux, is sold in commissaries for around $8.00. Fixodent denture adhesive costs an Idaho prisoner $12.28. Reading glasses run over $15 in Vermont prisons—"about 5 times the price a shopper would find at Walgreens," *The Appeal* noted.

In lockups without air conditioning, personal fans are more necessity than luxury—if prisoners can afford them. At Delaware's Sussex Correctional Institution, an 8-inch plastic fan costs nearly $40. A similar fan in Mississippi is $29.95, while in Indiana it's around $33.

Televisions can be costly, too. In the Tennessee DOC, a 15" LCD TV runs $179.95 to $224.95, plus a $5 "recycling fee." That doesn't include the cost of a remote, remote battery, coax cable or digital antenna. Tennessee contracts with California-based Union Supply Group, Inc., to provide commissary and property items.

## Religious Price-Gouging

Some prison commissaries sell religious items, which tend to be more expensive for Muslim prisoners, *The Appeal* found. For example, a Christmas card in Virginia prisons cost $.80 while a Ramadan card was $2.33. In the Connecticut DOC, a Bible sold for $4.55, while the Noble Quran was $25.99. Tennessee's prison system sells a prayer rug to Muslim prisoners for $17.95, but a rag floor rug is less than $6.00.

Inflated commissary prices are problematic for several reasons. First, prisoners are paid slave wages—from $.14 to $.63 per hour for most institutional jobs, according to a 2017 report by the non-profit, nonpartisan Prison Policy Initiative (PPI). In Tennessee where most prison jobs pay $.17 to $.50 per hour—which hasn't changed in over 30 years—it takes a prisoner earning the lowest pay rate three hours of work to afford a single pack of ramen.

As a result, family members often send money to their imprisoned loved ones so they can make commissary purchases. "Incarcerated people are using their hard-earned money and their family's hard-earned money to buy things to help them survive," stated PPI's Wanda Bertram.

## Markups and Kickbacks

Commissary prices are inflated by high markups, often because prison systems receive kickbacks from for-profit commissary vendors. The Florida DOC's $175 million, five-year contract with Keefe Group includes a 35.6% "commission" kickback on marked-up commissary items. Kentucky's prison system gets a 16% kickback under its contract with Union Supply Group.

The resulting markups on commissary items can be significant. In Georgia prisons, peanut butter was marked up over 70%. In Missouri, the price of ramen was inflated by more than 65%. The Arkansas DOC marks up all commissary items 40% to 50%. Until recently markups in the California Department of Correction and Rehabilitation (CDCR) ranged from 63% to 200%.

On top of that, sales tax adds over 9% in Tennessee. Iowa prisons add a 6% "Pay for Stay" fee to most commissary items. The Alaska DOC adds a 3% surcharge to many items that feeds an Inmate Welfare Fund. In Tennessee, Union Supply charges prisoners' families a fee of around $6.00 each time they make an online payment for commissary or personal property items.

"Whether it is a private, external contractor or a state-run contractor, there is still a profit model built in," explained Priya Sarathy Jones, deputy executive director of Fines and Fees Justice Center.

An Idaho DOC spokesperson said that commissary prices were "routinely" checked against convenience store prices for similar items. But convenience stores have higher prices than other retailers because customers pay more for "convenience" shopping—something that doesn't apply to prisoners.

There have been efforts to reduce prison commissary prices. There are no markups on "basic hygiene" or religious items in Wyoming prisons. In 2023, the Nevada DOC eliminated markups on hygiene purchases, too. The Michigan DOC did the same in July 2022, later reducing the markup on food to 14%. CDCR recently capped commissary markups at 35% until 2028. Yet those are exceptions and not the rule—particularly when commissaries are operated by for-profit companies that provide lucrative kickbacks to prison systems. ◾

Sources: *The Appeal,* Tenn. SWC-569, Union Supply

**Roget's Thesaurus**
Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. $9.95
See page 69 for ordering information.

# THE PLRA HANDBOOK

## Law and Practice under the Prison Litigation Reform

By John Boston

### Edited by Richard Resch



*The PLRA Handbook* is the best and most thorough guide to the PLRA in existence and provides an invaluable roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims.

Anyone involved in federal court prison and jail litigation needs *the PLRA Handbook* – lawyers, judges, court staff, academics, and especially, pro se litigants.

Although *the PLRA Handbook* is intended primarily for litigators contending with the barriers the PLRA throws up to obtaining justice for prisoners, it'll be of interest and informative for anyone wishing to learn how the PLRA has been applied by the courts and how it has impacted the administration of justice for prisoners. It is based primarily on an exhaustive review of PLRA case law and contains extensive citations. John Boston is best known to prisoners around the country as the author, with Daniel E. Manville, of the *Prisoners' Self-Help Litigation Manual* – commonly known as the "bible" for jailhouse lawyers and lawyers who litigate prison and jail cases. He is widely regarded as the foremost authority on the PLRA in the nation.

*"If prisoners will review The PLRA Handbook prior to filing their lawsuits, it is likely that numerous cases that are routinely dismissed will survive dismissal for failure to exhaust."*

*— Daniel E. Manville, Director, Civil Rights Clinic*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## THE PLRA HANDBOOK

Paperback, 576 pages

**Prisoners: $84.95**

**Professionals: $224.95**

*(includes shipping)*

**Order by mail, phone, or online.** Amount enclosed _____

By: ☐ check    ☐ credit card    ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Human Rights Defense Center** PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
**Dedicated to Protecting Human Rights** WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

# With HRDC *Amicus* Brief, Survivor of Dead Washington Prisoner Wins Public Records Case

*by Sam Rutherford*

On April 11, 2024, the Supreme Court of Washington held that the one-year statute of limitations (SOL) for bringing a lawsuit under the state Public Records Act (PRA), RCW 42.56.001, et seq., begins on the date that a state agency issues a final, determinative response to a public records request. That, in turn, is assessed under an objective standard, which the Court described as sufficient to put a non-attorney on notice that the agency does not intend to disclose additional records or further address the request.

After Renee Field died in custody of the state Department of Corrections (DOC) in March 2016, an investigation by the Office of Corrections Ombuds concluded that the medical care she received "did not meet community healthcare standards, and her death could have been prevented." The Washington Medical Commission also imposed sanctions against a DOC physician assistant for ordering Field's transfer to a different prison instead of a hospital, thereby contributing to her death.

Field's sister, Terry Cousins, was named the personal representative of her estate and submitted a public records request to DOC on July 21, 2016, seeking "[a]ny and all records" regarding Field "from January 1, 2014 to present." Over the next two and a half years, DOC released responsive records in seven installments. But Cousins repeatedly objected that records appeared to be missing. Without specifically addressing that objection, DOC issued a letter with its final installment on January 17, 2019, calling the request closed but adding that Cousins was free to contact DOC with any follow-up questions.

Cousins immediately informed a DOC records specialist that the response to her request was incomplete. For the next 11 months, she exchanged emails and phone calls with DOC staff concerning the missing records—something DOC never specifically addressed, stating instead that Cousins' request had been closed either for nonpayment of fees or because all responsive records had been provided. After Cousins pointed out that she had paid for each installment of records and again reiterated that no one had addressed her contention that records were missing, DOC simply stopped responding in November 2019.

Months later, when Cousins still had no response, she emailed DOC records specialist Paula L. Terrell. Realizing that Cousins' request had been mistakenly closed for nonpayment, Terrell reopened it on July 15, 2020, to search for the records Cousins claimed had gone missing for three years. These documents were then found, and Cousins got them in three additional installments between October and December 2020.

In January 2021, Cousins sued DOC for "denial of access to public records without justification or exemption, intolerable delay, a failure to conduct an investigation to identify responsive records, and a lack of any explanation" why the records were withheld. In answer, DOC asserted an SOL defense. It also continued to search for and produce hundreds of pages of previously undisclosed responsive records—some of which had been printed in August 2016, but never sent. DOC closed Cousins' request a second time in June 2021 while her suit was pending.

The agency then moved for summary judgment, arguing that Cousins' lawsuit was time-barred because more than one year had passed since its 2019 closing letter. The trial court granted the motion, and the Court of Appeals affirmed in a split decision. The Washington Supreme Court then granted discretionary review, reversing the ruling in a unanimous opinion.

The question Cousins presented was whether DOC's 2019 closing letter triggered the one-year SOL, the Court noted. Pointing to *Belenski v. Jefferson Cty.*, 378 P.3d 176 (Wash. 2016), it said that the one-year SOL is triggered by an agency's "final, definitive response" to a public records request; but that case did not provide clear guidelines for assessing whether an response is sufficient to provide such a trigger. So review of Cousins' case was granted to clarify that the "final, definitive response test is an objective inquiry"—meaning that "the agency's subjective intent and the requester's subjective understanding are not relevant." Moreover, the Court said, the inquiry must "assum[e] that the requester is a lay person with no specialized knowledge or expertise."

The Court formulated a test to determine when a closing letter is sufficient to trigger the SOL: Whether it provides "(1) how the PRA request was fulfilled and why the agency is now closing the request; (2) that the PRA's one-year [SOL] to seek judicial review has started to run because the agency does not intend to further address the request, and (3) that the requester may ask follow-up questions within a reasonable time frame, which may be specified by the agency." If there are follow-up questions, the agency is not required to search additional records, the Court said. "However, if the agency does not intend to further address the request, it must explicitly say so and reiterate that the SOL has started to run."

The Washington Attorney General's Advisory Model Rules should also be consulted, the Court added, to determine whether a closing letter is sufficient to trigger the SOL. Under these rules, "agencies must refrain from closing a request until the request has been fulfilled pursuant to applicable regulations," the Court said, citing WAC 44-14-04006(1).



**Ink From The Pen**

Artist behind the walls?
Inspired by prison art?
Roll with the big dogs!
Check out *Ink from the Pen*!

1440 Beaumont Ave. · Ste. A2-266 · Beaumont, CA 92223

760.616.0557 | www.InkFromThePen.com | 🅕🅘
*Magazines are allowed in most State and Federal Prisons*

Once an agency has issued a closing letter consistent with these standards, the one-year SOL will begin to run. Later production of additional records typically will not restart that clock, but "may be relevant to liability or penalties," the Court noted. However, there is a limited exception to this rule: "An insufficient or premature closing letter may not trigger the [SOL], or it may provide a basis for equitable tolling, depending on the particular circumstances presented." Thus, if a requester discovers after the limitation period expires that an agency issued a closing letter without producing all responsive records, the SOL may be equitably tolled.

In Cousins' case, because DOC's 2019 closing letter "simply stated that Cousins' request was 'closed,' without explaining what that meant or why the request had been closed," the Court held that it was insufficient to trigger the SOL. Moreover, that same closing letter invited Cousins to ask follow-up questions, but DOC then ignored her assertions that the records produced were incomplete. "This ambiguous, partial response was not objectively sufficient to put a reasonable lay person on notice that DOC did not intend to further address Cousins' request," the Court declared. Rather, "a direct answer to Cousins' timely follow-up questions—any answer—was necessary" to trigger the SOL. The Court therefore concluded that the SOL did not begin to run until DOC issued its second closing letter in June 2021—after Cousins had already filed her suit.

Accordingly, the Court of Appeals' opinion was reversed, along with the trial court's order dismissing Cousins' case as time-barred, and the action was remanded for further proceedings. Cousins was ably represented by attorneys Joseph R. Shaeffer and Timothy K. Ford of MacDonald, Hoague & Bayless in Seattle. The Human Rights Defense Center (HRDC), nonprofit publisher of *PLN* and *Criminal Legal News*, submitted an amicus curie brief supporting Cousins, with representation from attorneys Eric M. Stahl and Jennifer K. Chung of Davis Wright Tremaine, LLP in Seattle. *See: Cousins v. State*, 546 P.3d 415 (Wash. 2024).

# Former Kentucky Sheriff Indicted for Murdering Judge in Chambers

Shawn "Mickey" Stines, 43, the former Sheriff of Kentucky's Letcher County, was indicted by a grand jury on November 21, 2024, for the murder of state District Judge Kevin Mullins. The 54-year-old judge and then-Sheriff Stines had just finished lunch with a group on September 19, 2024, when they returned to Mullins' chambers in the County Courthouse and Stines allegedly shot him to death. The former Sheriff then retired on September 30, 2024.

Surveillance footage played for the grand jury captured Stines as he hunted down the judge, who was hiding behind his desk, shooting him repeatedly; the Sheriff then began to leave but turned back to shoot the judge a few more times. Immediately before the shooting, Stines had reportedly demanded and gotten Mullins' cellphone, using it to place a call to Stines' daughter and then trying again to contact her on his own phone. Testimony presented to the grand jury showed it was not the only call from the judge's phone to Stines' daughter, who was not named.

Defense attorneys didn't deny that Stines executed the judge, arguing instead for a manslaughter charge due to an "extreme emotional disturbance" that he was suffering. Stines' replacement, Billy Jones, was sworn into office on October 1, 2024. Stines was denied bail and remains in the Leslie County Jail. His attorneys also argued that the shooting is connected to a deposition that the former Sheriff gave in a civil case filed by a woman molested by former Deputy Ben Fields, who dangled favorable incarceration terms to extort sex from her in Fields' chambers, as *PLN* reported. [See: *PLN*, June 2022, p.62.]

Fields, 38, was convicted in June 2024 of third-degree rape and sodomy, plus second-degree perjury and witness tampering; he received a five-year sentence, with a month in jail and the rest to be spent under supervision. Attorneys for his victim, Sabrina Adkins, lost a bid to wrest the deposition from state Attorney General Russell Coleman (R) on August 28, 2024, when the federal court for the Eastern District of Kentucky ruled that Coleman was immune from her civil suit. *See: Adkins v. Fields,* 2024 U.S. Dist. LEXIS 158804 (E.D. Ky.). If that deposition is released during Stines' trial, it may prove crucial to Atkins' recovery, too.

Source: *CNN, Louisville Courier Journal*

## Call for Essays

The American Prison Writing Archive (APWA) is a growing public, internet-based collection of non-fiction writing about direct experience with the U.S. prison system. Anyone who has been incarcerated or has volunteered inside can send handwritten or typed pieces. All writing skill levels are welcome. 5,000 word limit.

Visit us at: PRISONWITNESS.ORG

We read and respond to all writing. No reading fees or SASE required. A signed Permissions-Questionnaire (PQ) form is required for writing to be included in the APWA. For more information, or to receive our PQ form, please write to:

American Prison Writing Archive
Johns Hopkins University
3400 N. Charles St.
Baltimore, MD 21218

AMERICAN PRISON WRITING ARCHIVE

# Michigan Supreme Court Greenlights Adding Restitution At Resentencing of Former Juveniles Sentenced to LWOP

On July 8, 2024, the Supreme Court of Michigan held that imposing a new restitution obligation—by retroactive application of restitution statutes enacted *after* a criminal defendant committed his underlying offense—could nevertheless happen during a resentencing hearing, without violating the ex post facto clauses of either the state or federal constitutions.

In 1993, when he was 17, William E. Neilly was convicted of felony-murder and related offenses for a killing committed during a theft with multiple co-defendants. Neilly was originally sentenced to life without parole (LWOP), but that sentence was vacated pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016)—decisions in which the Supreme Court of the U.S. (SCOTUS) held that (1) mandatory LWOP sentences for juvenile defendants were barred by the Eighth Amendment prohibition on cruel and unusual punishment and (2) that the decision applied retroactively.

Under Mich. Compiled Laws (MCL) § 769.25a—a statutory procedure for resentencing defendants, such as Neilly, who had received LWOP sentences as juveniles, which was created in response to those SCOTUS decisions—Neilly was resentenced to 35 to 60 years in prison. At resentencing, the murder victim's mother also requested $14,895.78 in restitution for funeral expenses. The court imposed the requested restitution "joint and several with co-defendants, citing as legal authority those restitution statutes enacted long after Neilly's criminal offense.

Neilly appealed, arguing that retroactive application of these amended restitution statutes violated the ex post facto clauses of the federal and state constitutions. Both U.S. Const., art. I, § 10, and Mich. Const., art. 1, § 10 (1963), forbid retroactive application of a law if it:

"(1) punishes an act that was innocent when the act was committed; (2) makes an act a more serious criminal offense; (3) increases the punishment for a crime; or (4) allows the prosecution to convict on less evidence," as laid out in *People v. Earl*, 845 N.W.2d 721 (Mich. 2014).

The Court recognized that the amended statutes "are less favorable" to Neilly than those in effect in 1993 because "the former restitution statutes provided that the imposition of restitution was discretionary, rather than mandatory." The prior statute also required the trial court to consider a defendant's "financial resources and earning ability" before imposing restitution, whereas the amended statutes did not. The question presented in Neilly's case was whether the retroactive application of the amended restitution statutes constituted increased punishment in violation of the ex post facto clauses.

A law is ex post facto only if it imposes a criminal punishment rather than a civil remedy, the Court began, pointing to *People v. Betts*, 968 N.W.2d 497 (Mich. 2021). In turn, determining whether a law is criminal versus civil depends on what the legislature intended; if it intended the law as punishment, the inquiry ends and it cannot be applied retroactively. However, if the legislature created a civil remedy, then the reviewing court must decide, in the words of *Earl*, "whether the statutory scheme is so punitive either in purpose or effect so as to negate the State's intention to deem it civil."

Neither of the restitution statutes, MCL 769.1a nor MCL 780.766, expressly stated whether it provided a punishment or a civil remedy. But the Court said it had long been recognized that their purpose was to "enable victims to be compensated fairly for their suffering at the hands of convicted offenders," per *People v. Peters*, 537 N.W.2d 160 (Mich. 1995), rather than "to impose additional punishment on offenders," in which *United States v. Arutunoff*, 1 F.3d 1112 (10th Cir. 1993) and *United States v. Newman*, 144 F.3d 531 (7th Cir. 1998) were in accord. The fact that restitution "imposes some financial pain" on defendants does not make it punishment, the Court continued, because the restitution statutes are "tailored



## Disciplinary Self-Help Litigation Manual, Second Edition, by Dan Manville

By the co-author of the *Prisoners' Self-Help Litigation Manual*, this book provides detailed information about prisoners' rights in disciplinary hearings and how to enforce those rights in court.

Now available from Prison Legal News Publishing.
**$49.95**, shipping included

**Order by mail, phone or on-line.**

By: ☐ check  ☐ credit card  ☐ money order

Name: _____

DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____  State: _____  Zip: _____

**Human Rights Defense Center**
Dedicated to Protecting Human Rights
PO Box 1151 · Lake Worth Beach, FL 33460
Tel 561-360-2523 · www.prisonlegalnews.org

to the harm suffered by the victim rather than the defendant's conviction or judgment of sentence."

Moreover, the Court continued, the history of restitution orders in American jurisprudence indicates that they have always been "considered an equitable, remedial measure designed to prevent the unjust enrichment of wrongdoers," again citing *Newman*. Criminal fines, on the other hand, are historically punitive because they are based on the defendant's conduct and are paid to the State, not crime victims.

Finally, the fact that a defendant may be incarcerated for failing to pay restitution does not convert an otherwise civil remedy into punishment, the Court said. While the potential for imprisonment is certainly a strong indicator that a law is punitive, as held in *Betts*, "this punitive effect is somewhat lessened" by the fact that a defendant may be confined only if he or she has failed to make a "good faith effort" to pay the restitution order, a determination that turns on the defendant's earning capacity, employment status and the willfulness of any failure to pay. *See:* MCL 780.766(11); MCL 769.1a(11).

Therefore, the Court held that retroactive application of the restitution statutes to Neilly did not violate any constitutional ex post facto clauses. The trial court's restitution order was thus affirmed. See: *People v. Neilly*, 2024 Mich. LEXIS 1270 (Mich. 2024). ◀

## Second Rapper Stabbed in Atlanta Jail During Record-Long Trial

Rapper Yak Gotti, whose real name is Deamonte Kendrick, 32, was stabbed in the south annex of Atlanta's Fulton County Jail on December 1, 2024, during a racketeering trial involving fellow rapper Young Thug—real name Jeffrey Lamar Williams, 33—and four others. Earlier in what has become Georgia's longest trial in history, co-defendant Shannon "SB" Jackson or Stillwell, was also stabbed in the main jail on December 10, 2023.

Kendrick recovered and was back in court for jury selection the next day. He and Stillwell are the last two defendants in the case, allegedly part of a criminal street gang masquerading as a group of musicians signed to Williams' Young Stoner Life label while they perverted the label's YSL monogram to live a "Young Slime Life" that included multiple weapons and drug crimes.

Stillwell was hospitalized after his attack and recovered. Fellow jail detainee Willie Brown was charged with assault, but no further details were available. At his arrest, Stillwell was reportedly sacrificing a goat for a religious ceremony, but his attorneys have tried to suppress video of that, arguing it might unfairly prejudice jurors.

Williams and three other co-defendants accepted plea deals in November 2024. According to the terms of Williams' deal, he is banned from Atlanta for 10 years and not allowed in the presence of weapons, on top of performing 100 hours of community service for 15 years; he was also banned from flashing "real or suspected" gang signs, though it was unclear how that would be enforced.

Sheriff Pat Labat blamed "dangerous overcrowding" for 10 detainee deaths in 2023 at the jail. Squalid conditions prompted the federal Department of Justice to open a civil rights investigation in July 2023, as *PLN* reported. [See: *PLN*, Feb. 2024, p.12.] ◀

Sources: *Atlanta News First*

### If You Write to *Prison Legal News*

We receive many, many letters from prisoners – around 1,000 a month, every month. If you contact us, please note that we are unable to respond to the vast majority of letters we receive.

In almost all cases we cannot help find an attorney, intervene in criminal or civil cases, contact prison officials regarding grievances or disciplinary issues, etc. We cannot assist with wrongful convictions, and recommend contacting organizations that specialize in such cases – see the resource list on page 68 (though we can help obtain compensation *after* a wrongful conviction has been reversed based on innocence claims).

Please do not send us documents that you need to have returned. Although we welcome copies of verdicts and settlements, do not send copies of complaints or lawsuits that have not yet resulted in a favorable outcome.

Also, if you contact us, please ensure letters are legible and to the point – we regularly receive 10- to 15-page letters, and do not have the staff time or resources to review lengthy correspondence. If we need more information, we will write back.

While we wish we could respond to everyone who contacts us, we are unable to do so; please do not be disappointed if you do not receive a reply.

## South Dakota DOC Locks Down Third Prison in 2024

On October 7, 2024, the South Dakota Department of Corrections (DOC) announced the results of searches conducted during a nearly three-week lockdown begun at the state penitentiary on September 15, 2024. During that time all visitation was suspended for its 1,262 prisoners, except for prisoner meetings with their attorneys and pre-approved special visits. Communication with the outside world was also restricted, with the DOC warning that phone access could be disabled.

The lockdown was not caused by an assault or fight, the DOC said, but was implemented as a "proactive security measure." Searches turned up handmade weapons and illegal electronics equipment—of which DOC provided some pictures—but no numbers. Meanwhile, prisoners were allowed to shower only every four days and eat every 12-14 hours.

The DOC shut down tablet-based communication for prisoners in March 2024, leading to unrest in which several prisoners were charged. After tablet-based calling was restored, text messaging remained blocked. More unrest at Mike Durfee State Prison in July 2024 left six prisoners injured in violent altercations. But the DOC was tight-lipped about specifics, denying claims by prisoners that the number injured was higher.

DOC Secretary Kellie Wasco called the latest lockdown "a success." ◀

Sources: *Nexstar Media Group, South Dakota Searchlight*

# New York City Held in Contempt in Long-Running Rikers Island Class-Action

On November 27, 2024, the United States District Court for the Southern District of New York held the city Department of Correction (DOC) in contempt of a consent decree and subsequent remedial orders entered in a long-running class action challenging what the Court described as the DOC's "pattern and practice of using unnecessary and excessive force against incarcerated individuals." Moreover, in light of ever-increasing levels of violence in DOC lockups—particularly those in the Rikers Island jail complex—plus the agency's long history of non-compliance, the Court moved one step closer to appointing a receiver to implement reforms under court supervision.

In 2012, a group of prisoners filed the lawsuit against the DOC alleging a pattern and practice of excessive and unnecessary force in city jails. It was the sixth such lawsuit. Plaintiffs sought declaratory and injunctive relief in addition to money damages for excessive force allegedly suffered by named plaintiffs. The U.S. government, represented by the U.S. Attorney for the Southern District of New York, subsequently intervened in the case in light of the severity and ongoing constitutional violations in DOC jails.

The parties reached a settlement in October 2015, stipulating to entry of a consent decree. The judgment comprised 25 sections with hundreds of provisions, requiring the DOC to take specific actions to remedy violence by staff against prisoners and to develop and implement new policies and procedures to ensure their safety and wellbeing. The parties also stipulated to the appointment of a monitor, Steve J. Martin, to oversee the DOC's compliance with the consent decree.

Martin and his team issued "more than 50 reports" after conducting "countless site visits," staff meetings, and data review, including "thousands of videos, reports, and investigation documentation related to use of force, other violent incidents, and other DOC operations," the Court recalled. Martin's team issued over 700 recommendations related to the DOC's use-of-force practices, security protocols, supervision and training. But the DOC largely ignored these recommendations, and Martin ultimately informed the Court the DOC was not in compliance with the consent decree.

Between August 2020 and November 2021, the parties stipulated to entry of three remedial orders intended to correct the DOC's noncompliance with the consent decree. As the Court explained, the remedial orders were necessary because, "even four years after entry of the Consent Judgment, Defendants had still failed to comply with the Consent Judgment's requirement to implement a use of force directive, which in turn had stymied the Department's ability to progress toward compliance with other provisions of the Consent Judgment."

But these remedial orders did not improve conditions in City jails. In late 2021 and again in 2022, the monitoring team reported that the DOC seemed unable to implement either the consent decree or the remedial orders, and that conditions within the DOC facilities remained "unstable and unsafe." The team recommended requiring the DOC to shift focus to addressing "foundation issues" hampering its ability to comply with the consent decree's many requirements, including flawed security practices and procedures, inadequate supervision of staff, ineffective staffing procedures and limited accountability imposed for staff misconduct.

The monitoring team asserted that until the DOC made progress in these basic areas, the "widescale reform" envisioned by the consent decree was impossible. The report concluded that the DOC's inability to address these foundational issues "created a polycentric problem" resulting in "a complicated set of dysfunctional practices unlike any jail system with which the Monitoring Team has had experience."

In spring 2022, the parties and monitoring team held a series of meetings resulting in the development of an "Action Plan" intended to address the DOC's progress related to staffing and security practices, management of people in custody and timely staff accountability. The DOC's Commissioner agreed in open court that the agency had "significant input" on the action plan's requirements and that it was reasonable. The parties stipulated to the plan's adoption by the Court on June 14, 2022.

Despite narrowing the issues that the DOC was required to focus on improving, the monitoring team reported on July 10, 2023, "that the City and Department have not made substantial and demonstrable progress in implementing the reforms, initiatives, plans, systems, and practices outlined in the Action Plan." The team recommended a series of interim measures for the DOC to implement no later than December 31, 2023, which the Court adopted in August of that year.

But the DOC failed to comply with the Court's order and "ceased all pretext of cooperating with the Monitor"; so another order was entered on October 10, 2023, directing the DOC to "devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm in the New York City jails." Sadly but unsurprisingly, the DOC failed to comply with this order as well, despite assurances that it would do so no later than August 2024.

The prisoner-plaintiffs, joined by the federal government, then moved to hold the DOC in contempt of the 18 individual provisions of the consent decree, remedial orders, and action plan. Citing the DOC's long history of non-compliance and worsening conditions within its jails, the Court granted the motion.

## Contempt Order Findings

The Court found that the "use of force rate and other rates of violence, self-harm, and deaths in custody are demonstrably worse than when the Consent Judgment went into effect in 2015." For example, there



### *Surrogate Sisters*

Services For The Incarcerated For 20 Years

We Offer….
- Sexy Photos
   Non-Nude/Nude, Male/Female
- Gifts For Loved Ones
- Erotic Stories
- Pen-Pal Services
- Bi-monthly Specials

…. And More

For Free Info Send A Self Addressed Stamped Envelope To:

Surrogate Sisters
P.O. Box 95043, Las Vegas
NV 89193

Service@Surrogatesisters.com

were 4,652 use-of-force incidents in 2016, but that number rose to 6,784 by 2023. The Court also noted the sharp rise in stabbings, pointing out that in 2016 "there were 159 stabbings and slashings systemwide" before the number "skyrocketed to 420 and 468 in 2021 and 2022, respectively."

Finally, "the most disturbing" statistic was the high number of in-custody deaths: 19 prisoners and detainees died in 2022, nine more in 2023, and five between January and August 2024. The monitoring team reported that, based on its review of video footage, none of the deaths were "particularly unusual or unique"; instead they were "typical of the variety of security problems that plague all the Department's housing units[,]" including "security lapses like unsecured doors, individuals in unauthorized areas, superficial Officer and Supervisor tours, and staff being off-post or providing inadequate supervision." The monitoring team concluded that these problems have "become normalized" by DOC staffers, who fail to recognize how their ineffective security practices "elevate the likelihood of a tragic outcome."

In addition to the increasing violence within New York City jails, the Court also focused on the DOC's long history of non-compliance with its orders. It specifically found "clear and convincing evidence" of the DOC's "ineffective attempts" to: (1) implement use-of-force directives; (2) conduct use-of-force investigations and hold staff accountable; (3) correct security and basic correctional practices; (4) adequately train supervisory staff; (5) effectively deploy guards to adequately supervise prisoners; (6) curb the excessive use of Emergency Response Teams—colloquially known as "goon squads" who often respond to minor incidents with overwhelming and unnecessary force; (7) cooperate with the monitoring team; and (8) timely implement reforms envisioned by the consent decree.

As the Court explained, a contempt finding was appropriate because "[i]n the nine years since the Consent Judgment went into effect, Defendants have not only failed to comply with the Contempt Provisions, but they have also failed to police the efficacy of the efforts they have actually made to comply and have failed to modify their approaches when advised that such efforts have fallen short." The DOC has been on notice about its non-compliance "every step of the way," the Court added,

but has turned a blind eye to "compliance with court orders."

The Court therefore found the DOC "in contempt of eighteen different provisions of the Court orders in this case—provisions that go directly to the safety of those who live and work in the Rikers Island jails[.]" The Court next concluded that imposing financial sanctions would do little to effect meaningful change because the DOC already "pays large sums" ($37.2 million in fiscal year 2022) to settle the "many damages cases" brought against it each year. The court also declined to jail DOC supervisors until compliance is achieved, nor would

it convene a three-judge panel to order prisoners released from jail, because it was "skeptical" that such remedies would compel compliance with its orders.

Instead, the Court held that any remedy for the DOC's contempt must be aimed at addressing the "key issues that have blocked compliance with the Consent Judgment and subsequent court orders": namely, leadership that is "insufficiently resourced"; management plagued by "a lack of continuity"; failures of "supervision and cooperation" between guards and their supervisors; a lack of "skill or imagination" needed to "create and implement transfor-

---

# CLASS ACTION LAWSUIT CHALLENGING THE HIGH PRICES OF PHONE CALLS WITH INCARCERATED PEOPLE

Several family members of incarcerated individuals have filed an important class action lawsuit in Maryland. The lawsuit alleges that three large corporations – GTL, Securus, and 3CI – have overcharged thousands of families for making phone calls to incarcerated loved ones. Specifically, the lawsuit alleges that the three companies secretly fixed the prices of those phone calls and, as a result, charged family members a whopping $14.99 or $9.99 per call. The lawsuit seeks to recover money for those who overpaid for phone calls with incarcerated loved ones.

### If you paid $14.99 or $9.99 for a phone call with an incarcerated individual, you may be eligible to participate in this ongoing lawsuit.

Notably, you would not have to pay any money or expenses to participate in this important lawsuit. The law firms litigating this case—including the Human Rights Defense Center—will only be compensated if the case is successful and that compensation will come solely from monies obtained from the defendants.

If you are interested in joining or learning more about this case, please contact the Human Rights Defense Center at (561)-360-2523 or info@humanrightsdefensecenter.org.

*ADVERTISING MATERIAL*

---

## NEW YORK CITY cont'd

mative plans"; plus an "unwillingness or inability to cooperate" with recommendations by the Monitoring Team, thereby failing to accomplish the "urgently necessary changes in the safety profile of the jails."

With these goals in mind, the Court determined that the "correct remedy" would be to place DOC jails under a receivership; it directed the parties to meet and confer in conjunction with the monitoring team to hash out the details of appointing a receiver—though the Court pulled many teeth from its threatened bite by including in the negotiations whether the receiver "would supplant or work alongside the DOC Commissioner."

The Court further ordered the monitoring team to submit a status report by January 14, 2025, to which the parties would then have a week to object. So it will be February 2025 at the earliest before the Court begins the process of putting DOC jails—along with their 6,530 detainees and prisoners—under new management. *PLN* will update developments as they are available: *See: Nunez v. N.Y.C. Dep't of Corr.*, 2024 U.S. Dist. LEXIS 215888 (S.D.N.Y. 2024).

# Lawsuits by Michigan Prisoner Yield $57,750 in Settlements, Plus Policy Changes

In a letter received in August 2024, Michigan state prisoner John Patrick Moore II notified *PLN* about three successful lawsuits he filed against the state Department of Corrections (DOC) which resulted in settlement agreements.

In an important case, Moore challenged a prison policy that allowed Muslim prisoners to wear kufi religious head coverings outside their cells only when they were attending or going to or from religious services. Similar restrictions were not imposed on head coverings worn by prisoners of other faiths, according to the complaint he filed, "including yarmulke for Jewish men and hijab for Muslim women."

The federal court for the Eastern District of Michigan denied qualified immunity (QI) to Defendant DOC officials on February 3, 2022, noting that they had "abundant notice that they were violating Moore's First and Fourteenth Amendment rights" by barring him from wearing a kufi while allowing other prisoners to wear both religious and non-religious head coverings. *See: Moore v. Washington,* 2022 U.S. Dist. LEXIS 32274 (E.D. Mich).

The parties then proceeded to reach their settlement agreement on June 25, 2022. Under its terms, DOC changed its policy to allow Muslim prisoners to wear kufis at all times; the agreement also provided payment to Moore of $25,000 in damages. He was represented in the suit by attorneys with the state chapter of the Council on American-Islamic Relations, as well as Daniel Manville at the Michigan State University Law Clinic. *See: Moore v. Washington,* USDC (E.D. Mich.), Case No. 2:19-cv-13616.

In a separate lawsuit filed in 2020, Moore was one of more than two dozen plaintiffs who argued that temporary denial of group religious services at Parnell Correctional Facility during the COVID-19 pandemic violated prisoners' equal protection rights and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. ch. 21C § 2000cc et seq. Plaintiffs objected that religious services were denied while certain secular activities and programs were allowed to continue—including vocational and educational classes, in-person visits, barbershops and co-mingling of prisoners on the recreation yard and in the dining hall.

While some congregate religious services resumed in May 2021, restrictions remained; for example, Catholic and Protestant prisoners were not allowed to have services on Sunday. Secular visitors were allowed to enter the prison, but religious volunteers were not. The district court refused to dismiss RLUIPA claims on July 6, 2022, finding that Defendants failed to meet their burden of justifying why accommodations were made for secular activities but not religious services. *See: Rouse v. Whitmer,* 2022 U.S. Dist. LEXIS 118606 (E.D. Mich.).

The parties then proceeded to reach a settlement on March 7, 2023, with an agreement by DOC that future proposed restrictions on religious services due to COVID-19 must be documented in the facility's action plan, and "must include consideration of whether there are (1) less-restrictive means to prevent the spread of COVID-19, and (2) comparable restrictions imposed on non-religious services."

Moore was represented by the Oliver Law Group, PC, which was awarded $12,750 in fees and costs. *See: Rouse v. Whitmer,* USDC (E.D. Mich.), Case No. 2:20-cv-12308.

Moore's most recent suit was filed to challenge DOC policies related to Islamic religious items and worship practices at Parnell. Again, the district court denied Defendant DOC officials' motion to dismiss on February 28, 2023. *See: Moore v. Washington,* 2023 U.S. Dist. LEXIS 33482 (E.D. Mich.). As part of the agreement reached to settle the case, prison officials modified policy to let Muslim prisoners purchase and possess one ounce of prayer oil, two turbans (male prisoners only) and miswak sticks. Further, DOC changed its yard rules to allow prisoners to engage in non-disruptive "religious discussion/prayer" on prison yards. Moore said he received $20,000 in damages, of which $15,000 went to his attorneys representing him again from the Oliver Law Group. *See: Moore v. Washington,* USDC (E.D. Mich.), Case No. 2:21-cv-12564.

Notably, in pursuing his successful lawsuits, Moore managed to navigate DOC's Byzantine, deliberately complicated grievance system, which is "not intended to resolve anything"—as he told the district court before it dismissed yet another suit of his on February 21, 2024. *See: Moore v. Washington,* 2024 U.S. Dist. LEXIS 66483 (E.D. Mich.). But as he noted, copies of settlements that he provided *PLN* let other prisoners "see them and know that things are being won," and they should "be encouraged to continue to fight."

# Top Doc Sacked from Maryland Psych Hospital with "Climate of Chaos"

At Clifton T. Perkins Hospital Center, Maryland's primary secure psychiatric facility, a team from the National Association of State Mental Health Program Directors arrived on October 8, 2024, to conduct a two-day evaluation of processes, policies and procedures in the wake of a top-level staff shakeup after former CEO Dr. Scott Moran was fired in May 2024.

Moran, 54, had been barred from the lockup since February 2024 after employees accused him of online harassment. The state Board of Physicians suspended his license for a year in September 2024, saying that he had been "diagnosed with a medical condition which impacted his ability to practice medicine safely."

An appointee of former Gov. Larry Hogan (R), Moran accumulated "years of well-documented but unaddressed complaints about hospital mismanagement and safety that had prompted staff departures and, at times, left employees and patients vulnerable," according to an investigation published by the *Washington Post* on October 15, 2024. Among the examples cited was the 2023 death of Martina Morgan, 40. An investigation by the state Office Health Care Quality found five violations of standard procedures and two more state law violations—including the failure of Moran's staff to preserve surveillance video that might have revealed staff actions on the night of the death.

Between 2020 and 2024, Perkins—a 289-bed lockup for accused criminals found mentally incompetent to stand trial—was plagued with "violent staff assaults, high employee turnover, security understaffing and persistent challenges stopping contraband drugs from entering the hospital, including K2, marijuana and suboxone," the *Post* reported. Former social worker Christopher Yellen, who said no guards were around to respond after he was sucker punched by a detainee, decried the hospital's "climate of chaos."

State Health Department Secretary Laura Herrera Scott, who promoted Moran to CEO in 2023, brushed off responsibility for his mismanagement, saying she had relied on the advice of departing department officials. American Federation for State and County Municipal Employees Local President Patrick Moran, who is no relation to the fired CEO, said that members of his union who work at the hospital were "cautiously optimistic." But the nonprofit Disability Rights Maryland said it had "grave concerns about a number of issues affecting patients at Perkins" that "change in leadership has not abated."

Sources: *Baltimore Sun*, *Washington Post*

# Special Offer for First Time Prison Legal News Subscribers

## A 6-Month Subscription for $5.00 (That's 75% off the cover!)

Are you reading someone else's PLN? You don't want to risk missing a single issue.
For over 30 years, PLN has been bringing prisoners the information they need to stay informed.

This offer is only available to customers that have not previously subscribed to PLN. All sales are final. Orders placed for non-eligible prisoners will have a 2-month pro-rated period added to their PLN account. Your first issue will be mailed in 6-10 weeks via USPS. Renewal notices will be sent no later than 30 days prior to expiration at the current renewal rate (as of 1/1/2022 PLN's annual renewal rate is $36.00, plus sales tax where applicable).

**Act now as this offer is only valid through 12/31/2024**

Name_____ Amount enclosed: $_____

DOC/BOP Number: _____ Facility: _____

Address: _____

City: _____ State: _____ Zip_____



**Human Rights Defense Center, PO Box 1151, Lake Worth Beach, FL 33460**
**561-360-2523 • WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG**

# 1994 Crime Bill Turns 30: A Legacy of Controversy

Thirty years later, 1994's Violent Crime Control and Law Enforcement Act (VCCLEA) is still criticized by progressive politicians for stoking mass incarceration in the United States. Others, like former Pres. Joseph R. Biden, Jr. (D)—who co-sponsored the bill as a Senator from Delaware—point to the sharp drop in crime rates that followed. Still others, like Sen. Bernie Sanders (I-Vt.), voted for the bill because of winning non-criminal provisions like the Violence Against Women Act, a now-expired 10-year assault weapons ban and firearm background checks.

VCCLEA pumped money to states to build a slew of new prisons, and incarceration rates rose to unprecedented levels. But the nonprofit Prison Policy Initiative found that incarceration at all levels—state, local and federal—had been climbing rapidly before the bill and leveled off a few years later.

Federal prison stays also lengthened with the bill's "truth in sentencing" (TIS) provision, which further encouraged states to pass analogous laws requiring prisoners to serve at least 85% of their sentences. But the Government Accountability Office was later able to identify only four states whose TIS laws were directly prompted by VCCLEA; in the rest, TIS momentum had already been building for several years.

Along with back-to-back epidemics of powder cocaine in the 1970s and crack cocaine in the 1980s came gang wars and drive-by shootings; the spike in urban crime juiced a mass exodus underway since the late 1940s from American cities to their suburbs. At its peak, the rate of violent crime passed 758 per 100,000 U.S. residents; even after a spike in crime after the COVID-19 pandemic, the rate in 2023 was just half of that 1991 peak.

As some social scientists point out, that peak came 18 years after the Supreme Court of the United States (SCOTUS) legalized abortion in *Roe v. Wade*, 410 U.S. 113 (1973). But even with the return of abortion restrictions after SCOTUS gutted *Roe* with its decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), it's unknown if another peak awaits in 2040.

Also unknown is whether Biden's history with VCCLEA contributed to the collapse in his support as President in 2021, forcing him to withdraw his re-election bid three years later. Or whether the law's long shadow helped doom the campaign of his replacement on the Democratic ticket, Vice-Pres. Kamala Harris (D), who built her career as a "tough-on-crime" California prosecutor in the 1990s. Hillary Clinton was merely First Lady when the law was signed by her husband, then-Pres. Bill Clinton (D). Yet she remained under its cloud 22 years later, when *The New Jim Crow* author Michelle Alexander cited VCCLEA to criticize Clinton's unsuccessful 2016 Presidential campaign.

Kumar Rao, Senior Advocate for the Vera Institute of Justice, said that VCCLE's premise was that prisons, policing and prosecution create safe communities—an approach he called "misguided" for "prioritize[ing] policing and incarceration over community-based solutions." *CourtTV* legal analyst Sunny Slaughter agreed that VCCLEA's more drastic provisions did more harm than good, "exacerbat[ing] generational trauma" and "impacting lives, families, and communities more deeply than the issues it sought to solve." ◾

Sources: *Axios, Vox*

# Colorado Legislature's New Jail Oversight Committee Not Weighted in Detainees' Favor

On June 3, 2024, Colorado Gov. Jared Polis (D) signed HB 1054 into law, extending the life of a Legislative Oversight Committee to enforce jail standards in the state, while also letting a companion Legislative Oversight Commission on jail standards die at the end of June 2024.

The devil was in the details though; the Committee's seven members will include just one member representing the interests of incarcerated citizens, another representing medical and mental health providers who serve them and a third who is a public defender. The remaining four committee seats were split between sheriffs and the county commissioners who fund their budgets, including payouts for detainee injuries and deaths.

That largely preserves a status quo established when the current Committee and Commission were established with passage of H.B. 1063 in 2022 after Sheriffs in the state successfully beat back lawmakers' initial version of the bill that would have established a regulatory agency to provide jail oversight. The compromise bill that resulted created the twin bodies and their limited mission to study the idea for two years.

Now, the 22-member Commission is gone. But the new bill also established an advisory committee to assess compliance with state jail standards and make recommendations for revisions to them, as well as any actions necessary to comply with them. Lawmakers also provided $369,000 for associated costs the first year. Finding sources of funding beyond that was footballed to the state Department of Public Safety's Criminal Justice Division. The new committee was scheduled to begin meeting in July 2024 and make its first assessments one year later. *See: Colo. H.B.1054* (2024).

Opponents of the initial version of H.B. 1063 resented its attempt to rein in Sheriffs in operation of their jails—putting some Sheriffs in a "reactionary position," Weld County Sheriff Steve Reams (R) said. He and others like him hashed out the compromise that paved the way for the new law. Yet that turned out to be so toothless that another oversight opponent, state Rep. Rod Brockenfeld (R-Watkins), said that he "could not believe, with the high cost of putting this committee together, that this isn't a duplication of government." ◾

Additional sources: *Colorado Politics, Colorado Sun*



**COAST-TO-COAST PRISONERS' RIGHTS LAWYERS**

**Excessive Force, Conditions of Confinement, Denial of Medical Care**

**SEND US YOUR STORY - SE HABLA ESPAÑOL**

**Saeed & Little, LLP - Dept. PLN**
**#189 - 133 West Market Street,**
**Indianapolis, IN 46204**

## First Circuit Rejects Request by Securus and Pay Tel to Stay FCC Prison Phone Rate Caps

On November 18, 2024, the United States Court of Appeals for the First Circuit issued two orders denying motions filed by Securus Technologies, LLC, and Pay Tel Communications, Inc., seeking to stay implementation of a rule recently adopted by the Federal Communications Commission (FCC) which capped the amount both companies may charge for telecommunication services provided to prisoners.

As *PLN* reported, the FCC published a final rule on August 24, 2024, to significantly reduce the cost of phone and video calls made by people held in prisons and jails nationwide. Under the new rule, which takes effect in 2025, rates in state prisons are limited to $0.06 per minute, while rates in local jails dropped to no more than $0.12 per minute. The FCC also capped the cost of video calls at $0.16 per minute in prisons and between $0.11 to $0.25 per minute in jails. [See: *PLN*, Oct. 2024, p.1.]

Securus and Pay Tel filed petitions for review of the FCC rule in the First Circuit, moving to stay implementation of the rate caps pending final resolution of the appeals. In brief two-page orders signed by Chief Judge David J. Barron and Circuit Judges Gustavo Gelpi and Seth R. Aframe, the Court denied the motions to stay "without prejudice to later revisitation of relevant points in briefing and during merits review." *See: Securus Techs., LLC v. Fed. Comm. Comm'n*, USCA (1st Cir.), Case Nos. 24-1927 and 24-8028; and *Pay Tel Comms., Inc. v. Fed. Comm. Comm'n*, USCA (1st Cir.), Case Nos. 24-1969 and 24-8028.

Immediately following the Court's orders, Securus subsidiary JPay notified the New Jersey Department of Corrections (DOC) that video visits would temporarily go offline while the company updates its system to provide per-minute billing, in compliance with the FCC rule. Washington's DOC also announced that video calls would be unavailable due to a "system update" from November 18 to 22, 2024. Securus/JPay's announcement hinted that some prisons might lose video calling, as reported elsewhere in this issue. [See following article.]

Additional source: *Filter Mag*

## Securus/JPay Video Calling Service Potentially Threatened by New Rate Caps

On November 19, 2024, prison telecom Securus Technologies, Inc., along with subsidiary JPay, notified users of services provided by the firms at prisons and jails of steps being taken to comply with a recent Federal Communications Commission (FCC) order. As *PLN* reported, that August 2024 order capped phone rates at $.06 per minute for prisons and $.12 per minute for jails; video calling transaction fees were also eliminated and rates capped at $.16 per minute in prisons and $.11 to $.25 per minute in jails, depending on size. [See: *PLN*, Oct. 2024, p.1.]

In its announcement of these changes, Securus/JPay advised incarcerated users that it currently doesn't have the functionality to charge by the minute for video calling, as the order requires. So free video calling "may" be offered at some lockups while the firms revamped their programs to accommodate the order. But the announcement also included a vague threat that "some facilities might choose to temporarily disable video calling."

Meanwhile, on November 19, 2024, Securus Video Connect went offline throughout the Washington Department of Corrections (DOC) for five days while a "system update" was underway. Video calling in DOC prisons currently costs $4.95 for 30 minutes—a little over 3% more than the new rate cap will allow. However, the current system does not allow for shorter—and therefore cheaper—calls.

Additional source: *KNDO/KNDU*

## Georgia Prisoner Accused of Running $3.5 Million "Protection" Racket

Georgia Department of Corrections (DOC) prisoner Asaad Amir Hasuan, 43—also known as "Dante Frederick"—was indicted by a federal grand jury in Delaware on November 14, 2024, for allegedly scamming at least $3.5 million from friends and loved ones of fellow prisoners to whom he gave bogus promises to provide physical protection or legal help.

Hasuan allegedly used a contraband cellphone from cells at Glynn County Detention Center and later Telfair State Prison to call and text an unnamed Delaware victim with a promise to get a witness in a prisoner's case "to recant her statement in exchange for a $40,000 payment." He threatened the same victim that the prisoner would be killed unless additional money was sent. All together he is accused of swindling the victim of $3.5 million between November 2021 and November 2022.

Eight non-incarcerated Brunswick residents were also charged with acting as "money mules" in the scheme, laundering the pilfered funds through a car rental firm called One Way Auto and using it to buy property, mobile homes and cars. One of those, Audrey Gibbons, 64, sits on the Glynn County Board of Education. Charged along with her were Deborah Daniel Stunstill, 73; Destinee Lecount, 27; Penny Hunter, 58; Beverly Frederick, 59; Lakisha Easton, 40; Jasmine Warren, 31; and Manuel Joseph Rocha, 53.

The United States Attorney for the District of Delaware is also seeking any additional victims. *See: United States v. Asaad*, USDC (D. Del.), Case No. 1:24-cr-00040.

Additional source: *WSAV*

# GOP Michigan County Commissioner Re-elected— and Headed to Federal Prison

Voters in Michigan's Monroe County returned Mark Brant to the County Commission on November 5, 2024—most not knowing that he was due to report to federal prison. Brant, 68, was sentenced to an 18-month term in federal court for the Northern District of Ohio on September 11, 2024, for leasing land that was used to grow marijuana sold illegally in Ohio.

Brant neglected to mention his indictment until just before fellow commissioners accepted his resignation on October 1, 2024. By that time, it was too late to remove his name from the ballot and too late for any other candidate's name to be added. He faced no Democratic opposition in the GOP-dominated district and won re-election with 90% of the vote. He said when resigning, "I don't want my personal circumstance to interfere with the smooth operation of the county I so dearly love." But after winning re-election, he hurried to be sworn in for his fourth term before reporting to prison.

In addition to his prison term, Brant was ordered to serve two years of supervised release and pay over $800,000—a $500,000 fine, a $1,000 special assessment plus forfeiture of more than $300,000 found by federal agents who searched his home. He was scheduled to report to the Federal Correctional Institution in Morgantown, West Virginia, on November 29, 2024. *See: United States v. Brant*, USDC (N.D. Ohio), Case No. 1:22-cr-00701.

It was Brant's second conviction; he served two years on probation after he was found guilty in 1984 of selling misbranded drugs as "over-the-counter diet pills." His fellow commissioners blasted County Administrator Michael Bosanac and his deputy, Aundrea Armstrong, for failing to inform them when they wrote supportive letters that Brant's lawyer forwarded to his judge on June 4, 2024. Both administrators claimed ignorance that the letters were solicited in a bid for sentencing leniency. "Knowing what I know now," Armstrong said, "I would have probably asked questions regarding what the letter was being used for."

But it was elected leaders who drew residents' criticism for keeping quiet so long about Brant's legal travails. Said one of their targets, state Sen. Joe Bellino, Jr. (R-Monroe), who sent a supportive letter on official Senate stationery, "Now that it's drummed up 74 bee's nests, I'd probably use different stationery."

Meanwhile, the county charter contains no requirement for commissioners to attend meetings in person. State law prevents felons from holding office only if their conviction was related to their service. Brant said there is no way to prevent him from collecting the $15,000 annual salary for his commission seat, so he plans to serve constituents from his prison cell—at least those willing to accept a collect call. He also shrugged off any moral implications of holding office as a convicted felon.

"Well, I voted for Trump," he said. ◼

Additional source: *USA Today*



# The Habeas Citebook *(2nd edition)*
by Brandon Sample and Alissa Hull

"...an essential resource..." — Peter Schmidt, Publisher, *Punch & Jurists*

The HABEAS CITEBOOK: Ineffective Assistance of Counsel

2nd EDITION

By BRANDON SAMPLE & ALISSA HULL
Edited by SUSAN SCHWARTZKOPF
Foreword by ELIZABETH ALEXANDER

"...handy and easy-to-use... "—Kent Russell

The second edition of *The Habeas Citebook* is now available! Published by Prison Legal News, it is designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief.

This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel. It will save litigants thousands of hours of research and it focuses on the winning cases criminal defendants need to successfully challenge their convictions.

Well organized into 52 concise chapters, this easy-to-use book puts the law at the reader's fingertips.

**Price: $49.95**
(shipping included)
**275 pages**
*Order by mail, phone, or online.*

Amount enclosed for *Habeas Citebook* _____ By: ☐ check ☐ credit card ☐ money order

Name: _____ DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____ State: _____ Zip: _____

**Human Rights Defense Center** PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
Dedicated to Protecting Human Rights    WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

# Push to Digitize Rikers Island Mail
# Based on Faulty Drug Tests

Since 2022, New York City's Department of Correction (DOC) has warned that its Rikers Island jail complex was swamped with letters soaked in fentanyl and other contraband drugs. As a result, DOC officials called to follow the state and numerous other prison and jail systems across the country in replacing physical mail with copies printed from electronic scans by a contracted vendor. Even Mayor Eric Adams (D) got behind the push to ban jail mail.

But on November 20, 2024, the city Department of Investigation (DOI) reported that evidence of letters laced with fentanyl and other drugs had been vastly overstated. Why? The DOC was using and relying on test kits with a sky-high rate of false positive results—nearly 85%. "The field tests don't support a concern that a high rate of fentanyl-laced objects are coming in from the mail," declared DOI Commissioner Jocelyn Strauber.

The DOC switched to test kits manufactured by DetectaChem after the state Department of Corrections and Community Services (DOCCS) discovered a high rate of false-positives in tests made by former supplier Sirchie in 2020; as *PLN* reported, DOCCS revised 2,772 prisoner disciplinary records affected by the faulty tests. [See: *PLN*, Aug. 2024, p.18.] The DOC found the Sirchie tests had a 91% false-positive rate, even higher than those made by DetectaChem.

But the overblown claims of drug-laced letters by then had ramped up calls to digitize detainee mail—even as dozens of guards were arrested and charged with smuggling drugs into city lockups. Meanwhile, DOI said that Rikers Island officials dragged their feet in implementing many recommendations to better screen staffers for contraband.

Former DOC Commissioner Louis Molina famously flashed a child's drawing of a reindeer that he said tested positive for fentanyl. That picture was among 71 pieces of mail retested by DOI for its most recent report, but it was not among 10 that actually tested positive for drugs. Warned Strauber: "To the extent policy determinations are based on flawed data, they ought to be reconsidered."

Source: *ABC News*



# INMATE SHOPPER

**DON'T WASTE YOUR MONEY! KNOW WHO YOU ARE DEALING WITH! BUSINESS DIRECTORY WITH RATINGS**

**AMERICA'S LARGEST PUBLICATION OF Inmate Resources & Services**

**1000+ LISTINGS:** all businesses and services are reviewed regularly and rated by the publisher based on feedback from inmates. NEW Content every issue.

**Pen Pal Resources**
**Photo Spread** (Non Nude)
**Catalogs to Order**
**Magazine Sellers**
**LGBTQ Section**
**Criminal Justice News**

**Sexy Photos Sellers**
**Social Media/Text/Phone**
**Major Sport Schedules**
**Articles, Tips & Facts**
**Always Up-to-Date**
Softcover, 8x10 350+ pgs.

**NEW!! 2024-2025 INMATE SHOPPER**
**$29.99 incl. s/h with tracking**

## GIFT LOOK BOOK  FULL COLOR

**SEND YOUR LOVED ONES SOMETHING SPECIAL TO SHOW THEM HOW MUCH YOU APPRECIATE THEM.**



**EVERY HOLIDAY & OCCASION**
Hundreds of high quality gifts to choose from, all made in the USA. We offer complete line of custom designed gift baskets, our flowers delivered fresh in bud-form so they open up in front of your loved ones. Our chocolates are of the finest quality, all made fresh. All our baked goods are made to order.

Softcover, 8x10, 110+ pgs.  **With every book receive a $19.99 voucher**

**GIFT LOOK BOOK**
**$19.99 incl. s/h with tracking**

# Freebird Publishers
**221 Pearl St., Ste. 541**
**North Dighton, MA 02764**
**www.FreebirdPublishers.com**

# "Whoppergate" Embroils Georgia Sheriff

A Georgia Sheriff who sent deputies to a local Burger King when displeased with its service endured weeks of taunts on his department's Facebook page in October 2024. It was then that Cobb County Sheriff Craig Owens, Sr. (D) blocked the page's comments section to David Cavender, his Republican challenger, who lost the election on November 5, 2024. Undeterred, Cavender filed suit in federal court for the Northern District of Georgia on November 13, 2024, accusing the Sheriff of violating his constitutional rights with the social media block.

The March 2023 incident was captured by the body-worn camera of deputies who responded to a call from Owens at the Burger King in Mableton. The Sheriff, who was not in uniform, had complained about his order to staffers, who responded by locking him outside the doors. Owens told the deputies to get the name and number of the manager; an assistant manager then told them that the doors had been locked to prevent Owens from threatening staff the way other irate customers sometimes did.

"You didn't tell him who I was, did you?" Owens demanded of the deputy, who responded that he had not.

Cavender posted the video to his campaign website on October 11, 2024; 18 days later, Owens restricted comments on his Facebook page, prompting the suit from Cavender just over two weeks after that. The United States Supreme Court has ruled that public officials may not block citizens from social media accounts on which they "speak on the state's behalf." *See: Lindke v. Freed,* 601 U.S. 187 (2024). Cavender's suit against Owens remains pending. *See: Cavender v. Owens*, USDC (N.D. Ga.), Case No. 1:24-cv-05205.

For his part, Owens admitted that he "probably should have just drove off and took the bad service and left and came back another day."

Additional source: *Washington Post*

## Turn Key Health Walks Away From Oklahoma County Jail

On October 9, 2024, Turn Key Health Clinics ended its contract to provide healthcare at the Oklahoma County Jail in Oklahoma City. The firm gave notice 30 days earlier, after winning just a one-year $7.4 million extension to the contract it has held since 2018; Turn Key wanted a longer deal, and when it didn't get one, it terminated its contract and left.

In doing so, the contractor accused jailers of maintaining insufficient guard staff to provide security and escorts for detainees needing medical attention. "We can't provide the quality of care we expect from our team if we can't access patients in need," declared company spokesperson Kenna Griffin.

After the Oklahoma County Justice Authority (OCJA) took over jail operations from then-Sheriff P.D. Taylor in 2020, there were 39 detainee deaths through September 2023, as *PLN* reported. [See: *PLN*, Mar. 2024, p.1.] OCJA board members then couldn't agree to renew Turn Key's contract when it expired in June 2024, leaving the company working on a month-to-month basis until the one-year extension was signed in September 2024. But within hours, Turn Key made its dissatisfaction with that agreement known and gave notice it was leaving.

OCJA has since hired 62 former Turn Key staffers, who continue to provide detainee medical care while reporting to jail CEO Brandi Gardner. Meanwhile, OCJA board members reviewed contract proposals from new healthcare and mental healthcare vendors on October 9, 2024, accepting none and opting to continue negotiations.

Source: *Frontier, KOSU, Oklahoman*

# News in Brief

**Australia**: Brisbane Correctional Center prisoner Jack James Peterson, 29, was sentenced to an additional 18 months in January 2023 for assaulting a guard with a squash racket, the *Courier* reported. Peterson struck the unnamed 34-year-old during a confrontation involving a riot response team, leaving him with a forehead contusion and a broken thumb requiring surgery. The prisoner apologized in court, adding that after five years of sobriety and commitment to the Islamic faith, "I'm not that person anymore." But Judge Jodie Wooldridge was moved only enough to extend his parole eligibility by just four months to February 2026.

**California**: A federal Bureau of Prisons (BOP) guard Sandra Munagay, 42, was indicted on November 13, 2024, for allegedly assaulting an unnamed prisoner at the United States Penitentiary in Atwater. Munagay allegedly struck the prisoner and submitted a false account to cover it up in November 2023. If convicted, she faces up to 20 years in prison and a fine up to $250,000. *See: United States v. Munagay*, USDC (C.D. Cal.), Case No. 1:24-cr-00256.

**California**: Former California Department of Corrections and Rehabilitation (CDCR) guard Avelino Ramirez, 52, was indicted on October 31, 2024, for an alleged smuggling scheme and related fraudulent overtime claims. The *Latin Times* reported that the K-9 officer is accused of smuggling drugs, cellphones, weapons, and tobacco into San Quentin and Vacaville state prisons so that he could then stage its discovery to boost his career. In the process, he also filed claims for $8,200 for overtime pay while writing reports about the phony finds. Suspicious supervisors who removed him from his post then saw a "dramatic reduction" in contraband discoveries. *See: United States v. Ramirez*, USDC (N.D. Cal.), Case No. 3:24-cr-00564. San Quentin janitor Keith Reindeer Randle was also indicted on September 26, 2024, for allegedly attempting to smuggle methamphetamine and cannabis oil into the lockup. *See: United States v. Randle*, USDC (N.D. Cal.), Case No. 3:24-mj-71438.

**California**: State prisoner Juan Linares, 44, was fatally stabbed at High Desert State Prison on November 26, 2024, allegedly by fellow prisoner Zachary Barron, 32, *KRCR* in Redding reported. Linares was 15 years into a 36-years-to-life sentence for second-degree murder in Alameda County. Baron is serving 14 years to life for first-degree murder in San Bernardino County. He has been placed in restricted housing, CDCR said.

**California**: El Dorado County Jail guard Michael Griffiths IV, 24, was arrested on November 22, 2024, for sexually assaulting an unnamed detainee, the *Sacramento Bee* reported. Sgt. Kyle Parker, another deputy of County Sheriff Jeff Leikauf, said that Griffiths was placed on leave and booked into the jail on $50,000 bail.

**California**: Aryan Brotherhood (AB) member Ronald Yandell, 62, was charged with attempted murder after attacking two CDCR guards at California State Prison in Sacramento on November 22, 2024, according to *KMAX* in Sacramento. Other



**Build model motorcycles- no power tools needed!**

Easy-to-follow instructions for builders of all skill levels.

Turn scrap wood into marketable motorcycles

BONUS:
Three complete sets of detailed instructions with to-scale illustrations.

*A Bike Hobby:*
*A Step-by-Step Guide to Building Wooden Model Motorcycles*

Build the model bike of your dreams!

On sale now for only $19.99
*(Get yours for Christmas on Amazon)*

guards subdued him with pepper spray, and no injuries were reported. Yandell was incarcerated in 2004 for first-degree murder and voluntary manslaughter, and he was convicted on April 30, 2024, for helping orchestrate murders of AB members who violated gang rules. [See: *PLN*, Feb. 2024, p.14.] He was being held under heightened security ahead of a scheduled December 2024 sentencing.

**Connecticut**: The *Boston Herald* reported that DOC guard Todd Blevons, 43, was arrested on November 20, 2024, and accused of assaulting an unnamed 66-year-old prisoner during a November 2023 pat-down search at Corrigan Correctional Center. When the guard discovered that the prisoner had taken cookies from the cafeteria, in violation of prison rules, he allegedly threw him to the ground, punched him, kneed him in the back and pepper-sprayed him—even after other guards arrived and restrained the prisoner. The attack was caught on surveillance video and left the prisoner with injuries including broken ribs and a laceration requiring stitches. Blevons was placed on leave and charged with assault in the third degree on an elderly person.

**District of Columbia**: A sweeping indictment was unsealed on November 19, 2024, charging a guard, detainees and outside accomplices in a contraband smuggling operation at the D.C. Jail. U.S. Attorney Matthew M. Graves, alongside the FBI and D.C. DOC, announced the charges against jail guard Rashaad Roper, 36, and five others. The scheme involved supplying knives, drugs and cellphones detainees awaiting trial for violent crimes. The contraband was concealed in Tupperware containers within plastic-wrapped packages. LaTara Brown, 31, and Kiya Holland, 33, delivered the packages, which Roper—and possibly other guards—smuggled into the facility. Once inside, detainees Darius Robertson, 31, Marcel Vines, 28, and Stefon Freshley, 28, allegedly received the items. A February 2024 raid intercepted contraband including a switchblade, iPhone, marijuana and gambling items, while a July 2024 search uncovered synthetic drugs, additional phones and cigarettes hidden in cells. If convicted, Defendants face up to 20 years for contraband possession and five years for conspiracy. *See: United States v. Roper*, USDC (D.D.C.), Case N0. 1:24-cr-00520.

**Florida**: *WTVJ* in Miami reported that state DOC guards Christopher Rolon, Kirk Walton and Jeremy Godbolt were sentenced to 20 years in prison on October 25, 2024, for the brutal beating death of 60-year-old mentally ill prisoner Ronald Ingram at Dade Correctional Institution in February 2022. As *PLN* reported, the guards retaliated when Ingram threw urine at them, beating him and leaving him with 20 broken ribs in a transport van, where he was found dead hours later and hundreds of miles away. [See: *PLN*, May 2022, p.34.] Despite initially accepting plea deals in exchange for testifying against a fourth guard, Ronald Connor (who was ultimately acquitted of murder), Walton and Rolon attempted to withdraw their pleas. But state Judge Teresa Pooler refused, calling the crime "heinous and horrible." If not for the plea deals, she would have sent them all to prison for life, she said, because "[t]hat man died in the worst way possible by himself in pain in a prison vehicle chained up."

**Florida**: Former Broward County Jail guards Tracy Wade, 51, and Carolyn Wade, 49, were convicted in federal court on October 23, 2024, of submitting fraudulent

---



# FEDERAL PRISON HANDBOOK

### BY CHRISTOPHER ZOUKIS

**THE DEFINITIVE GUIDE TO SURVIVING THE FEDERAL BUREAU OF PRISONS**

**Price:** $74.95 *(shipping included)*

This handbook teaches individuals facing incarceration, prisoners who are already inside, and their friends and family everything they need to know to protect themselves and their rights. The thorough information was compiled by someone who has first-hand experience with the federal prison system.

Name _____

DOC/BOP # _____

Institution/Agency _____

Address _____

City _____

State _____ Zip _____

**Prison Legal News • PO Box 1151 • Lake Worth Beach, FL 33460**
**Tel. 561-360-2523 • www.prisonlegalnews.org**

## PLN Needs Your Photos, Videos, Verdicts and Settlements!

We are expanding the multimedia section on PLN's website, and need more prison and jail-related content! We know many of our readers have pictures and videos related to prison and criminal justice topics, and we'd like to post them on our site. We are seeking *original* content only – photos or video clips that you have taken yourself.

Please note that we are *not* seeking articles, editorials, poems or other written works; only photos and videos. They can be taken inside or outside of prison, but must relate to prisons, jails or criminal justice-related topics. By sending us multimedia content, you are granting us permission to post it on our website. Please send all submissions via email to:

**CONTENT@PRISONLEGALNEWS.ORG**

Please confirm in your email that the photos or videos are your original content, which you produced. Also please provide some context, such as where and when they were taken. Your name will not be posted online or otherwise disclosed. Please spread the word that PLN needs photos and videos for our website.

_____

We also need verdicts and settlements in cases won by the plaintiff. Note that we are *only* seeking verdicts, final judgments or settlements – not complaints or interim orders in cases that are still pending. If you've prevailed in court against prison or jail staff, please send us a copy of the verdict, judgment or settlement and last complaint so we can post them on our site and potentially report the case in PLN. If possible, please e-mail your submissions; we cannot return any hard copy documents. Send to:



**Prison Legal News**
PO Box 1151
Lake Worth Beach, FL 33460
content@prisonlegalnews.org

---

## NEWS IN BRIEF cont'd

applications for loans totaling over $40,000 from the Paycheck Protection Program, which Congress passed to ease the burden of the COVID-19 pandemic. Rather than being used to maintain payroll and save jobs, the funds were diverted to personal use by the Wades and over 20 other deputies of County Sheriff Greg Tony, all of whom have been convicted or pleaded guilty to similar crimes, the *Miami Herald* said. *See: United States v. Wade*, USDC (S.D. Fla.), Case No. 0:23-cr-60173.

**Florida**: *WSVN* in Miami identified the man who impregnated Turner Guilford Knight Correctional Center detainee Daisy Link, 28: fellow detainee Joan Depaz, 23. The paternity was a mystery when Link's baby arrived in June 2024, as *PLN* reported. [See: *PLN*, Oct. 2024, p.21.] Though they never met, the second-degree murder suspect later confessed that she communicated with Depaz through an air conditioning vent, using it to pass his semen rolled in Saran Wrap. She then injected it using yeast treatment applicators. The couple remains incarcerated in separate lockups, maintaining phone contact with one another and their infant.

**Illinois**: Cook County Jail guard Reginald Roberson, 53, was acquitted on November 22, 2024, of charges stemming from an alleged jail beating amid prosecutorial misconduct, the *Chicago Tribune* reported. Roberson was accused of using handcuff-like brass knuckles when he punched a 29-year-old detainee, as *PLN* reported. [See: *PLN*, June 2023, p.63.] But Assistant State's attorney Tiffani Mims allegedly promised the detainee better housing in exchange for testimony against Roberson—a deal never disclosed to the Defense. Judge William Gamboney denied a mistrial motion but allowed the additional evidence and ultimately acquitted Roberson.

**Indiana**: Westville Correctional Facility guard Salina Newton, 43, was arrested on November 14, 2024, and charged with attempting to smuggle contraband to an unnamed prisoner, according to *WTRC* in Niles, Michigan. Fellow guards conducting a routine search discovered a package wrapped in black electrical tape containing marijuana, tobacco and rolling papers, which was concealed between Newton's legs. A subsequent strip search at the La Porte County Jail uncovered another package with suboxone hidden in a body cavity. If convicted, Newton faces up to six years in prison for each charge.

**Kentucky**: On November 22, 2024, former BOP guard Sean T. Lawless pleaded guilty to smuggling alcohol and other contraband into the Federal Correctional Institution in Ashland, the *Lexington Herald-Leader* reported. Lawless worked at lockup between September 2020 and February 2022, when he muled an unnamed prisoner at least five bottles of Fireball whiskey, three cans of Copenhagen smokeless tobacco, two vape pens and cigarettes. His plea agreement also stated that Lawless provided liquor, vape pens and cigarettes to a second prisoner. At sentencing in January 2025, he faced up to a year in prison. *See: United States v. Lawless*, USDC (E.D. Ky.), Case No. 0:24-cr-00023.

**Louisiana**: According to *WBRZ* in Baton Rouge, East Baton Rouge Parish Prison guards Elijah Christopher, 25, Julius Conner Jr., 25, and Noah Jenkins, 23, were fired and arrested on October 18, 2024, for malfeasance in office and simple battery of a unnamed detainee. Surveillance video

# Special Offer for 1st Time Criminal Legal News Subscribers

## A 6-Month Subscription for $7.00 (That's 75% off the cover!)

Are you reading someone else's CLN? You don't want to risk missing a single issue.
For over 30 years, we have been bringing prisoners the information they need to stay informed.

This offer is only available to customers that have not previously subscribed to CLN. All sales are final. Orders placed for non-eligible prisoners will have a 2-month pro-rated period added to their CLN account. Your first issue will be mailed in 6-10 weeks via USPS. Renewal notices will be sent no later than 30 days prior to expiration at the current renewal rate (as of 1/1/2022 CLN's annual renewal rate is $48.00, plus sales tax where applicable).

**Act now as this offer is only valid through 12/31/2024**

Name_____ Amount enclosed: $_____

DOC/BOP Number: _____ Facility: _____

Address: _____

City: _____ State: _____ Zip_____

**Human Rights Defense Center, PO Box 1151, Lake Worth Beach, FL 33460**
**561-360-2523 • WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG**

showed that he was not resisting when they pulled him from his cell in June 2024 and assaulted him with pepper spray. The investigation also led to additional charges against Christopher for allegedly assaulting detainees in July and August 2024, while using racial slurs against them. He was a five-year employee of Parish Sheriff Sid J. Gautreaux III. Jenkins had worked for three and a half years and Conner for nine months.

**Louisiana**: Six months after escaping the Tangipahoa Parish Jail in May 2024, state prisoner Jamarcus Cyprian, 20, was found hiding in a closet at a Hammond-area apartment on November 20, 2024, according to *WVUE* in New Orleans. Cyprian escaped with three other prisoners who were caught the same week that they shimmied under a fence and scaled two walls in May 2024—though they were not missed for two days by jailers who skipped head counts, as *PLN* reported. [See *PLN*, Aug. 2024, p.62.] Sheriff Gerald Sticker said that Cyprian was found with a firearm during an investigation into a shooting that led to the arrest of four other people involved, who allegedly were harboring the prisoner.

**Maryland**: On October 2, 2024, state prisoner Gordon Staron, 35, pleaded guilty to fatally strangling cellmate Javarick Gantt, 34, at Baltimore Central Booking and Intake Center in 2022, the *Independent* reported. At the time, Staron was awaiting sentenced for killing an elderly man with an ax at a bus stop. Gantt, who was deaf and nearly illiterate, was arrested on minor domestic disturbance charges yet detained for months due to court backlogs. State's Attorney Ivan Bates personally prosecuted the case a year after Gantt's murder, the first time in "nearly a decade" that a state's attorney had done so. On December 19, 2024, Staron was sentenced to life without possibility of parole.

**Massachusetts**: The U.S. Attorney's Office for the District of Massachusetts reported that a former Bosnian prison guard living in Swampscott was convicted on October 18, 2024, of concealing his involvement in the persecution of Serb prisoners at the notorious Čelebići prison camp during the 1990s. Kemal Mrndzic, who had immigrated to the U.S. and become a naturalized citizen, was found guilty of making false statements to immigration authorities and possessing fraudulent documents. During his two-week trial, survivors of the Čelebići camp testified about horrific abuse they endured, including "near suffocation after being sealed in manholes for hours at a time" and daily and nightly beatings that were administered with a "baseball bat, wooden poles and rifle butts." Some detainees were murdered, they said, while another's tongue was burned with a heated knife blade. Mrndzic's conviction is part of ongoing efforts to hold accountable those who perpetrated atrocities during the Bosnian War.

**Massachusetts**: A former state DOC guard was arrested on November 2, 2024, for allegedly smuggling synthetic cannabinoid-laced paper worth over $500,000 into Massachusetts Correctional Institution at Shirley. The arrest of Roxsandra Wright, 38, followed a joint investigation by state police and the DOC. Wright resigned at the end of October 2024 and planned to move to New Jersey before her arrest. Her bail was set at $50,000 cash.

**Michigan**: *WJRT* in Flint reported that former Saginaw County Jail guard Angelina Young, 33, avoided jail time at sentencing on November 25, 2024, after pleading no contest to assaulting a fellow guard. As *PLN* reported, she tasered her unnamed fellow guard in March 2024, knocking him from his chair, but claimed it was a practical joke. [See: *PLN*, Sep. 2024, p.61.] Sheriff Bill Federspiel placed her on leave and then fired her in June 2024. She faced up to 93 days behind bars but was sentenced to pay $455 in fines and court costs.

**Minnesota**: A prisoner and a former



www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

## NEWS IN BRIEF cont'd

guard at Minnesota Correctional Facility in Stillwater were sentenced for their roles in a methamphetamine smuggling operation on November 18, 2024. According to *KFGO* in Fargo, N.D., prisoner Axel Kramer, 37, was already serving 24 years for second-degree murder when he received an additional 15-year sentence followed by 10 years of supervised release. The former guard, Faith Gratz, 26, was sentenced to over two years in prison followed by two years of probation. As *PLN* reported, Kramer and another prisoner coordinated with outside drug sources to supply methamphetamine to Gratz, who exploited her position to smuggle the drugs into the lockup and tip off Kramer about upcoming cell searches; they also exchanged hundreds of text messages detailing the plan as well as their romantic relationship. [See: PLN, Nov. 2022, p.65.] Kramer also pleaded guilty to a meth conspiracy in January 2024.

**New Jersey**: DOC guards Gary Nieves, 53, and William Young, 35, were suspended without pay and charged on October 29, 2024, with sexual assault of an unnamed 18-year-old prisoner at the Female Secure Care and Intake Facility in Bordentown. According to a statement by state Attorney General Matt Platkin (D), the two also ad-

mitted to related charges of criminal sexual contact, official misconduct and witness tampering. If convicted, each faced up to 10 years in prison. The alleged abuse took place in various locations in the prison and was reported in August 2024 after staff tipped off the state Juvenile Justice Commission.

**New Jersey**: Former Bayside State Prison guard Joshua Hand, 35, was sentenced to 20 months in federal prison on November 5, 2024, for failing to prevent prisoner-on-prisoner assaults, *NJ Advance Media* reported. As *PLN* reported, Hand pleaded guilty in February 2024 to depriving prisoners of their constitutional rights when, in December 2019, he witnessed multiple prisoners assault another prisoner, pinning him to the floor and delivering repeated blows—after which the guard did nothing to intervene or notify supervisors. Later that day, Hand also observed a guard strike another prisoner's legs with a broomstick and again failed to act. [See: PLN, May 2024, p.61.] In addition to his prison term, U.S. District Judge Karen M. Williams ordered Hand to pay a $10,000 fine and serve three years of supervised release. *See: United States v. Hand*, USDC (D.N.J.), Case No. 1:24-cr-00119.

**New Jersey**: *WCAU* in Philadelphia reported that Burlington County Jail guard Austin Metivier, 34, was arrested at the jail on November 15, 2024, and charged with

possession of child sexual abuse material. In October 2024, investigators acting on a tip from Pemberton Township cops found pornographic photos of underage girls on a hard drive that he owned. He was booked into Camden County Correctional Facility.

**New Mexico**: Cibola County Correctional Center detainees Lupe Vargas and Edward Vallez were among nine people arrested at a sweep of 13 locations on October 30, 2023, in what the U.S. Attorney for the District of New Mexico called a significant prison drug ring. Also arrested was Monalisa Vargas, Lupe Vargas' wife. Fentanyl, heroin, methamphetamine, firearms, and ammunition seized during the raids included over 1,000 fentanyl pills found inside the jail, which is privately operated under contract by CoreCivic.

**New York**: Rockland County Jail guard Sgt. Daniel Dworkin, 44, was arrested on November 21, 2024, after allegedly downloading child pornography to his computer, the *Rockland News* reported. The smut included 51 photos and videos of girls under 16 in sexual performances. The investigation began when state police contacted the Rockland District Attorney's Internet Crimes Against Children Unit about Dworkin, an 18-year veteran of the County Sheriff's Office who also held a high position in the union representing jail guards. He was arraigned and suspended without

## PLN Classifieds

**PENPALS.BUZZ**
Prison Pen Pal Podcast
TikTok and Facebook Ads
Fastest Customer Service
Free Brochure: PenPals.Buzz
PO Box 456, Anderson, CA 96007

**Bigshot Products**
Vintage Adult Novels! 2500 titles
and growing, $8.99 ea. Free lists.
SASE to: BSP PO Box 741176
Boynton Beach, FL 33474

**AN INMATE'S BEST BUDDY!**
Felon's Friend, LLC offers pictures, legal
resources, stories, games and more!
Send SASE to Felon's Friend, LLC
PO Box 3161 Carmichael CA 95609

**BOLO**
**Semi-custom Hot/Cold tumblers**
for your loved ones. Great gifts!
Send SASE for more info:
PO Box 8660 Warrenton, VA 20187.
Quality and care, perfect for everybody!

**THE INSIDER PRIZE**
For writers in Texas prisons
from American Short Fiction.
Fiction & memoir < 2000 words.
Winners published online.
P.O. Box 4828, Austin, TX 78765
Yearly postmark deadline: 12/31

**WELCOME TO FREEBIRD PUBLISHERS**
See Our Offerings. New Updated
Vol. 4-Full Color Catalog-92-pgs.
Brand New Books, Gifts, Services
Send $5, Add $5 Track or 15 FCS
Or Send SASE for flyers
Freebird Publishers 221 Pearl St.
Ste. 541, Dighton, MA 02764

**PEN PAL SERVICE**
Send S.A.S.E. for brochure to:
Friends4Prisoners - PLN
20770 Hwy 281 N., Ste. 108-178
San Antonio, TX 78258

**SO YOU WANT TO BE A MICHIGAN
PRISON LEGAL WRITER**
is for Michigan prisoners.
Chapters include: Constitutional
Amendments, Federal and Michigan
Law, Writing Methods, 1983/ 2254, and
a Resource Guide. By John Halcomb.
Amazon.com $24.95

**CASE PUBLICLY. LEGAL RESEARCH,**
Fed, State, Pacer. Press releases, Social media,
We publish ur t-shirts, books, music.
Shopify websites. 300+ happy customers
in prison. info@cadmuspublishing.com
Cadmus PO Box 8664, Haledon, NJ. 07538
Tablet emails accepted. Rated A+ by BBB.
Free monthly newsletter

pay; he pleaded not guilty and was given a minimum $500,000 cash bond.

**Ohio**: Former Cuyahoga County Jail guard Austin Casto, 24, was sentenced to six months in jail on November 18, 2024, for his role in a June 2024 urine-tossing incident involving a convicted felon, according to *WKYC* in Cleveland. Casto pleaded guilty to two counts of attempted harassment with a bodily substance for assisting prisoner Romelle Smith in throwing bodily fluids at five guards and supervisors, including the jail warden. Smith pleaded guilty to five counts of harassment by an inmate. Casto resigned his position and agreed to forego future employment in corrections. Common Pleas Judge William Vodrey also fined the former guard $2,000 and ordered him to serve the sentence in any county jail except Cuyahoga.

**Pennsylvania**: On October 31, 2024, Judge Rose Marie DeFino-Nastasi exonerated former state prisoner Tracy Jordan, finding that the former Marine, ex-Philadelphia Housing Authority police officer and father of three was wrongly convicted for the 2004 murder of Harold Wexler at a Philadelphia check-cashing store. According to the University of Michigan Law School's National Registry of Exonerations, Jordan had long maintained his innocence despite being sentenced to life without parole in 2006. He made appeals and petitions in 2008, 2015, 2016, 2017 and 2021; all were dismissed or denied. Attorneys from the Conviction Integrity Unit (CIU) of the Philadelphia County District Attorney's Office then began a review of his case in 2023 and found that the state had failed to disclose a wide range of exculpatory evidence that impeached the prosecution's witnesses, refuted its evidence and challenged its theory of the crime. Jordan's attorneys argued that this misconduct deprived him of a fair trial. A motion for a new trial filed in May 2024 asserted that the state's case was riddled with errors, casting doubt on the legitimacy of his conviction and leading ultimately to his exoneration.

**Pennsylvania**: The *Wilkes-Barre Citizens' Voice* reported that a court paperwork error led to the accidental release of a prisoner Derek Havard, 42, from the Luzerne County Minimal Offender Unit on November 26, 2024. James Wilbur, jail warden and head of the county division of correctional services, explained that the second page of a Protection from Abuse document— without a prisoner's name but authorizing release—was attached to a judge's order dismissing Havard's motions to dismiss and to modify bail. The error was discovered shortly after Havard's release, and he was apprehended and returned to custody the next day.

**Rhode Island**: *WLNE* in Providence reported that former Donald W. Wyatt Detention Facility guard Kaii Almeida-Falcones, 30, was sentenced to six months in federal prison on November 14, 2024, for smuggling controlled substances to detainees. U.S. Attorney Zachary A. Cunha said that the guard worked with detainees Roosevelt Dale and Yahaira Cristina Contreras to smuggle suboxone strips from outside accomplices; the contraband was discovered during a detainee strip search in February 2021. More contraband was found concealed in a pillowcase in another detainee's cell. Surveillance footage showed Almeida-Falcones entering both cells the night before the substances were discovered, leading to his arrest and charges.

**Tennessee**: Former Trousdale Turner Correctional Center guard Nkoli Nwosu, 49, was arrested on October 9, 2024, for money laundering and other charges related to smuggling contraband to a prisoner with whom she had a personal relationship. According to the *Tennessean*, the guard accepted $4,135 via CashApp from the prisoner in exchange for food, drug paraphernalia and personal items, including sneakers, SD cards and synthetic cannabinoids. Trousdale Turner, which is privately operated by CoreCivic, is under federal investigation for ongoing violence, understaffing and drug smuggling, as *PLN* reported. [See: *PLN*, Dec. 2024, p.56.] Nwosu had been employed since May 2023, admitting that the relationship began shortly thereafter. She was given away when investigators discovered her failure to confiscate a contraband cellphone used by the prisoner, tracing then her use of the illicit funds for personal expenses.

**United Kingdom**: The Ministry of Justice (MoJ) confirmed a data breach affecting prisons in England and Wales in the second and third weeks of November 2024. The *BBC* reported that confidential layouts with details of key security features in at least 20 prisons were leaked onto the dark web. The National Crime Agency was providing advisory support, but no formal investigation was underway, MoJ said.

**Virginia**: Former Coffeewood Correctional Center guard Davey Jonathan Sisk, 30, was sentenced to 40 years in federal prison on November 21, 2024, after pleading guilty in June 2024 to two counts of sexually exploiting and attempting to

**PEN PAL PROFILE NOTICED!!**
Catch The Attention You Deserve
Seen Numerous Times By Pen Pals
Use Our Successful Options
Premier Sections & Tab Displays
Your Profile Updated Online/Mail
Send 2 FCS App/Info. Penacon
221 Pearl St. Ste. 553, N. Dighton, MA 02764

**ReEntry/Addiction Peer Recovery**
Study Guides & Training @$45+
Start Your (Non-CDL) Truck Biz!
Books $10+ / Certificates Avail
Send self-addressed envelope (SASE):
GO ParaPro Svcs, PO Box 660,
Lancaster, TX 75146
www.goparapro.com

**OVER 1,400 UP-TO-DATE RESOURCES!**
Legal Help, Sexy Pics, Pen Pals,
Make Money, FREE Books & Mags,
Social Media, Advocates, & Much,
Much, More! Too much to list!
Order NOW! ONLY $19.99 + $7 s/h.
Send Payment to:The Cell Block (PLN);
PO BOX 1025; R.C., CA 95741

**Discover Unique Worlds!**
Support Independent Lit! Sci-Fi,
Thrillers & More from Reese
Halden. Visit ReeseHaldenLLC.com
or write for info to PO Box 189,
Brattleboro VT 05302

**USAINMATE / SUBTEXT**
Photo prints, stocks, horoscopes,
Google research, and more.
Federal only. FREE trial:
760-421-9913 or www.usainmate.com
P.O. Box 698, Holt, MI 48842

**Beautiful Asian Women**
Desire Penpals, Romance, Friends
Send S.A.S.E. for Free Brochure!
P.I.C. Box 4601-PN
T.O. CA 91362
ww.pacisl.com

## *NEWS IN BRIEF cont'd*

sexually exploit a child as well as one count of receiving child pornography. Sisk used the Telegram social media app to receive illicit videos that his girlfriend Anna Layher created of three- and six-year-old family members. She received a 40-year sentence in September 2024. Sisk admitted to paying over $450 through Cash App to purchase child pornography from a 12-year-old in Texas who engaged in sexual intercourse with another child and then sold videos and images of these encounters. *See: United States v. Sisk*, USDC (W.D. Va.), Case No. 3:24-cr-00009.

**Washington**: *Outkick* reported that Michelle Goodman, 31, a former guard at Green Hill School juvenile lockup in Chehalis, was arrested on October 17, 2024, and charged with multiple counts of custodial sexual misconduct in the first degree for allegedly recording sexual acts with a 23-year-old resident in the facility's staff bathroom earlier this year. The victim's attorney provided screenshots from the recordings, which reportedly took place in January 2024. Surveillance footage corrobo-

rated that Goodman and the victim entered the staff locker area on two occasions. At her initial court appearance, bond was set at $100,000. In March 2024, she was arrested for allegedly facilitating and laughing at an attack on another resident. Goodman is the third Green Hill employee charged with sexual misconduct. In addition to criminal charges, she also faces a civil lawsuit from the victim, alleging that she exploited her position of authority to coerce him into a sexual relationship and pressured him to film their encounters. Filed in Thurston County Superior Court, the suit further accuses Goodman of repeatedly engaging in similar behavior.

**West Virginia**: Former Southern Regional Jail guards Johnathan Walters and Corey Snyder pleaded guilty to federal civil rights violations on November 18, 2024, and November 19, 2024, respectively, in the March 2022 death of detainee Quantez Burks. According to *AP News*, they face up to 30 years in prison and fines up to $250,000. As *PLN* reported, Burks, 37, died less than a day after being booked on a wanton endangerment charge, when the guards allegedly beat him in a room lacking surveillance cameras; handcuffed

and restrained during the incident, Burks sustained fatal blunt force trauma, as confirmed by a private autopsy requested by his family. [See: *PLN*, May 2024, p.22.] Mark Holdren, another guard charged Burks' death, pleaded guilty in federal court on November 13, 2024. *See: United States v. Holdren*, USDC (S.D. W.Va.), Case No. 5:23-cr-00188.

**West Virginia**: Former South Central Regional Jail guard Stephen A. Elswick, 52, was arrested on November 26, 2024, and charged with two counts of imposing sexual acts on an incarcerated victim. According to a criminal complaint filed in Kanawha County, Elswick allegedly engaged in sexual acts with the prisoner on multiple occasions—once even waking the victim in her cell to perform a sex act. Other prisoners reportedly witnessed the assaults. Elswick confessed to tipped-off investigators, who also interviewed the victim and corroborated details of the complaint. He was fired by the state Department of Corrections and Rehabilitation, according to spokesperson Andy Malinoski. After posting a $3,000 bond, Elswick was released pending a preliminary hearing set for December 3, 2024, in Kanawha County Magistrate Court.

# ⚸ PRISONLEGALNEWS.org

## Dedicated to Protecting Human Rights    >>FREE Data Search |

| Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements |

**I**f you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**

◆ **Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.**

▸ PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.

▸ Publications section has numerous downloadable government reports, audits and investigations from around the country.

▸ Full text decisions of thousands of court cases, published and unpublished.

▸ All content is easy to print for downloading and mailing to prisoners.

▸ Most complete collection of prison and jail related verdicts and settlements anywhere.

▸ Order books, print subscriptions and make donations on line.

▸ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.

▸ Links to thousands of prison, jail, criminal justice and legal websites around the world.

▸ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.

▸ Search free, pay only if you find it!

▸ The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month • $149.95 per year**

**Subscribe to Prison Legal News Online!** http://www.prisonlegalnews.org

# Human Rights Defense Center Book Store

FREE SHIPPING on all book orders OVER $50 (effective 9-21-2022 until further notice). $6.00 S/H applies to all other book orders.

**Prison Profiteers: Who Makes Money from Mass Incarceration,** edited by Paul Wright and Tara Herivel, 323 pages. **$24.95**. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. Prison Profiteers is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how. **1063**

**Prison Education Guide,** by Christopher Zoukis, PLN Publishing (2016), 269 pages. **$24.95**. This book includes up-to-date information on pursuing educational coursework by correspondence, including high school, college, paralegal and religious studies. **2019**

**The Habeas Citebook: Ineffective Assistance of Counsel, 2nd Ed. (2016)** by Brandon Sample, PLN Publishing, 275 pages. **$49.95**. This is an updated version of PLN's second book, by former federal prisoner Brandon Sample, which extensively covers ineffective assistance of counsel issues in federal habeas petitions. **2021**

**Prison Nation: The Warehousing of America's Poor,** edited by Tara Herivel and Paul Wright, 332 pages. **$54.95**. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S. **1041**

**The Celling of America, An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$24.95**. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system. **1001**

**The Criminal Law Handbook: Know Your Rights, Survive the System**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, 16th Ed, Nolo Press, 648 pages. **$39.99**. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy-to-understand question-and-answer format. **1038**

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, 10th Ed, Nolo Press, 600 pages. **$39.99**. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. **1037**

**Writing to Win: The Legal Writer**, by Steven D. Stark, Broadway Books/Random House, 303 pages. **$19.95**. Explains the writing of effective complaints, responses, briefs, motions and other legal papers. **1035**

**The Blue Book of Grammar and Punctuation**, by Jane Straus, 201 pages. **$19.99**. A guide to grammar and punctuation by an educator with experience teaching English to prisoners. **1046**

**Legal Research: How to Find and Understand the Law**, 19th Ed., by Stephen Elias and Susan Levinkind, 368 pages. **$49.99**. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises. **1059**

**All Alone in the World: Children of the Incarcerated**, by Nell Bernstein, 303 pages. **$19.99**. A moving condemnation of the U.S. penal system and its effect on families" (Parents' Press), award-winning journalist Nell Bernstein takes an intimate look at parents and children—over two million of them - torn apart by our current incarceration policy. **2016**

**Blue Collar Resume**, by Steven Provenzano, 210 pages. **$16.95**. The must have guide to expert resume writing for blue and gray-collar jobs. **1103**

**Protecting Your Health and Safety**, by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00**. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation. **1060**

**Spanish-English/English-Spanish Dictionary**, 2nd ed., Random House. 694 pages. **$15.95**. Has 145,000+ entries from A to Z; includes Western Hemisphere usage. **1034a**

**The Merriam-Webster Dictionary**, 2016 edition, 939 pages. **$9.95**. This paperback dictionary is a handy reference for the most common English words, with more than 75,000 entries. **2015**

**Roget's Thesaurus**, 709 pages. **$9.95**. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words. **1045**

**Beyond Bars, Rejoining Society After Prison**, by Jeffrey Ian Ross, Ph.D.  and Stephen C. Richards, Ph.D., Alpha, 224 pages. **$14.95**. Beyond Bars is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more. **1080**

**Directory of Federal Prisons: The Unofficial Guide to Bureau of Prisons Institutions**, by Christopher Zoukis, 764 pages. **$99.95**. A comprehensive guidebook to Federal Bureau of Prisons facilities. This book delves into the shadowy world of American federal prisoners and their experiences at each prison, whether governmental or private. **2024**

**Merriam-Webster's Dictionary of Law**, 634 pages. **$19.95**. Includes definitions for more than 10,000 legal words and phrases, plus pronunciations, supplementary notes and special sections on the judicial system, historic laws and selected important cases. Great reference for jailhouse lawyers who need to learn legal terminology. **2018**

**The Best 500+ Non-Profit Organizations for Prisoners and Their Families**, 5th edition, 170 pages. $19.99. The only comprehensive, up-to-date book of non-profit organizations specifically for prisoners and their families. Cross referenced by state, organization name and subject area. Find what you want fast! **2020**

**Deposition Handbook**, by Paul Bergman and Albert Moore, 7th Ed. Nolo Press, 440 pages. **$34.99**. How-to handbook for anyone who conducts a deposition or is going to be deposed. **1054**

**Please Note**: Book orders are mailed via the U.S. Postal Service with delivery confirmation. PLN does not assume responsibility to replace book orders once their delivery to the destination address (facility) is confirmed by the postal service. If you are incarcerated and placed a book order but did not receive it, please check with your facility's mailroom before checking with us. If books ordered from PLN are censored by corrections staff, please file a grievance or appeal the mail rejection, then send us a copy of the grievance and any response you received

**Prisoners' Self-Help Litigation Manual**, updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 928 pages. **$69.95**. The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Includes detailed instructions and thousands of case citations. Highly recommended!    **1077**

**How to Win Your Personal Injury Claim**, by Atty. Joseph Matthews, 9th edition, NOLO Press, 411 pages. **$34.99**. While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.    **1075**

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits**, by Lewis Laska, 336 pages. **$39.95**. Written for victims of medical malpractice/neglect, to prepare for litigation. Note that this book addresses medical malpractice claims and issues in general, not specifically related to prisoners.    **1079**

**Disciplinary Self-Help Litigation Manual**, by Daniel Manville, 355 pages. **$49.95**. By the co-author of the Prisoners' Self-Help Litigation Manual, this book provides detailed information about prisoners' rights in disciplinary hearings and how to enforce those rights in court. Includes state-by-state case law on prison disciplinary issues. This is the third book published by PLN Publishing.    **2017**

**The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act,** by John Boston, 576 pages. **Prisoners - $84.95, Lawyers/ Entities - $224.95**. This book is the best and most thorough guide to the PLRA provides a roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims.    **2029**

**Everyday Letters for Busy People: Hundreds of Samples You Can Adapt at a Moment's Notice**, by Debra May, 287 pages. **$21.99**. Here are hundreds of tips, techniques, and samples that will help you create the perfect letter.    **1048**

**Federal Prison Handbook**, by Christopher Zoukis, 493 pages. **$74.95**. This leading survival guide to the federal Bureau of Prisons teaches current and soon-to-be federal prisoners everything they need to know about BOP life, policies and operations.    **2022**

**Locking Up Our Own, by James Forman Jr.**, 306 pages. **$19.95**. In Locking Up Our Own, he seeks to understand the war on crime that began in the 1970s and why it was supported by many African American leaders in the nation's urban centers.    **2025**

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.**, by Mumia Abu-Jamal, 286 pages. **$16.95**. In Jailhouse Lawyers, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned advocates who have learned to use the court system to represent other prisoners—many uneducated or illiterate—and in some cases, to win their freedom.    **1073**

**The Habeas Citebook: Prosecutorial Misconduct**, by Alissa Hull, 300 pages. **$59.95**. This book is designed to help pro se litigants identify and raise viable claims for habeas corpus relief based on prosecutorial misconduct. Contains hundreds of useful case citations from all 50 states and on the federal level.    **2023**

**Arrest-Proof Yourself,** Second Edition, by Dale C. Carson and Wes Denham, 376 pages. **$16.95**. What do you say if a cop pulls you s to search your car? What if he gets up in your face and uses a racial slur? What if there's a roach in the ashtray? And what if your hot-headed teenage son is at the wheel? If you read this book, you'll know exactly what to do and say.    **1083**

**Caught: The Prison State and the Lockdown of American Politics**, by Marie Gottschalk, 496 pages. **$27.99**. This book examines why the carceral state, with its growing number of outcasts, remains so tenacious in the United States.    **2005**

**Encyclopedia of Everyday Law**, by Shae Irving, J.D., 11th Ed. Nolo Press, 544 pages. **$34.99**. This is a helpful glossary of legal terms and an appendix on how to do your own legal research.    **1102**

**\* ALL BOOKS SOLD BY PLN ARE SOFTCOVER / PAPERBACK \***

---

**To Pay by Credit Card, Go to Our Website: www.prisonlegalnews.org or Call Us at 561-360-2523**

### Subscription Rates

| | 1 Year | 2 Years | 3 Years | 4 Years |
|---|---|---|---|---|
| **Prisoners/Individuals** | **$36** | **$72** | **$108** | **$144** |
| **Professionals** | **$96** | **$192** | **$288** | **$384** |
| (attorneys, agencies, libraries) | | | | |

<u>Mail Payment and Order to:</u>

Human Rights Defense Center
PO Box 1151
Lake Worth Beach, FL 33460

Please Change my Address to what is entered below: ☐

**Ship Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

### Subscription Bonuses

**2 year subscription include 2 extra issues**
**3 year subscription include 4 extra issues**
**4 year subscription include 6 extra issues**
(All subscription rates and bonus offers are valid as of *1/1/2022*)

### Subscribe to Prison Legal News

**6 month subscription (prisoners only) - $20**    _____

**1 yr subscription**    _____

**2 yr subscriptions (2 bonus issues)**    _____

**3 yr sub (4 bonus issues)**    _____

**4 yr sub (6 bonus issues)**    _____

Single back issue or sample copy of PLN - $6.00    _____

### Book Orders

_____ ____ _____

_____ ____ _____

_____ ____ _____

_____ ____ _____

Add $6.00 S/H to BOOK ORDERS under $50    _____

**FL residents ONLY add 7% to Total <u>Book</u> Cost**    _____

**TOTAL Amount Enclosed:**    _____

**\* NO REFUNDS on PLN subscription or book orders after orders have been placed. \***
**\* We are not responsible for incorrect addresses or address changes after orders have been placed. \***

*Introducing the latest in the Citebook Series from Prison Legal News Publishing*



# The Habeas Citebook: Prosecutorial Misconduct

**By Alissa Hull**
**Edited by Richard Resch**

*The Habeas Citebook: Prosecutorial Misconduct* is part of the series of books by Prison Legal News Publishing designed to help pro se prisoner litigants and their attorneys identify, raise and litigate viable claims for potential habeas corpus relief. This easy-to-use book is an essential resource for anyone with a potential claim based upon prosecutorial misconduct. It provides citations to over 1,700 helpful and instructive cases on the topic from the federal courts, all 50 states, and Washington, D.C.  It'll save litigants hundreds of hours of research in identifying relevant issues, targeting potentially successful strategies to challenge their conviction, and locating supporting case law.

The Habeas Citebook: Prosecutorial Misconduct *is an excellent resource for anyone seriously interested in making a claim of prosecutorial misconduct to their conviction. The book explains complex procedural and substantive issues concerning prosecutorial misconduct in a way that will enable you to identify and argue potentially meritorious claims. The deck is already stacked against prisoners who represent themselves in habeas. This book will help you level the playing field in your quest for justice.*

—Brandon Sample, Esq., Federal criminal defense lawyer, author, and criminal justice reform activist

---

**The Habeas Citebook: Prosecutorial Misconduct**

Paperback, 300 pages

**$59.95**

*(includes shipping)*

**Order by mail, phone, or online.**  Amount enclosed _____

By: ☐ check    ☐ credit card    ☐ money order

Name: _____

DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____ State: _____ Zip: _____

## Human Rights Defense Center
**Dedicated to Protecting Human Rights**

PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG  •  WWW.CRIMINALLEGALNEWS.ORG



**Prison Legal News**
PO Box 1151
Lake Worth Beach FL 33460

**Change Service Requested**

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

## 1/25—Subscription Renewal

The above mailing address for *PLN* subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of *PLN* remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify *PLN* as soon as possible so your issues can be mailed to your new address! *PLN* only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

# Criminal Legal News



*Criminal Legal News* is the sister publication of *Prison Legal News.* Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN,* BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- Criminal Law & Procedure
- Prosecutorial/Police Misconduct
- Ineffective Counsel
- Militarization of Police
- Junk Science
- False Confessions
- Witness Misidentification
- Post-Release Supervision
- Due Process Rights

- Police Brutality
- Habeas Corpus Relief
- Sentencing Errors & Reform
- Surveillance State
- Wrongful Convictions
- Search & Seizure Violations
- Paid/Incentivized Informants
- Police State in America

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to:
Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

# Criminal Legal News

## PUBLISHED BY THE HUMAN RIGHTS DEFENSE CENTER

VOL. 8  No. 1
ISSN 2576-9987 (Print)
ISSN 2577-0004 (Online)

*Dedicated to Protecting Human Rights*

**January 2025**

# Touch-Transfer DNA Remains Misunderstood and Still Poses High Risk of Wrongful Conviction

### by J.D. Schmidt

Modern criminal investigations, especially cold homicide cases, often rely on what is known as "touch-transfer" DNA to identify the perpetrator. But in recent years, developments in DNA research have shown that there is an increased risk of falsely linking an individual to a crime scene through its use. One study detailed in December 2015 as part of Forensic Science International's Genetic Supplement Series called attention to the "increased chance of detecting the transfer of DNA from individuals not involved in the commissioning of an offence to scenes and/or exhibits of the cross transfer of DNA between scenes or items."

For the last four decades, forensic investigators have utilized increasingly sophisticated techniques to build a record of DNA profiling as investigators' ultimate tool for providing seemingly unassailable identification of the individual human beings whose bodies these types of tissue and fluid samples once belonged to. Yet against this vaunted record stands the problem of proving how and when the samples in question ended up in the place discovered.

Touch-transfer DNA has falsely implicated people in heinous crimes who have never had any direct interactions with victims or crime scenes, including toddlers and even the dead. Add this to the reality that most touch-transfer DNA analysis relies on fragmentary DNA, which is often a decaying and degraded collection of cells that may come from several individuals.

When we delve below the pop culture, surface-level perception of DNA analysis into the complications and contradictions highlighted by scientific studies and criminal cases alike, we find that the accuracy of identification can all too often be highly questionable. However, as demonstrated by decades of trial proceedings and the ongoing work of groups such as the Innocence Project, it can also be a powerful tool for exonerating the accused and overturning wrongful convictions. In fact, sometimes it is the only tool available to right those grievous injustices.

### Types of DNA Transfer

"Touch DNA" refers to DNA, most often from skin cells, that is transferred directly and left behind when a person touches an object. This type of DNA deposit is known as a "primary transfer." Along with DNA from bodily fluids and hairs, touch or primary transfer DNA is a crucial form of evidence that authorities can use to indicate the presence of an individual at a crime scene. This is especially true when other types of evidence are scarce or unavailable. At the same time, touch DNA evidence carries serious risks. These include the possibility of crime scene and post-collection contamination, as well as the difficulty of distinguishing between primary and secondary sources of DNA.

Scientists and technicians use the term "secondary transfer" to refer to situations in which DNA left behind by a touch of some sort is transferred from one surface to another. A handshake can lead to primary transfer; touching a bottle, cup, doorknob, or car door afterwards can lead to secondary transfer, as one person's DNA is transferred from a second individual's hand to the next surface they touch. Secondary transfer can potentially hinder or even negate the interpretation of DNA evidence, leading to confusing or even wildly inaccurate identifications as to who was actually present at a crime scene or involved in the commission of a crime.

"Tertiary transfer" is yet another method in which DNA is moved through multiple vectors. When someone touches a surface that has previously been touched by another person, in the process picking up that first person's

## INSIDE

| | |
|---|---|
| From the Editor | 11 |
| IL S Ct Reverses Jussie Smollett's Conviction | 13 |
| 3d Cir: Claim of Innocence and IAC | 16 |
| Column: Surveillance State Is Making a List | 18 |
| KS S Ct D Retains 5th Right After Guilty Plea | 21 |
| CA S Ct Announces Retroactivity of § 1170 | 26 |
| OR S Ct: 60-Day Limit Applies to Retrials | 29 |
| Scent of Death Evidence Admitted at IN Trial | 31 |
| People Not Taking Advantage Expungement Laws | 36 |
| MD S Ct Announces New Rule for Child-Witnesses | 38 |
| 7th Cir Announces Rule for Max Revocation Sentence | 43 |
| 6th Cir Announces OH Judicial Bias Rule Contrary Fed | 44 |
| News in Brief | 49 |

**EXHIBIT**

**1-E**



### The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act

**John Boston**         ☐ **Prisoners $84.95**    ☐ **Lawyers/Entities $224.95**

ISBN-13: 979-8-9854138-0-9 • Paperback, 576 pages

The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act is the best and most thorough guide to the PLRA provides a roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims.



### Prison Education Guide                                                    $24.95

**Christopher Zoukis**

ISBN: 978-0-9819385-3-0 • Paperback, 269 pages

Prison Education Guide is the most comprehensive guide to correspondence programs for prisoners available today. This exceptional book provides the reader with step by step instructions to find the right educational program, enroll in courses, and complete classes to meet their academic goals. This book is an invaluable reentry tool for prisoners who seek to further their education while incarcerated and to help them prepare for life and work following their release.



### The Habeas Citebook: Ineffective Assistance of Counsel, Second Edition        $49.95

**Brandon Sample & Alissa Hull**

ISBN: 978-0-9819385-4-7 • Paperback, 275 pages

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



### Disciplinary Self-Help Litigation Manual, Second Edition                   $49.95

**Dan Manville**

ISBN: 978-0-9819385-2-3 • Paperback, 355 pages

The Disciplinary Self-Help Litigation Manual, Second Edition, by Dan Manville, is the third in a series of books by Prison Legal News Publishing. It is designed to inform prisoners of their rights when faced with the consequences of a disciplinary hearing. This authoritative and comprehensive work educates prisoners about their rights throughout this process and helps guide them at all stages, from administrative hearing through litigation. The Manual is an invaluable how-to guide that offers step-by-step information for both state and federal prisoners, and includes a 50-state analysis of relevant case law and an extensive case law citation index.



### The Habeas Citebook: Prosecutorial Misconduct                              $59.95

**Alissa Hull**

ISBN-13: 978-0-9819385-5-4 • Paperback, 300 pages

The Habeas Citebook: Prosecutorial Misconduct is the second in PLN Publishing's citebook series. It's designed to help pro se prisoner litigants identify and raise viable claims for potential habeas corpus relief based on prosecutorial misconduct in their cases. This invaluable title contains several hundred case citations from all 50 states and on the federal level, saving readers many hours of research in identifying winning arguments to successfully challenge their convictions.

---

☐ The PLRA Handbook

☐ Prison Education Guide

☐ The Habeas Citebook

☐ Disciplinary Self-Help Litigation Manual

☐ The Habeas Citebook: Prosecutorial Misconduct

Order by mail, phone, or online.    Amount enclosed _____

By: ☐ check  ☐ credit card  ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG  •  WWW.CRIMINALLEGALNEWS.ORG

## ♜ Criminal Legal News

*a publication of the*
*Human Rights Defense Center*
**www.humanrightsdefensecenter.org**

**EDITOR**
Paul Wright

**SENIOR MANAGING EDITOR**
Richard Resch, JD

**ASSISTANT EDITOR**
James Mills

**COLUMNIST**
Dale Chapelle

**CONTRIBUTING WRITERS**
Anthony W. Accurso, Douglas Ankney,
Casey Bastian, Matthew Clarke,
Jo Ellen Nott, David M. Reutter,
Sam Rutherford,
Michael Dean Thompson

**ADVERTISING COORDINATOR**
Patricia Lamarca

**HRDC LITIGATION PROJECT**
Jonathan Picard - Litigation Director
Andrew Free - Staff Attorney

***CLN* is a monthly publication.**

A one year subscription is $48 for prisoners and individuals, and $96 for professionals and institutions. Subscriptions will be pro-rated at $4 each; do not send less than $24 at a time; pro-rated subscriptions are only available to prisoners. All foreign subscriptions are $100 sent via airmail. *CLN* accepts credit card orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. HRDC is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Criminal Legal News**
**PO Box 1151**
**Lake Worth Beach, FL 33460**
**561-360-2523**
**info@criminallegalnews.org**
**www.criminallegalnews.org**

*CLN* reports on state and federal appellate court decisions and news stories related to substantive criminal law, criminal procedure, official misconduct and constitutional rights within the criminal justice system, and the police state. *CLN* welcomes all news clippings, legal summaries, and leads on people to contact related to the foregoing issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

## Touch-Transfer DNA (cont.)

DNA (in the form of skin cells, saliva, sweat, or other bodily fluids), this secondary transfer can become tertiary. Or as an October 26, 2015, article in *The New Republic* described, "Tertiary helps signify that the DNA ended up in a place three steps removed from the initial contact with its owner." While alleged to be statistically far less common, or at least less detectable, tertiary transfer has been shown to occur in scientific testing and is theorized to have been responsible for some of the most seemingly bizarre results returned by crime scene DNA analysis.

It should be clear by now that the problem with focusing on the mere presence of touch-transfer DNA at a crime scene or on an incriminating item of evidence found elsewhere is that it's nearly impossible to determine whether it's the result of a primary, secondary, or tertiary transfer. However, the method of transfer is of enormous importance and often the difference between accurately identifying the guilty party and falsely suspecting a completely innocent person.

Christopher Zoukis provided a stark example of this problem in the September 2018 issue of *CLN* in which he wrote:

In 2008, European authorities were hot on the trail of a highly prolific serial killer and burglar. The "Phantom of Heilbronn" robbed jewelers, burglarized caravans and murdered multiple people, including a law enforcement officer.

The Phantom left forensic evidence all over the continent. His DNA was found at 40 crime scenes in Germany, France and Austria. Police offered a large reward for his capture, and spent an estimated 16,000 hours working the case. But there was one small problem with the case.

He was a she, and she wasn't a criminal mastermind. The Phantom of Heilbronn was an elderly Polish factory worker who unwittingly contaminated the forensic swabs she manufactured. While she worked, she transferred her DNA onto the swabs. Investigators later transferred her DNA to the scene of a slew of unrelated crimes.

The Phantom of Heilbronn debacle is a good example of the dangers of DNA contamination.

*Inside the Cell* author Erin Murphy draws a distinction between DNA contamination and DNA transfer. Contamination, Murphy argues, can be avoided or limited by employing best practices. DNA transfer, however, is a much more insidious problem, because it is utterly unavoidable. In two minutes, Murphy says, the average person sheds enough skin cells to cover a football field.

### DNA Analysis

As a 2016 article in the journal *Science* asserted: "Its accuracy has made DNA evidence virtually unassailable. A landmark report published by the National Research Council in 2009 dismissed most forensics as unproven folk-wisdom but singled out DNA as the one forensic science worthy of the name."

"The discovery of the human genome was a watershed moment in the development of modern forensic investigation techniques," Zoukis wrote. "With the advent of DNA testing, investigators have become proficient at narrowing down the sources of biological material to a statistical near-certainty. When blood, hair, or semen is found at the scene of a crime, forensic scientists can now establish a genetic profile that will exactly match only one person out of about a quadrillion."

Anthony W. Accurso outlined the process of DNA analysis in the October 2021 issue of *CLN* as follows: "Genotyping is a science built on probabilities. Sequencing the entire genome (all of a person's DNA) of every suspect would be prohibitively expensive and time consuming. As a shortcut, the FBI has identified 13 core locations (known as "STR," for short tandem repeat markers or "loci") on a person's genome that, when sampled, are likely to enable unique identification. However, different ethnic groups can require different numbers of sample loci to establish uniqueness. Interpol uses ten loci when sampling persons from Great Britain and greater Europe, but only nine loci are generally used when processing samples from persons native to the Indian sub-continent."

If "crime scene evidence is in a very small quantity, poorly preserved, or highly degraded," such that only four genetic locations can be sampled, then according to a 2008 Nature.com article on DNA fingerprinting, the probability of uniqueness drops to "roughly 1 in 331," Accurso wrote.

Recently developed techniques such as Polymerase Chain Reaction ("PCR") testing

**Touch-Transfer DNA (cont.)**

allow for sometimes-highly accurate identifications to be made from minute, microscopic amounts of DNA-bearing material. Samples of a few dozen cells or fewer can now be utilized. However, investigators, prosecutors, and the public at large still tend to think of DNA in terms of the large-sample, "smoking gun" technology that criminology and popular media embraced in the 1990s and early 2000s, when DNA evidence was primarily derived from sources such as relatively large samples of blood and semen.

As Accurso pointed out, "things get infinitely more complicated (and less reliable) when the imperfect sample is from more than one person." He asserted that public education would go a long way toward correcting the "mystique of the infallibility of DNA evidence in the courtroom."

### Touch-Transfer DNA on Trial

Touch-transfer DNA has featured prominently in a number of high-profile cases in recent years. One of the most notorious is that of Amanda Knox, the U.S. exchange student tried, convicted, and ultimately exonerated in the 2007 murder of her roommate, Meredith Kercher, in Perugia, Italy. Knox and her then-boyfriend were both convicted of Kercher's murder in their initial 2009 trial, based primarily on touch-transfer DNA found on the victim's bra strap and a knife found in the boyfriend's apartment.

Trace amounts of what was determined to be the boyfriend's DNA were found on the bra strap. Both Knox's and the victim's DNA were alleged to have been detected in trace amounts on the kitchen knife, which was determined by forensic experts to not match stab wounds on the victim's body. A third defendant—whose DNA, bloody fingerprints, and other evidence associated with him was found in the victim's room and on her body—was convicted in a separate trial.

The boyfriend's DNA on the victim's bra and the mixture of Knox's and the victim's DNA on the knife handle were easily attributable to touch and/or secondary transfer. Knox was known to have used the knife while cooking in her boyfriend's kitchen. Moreover, the alleged finding of the victim's DNA on the knife handle was considered highly questionable by international forensic DNA experts.

Writing in a May 13, 2015, article in *New Scientist*, Idaho Innocence Project Director

Greg Hampikian, who testified for Knox's defense, stated that "on one swab from the blade, a minuscule trace of DNA was detected, just once during many analyses. It had some that was consistent with the victim's. This finding was never repeated, despite many attempts."

In fact, Hampikian noted, "[T]he DNA on the blade came from so few molecules that analytical instruments were pushed to read below the level that the FBI, my lab, or anyone I knew would go. We asked the Italian lab to supply validation of such a sensitive measurement, but they never complied. Despite this, Knox was convicted. DNA experts in the U.S. spoke out, and a new study on the knife was then ordered in Italy. This failed to repeat the DNA finding," and that failure was a significant factor in both Knox and her ex-boyfriend eventually being exonerated by Italy's Supreme Court in 2015.

A similarly high-profile case involving touch-trace DNA is that of the 2022 University of Idaho student murders in Moscow, Idaho. Four students were stabbed to death in a shared apartment near the campus on the night of November 13, 2022. The person accused of this crime, Bryan Christopher Kohberger, has allegedly been tied to the scene by a variety of circumstantial evidence, including touch-transfer DNA that police claim was detected on the button of a leather knife sheath found near one of the victims. According to a January 5, 2023, story in *USA Today*, police "got a warrant to go through trash from Kohberger's family home in Pennsylvania, and obtained DNA from the trash, which they were able to identify with a high level of probability as belonging to the biological father of the person whose DNA was on the knife sheath," thus establishing an alleged link to the accused. Kohberger, who maintains his innocence, is scheduled to go on trial in August 2025.

During the early 2000s, a cold case involving the 1969 murder of law student Jane Mixer near Ann Arbor, Michigan, shined an early spotlight on troubling issues involving touch-transfer DNA. Mixer's case had been lumped in with a string of other slayings known collectively as the "Michigan Murders" and generally attributed to convicted serial killer John Norman Collins. It was reopened in 2005 when investigators subjecting cold-case physical evidence to DNA testing got a hit. The match was allegedly from touch-transfer DNA theorized to be from perspiration on Mixer's pantyhose, as well as a partial match from blood found on a towel placed under her head.

The person whose DNA purportedly fit the profile was retired nurse Gary Leiterman, who lived about 20 miles away from the crime scene at the time of the murder. Prosecutors and police were thrown a curveball, however, when DNA from a separate sample—a blood drop found on Mixer's body—came back as a match with convicted murderer John Ruelas. The problem this presented was that Ruelas was only four and a half years old in 1969. This confusing contradiction gave Leiterman's defense the opportunity to call into question the crime lab's DNA testing processes, alleging post-collection contamination or some other form of malpractice. Despite this bizarre result and the questions it raised, the jury was not convinced that the lab's analysts had erred in matching Leiterman's DNA to the other samples, and he was convicted and sentenced, ultimately dying in prison in 2019.

In his August 15, 2018, *CLN* story, Christopher Zoukis detailed a similar case in which secondary touch-transfer DNA played a troubling role. In September 2009, Yale graduate student Annie Le was murdered in a secure laboratory facility on the university's campus. Her body was found stuffed into a mechanical chase space behind a laboratory wall. DNA samples from her body and the scene inside the wall yielded two different profiles. One was that of a lab worker who was eventually tried and found guilty of her murder. The other profile, drawn from samples taken both inside the chase and on the victim's body, including the waistband of her underwear, yielded a hit in criminal databases as a local convicted felon. Zoukis wrote, "Unsurprisingly, investigators looked at the convicted felon first. That turned out to be a literal dead end—the man had died two years before the murder."

In 2015, *The New Republic* described the scene inside the cramped space: "[Y]ears earlier," the offender who yielded a hit "had spent one long, hot summer building the very mechanical chase in which the victim was found." Because the space was "closed from ordinary traffic or regular cleaning, coupled with the building's strict temperature and environmental regulation (as a result of its role as a scientific lab)," a large quantity of DNA from the construction worker's sweat was left behind. Due to this sweating and other conditions, the *CLN* article added, "[The offender] also was very likely to have been what scientists studying DNA transfer would call a 'good' shedder. Some people are naturally prodigious shedders of biological material.

Those with flaky, sweaty, or diseased skin are thought to be good shedders."

This case could have taken a radically different turn if the construction worker had still been alive. According to *The New Republic*, "Absent a good alibi—in this case, the irrefutable proof of his prior death—the worker might have ended up implicated in the crime. His familiarity with the space, along with his prior record, might have been used against him to prove that he had special knowledge of a good place to dispose of the body." That potentially could have led prosecutors to pivot away from the laboratory worker—who was eventually charged, tried, and convicted for Le's murder—and instead focus on the wrong individual.

Importantly, touch-transfer DNA truly is a double-edged sword. It can exonerate the wrongfully convicted, but it can also implicate the factually innocent. Unfortunately, many within the criminal justice system fail to appreciate the true nature of touch-transfer DNA and its limitations.

The plight of Lukis Anderson serves as one of the most compelling cautionary touch-transfer DNA cases ever. In 2012, Anderson, 25 at the time, was living on the streets of San Jose, California, struggling with alcoholism. He was familiar to many in law enforcement and healthcare in the area, known as a "frequent flier" at local hospitals due to his habit of public intoxication. When a wealthy local tech investor was murdered in an apparent home invasion just 10 miles away, investigators found the DNA of three people at the crime scene. Anderson's DNA was on the victim's fingernails. As *Forbes* reported, "Law enforcement crafted a theory of the case based on this evidence and Anderson's lengthy criminal record, dangling the death penalty over Anderson's head."

Anderson, who was so intoxicated on the night in question that he struggled to remember where he had been or what he had done, began to doubt his own innocence, telling his public defender, "Maybe I did do it." However, the public defender's own investigator was able to determine that Anderson had spent the night in a local hospital being treated for intoxication at the time of the murder. The lead investigator on the case, who was determined to understand how the DNA evidence could possibly have pointed to a man who simply could not have been there, dug further into what happened. He discovered that the two paramedics who responded to the scene of the murder were the same ones who had picked Anderson up and brought him to the hospital hours earlier that night. DNA from Anderson was suspected to have been transferred to the victim's hand via a pulse oximeter or possibly via the paramedics' uniforms.

As Zoukis observed, "undoubtedly many detectives are not as open-minded and flexible in their thinking…. Had one of those detectives led the investigation in Anderson's case, it could very well have had a tragic ending."

### Scientific Research

Puzzlingly, there's an apparent lack of interest among researchers in the U.S. in studying touch-transfer DNA. Most of the cutting-edge research that has pushed this particular sector of the field forward and delved into its problems and contradictions has come from abroad—notably, Australia, Europe, and the U.K. In fact, writing in an October 14, 2019, article for *CLN*, Steve Horn noted that "[a]lthough it's an area that has become increasingly prominent in trial and appellate court litigation … *CLN* could only find a single lab in the U.S. that has published a significant piece of scholarship on the topic"

# Special Offer for First Time Prison Legal News Subscribers

## A 6-Month Subscription for $5.00 (That's 75% off the cover!)

Are you reading someone else's PLN? You don't want to risk missing a single issue.
For over 30 years, PLN has been bringing prisoners the information they need to stay informed.

This offer is only available to customers that have not previously subscribed to PLN. All sales are final. Orders placed for non-eligible prisoners will have a 2-month pro-rated period added to their PLN account. Your first issue will be mailed in 6-10 weeks via USPS. Renewal notices will be sent no later than 30 days prior to expiration at the current renewal rate (as of 1/1/2022 PLN's annual renewal rate is $36.00, plus sales tax where applicable).

**Act now as this offer is only valid through 12/31/2024**

Name_____ Amount enclosed: $_____

DOC/BOP Number: _____ Facility: _____

Address: _____

City: _____ State: _____ Zip_____



**Human Rights Defense Center, PO Box 1151, Lake Worth Beach, FL 33460**
**561-360-2523 • WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG**

**Touch-Transfer DNA (cont.)**

of secondary DNA transfer. Not much has changed since then.

In his groundbreaking 1997 Australian study of touch-transfer DNA, which was published in the journal *Nature* and titled "DNA Fingerprints from Fingerprints," forensic scientist Roland van Oorschot both expanded and complicated the field of DNA analysis. He inadvertently challenged the basic assumption of the exchange principle, which was theorized by French scientist Edmond Locard that a criminal actor will always leave traces of his or her presence at a crime scene.

Van Oorschot and co-author Maxwell Jones described both how a successful DNA identification could be made from the minute amounts of DNA left by touch-transfer and how the very sensitivity of DNA testing technology opened up opportunities for error. "We show that an individual's genetic profile can now also be generated from swabs taken from objects touched by hands, providing a new tool for crime scene investigations," they wrote. They then warned: "Our findings also demonstrate the need for caution when handling exhibits and when interpreting results."

The Forensic Institute in Glasgow, Scotland, reached a similar conclusion in its 2013 study "DNA transfer: review and implications for casework." According to the study: "It is important to consider indirect transfer in the evaluation of trace DNA in casework…. The detection of a DNA profile upon a surface cannot be considered proof of contact. Research has demonstrated that the quantity of DNA recovered and the quality of DNA profiles obtained are complex issues dependent on many factors." The study additionally stated: "While direct contact may be the most obvious conclusion, there is insufficient scientific data to establish the most likely mode of transfer in any specific instance. Furthermore, it has also been shown that DNA can be transferred during the forensic examination of items. It may therefore be difficult to rely on the locations of the finding of the DNA to inform on how DNA was deposited."

In 2019, van Oorschot was the lead author on another paper on these issues published in *Forensic Science International: Genetics*. The paper, titled "DNA transfer in forensic science: A review," served as a meta-analytical survey of high-profile literature on touch-transfer DNA issues to that point. As Horn noted, despite employing such a broad survey approach, none of the authors hailed from the U.S. They were all based in The Netherlands, Australia, or Great Britain.

Van Oorschot and his co-authors highlighted once again the problems involved in forensic analysis of touch-transfer DNA, both in terms of accurately interpreting potentially mixed and transferred DNA from crime scene evidentiary samples and in terms of the possibility of contamination via handling and analysis. "This review demonstrates that over the last few years we have become aware of several factors affecting [secondary DNA transfer], but much more research needs to be undertaken to understand the impact of the many variables, build the data necessary to determine probabilities of different profile type occurrences in different situations, and to improve the accuracy of the profile interpretation given the uniqueness of each case scenario to be considered," they outlined. "As the number of potential scenarios in which [secondary DNA transfers] are to be contemplated is infinite, there will be reliance on extrapolating from research findings. The

# Is someone skimming money

## or otherwise charging you and your loved ones high fees to deposit money into your account?

*Prison Legal News* (PLN) is collecting information about the ways that family members of incarcerated people get cheated by the high cost of sending money to fund inmate accounts.

Please write to *PLN*, and **have your people on the outside contact us as well**, to let us know specific details about the way that the system is ripping them off, including:

- Fees to deposit money on prisoners' accounts or delays in receiving no-fee money orders

- Costly fees to use pre-paid debit cards upon release from custody

- Fees charged to submit payment for parole supervision, etc.

This effort is part of the Human Rights Defense Center's *Stop Prison Profiteering* campaign, aimed at exposing business practices that result in money being diverted away from the friends and family members of prisoners.



*Friends and families of prisoners can follow this effort, which is part of the Nation Inside network, at*

**WWW.STOPPRISONPROFITEERS.ORG**

Please direct all related correspondence to HRDCLegal@humanrightsdefensecenter.org Call (561) 360-2523, or send mail to PLN



**Human Rights Defense Center**
Attn: Legal Team
PO Box 1151
Lake Worth Beach, FL 33460

research thus needs to be of high quality, broad scope, and sufficient quantity."

The paper described a concerning lack of sophistication in the industry in regard to what they termed "DNA transfer, persistence, prevalence and recovery" or DNA-TPPR, stating that "far more research is still required to better understand the variables impacting DNA-TPPR and to generate more accurate probability estimates of generating particular types of profiles in more casework relevant situations. This review explores means of achieving this. It also notes the need for all those interacting with an item of interest to have an awareness of DNA transfer possibilities post criminal activity, to limit the risk of contamination or loss of DNA."

Christopher Zoukis declared in his September 2018 *CLN* article: "There has been an unconscionable lack of interest among forensic scientists to study secondary transfer. But there is little doubt that what van Oorschot discovered is accurate." Zoukis then went on to detail one of the few independent U.S. academic studies that has actually been done on the subject, the results of which supported van Oorschot's conclusions. This was a study conducted by Cynthia Cale and other researchers with the Human Biology Program at the University of Indiana titled "Could Secondary DNA Transfer Falsely Place Someone at the Scene of a Crime?" and published in the January 2016 issue of the *Journal of Forensic Science.*

Cale and her colleagues conducted an experiment in which a group of people divided into pairs exchanged two-minute-long hand-shakes—after which one person in each pair then handled multiple knives. Each knife was then tested, and DNA from the persons who handled the knives was detected in almost every case. Notably, testing also detected the DNA profile of the person who had not touched the knife 85 percent of the time. Furthermore, 20 percent of the time, the non-touching person came back as the primary, and in some cases, the only contributor of DNA.

Cale rightfully characterized the findings as "scary." She added that "Analysts need to be aware that this can happen, and they need to be able to go into court and effectively present this evidence. They need to school the jury and the judge that there are other explanations for this DNA to be there."

Writing in the journal *Nature*, Cale and her co-authors proclaimed, "We urgently need to review how DNA evidence is assessed, viewed and described. Everyone in the medi-co-legal community—forensic scientists and technicians, DNA analysts, potential jurors, judges and lawyers for both the prosecution and defense—must know and understand the potential for mistakes." Does anyone genuinely believe that the foregoing constituencies are aware of the potential for mistakes and the various ways a person's DNA can be deposited at a crime scene or on a piece of evidence via touch-transfer?

Beyond the direct results of the hand-shake-to-knife transfers, another finding Cale and her co-authors highlighted was the fact that no matter how much they tried to sanitize their experiment, unknown third-party DNA was also detected in the results, demonstrating the troubling reality of post-collection contamination associated with touch-transfer DNA. Cale's experiment provided a huge red flag for the entire U.S. criminal justice system. It should have compelled the DNA analysis industry and the forensic science community to engage in deep broad-based review of how DNA is handled in criminal investigations and prosecutions. But it didn't.

Steve Horn's article titled "U.S. Government Lab Withheld Groundbreaking Study for 5 Years That Can Help Defendants Question the Reliability of Certain DNA Evidence," which appeared in the March 2019 issue of *CLN*, mentions that U.S. government entities often have a vested interest in holding back information that would benefit criminal defendants. His article described the results of a series of experiments performed by the Applied Genetics Group of the National Institute of Standards and Technology ("NIST"), a unit of the U.S. Department of Commerce.

The NIST study was published on August 1, 2018, in the journal *Forensic Science International: Genetics* under the title "NIST interlaboratory studies involving DNA mixtures (MIX05 and MIX13): Variation observed and lessons learned." It was based on a series of experiments conducted in 2005 and 2013. The experiments involved dozens of state and federal government labs—69 of them in the 2005 experiment and 108 in the 2013 experiment. The labs voluntarily enlisted to perform analysis on electronic files of DNA profiles derived from mock physical evidence taken from a variety of mock crime scenes, including sexual assaults, murders, and robberies. According to the NIST study, "The goal of the MIX05 and MIX13 studies was to examine sources of variability in interpretation rather than instrument sensitivity or amount of DNA being examined. Therefore, these studies involved sharing electronic files of DNA profiles with study participants rather than sharing of biological samples." The study's authors then compared and contrasted the results, looking for variations and patterns in how the labs interpreted their analysis of information on different mixed-DNA samples from these artificial scenarios.

The fabricated DNA mixtures were created with a range of different levels of genetic material available from various contributors including victims, suspects, "persons of interest," and relatives of suspects. The labs were also provided with profiles of some, but not all, of the suspects and persons of interest in the various cases to compare the mixture samples with. Some case scenarios also included profiles of "decoy" non-contributors. The information was supposed to have been derived from DNA samples found on a variety of different types of crime scene evidence, ranging from mock rape kits to pieces of alleged physical evidence such as a suspected murder weapon found near a crime scene or a ski mask found in a trash can blocks away from a crime scene.

The ski mask scenario from the 2013 experiment provided the most telling example of the problems presented by different labs using a wide range of different software, statistical analysis protocols, and interpretive strategies when analyzing mixed touch-transfer DNA evidence. The ski mask was supposed to contain a mixture of DNA from four contributors, two of whom were alleged suspects identified by an informant. The labs were provided with information from buccal swabs taken from these suspects, as well as the profile of a fifth individual described as a "known accomplice" of these suspects whose DNA was not actually in the mixture and had never touched the ski mask.

Seventy-four of the 108 labs that participated in MIX13 got it wrong and included the "decoy" fifth person in their interpretation. According to the study, only seven out of the 108 laboratories arrived at the correct answer using the FBI's methodology for testing DNA, known as CPI, or combined probability of inclusion.

The study's lead author, John Butler, explained that this part of the study was specifically designed to determine whether modern DNA technology like that used in the participating labs can, indeed, place someone at the scene of a crime that he didn't commit. In an interview with *Forensic Magazine*, Butler stated that, "The mixture itself was designed

**Touch-Transfer DNA (cont.)**

to not show too many alleles. People would be tricked into thinking there are only two or three people there, instead of the four people that were really there. The way that it was designed was on purpose, to kind of help people realize that CPI can falsely include people—that was its purpose. And it demonstrated that really nicely." As for the study's implications for the wider field of DNA forensics with regard to the interpretation of data from touch-transfer DNA, study co-author and ski mask experiment designer, Michael Coble, is quoted in a March 7, 2016, *Science* article as saying "It's the Wild West out there. Too much is left to the analysts' discretion."

The NIST study's eventual publication in 2018 is of great interest to criminal defendants, their attorneys, and supporters. Publication in a peer-reviewed journal is one of the non-dispositive and non-exhaustive factors in determining the relevance and reliability for the admissibility of expert witness testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). But for five years prior to the study's publi-

cation in *Forensic Science International*, the authors' findings in the MIX05 and MIX13 studies were presented only in PowerPoint slideshows at conferences, rendering the crucial information inadmissible under *Daubert*. Considering the implications of the errors and inconsistencies the study brought to light, the years-long delay between the experiments and the study's publication in a peer-reviewed journal is telling and concerning for all whose cases were impacted by the prosecution's reliance on this type of biological evidence in criminal proceedings.

In a September 21, 2018, *New York Times* op-ed by Greg Hampikian, a Boise State University forensic biology and forensic science professor, he criticized the disturbing gap in time between the NIST Applied Genetics group's experiments and the study's publication in a peer reviewed journal. "I first learned about the results of this study in 2014, at a talk by one of its authors. It was clear that crime labs were making mistakes, and I expected the results to be published quickly," Hampikian wrote, "[b]ut years went by before the study was published, preventing lawyers from using the findings in court, and academics from citing the results in journal articles.

If some of us had not complained publicly, it may not ever have been published."

In a May 2018 *Forensic Magazine* interview, Hampikian described the consequences of the government's choice to delay publishing the NIST study's results in a peer-reviewed journal: "This is about five years of people being convicted by bad interpretations…. This is a huge story. It's the problem with DNA—the one everyone trusts. If it was contaminated peanut butter, or faulty airplanes, or airbags that failed, wouldn't NIST have felt compelled to do something more than just a couple PowerPoint shows? This is not just a case of salmonella—this is 20 years in prison. Some of these people died in prison."

In addition to, and perhaps as a primary source of, their foot-dragging on the issue of peer-reviewed publication, the NIST study's authors had conflicts of interest related to their employment with and studies at laboratories controlled by the FBI and other federal government entities. At the time of publication, two of the authors also sat on the board of *Forensic Science International*, which published the study, at the time of its publication. These conflicts of interest—particularly those related to law enforcement—may help explain

# Special Offer for 1st Time Criminal Legal News Subscribers

## A 6-Month Subscription for $7.00 (That's 75% off the cover!)

Are you reading someone else's CLN? You don't want to risk missing a single issue.
For over 30 years, we have been bringing prisoners the information they need to stay informed.

This offer is only available to customers that have not previously subscribed to CLN. All sales are final. Orders placed for non-eligible prisoners will have a 2-month pro-rated period added to their CLN account. Your first issue will be mailed in 6-10 weeks via USPS. Renewal notices will be sent no later than 30 days prior to expiration at the current renewal rate (as of 1/1/2022 CLN's annual renewal rate is $48.00, plus sales tax where applicable).

**Act now as this offer is only valid through 12/31/2024**

Name_____ Amount enclosed: $_____

DOC/BOP Number: _____ Facility: _____

Address: _____

City: _____ State: _____ Zip_____

**Human Rights Defense Center, PO Box 1151, Lake Worth Beach, FL 33460**
**561-360-2523 • WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG**

why the authors inserted what Hampikian called "carve-out" language into the study's publication, potentially derailing efforts to cite the study's results in a *Daubert* hearing.

"Overall, Hampikian says he believes that the field of forensic science has yet to divorce itself from police academies and crime labs, which may go to explain the lack of in-depth focus on the issue of DNA transfer in the U.S," Horn stated in his in-depth article in the October 2019 issue of *CLN*. "As Exhibit A, he pointed to the fact that NIST's forensics science unit, headed up by Butler, has been put in charge of doing a federal governmental review of forensic science techniques as a response to recommendations made by the National Academy of Sciences in a 2009 report." Such a review is badly needed. New techniques are in development that can potentially help with accuracy and dependability of touch-transfer DNA analysis, but more peer-reviewed, publicly accessible study is necessary at every level.

A recent Australian study investigated the possibility of secondary and tertiary DNA transfer via pets. As detailed in the March 2023 issue of *CLN*, the Victoria Police Forensic Services Department, forensic science researcher and Ph.D. candidate Heidi Monkman, and Dr. Mariya Goray of Australia's Flinders University collected human DNA from 20 pet cats from multiple households. "A whopping 80% of the samples contained detectable levels of DNA. And 'interpretable profiles that could be linked to a person of interest were generated from 70% of the cats tested,'" according to *CLN*.

Study co-author Goray summed up their results: "This type of data can help us understand the meaning of the DNA results obtained, especially if there is a match to a person of interest. Are these DNA findings the result of criminal activity or could they have been transferred and deposited at the scene via a pet?" For some people who find themselves the subject of a police investigation, the answer to that question could have life-altering implications.

### Problem Exists Between Keyboard and Chair

Adding to the complexities of minute and fragmentary samples from multiple subjects potentially mixing together—and then being transferred across multiple vectors—is the reality of the imperfectly designed and operated tools used to decode them. Modern DNA analysis has come to rely on highly sophisticated computer software to interpret the patterns and deduce the probabilities involved in attempting to assign criminal responsibility. Unfortunately, as *CLN* and other outlets have documented in multiple articles in recent years, how this software is written and deployed and how its results are interpreted by forensic analysts and technicians often vary widely from lab to lab and organization to organization. Mixed samples are vulnerable to misinterpretation due to variations in the fine-tuning of the mathematics involved and the data input through the software, as well as the training and experience of the technicians interpreting the data it spits out. This variability can lead to potentially devastating impacts on both the accused and the victims or survivors of crimes.

Writing on issues in software-enhanced forensic DNA analysis in the August 2019 issue of *CLN*, Michael Berk stated that with contemporary technology "not only is it possible to run tests on very small samples, but the practice of using software to sift 'irrelevant' information from the materials under analysis, while retaining enough fidelity to hold up in court, has expanded DNA profiling far beyond its early boundaries." Modern labs that do this high-tech work focus primarily on just forty short strands of DNA, or "alleles," because these have been observed to be the sections of DNA that vary the most between individuals within human populations. "It's extremely unlikely that two different people will share all 40 of these 'genetic markers,'" according to Berk.

That said, a particular set of alleles showing up in final results does not *necessarily* mean that a person whose DNA has all of those alleles contributed to the sample being analyzed. Berk highlighted the following example: "There could have been two (or more) people, each having *some* of the indicated alleles, who supplied material for the sample. (Imagine two contributors, each having alleles 1, 2, 3, 4 and 5, 6, 7, 8, respectively—the results would include the set 3, 4, 5, 6 … but that doesn't mean that someone having the distinct makeup 3, 4, 5, 6 contributed to the sample.)"

The type of computer program used in the interpretation of complex DNA mixtures is known as probabilistic genotyping software ("PGS"). These programs are built on statistical and biological modeling that is intended to determine the probability that the information revealed by testing indicates the presence of a specific individual's DNA. The software is supposed to be designed to account for the types of anomalies regularly encountered in DNA analysis, and its calculations result in what is known as a "likelihood ratio." The greater the likelihood ratio, the greater the probability that the test-sample DNA and the suspect's DNA can be considered a match. "This number," as Berk explained, "takes into consideration the frequency with which each allele (in partnership with other alleles) appears in the general population, and is an estimate of how likely it is that the particular set of alleles arising from the test of the sample came from the specified human subject." Contrary to the popular conception of DNA always delivering absolute certainty, these probabilistic models can all too often lead to results that remain subject to interpretation.

Therefore, how the software these test processes rely on is designed and how its results are interpreted by technicians, scientists, detectives, prosecutors, judges, and juries can be critical for the outcomes of criminal trials that hinge on DNA evidence. On the one hand, computers are an absolutely essential tool for doing the complex calculations necessary for modern forensic DNA analysis. On the other hand, poorly written or deployed software from a variety of competing and proprietary vendors can lead to highly variable and conflicting results for public and private labs alike. In fact, public forensics labs in New York, Texas, and Washington have had to temporarily shut down testing or switch tools because of flaws discovered in DNA testing tools being used.

The training and professional practices of the technicians who conduct these tests and interpret their results for law enforcement and the courts can also be a problem. Differences in experts' use of PGS may dramatically affect the results of DNA analyses. Different labs might produce different answers from the same sample simply based on variations in the programs used and their settings and controls, and such differences may call into question the reproducibility of test results.

### Emanuel Fair's Story

On June 11, 2019, a King County, Washington, jury found Emanuel Fair not guilty of first-degree murder. This ended an 11-year odyssey through the state justice system, nine years of which Fair spent incarcerated as one of the longest pretrial detainees in the state's history. This tortuous journey was precipitated by a harrowing combination of prosecutorial overreach that Fair claims was motivated by racism and circumstantial evidence—of which touch-transfer DNA was the most important piece.

On Halloween night in 2008, Fair was the only Black person in attendance at a group

## Touch-Transfer DNA (cont.)

party held by multiple tenants of a Redmond apartment complex. At least 50 partygoers, including residents of the complex and guests like Fair, moved freely between multiple rooms in multiple residents' homes within the complex, particularly those of the party hosts/organizers. In the aftermath of the party, one of the hosts, 24-year-old software developer Arpana Jinaga, was found murdered in her bedroom. She had been sexually assaulted and strangled. Fair, who had spent the night at the apartment of one of the party's other hosts, quickly became a suspect.

Fair told the police that he had been in and out of Jinaga's apartment over the course of the night, hanging out in her bedroom with a group of other partygoers and at one point using her bathroom. Other partygoers corroborated his account. He also helped clean up towards the end of the party, including in Jinaga's apartment. Investigators found DNA from at least three other men—including the victim's ex-boyfriend and two residents of the apartment complex—in Jinaga's apartment, on her body, and on items recovered from the complex's dumpster.

Fair had a prior conviction for statutory rape on his record. Investigators, guided by King County Senior Deputy Prosecuting Attorney Jeff Baird, quickly closed in on him as their prime suspect. Their zeal to build a case against Fair led Redmond police and King County investigators to seemingly ignore evidence that potentially implicated others. They even provided immunity to one initial suspect, the victim's next-door neighbor, in exchange for him providing evidence to bolster their case against Fair.

Despite their eagerness and myopic focus on Fair, the complexities of the case meant it was not until 2010 that authorities arrested him and officially charged him with sexually assaulting and murdering Jinaga. His family could not make bail. Over the course of a lengthy pretrial process and two trials—the first of which ended in a jury hung 11 to 1 in favor of acquittal and the second of which finally resulted in his acquittal—Fair would spend over nine years in the King County Jail. All of this happened because investigators pursued Fair with tunnel vision and where only able to build a flimsy circumstantial case against him that was based almost entirely on minute amounts of touch-transfer DNA evidence.

As reported by *The Seattle Times* on April 15, 2023, a U.S. District Judge backed up Fair's allegation, saying that "evidence and arguments presented by attorneys for Emanuel Fair could support his claim that racism motivated police to target him for the rape and murder of Arpana Jinaga to the exclusion of other viable suspects, and that King County prosecutors were negligent in pursuing the case."

The *Times* added that the judge's ruling "points out, based on the pleadings, that police found DNA from three other men on key pieces of evidence, including the bootlace used to strangle her and on a motor oil can and bathrobe tied to the crime scene. The pleadings say police also found DNA from Jinaga's white male neighbor, who was seen at the front door of her apartment just hours before she was killed, near her body." The article specifically focused on the controversial touch-transfer DNA that the police and prosecution turned into the centerpiece of their case: "The complaint alleges that Fair's DNA was in such minute quantities that it had to be sent to a special laboratory to identify it, and his complaint questions the validity of that conclusion."

The company that performed this specialized computer analysis of the mixed, touch-transfer DNA in question, Cybergenetics, still has a post on its website touting the use of its product in Fair's case, despite his acquittal. The page about Fair's case includes a note that the Washington State Patrol Crime Laboratory "developed mixed DNA data from the evidence items" but "could not draw conclusions from the data due to its complexity." It then touts the results of its TrueAllele computer DNA analysis produced for the prosecution. As of this writing, Emanuel Fair's lawsuit against Redmond and King County authorities is ongoing.

## Conclusion

Despite its growing use and importance in criminal investigations and prosecutions, a troubling number of law enforcement officers and prosecutors seem to lack a basic understanding of what touch-transfer DNA is and its critical limitations as standalone evidence. Attorney Marina Medvin wrote in a September 20, 2018, article for *Forbes*, "they expanded the search for touch-transfer DNA to all objects and surfaces, irrespective of the ability to find other identifying evidence connected to that DNA, such as a fingerprint. This led to the prosecution of individuals based on DNA from low-template and low-quality samples not connected to other identifying data.

Moreover, prosecutors failed to distinguish the unique nature of touch-transfer DNA and the likelihood of random and innocent touch-transfer origins, presenting it to juries as the equivalent of a smoking gun."

Consequently, according to Medvin, "when prosecutors present to a jury touch-transfer DNA evidence with the same oomph as large-sample DNA evidence, the jurors, under the influence of pre-set expectations for scientific evidence to prove culpability and the common notion that DNA evidence is inherently trustworthy, feel compelled to convict. The result is touch-transfer DNA can readily lead to conviction of the innocent."

Because members of the general public remain largely ignorant of what touch-transfer DNA is, they conflate it with the now familiar large-sample DNA evidence, which truly is the forensic evidentiary gold standard. But the same cannot be said about touch-transfer DNA. With ever-smaller samples of genetic material used as evidence, the possibility of touch-transfer and contamination of samples with DNA from a wide variety of other sources is exponentially increased. Add to that the lack of clear and uniform standards with respect to software and hardware for touch-transfer DNA analysis, and the risk of wrongful convictions is exacerbated.

Given what we already know about touch-transfer DNA evidence's ability to place a person at a location he's never visited as well as place a person who's been dead for years at a recent crime scene, the relative lack of new research into touch-transfer DNA and overall failure to properly educate police and prosecutors about the serious limitations of the evidentiary value of touch-transfer DNA as standalone evidence is alarming. The misuse of and overreliance on touch-transfer DNA evidence poses a high risk of wrongful convictions. *CLN* will continue to shine a light on this issue because there hasn't been much improvement since *CLN* began covering it back in 2017. As Medvin concluded in her *Forbes* article, "As of now, anytime we touch a public surface, we remain fair game for criminal suspicion based on touch-transfer DNA."

Sources: *sciencedirect.com, forbes.com, Criminal Legal News, investigationdiscovery.com, innocenceproject.org, unh.edu, nij.ojp.gov, forensicmag.com, science.org, seattletimes.com, genome.gov, lexology.com, usatoday.com, labmanager.com, newatlas.com, nature.com, discovermagazine.com, newscientist.com, cbsnews.com, newrepublic.com, cybgen.com, fsigenetics.com*

# From the Editor

*by Richard Resch*

As we usher in 2025, we also mark the eighth year of *Criminal Legal News* ("*CLN*"). To those of you who have been with us from the beginning, we extend our heartfelt gratitude for your continued support, which has been instrumental in our success. We are honored that readers find our content helpful and informative and will do our utmost to ensure *CLN* continues to be a valuable resource for your legal news.

This issue of *CLN* has been circulated to a wide and diverse audience beyond the usual suspects, so many individuals, including new subscribers, who have received a copy may not be familiar with *CLN's structure, mission, and philosophy*. Accordingly, I'd like to provide a brief overview of *CLN*.

*CLN* is a monthly print and online publication focusing on individuals' legal rights as they pertain to interactions with the criminal justice system. Specifically, *CLN's* coverage includes, but is not limited to, state and federal criminal law and procedure, constitutional rights, police and prosecutorial misconduct, official abuse of power, habeas corpus relief, ineffective assistance of counsel, sentencing errors and reform, militarization of police, surveillance state, junk science, wrongful convictions, false confessions, witness misidentification, *Brady* violations, paid/incentivized informants, plea agreements, asset forfeiture, capital punishment, search and seizure, *Miranda* warnings, sex offender registries, post-release supervision and control, and due process rights.

Each issue of *CLN* features a cover story, expert legal commentary and analysis by a columnist, legal news articles, summaries of useful appellate court decisions, and News in Brief (short topical stories from around the country—from the sublime to the ridiculous). Each issue of *CLN* contains relevant, high-interest news stories about the criminal justice system and summaries of state and federal appellate court decisions, with the majority of content constituting the latter variety.

Our mission at *CLN* is to provide readers with practical legal information that can be used to challenge convictions, sentences, and conditions of release where warranted. The primary means of educating and informing readers is through coverage of state and federal appellate court decisions dealing with criminal law, procedure, and associated constitutional rights. We're confident that the case law information we provide is of great value to anyone with an interest in the most recent developments in state and federal substantive criminal law and criminal procedure.

We believe that the breadth of our coverage is unique in that we review every opinion issued by the highest appellate court in all 50 states as well as from the 13 U.S. Courts of Appeals and the U.S. Supreme Court. *CLN* reports on decisions that implicate any of the issues we cover and meet our criteria for reporting, as follows: *CLN* reports on a decision if it (1) constitutes a win, in whole or in part, for the defendant, (2) announces a new rule of law, (3) expands, limits, modifies, or otherwise clarifies an existing rule of law, (4) involves a relevant issue of first impression, (5) provides usable information or guidance for our readers, or (6) is issued by the U.S. Supreme Court regardless of disposition. Finally, we also report on notable decisions from intermediate level state courts of appeal.

For each decision, we provide the (1) essential facts, (2) applicable rules of law, (3) application and reasoning, and (4) court's holding. We do our best to distill decisions down to these four essential elements for practical use by our readers. However, given the sheer number of cases upon which we report, please understand that we cover them within fairly rigid word count parameters, ranging from about 500 to 1,500 words, and we are summarizing appellate court decisions that often run several dozen pages in length. Consequently, while we have the utmost confidence in our coverage and treatment of each decision upon which we report, our summaries are, nevertheless, no substitute for reading the actual opinions themselves if they apply to your situation.

In addition to reporting on the latest developments in criminal and constitutional case law, *CLN* provides unflinching and unapologetic coverage of criminal justice issues and news. There are no sacred cows at *CLN*; we critically examine and question everything and everyone associated with the criminal justice system.

For example, we challenge the axiomatic belief that's become deeply ingrained in the law enforcement community and popular culture but poses a clear and present danger to public safety, viz., that an officer's first priority is to go home to his or her family at the end of each shift. But is it? That belief inevitably leads many officers to develop a "shoot first and ask (or answer) questions later" mentality, which in turn frequently results in an unreasonable risk of injury to or even death of members of the general public.

If that genuinely is an officer's ultimate priority, then everything else involved with being a member of the law enforcement community is subordinate, including taking reasonable and foreseeable risks that may place the officer in personal physical danger. But the assumption of a certain degree of risk to personal safety is an inherent, reasonable, and unavoidable aspect of being a law enforcement officer, much like it is with being a test pilot or stunt person. If you're unwilling to assume that risk, then you have absolutely no business whatsoever being a test pilot, stunt person, or, far more importantly, a law enforcement officer. All three jobs are voluntary; no one is forced to do any of them. But if you choose



John F. Mizner, Esq.
311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889
jfm@miznerfirm.com

MIZNER
— LAW FIRM —

Representing Pennsylvania Inmates
Medical mistakes
Inadequate care
Delay in treatment

## From the Editor (cont.)

to join any of those occupations, then you are also voluntarily choosing to accept the inherent risks that accompany it.

We have reported on a real-world example of this intolerable risk-averse mentality by a Tennessee police officer. The officer tasered an 81-year-old woman who allegedly brandished a rake in a "threatening manner" and ambled towards him from a distance of about 50 feet, leaving the petrified officer with a scant 14 seconds to react. The sheriff stood behind the decision, praising the officer because the only other options available, according to the sheriff, were to use lethal force or risk the officer's own life. Really?!

If this scenario constitutes a legitimate life and death situation in the mind of this officer and the sheriff, then the community would be far better served and much safer without them on the force. If any situation involving even the slightest risk to an officer's personal safety is viewed distortedly as presenting a binary choice between kill or be killed, which option do you suppose the officer will choose?

When law enforcement officers believe that their first priority is to make it home safely at the end of their shift, the acceptable degree of risk hovers around zero, and the public pays the price with octogenarians clutching gardening tools getting tased or worse.

Now, I'd like to talk briefly about our core philosophy. Call us wild-eyed optimists, but we at *CLN* don't think it's too much to ask members of the law enforcement community and prosecutors not to rape individuals in custody (or really anyone for that matter); brutalize or kill compliant suspects or members of the general public; plant or manufacture incriminating evidence; intentionally withhold exculpatory evidence from defendants; knowingly convict factually innocent people; and otherwise blatantly violate people's constitutional rights, personal well-being, and human dignity.

So basically, we at *CLN* don't believe it's too much to demand that law enforcement officers and prosecutors obey the law and follow the rules that they've sworn to uphold. Unfortunately, if the foregoing horrendous behaviors weren't occurring with terrifying

regularity all across the country, there would be no need for *CLN*. But they are, so here we are.

Finally, many readers and random commentators have asked why the headlines for most of the court-opinion articles are so long and detailed. That's a good question, and there's a good explanation. Many of our readers are incarcerated (as are the majority of our writers, who are among the top jailhouse lawyers and imprisoned writers in the country), so they receive the print version of *CLN*, which they often keep after reading to serve as a reference library of sorts. Because the issues are in print, they are not easily searchable like the online version. If the headlines were short and generic, it would be more difficult for incarcerated readers to locate a specific article from a previous issue of *CLN*. Consequently, court-opinion article headlines are long and detailed to make it easier for incarcerated readers to search past print issues of *CLN* for specific topics and court opinions.

To those of you who haven't already done so, "Stop resisting!" and subscribe to *CLN* today.

# PRISONLEGALNEWS.org

## Dedicated to Protecting Human Rights   >>FREE Data Search |

| Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements |



If you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**

**Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.**

‣ PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.

‣ Publications section has numerous downloadable government reports, audits and investigations from around the country.

‣ Full text decisions of thousands of court cases, published and unpublished.

‣ All content is easy to print for downloading and mailing to prisoners.

‣ Most complete collection of prison and jail related verdicts and settlements anywhere.

‣ Order books, print subscriptions and make donations on line.

‣ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.

‣ Links to thousands of prison, jail, criminal justice and legal websites around the world.

‣ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.

‣ Search free, pay only if you find it!

‣ The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget
$19.95 per month • $149.95 per year**

### Subscribe to Prison Legal News Online! http://www.prisonlegalnews.org

# Illinois Supreme Court Announces Dismissal by *Nolle Prosequi* as Part of Agreement Bars State From Bringing Second Prosecution Where Defendant Satisfied Obligations and Reverses *Empire* Actor Jussie Smollett's Conviction

*by Sam Rutherford*

THE SUPREME COURT OF ILLINOIS reversed and dismissed *Empire* actor Jussie Smollett's felony disorderly conduct convictions because the State previously entered into a non-prosecution agreement with the actor in exchange for his promise to forfeit the bond he posted and complete community service. The Court held that a subsequently appointed special prosecutor lacked authority to override the non-prosecution agreement and reindict Smollett because doing so constitutes a due process violation.

## Background

On January 29, 2019, Smollett told police that he was physically attacked outside his apartment building in Chicago. He claimed the attackers used racial and homophobic slurs. Investigators eventually determined that Smollett paid two acquaintances, brothers Olabinjo "Ola" Osundairo and Abimbola "Bola" Osundairo, $3,500 to stage the assault. The apparent motive was Smollett's dissatisfaction with his TV studio's failure to take hate mail he had received seriously.

In February 2019, the Cook County State's Attorney's Office filed a criminal complaint against Smollett for felony disorderly conduct. He turned himself into Chicago police the next day and posted a $10,000 bond. A grand jury subsequently returned a 16-count indictment against Smollett; he pleaded not guilty.

On March 26, 2019, the prosecution informed the Cook County Circuit Court it had reached an agreement with Smollett and made an oral motion to *nolle prosequi* ("nol-pros"), or dismiss without prosecution, the charges against him. An Assistant State's Attorney explained, "the State does have a motion in this case. After reviewing the facts and circumstances of the case, including Mr. Smollett's volunteer service in the community and agreement to forfeit his bond to the City of Chicago, the State's motion in regards to the indictment is to [nol-pros]. We believe this

outcome is a just disposition and appropriate resolution to this case."

The court granted the motion, finding that Smollett had complied with the terms of the agreement by preforming 15 hours of community service and agreeing to forfeit his $10,000 bond. The charges against Smollett were dismissed, and the court entered an order directing the clerk to transmit Smollett's bond to the city's Law Department.

This resolution triggered significant public outcry about leniency and favorable treatment afforded famous criminal defendants, including from former Chicago Mayor Rahm Emanuel and then-President and now President-Elect Donald Trump.

In April 2019, a retired appellate court judge filed a pro se motion to appoint a special prosecutor to "investigate and prosecute the People of the State of Illinois v. Jussie Smollett." The circuit court granted the motion over the objection of the prosecutor's office on June 21 and ordered that "a special prosecutor be appointed to conduct an independent investigation of the actions of any person or office involved in all aspects of the case." Smollett also objected to the order, but the court subsequently appointed former U.S. Attorney Dan K. Webb as special prosecutor.

In February 2020, after a lengthy investigation by Webb's office resulting in a 60-page report critical of the manner in which the Cook County State's Attorney's Office handled the case, a special grand jury indicted Smollett on six counts of felony disorderly conduct for the hoax. Smollett pleaded not guilty and subsequently moved to dismiss the indictment, arguing that his non-prosecution agreement with the State—the terms of which he had fulfilled—was an enforceable plea agreement barring the special prosecutor from reindicting him for the same offense.

The circuit court denied the motion. It concluded that when Cook County State's Attorney, Kim Foxx, recused herself from overseeing Smollett's prosecution, she had

improperly appointed her first assistant, Joseph Magats, as the acting State's Attorney; however, no such position exists under Illinois law. Instead, Foxx should have requested the court to assign a special prosecutor. Thus, the court concluded that the original nol-pros agreement was not entered into by a duly authorized prosecutor and was therefore a nullity, meaning that Smollett's subsequent reindictment was not prohibited by the agreement.

The case proceeded to jury trial. Smollett was convicted on five counts and sentenced to 30 months' probation, with the first 150 days to be served in the Cook County jail, and he was also ordered to pay a $25,000 fine and $120,106 in restitution to the city.

Smollett timely appealed, raising numerous issues, but the Illinois Court of Appeals affirmed his convictions and sentence in a 2-1 decision. Justice Freddrenna M. Lyle dissented, reasoning that the State's nol-pros agreement with Smollett was tantamount to a plea agreement, which prohibited his reindictment. The Illinois Supreme Court granted review.

## Analysis

The Court addressed only one issue on review—whether the non-prosecution agreement Smollett entered into with the State should be enforced. In the seminal case of *Santobello v. New York*, 404 U.S. 257 (1971), the U.S. Supreme Court held that when a defendant's guilty "plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Courts have since applied this general principle to a variety of contexts outside the traditional setting of guilty plea agreements.

For example, in *People v. Starks*, 478 N.E.2d 350 (Ill. 1985), the State agreed to dismiss the charges against a defendant if he passed a polygraph examination, but it

## Illinois Supreme Court (cont.)

failed to do so. The court ordered an evidentiary hearing to determine whether such an agreement existed and, if the answer was yes, instructed the circuit court to enforce it. As the *Starks* Court explained, "The prosecution must honor the terms of agreements it makes with defendants. To dispute the validity of this precept would surely result in the total nullification of the bargaining system between the prosecution and the defense." Specifically, the defendant relinquished something of "constitutional significance," i.e., his privilege against self-incrimination by submitting to the examination.

Similarly, in *People v. Stapinski*, 40 N.E.3d 15 (Ill. 2015), the defendant entered into a valid oral cooperation agreement that, if the defendant cooperated in the arrests of certain individuals, he would not be charged. The defendant fulfilled his end of the bargain, incriminating himself in the process, but the State charged him anyway. The circuit court concluded that the State violated the defendant's right to due process as well as the cooperation agreement and dismissed the indictment. The Illinois Supreme Court affirmed, recognizing that cooperation agreements must be honored both as a matter of due process and under contract law principles.

The *Stapinski* Court rejected the argument that the agreement was not binding because it was made orally by police rather being reduced to writing by a prosecutor. Rather, an "unauthorized promise may be enforced on due process grounds if a defendant's reliance on the promise has constitutional consequences." The constitutional consequence to the defendant in that case was fundamental fairness—an essential element of due process. Thus, dismissal was appropriate because the defendant's due process rights were violated when the State breached its agreement with him.

Turning to the present case, the Court explained that the case law mandates that the reinstated charges against Smollett should have been dismissed if they were originally "dismissed as part of an agreement with the State in which he fully performed his end of the agreement." The State contended, however, that no such agreement existed and that Smol-lett had performed community service and forfeited his bond as charitable and voluntary acts with the hope that he might garner favor with the prosecutor's office. However, the record belied this assertion.

To begin with, the prosecutor clearly stated during his oral nol-pros motion that the case was being dismissed in response to Smollett's "agreement to forfeit his bond" and that the State believe this was "an appropriate resolution." Moreover, the special prosecutor's report prepared after charges were dismissed and then reinstated specifically referenced "the agreement" negotiated between Smollett's lawyers and prosecutors, and a press release issued by the Cook County State's Attorney's Office expressly stated the charges against Smollett were dropped in return for his agreement to perform community service and forfeit his bond. "Without the completion of these terms, the charges would not have been dropped," the release stated.

The Court determined that the terms of the State's agreement were made equally clear from both the press release and the special prosecutor's report. Although the report was highly critical of the agreement, it unequivocally found that agreement contemplated (1) complete dismissal of the original 16-count indictment, (2) no requirement that Smollett plead guilty to any crime, (3) no requirement that he admit guilt, (4) Smollett's only punish was to perform 15 hours of community service, and (5) Smollett's forfeiture of his $10,000 bond despite the city having spent over $130,000 to investigate the alleged crime. These, the report concluded, were the "terms of the dismissal."

Next, the State attempted to avoid the mandatory nature of its agreement with Smollett by contending that it did not contemplate a final resolution of the case by pointing to the fact that nol-pros dismissals are not considered final dispositions in criminal cases and do not bar another prosecution for the same offense under Illinois law. *See People v. Milka*, 810 N.E.2d 33 (Ill. 2004). But again, both the prosecutor's words used to support the State's nol-pros motion and the special prosecutor's report showed otherwise, according to the Court. The prosecutor clearly stated that the agreement was "an appropriate resolution" in Smollett's case, and "page after page" of the special prosecutor's report indicated that the State viewed the case as "resolved." Moreover, the Court noted that "it defies credulity" to believe Smollett would forfeit a $10,000 bond



### *Disciplinary Self-Help Litigation Manual, Second Edition,* by Dan Manville

By the co-author of the *Prisoners' Self-Help Litigation Manual,* this book provides detailed information about prisoners' rights in disciplinary hearings and how to enforce those rights in court.

*Now available from Prison Legal News Publishing.*
**$49.95**, *shipping included*

**DISCIPLINARY SELF-HELP LITIGATION MANUAL**
Second edition
BY DANIEL MANVILLE

**Order by mail, phone or on-line.**

By:  ☐ check   ☐ credit card   ☐ money order

Name: _____

DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____  State: _____  Zip: _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**

PO Box 1151 • Lake Worth Beach, FL 33460
Tel 561-360-2523 • www.prisonlegalnews.org

believing that the State "could simply reindict him the following day." Thus, the Court concluded that the parties "intended finality" with respect to the agreement.

Importantly, the Court explained that because Smollett's "case involves an agreement to dismiss charges in exchange for defendant doing something and defendant did what the agreement required, *Starks* and *Stapinksi*" require that the reinstated indictment be dismissed. Under the foregoing case law, the Court stated to "allow the State to renege on the deal and bring new charges would be fundamentally unfair and offend basic notions of due process." The State attempted to distinguish those cases by noting that the defendants in them surrendered constitutional rights in exchange for dismissal; whereas, Smollett merely surrendered money and performed a few hours of community service. But this is a distinction without a difference, according to the Court.

The Court explained that nothing in *Starks* or *Stapinksi*'s "discussion of why the defendant's due process rights were violated by the State's breach of the agreement did the court say anything to suggest that the only enforceable agreements with the State are those in which the defendant waives a constitutional right as consideration." Instead, both cases focused on the fundamental unfairness of the State refusing to uphold an agreement the defendant relied upon to his detriment. "Clearly, the State reneging on a fully executed agreement after defendant had forfeited a $10,000 bond in reliance on the agreement would be arbitrary, unreasonable, fundamentally unfair, and a violation of the defendant's due process rights," declared the Court. Citing, *inter alia*, *Commonwealth v. Cosby*, 252 A.3d 1092 (Pa. 2021).

Then, the State argued that the special prosecutor's reinstatement of charges was proper even if the Court determined that the original prosecutors and Smollett's attorneys intended to enter into an agreement with finality because Illinois law has long held that nol-pros dismissals are not final dispositions that bar future prosecutions. However, the Court stated the rule that a defendant may be re-prosecuted after a nol-pros dismissal has never been "absolute" and must be reconciled with case law holding "that it is fundamentally unfair to allow the prosecution to renege on a deal with a defendant when the defendant has relied on the agreement to his detriment."

Relying on *State v. Kallberg*, 160 A.3d 1034 (Conn. 2017), the Court resolved this apparent conflict by emphasizing the difference between a nol-pros dismissal stemming from the unilateral decision by the State and "one that is entered as part of a bilateral agreement with the defendant." In that latter situation, the State must honor its agreement. To hold otherwise would create "terrible policy consequences" by completely undermining the validity of the plea-bargaining process, the Court stated, adding, "Case law thus establishes that, if a dismissal is entered as part of a nonprosecution agreement between the State and the defendant, the manner of the dismissal is not important."

Finally, the Court addressed the circuit court's reasoning that Smollett's re-indictment is not barred because the prosecutors who negotiated the nol-pros dismissal agreement with his attorneys were not properly appointed under Illinois law. The Court rejected that argument, explaining that Illinois appellate courts have long held that the "right to be prosecuted by someone with proper prosecutorial authority is a personal privilege that may be waived if not timely asserted in the circuit court." *People v. Woodall*, 777 N.E.2d 1014 (Ill. App. Ct. 2002). That is, "[t]he proper prosecutor rule exists to protect defendants, not to allow the State to take advantage of its own errors to get a do-over," the Court admonished.

## Conclusion

Accordingly, the Court reversed Smollett's convictions and remanded the case to the circuit court for it to dismiss the underlying indictment with prejudice. *See: People v. Smollett*, 2024 Ill. LEXIS 707 (2024).

*Editor's note*: Anyone interested in the topic of the enforcement of non-prosecution agreements generally is encouraged to read the Court's full opinion.

Unsurprisingly, media outlets that are unhappy with the result in this case are predictably claiming that Smollett got off on a "technicality," which is the go-to pejorative term used to describe the alleged reason for an unwelcomed case outcome by the media and the general public. However, the so-called technicality in this case is nothing less than the safeguarding of the constitutional right to due process. This same scenario played out when the Pennsylvania Supreme Court vacated Bill Cosby's convictions and

ordered his immediate release because his fundamental right to due process was violated.

The *Cosby* opinion was covered in the August 2021 issue of *CLN*. Our commentary then applies with equal force to the current case: "The criticism and outrage at the Pennsylvania Supreme Court's June 30, 2021, decision to vacate Bill Cosby's convictions, order his immediate release, and bar any retrial are largely ill-informed or just plain misguided. Those decrying the fact that Cosby got released on a so-called 'technicality' apparently believe that fundamental constitutional rights are mere technicalities, or more likely, most are simply ignorant of the actual legal principles and reasoning upon which the Court based its decision. The Court in no way ruled upon Cosby's factual guilt or innocence. Instead, what it did do was safeguard important constitutional rights that protect us all, from the most sympathetic among us to the wildly unpopular, against government abuse and overreach." █

### Are Phone Companies Taking Money from You and Your Loved ones?

HRDC and PLN are gathering information about the business practices of telephone companies that connect prisoners with their friends and family members on the outside.

Does the phone company at a jail or prison at which you have been incarcerated overcharge by disconnecting calls? Do they charge excessive fees to fund accounts? Do they take money left over in the account if it is not used within a certain period of time?

We want details on the ways in which prison and jail phone companies take money from customers. Please contact us, or have the person whose money was taken contact us, by email or postal mail:

**HRDCLEGAL@HUMANRIGHTSDEFENSECENTER.ORG**



**Human Rights Defense Center**
Attn: Legal Team
PO Box 1151
Lake Worth Beach, Florida 33460

# Third Circuit Announces Claim of Innocence Does Not Resolve Whether Defendant Would Have Accepted Plea Offer Absent Counsel's Error and Holds Counsel Ineffective for Failing to Properly Advise Defendant About Mandatory Sentences If Plea Offer Rejected

*by Sam Rutherford*

THE U.S. COURT OF APPEALS FOR THE Third Circuit granted a federal prisoner's habeas petition where his trial attorney failed to properly advise him of the mandatory sentences he would receive if he rejected the Government's plea offer and proceeded to trial, holding that such misinformation constituted ineffective assistance entitling the prisoner to reinstatement of the rejected plea offer.

## Background

In January 2010, Steven Baker robbed the First Atlantic Federal Credit Union in Neptune, New Jersey. He was apprehended, and the Government charged him with bank robbery by force and violence in violation of 18 U.S.C. §§ 2113(a) and using or carrying a firearm in furtherance of the robbery in violation of 18 U.S.C. § 924(c). Baker hired an attorney.

The Government offered Baker a plea deal in February 2010 in which it agreed to allow him to plead guilty as charged in exchange for a sentence between 15 and 17 years in prison, but he had to admit to two additional bank robberies from 2009 without being convicted of them. The offer remained open for a month.

Defense counsel met with Baker at the jail, explaining to him that if he rejected the offer, the Government would charge and try him not only for the two additional robberies but also two addition firearm charges under § 924(c). Counsel explained that if he were to be convicted, he would face a maximum sentence of 21 years for the three § 924(c) charges, consecutive to whatever sentence he received for the three robberies, for a total sentence range of 36 to 56 years' imprisonment. Defense counsel also advised that Baker's chances of receiving the maximum sentence were "slim to none." Counsel's contemporaneous notes from the conversation reflected that this was the advice she gave Baker.

Counsel's advice concerning the sentence Baker would receive if he proceeded to trial was grossly inaccurate. In actuality, Baker faced a mandatory minimum sentence of 57 years in prison for just the three § 924(c) offenses, consecutive to the underlying bank robbery sentences. This mandatory minimum was based on the "stacking" provisions then in effect, which provided for a seven-year sentence for the first firearm conviction followed by 25-year sentences for each additional conviction. 18 U.S.C. § 924(c)(1)(C) (prior to the 2018 amendment); *Deal v. United States*, 508 U.S. 129 (1993) (stacking provision applies to multiple counts in same indictment).

Relying on counsel's misinformation, Baker rejected the plea offer and proceeded to trial on all six charges. He was convicted. Baker said that he did not learn about the 57-year mandatory sentence until he reviewed the Government's pre-sentence report. The U.S. District Court for the District of New Jersey sentenced Baker to 57 years for the three § 924(c) convictions, consecutive to an 87-month sentence for the three bank robbery convictions. Still represented by the same attorney who misadvised him during plea negotiations, Baker timely appealed and lost.

In 2014, Baker filed a pro se habeas petition in the District Court pursuant to 28 U.S.C. § 2255 and asked the court to ap-

point counsel. The District Court appointed the Office of Federal Public Defender, which ultimately raised a claim of ineffective assistance based on Baker's attorney's failure to properly advise him of the stacking provision during plea negotiations. An evidentiary hearing was held on this claim, during which defense counsel's handwritten notes from the plea discussion were admitted into evidence.

The District Court denied the petition in 2023. Although acknowledging that defense counsel failed to properly advise Baker concerning the mandatory 57-year sentence, the court held that this deficient performance was not sufficiently prejudicial because Baker could not show he would have accepted the Government's plea offer in light of his repeated assertions that he was innocent. The court also held that Baker's testimony at the evidentiary hearing that he would have accepted the offer was not credible.

Baker timely appealed, and the Third Circuit reversed.

## Analysis

The sole issue on appeal was "whether Baker's plea counsel was constitutionally ineffective when she provided him with inaccurate advice regarding his sentence exposure for the three potential Section 924(c) firearm charges as he considered the plea offer." The District Court's resolution of this claim was reviewed de novo with respect to its legal conclusion and for clear error regarding its factual determinations. *Lambert v. Blackwell*, 134 F.3d 506 (3d Cir. 1997).

Defendants have the Sixth Amendment right to the effective assistance of counsel during the plea-bargaining stage of a criminal case. *Lafler v. Cooper*, 566 U.S. 156 (2012); *Missouri v. Frye*, 566 U.S. 134 (2012); *Hill v. Lockhart*, 474 U.S. 52 (1985). To establish ineffective assistance, defendants must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668 (1984). Defendants must also estab-



Conpals!™

BBB A+ rating

**INMATE CONNECTIONS**

www.ConvictPenPals.com

PERSONAL – LEGAL – ART & BUSINESS
Write for free brochure/application!
465 NE 181st Ave. #308 Dept. CLN
Portland, OR 97230   Help@Conpals.com

lish prejudice resulting from this deficiency, meaning that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*

Defense attorneys have a duty to "give a defendant enough information to make a reasonably informed decision whether to accept a plea offer." *United States v. Bui*, 795 F.3d 363 (3d Cir. 2015) (internal quotation marks and citations omitted). Counsel must therefore inform the defendant "of the comparative sentence exposure between standing trial and accepting a plea offer [because it] will often be crucial to the decision whether to plead guilty." *United States v. Day*, 969 F.2d 39 (3d Cir. 1992). Counsel also has a duty to conduct necessary legal research to impart accurate information, and the failure to do so "is a quintessential example" of deficient performance. *Hinton v. Alabama*, 571 U.S. 263 (2014).

The Court had "little difficulty" concluding that Baker's attorney's failure to adequately apprise him of the 57-year mandatory sentence he faced following a guilty verdict on the § 924(c) charges was objectively unreasonable deficient performance under *Strickland*'s first prong. The stacking provision under that statute was "established and longstanding" in 2010, so there was no legitimate reason for counsel's misadvise concerning its application to Baker. He was entitled to know about it when assessing the Government's plea offer. The Court determined that the District Court therefore correctly concluded that Baker's attorney's misinformation during plea negotiations was constitutionally deficient.

The next issue was whether this deficient performance caused sufficient prejudice to satisfy *Strickland*'s second prong. In the context of plea bargaining, defendants need only show a "reasonable probability" that, but for counsel's deficient performance, he would have accepted the plea offer. *Lafler*. The District Court concluded that Baker failed to make this showing by (1) concluding that his testimony at the evidentiary hearing that he would have accepted the Government's offer had he known about the 57-year mandatory sentence was not credible and (2) relying on Baker's protestations of innocence during trial and sentencing.

However, the Court noted that a defendant's statement that he would have accepted a plea offer absent counsel's deficient performance in combination with "significant disparities in sentence exposure can be sufficient to establish a reasonable probability the

defendant would have made an agreement." *See, e.g., Mask v. McGinnis*, 233 F.3d 132 (2d Cir. 2000); *Griffin v. United States*, 330 F.3d 733 (6th Cir. 2003). The Court explained that reliance on sentence exposure disparities in assessing prejudice "makes good sense" because it "offers an objective piece of evidence in an inherently speculative inquiry that requires [courts] to imagine a counterfactual scenario in which a defendant possessed information relevant to his plea calculus that he did not actually have due to an error by counsel." *United States v. Gordon*, 156 F.3d 376 (2d Cir. 1998); *Smith v. United States*, 348 F.3d 545 (6th Cir. 2003).

Applying this test to Baker's case showed that he proved sufficient prejudice under *Strickland*'s second prong because, at best, counsel informed him he faced a maximum possible sentence of 56 years in prison by proceeding to trial, and further stated that there was a "slim" chance he would actually receive it; whereas, he actually faced a mandatory 57-year term for just the firearm charges plus an additional 87-108 months for the robberies. "This great sentence-exposure disparity, the true scope of which Baker did not know due to his counsel's underestimate of the sentence for the potential firearm charges, weigh[ed] heavily in favor of prejudice," according to the Court. *United States v. Morris*, 470 F.3d 596 (6th Cir. 2006). Thus, the Court ruled that the District Court erred in concluding otherwise.

The Court also ruled that the District Court erred in making adverse credibility determinations against Baker, which was primarily based on his assertions of innocence at trial and discrepancies in his testimony at the evidentiary hearing about whether he told his trial attorney he had committed the robberies. But trial counsel testified that Baker had in fact admitted guilt to her during plea negotiations, which supported "existence of a reasonable probability that he would have been willing to plead guilty in order to accept the Government's plea offer."

And while a defendant's protestations of innocence may sometimes undermine the likelihood that he would have accepted a plea offer, *see Sanders v. United States*, 341 F.3d 720 (8th Cir. 2003), "courts have typically noted that insistence on innocence does not by itself determine whether a defendant can show a reasonable probability he would have accepted a plea but for counsel's error." *Cullen v. United States*, 194 F.3d 401 (2d Cir. 1999); *Osley v. United States*, 751 F.3d 1214 (11th Cir. 2014). The Court announced its agreement with the

case law from the other circuits and provided the following "considerations that may counsel for limiting the weight of such evidence as a general matter."

First, defendants have a constitutional right to avoid self-incrimination, so weighing a defendant's insistence on innocence against him when assessing prejudice under *Strickland* "risks unduly deterring defendants from exercising this constitutional right." Second, defendants may plead guilty under plea agreements without expressly admitting guilt, *North Carolina v. Alford*, 400 U.S. 25 (1970), so maintaining innocence "is not wholly at odds with a defendant's claim that he would have been willing to plead guilty pursuant to an agreement but for his counsel's error." And third, while a defendant's insistence on innocence during plea negotiations may weigh against finding that he would have accepted a plea absent counsel's misinformation, such insistence following the rejection of a plea "is less likely to be probative of the defendant's state of mind and calculus during plea negotiations."

Applying these principles to Baker's case tipped in favor of finding prejudice. He admitted guilt to his attorney during plea negotiations and only maintained his innocence after rejecting the Government's plea offer on advice of counsel. Thus, Baker's claim of innocence was not the type of "steadfast insistence" courts have previously relied on to find that a defendant would not have accepted a plea agreement under any circumstance but instead was based on advice from an attorney who had already misinformed him during plea negotiations, the Court reasoned.

In light of these facts, the Court held that Baker "demonstrated a reasonable likelihood he would have taken the plea offer but for his counsel's error in calculating his sentence exposure on the Section 924(c) counts." The District Court erred in concluding otherwise.

### Conclusion

Accordingly, the Court reversed the District Court order denying Baker's habeas petition and remanded the case "with an instruction to order the Government to reoffer the original plea agreement to Baker." See: *Baker v. United States*, 109 F.4th 187 (3d Cir. 2024).

*Editor's note*: Anyone interested in the issue of defense counsel providing erroneous information regarding sentencing in connection with a plea offer is strongly encouraged to read the Court's full opinion.

# You'd Better Watch Out: The Surveillance State Is Making a List, and You're On It

## by John & Nisha Whitehead

*This column was originally published on December 4, 2024, on Rutherford.org. It has been reprinted with permission.*

"He sees you when you're sleeping
He knows when you're awake
He knows when you've been bad or good
So be good for goodness' sake!"
—"Santa Claus Is Coming to Town"

You'd better watch out—you'd better not pout—you'd better not cry—'cos I'm telling you why: this Christmas, it's the Surveillance State that's making a list and checking it twice, and it won't matter whether you've been bad or good.

You'll be on *this* list whether you like it or not.

Mass surveillance is the Deep State's version of a "gift" that keeps on giving…back to the Deep State.

Geofencing dragnets. Fusion centers. Smart devices. Behavioral threat assessments. Terror watch lists. Facial recognition. Snitch tip lines. Biometric scanners. Pre-crime. DNA databases. Data mining. Precognitive technology. Drones. Contact tracing apps. License plate readers. Social media vetting. Surveillance towers.

What these add up to is a world in which, on any given day, the average person is now monitored, surveilled, spied on and tracked in more than 20 different ways by both government and corporate eyes and ears.

Big Tech wedded to Big Government has become Big Brother.

Every second of every day, the American people are being spied on by a vast network of digital Peeping Toms, electronic eavesdroppers and robotic snoops.

This creepy new era of government/corporate spying—in which we're being listened to, watched, tracked, followed, mapped, bought, sold and targeted—has been made possible by a global army of techno-tyrants, fusion centers and Peeping Toms.

Consider just a small sampling of the tools being used to track our movements, monitor our spending, and sniff out all the ways in which our thoughts, actions and social circles might land us on the government's naughty list, whether or not you've done anything wrong.

**Tracking you based on your phone and movements:** Cell phones have become de facto snitches, offering up a steady stream of digital location data on users' movements and travels. For instance, the FBI was able to use geofence data to identify more than 5,000 mobile devices (and their owners) in a 4-acre area around the Capitol on January 6. This latest surveillance tactic could land you in jail for being in the "wrong place and time." Police are also using cell-site simulators to carry out mass surveillance of protests without the need for a warrant. Moreover, federal agents can now employ a number of hacking methods in order to gain access to your computer activities and "see" whatever you're seeing on your monitor. Malicious hacking software can also be used to remotely activate cameras and microphones, offering another means of glimpsing into the personal business of a target.

**Tracking you based on your DNA.** DNA technology in the hands of government officials completes our transition to a Surveillance State. If you have the misfortune to leave your DNA traces anywhere a crime has been committed, you've already got a file somewhere in some state or federal database—albeit it may be a file without a name. By accessing your DNA, the government will soon know everything else about you that they don't already know: your family chart, your ancestry, what you look like, your health history, your inclination to follow orders or chart your own course, etc. After all, a DNA print reveals everything about "who we are, where we come from, and who we will be." It can also be used to predict the physical appearance of potential suspects. It's only a matter of time before the police state's pursuit of criminals expands into genetic profiling and a preemptive hunt for criminals of the future.

**Tracking you based on your face:** Facial recognition software aims to create a society in which every individual who steps out into public is tracked and recorded as they go about their daily business. Coupled with surveillance cameras that blanket the country, facial recognition technology allows the government and its corporate partners to identify and track someone's movements in real-time. One particularly controversial software program created by Clearview AI has been used by police, the FBI and the Department of Homeland Security to collect photos on social media sites for inclusion in a massive facial recognition database. Similarly, biometric software, which relies on one's unique identifiers (fingerprints, irises, voice prints), is becoming the standard for navigating security lines, as well as bypassing digital locks and gaining access to phones, computers, office buildings, etc. In fact, greater numbers of travelers are opting into programs that rely on their biometrics in order to avoid long waits at airport security. Scientists are also developing lasers that can identify and surveil individuals based on their heartbeats, scent and microbiome.

**Tracking you based on your behavior:** Rapid advances in behavioral surveillance are not only making it possible for individuals to be monitored and tracked based on their patterns of movement or behavior, including gait recognition (the way one walks), but have given rise to whole industries that revolve around predicting one's behavior based on data and surveillance patterns and are also shaping the behaviors of whole populations. One smart "anti-riot" surveillance system purports to predict mass riots and unauthorized public events by using artificial intelligence to analyze social media, news sources, surveillance video feeds and public transportation data.

**Tracking you based on your spending and consumer activities:** With every smartphone we buy, every GPS device we install, every X/Twitter, Facebook, and Google account we open, every frequent buyer card we use for purchases—whether at the grocer's, the yogurt shop, the airlines or the department store—and every credit and debit card we use to pay for our transactions, we're helping Corporate America build a dossier for its government counterparts on who we know, what we think, how we spend our money, and how we spend our time. Consumer surveillance, by which your activities and data in the physical and online realms are tracked and shared with advertisers, has become big business, a $300 billion industry that routinely harvests your data for profit. Corporations such as Target have not only been tracking and assessing the behavior of their customers, particularly their purchasing patterns, for years, but the retailer has also funded major surveillance in cities

# HRDC 2024 ANNUAL FUNDRAISER



## *Please Help Support the*
## *Human Rights Defense Center!*



The Human Rights Defense Center (HRDC), which publishes Prison Legal News and Criminal Legal News, cannot fund its operations through subscriptions and book sales alone. We rely on donations from supporters!

HRDC conducts only one annual fundraiser; we don't bombard our readers with donation requests, we only ask that if you are able to contribute something to our vital work, then please do so. Every dollar counts and is greatly appreciated and will be put to good use. No donation is too small (or too big)!

Where does your donation go? Here's some of what we have done in the past year:

- Thanks to HRDC's decades of advocacy the FCC has lowered prison and jail phone rates.
- We won censorship lawsuits against jails in California and Indiana ensuring prisoners can receive books and magazines in the mail.
- We filed lawsuits against the prison systems in New Mexico and continue litigating lawsuits against prison systems in Missouri and Illinois and won a landmark censorship lawsuits against the North Carolina prison system which had censored HRDC publications.
- We won public record lawsuits against private prison company, Centurion and various other state and federal agencies including the Drug Enforcement Agency (DEA).
- We advocated for lower prison phone rates before the Federal Communications Commission and the California Public Utilities Commission. We are also litigating an anti-trust lawsuit against Global Tel Link and Securus.
- We continue litigating three national class action lawsuits around fee laden debit cards in the criminal justice system. We have also advocated on this issue with various regulatory agencies. We won a major lawsuit against one debit card company.
- We need your help to keep doing this and a lot more!

### We need your help to keep doing this and a lot more! Please send your donation to:

### Human Rights Defense Center, PO Box 1151, Lake Worth Beach, FL 33460

*Or* call HRDC's Office  at 561-360-2523 and use your credit card to donate

*Or* visit our websites at prisonlegalnews.org or criminallegalnews.org and click on the "Donate" link.

## HRDC Support Gifts

All contributions to HRDC are greatly appreciated! For those who make a donation of $75 or more, we are pleased to offer the following gifts as a way of thanking you for your generosity!

All donations, regardless of amount will help further our criminal justice reform and prisoners' rights efforts.

### Gift Option 1



In recognition of your support, we are providing the PLN hemp tote bag when making a donation of at least $75. Carry books and groceries stylishly and help end the war on drugs!

### Gift Option 2

To show our appreciation for your support we are providing the following selection of books for you to choose from when making a donation of $100. Donations of $100 or more can choose one free title. Each $100 donation entitles you to another free title; i.e., donate $500 and you get five books! $1,000 and you get everything on the page! Please circle the books you want and send the corresponding donation amount.






### Gift Option 3

As a thank you for your support, we are providing the entire PLN anthology of critically acclaimed books on mass imprisonment signed by editor Paul Wright! (The Celling of America, Prison Nation and Prison Profiteers) plus the PLN hemp tote bag to carry the books in when making a donation of $250 or more.





## You'd Better Watch Out (cont.)

across the country and developed behavioral surveillance algorithms that can determine whether someone's mannerisms might fit the profile of a thief.

**Tracking you based on your public activities:** Private corporations in conjunction with police agencies throughout the country have created a web of surveillance that encompasses all major cities in order to monitor large groups of people seamlessly, as in the case of protests and rallies. They are also engaging in extensive online surveillance, looking for any hints of "large public events, social unrest, gang communications, and criminally predicated individuals." Defense contractors have been at the forefront of this lucrative market. Fusion centers, $330 million-a-year, information-sharing hubs for federal, state and law enforcement agencies, monitor and report such "suspicious" behavior as people buying pallets of bottled water, photographing government buildings, and applying for a pilot's license as "suspicious activity."

**Tracking you based on your social media activities:** Every move you make, especially on social media, is monitored, mined for data, crunched, and tabulated in order to form a picture of who you are, what makes you tick, and how best to control you when and if it becomes necessary to bring you in line. As *The Intercept* reported, the FBI, CIA, NSA and other government agencies are increasingly investing in and relying on corporate surveillance technologies that can mine constitutionally protected speech on social media platforms such as Facebook, Twitter and Instagram in order to identify potential extremists and predict who might engage in future acts of anti-government behavior. This obsession with social media as a form of surveillance will have some frightening consequences in coming years. As Helen A.S. Popkin, writing for *NBC News*, observed, "We may very well face a future where algorithms bust people en masse for referencing illegal 'Game of Thrones' downloads... the new software has the potential to roll, Terminator-style, targeting every social media user with a shameful confession or questionable sense of humor."

**Tracking you based on your social network:** Not content to merely spy on individuals through their online activity, government agencies are now using surveillance technology to track one's social network, the people you might connect with by phone, text message, email or through social message, in order to ferret out possible criminals. An FBI document obtained by *Rolling Stone* speaks to the ease with which agents are able to access address book data from Facebook's WhatsApp and Apple's iMessage services from the accounts of targeted individuals *and* individuals not under investigation who might have a targeted individual within their network. What this creates is a "guilt by association" society in which we are all as guilty as the most culpable person in our address book.

**Tracking you based on your car:** License plate readers are mass surveillance tools that can photograph over 1,800 license tag numbers per minute, take a picture of every passing license tag number and store the tag number and the date, time, and location of the picture in a searchable database, then share the data with law enforcement, fusion centers and private companies to track the movements of persons in their cars. With tens of thousands of these license plate readers now in operation throughout the country, affixed to overpasses, cop cars and throughout business sectors and residential neighborhoods,



**Vol. 4**

## FREEBIRD PUBLISHERS

All New Catalog Vol. 4. Our full color catalog has product listings of our prisoner publications: books, photo services, high quality gifts and holiday selections too! Catalog includes complete detailed ordering information, forms and more. All pages featured in detailed full color photographs on 5.5" x 8.5", 92 pages with full descriptions & prices. **$5.00**

**Freebird Publishers
221 Pearl St. Ste. 541 N. Dighton MA 02764**



CHRISTOPHER ZOUKIS

"A true resource for anyone involved with the prison system."
—ALAN ELLIS, America's leading federal criminal defense attorney

# FEDERAL PRISON HANDBOOK

### BY CHRISTOPHER ZOUKIS

**THE DEFINITIVE GUIDE TO SURVIVING THE FEDERAL BUREAU OF PRISONS**

**Price: $74.95** *(shipping included)*

This handbook teaches individuals facing incarceration, prisoners who are already inside, and their friends and family everything they need to know to protect themselves and their rights. The thorough information was compiled by someone who has first-hand experience with the federal prison system.

Name _____

DOC/BOP # _____

Institution/Agency _____

Address _____

City _____

State _____ Zip _____

**Prison Legal News • PO Box 1151 • Lake Worth Beach, FL 33460**
**Tel. 561-360-2523 • www.prisonlegalnews.org**

it allows police to track vehicles and run the plates through law enforcement databases for abducted children, stolen cars, missing people and wanted fugitives. Of course, the technology is not infallible: there have been numerous incidents in which police have mistakenly relied on license plate data to capture out suspects only to end up detaining innocent people at gunpoint.

**Tracking you based on your mail:** Just about every branch of the government—from the Postal Service to the Treasury Department and every agency in between—now has its own surveillance sector, authorized to spy on the American people. For instance, the U.S. Postal Service, which has been *photographing the exterior of every piece of paper mail* for the past 20 years, is also spying on Americans' texts, emails and social media posts. Headed up by the Postal Service's law enforcement division, the Internet Covert Operations Program (iCOP) is reportedly using facial recognition technology, combined with fake online identities, to ferret out potential troublemakers with "inflammatory" posts. The agency claims the online surveillance, which falls outside its conventional job scope of processing and delivering paper mail, is necessary to help postal workers avoid "potentially volatile situations."

Now the government wants us to believe that we have nothing to fear from these mass spying programs as long as we've done nothing wrong.

Don't believe it.

The government's definition of a "bad" guy is extraordinarily broad, and it results in the warrantless surveillance of innocent, law-abiding Americans on a staggering scale.

As I make clear in my book *Battlefield America: The War on the American People* and in its fictional counterpart *The Erik Blair Diaries*, surveillance, digital stalking and the data mining of the American people—weapons of compliance and control in the government's hands—haven't made America any safer. And they certainly aren't helping to preserve our freedoms.

Indeed, America will never be safe as long as the U.S. government is allowed to shred the Constitution.

### About John W. Whitehead

Constitutional attorney and author John W. Whitehead is founder and president of The Rutherford Institute. His most recent books are the best-selling *Battlefield America: The War on the American People*, the award-winning *A Government of Wolves: The Emerging American Police State*, and a debut dystopian fiction novel, *The Erik Blair Diaries*. Whitehead can be contacted at staff@rutherford.org. Nisha Whitehead is the Executive Director of The Rutherford Institute. Information about The Rutherford Institute is available at www. rutherford.org.

# Kansas Supreme Court Announces Defendant-Witness Retains Fifth Amendment Privilege Against Compelled Self-Incrimination After Guilty Plea and Sentencing as Long as Testimony Sought Presents Legitimate Risk of Incrimination

### *by Sam Rutherford*

THE SUPREME COURT OF KANSAS held that a defendant's privilege against compelled self-incrimination concerning his alleged criminal conduct survived his guilty plea and sentences for that alleged offense where legal avenues remained open to the defendant to challenge the guilty plea. The Court therefore vacated a judgment finding him in contempt based on his refusal to testify on Fifth Amendment grounds at a co-defendant's trial.

### Background

In 2018, Matthew Douglas Hutto and three other men took part in a double murder. Hutto ultimately pleaded guilty to and was sentenced for two counts of felony murder. He filed a motion to withdraw this guilty plea not long after sentencing. The district court denied the motion, and on July 9, 2021, the Kansas Supreme Court affirmed.

After the Supreme Court affirmed the denial of Hutto's motion to withdraw his plea but before the time limit for seeking reconsideration of that decision expired, the State subpoenaed Hutto to testify against one of his co-defendants, Richard Daniel Showalter. The State granted Hutto "use immunity" for this testimony, but when he was called to testify, Hutton refused to do so.

The trial court held a hearing outside the presence of the jury. When the prosecutor asked Hutto why he had been convicted of felony murder, he responded, "I told you guys that I'm not testifying. I plead the Fifth." The trial court ruled that Hutto no longer possessed a Fifth Amendment privilege concerning the conduct underlying his felony-murder convictions because he was already serving "50-plus years" for those crimes. The court ultimately held Hutto in contempt for refusing to testify on the State's behalf and imposed a six-month jail sentence as a sanction independent of his existing felony murder sentences.

Hutto appealed the trial court's contempt finding and sanction, arguing that his Fifth Amendment privilege survived his guilty plea and sentence because viable avenues remained open to him to challenge his conviction and sentence. He noted that at the time he was called to testify, he still had the right to file a motion for rehearing of the Kansas Supreme Court decision rejecting his motion to withdraw his guilty plea and the right to file a petition for habeas corpus relief.

The Kansas Court of Appeals rejected this argument, holding that Kansas Supreme Court case law establishes that defendants lose their privilege against self-incrimination at sentencing when they plead guilty and do not move to withdraw their plea before sentencing. Because Hutto was sentenced before he sought to withdraw his felony-murder guilty pleas, the panel found he lost his privilege against self-incrimination when sentenced for those crimes. It therefore affirmed the district court's contempt finding and sanction.

The Kansas Supreme Court granted discretionary review and reversed. In so doing, it overruled several of its prior decisions inconsistent with its decision in Hutto's case because they conflicts with controlling authority from the U.S. Supreme Court.

---

**Kansas Supreme Court (cont.)**

### Analysis

The Court addressed three interrelated issues on review: "(1) the proper standard to assess whether a witness can invoke the Fifth Amendment privilege to prevent compelled testimony; (2) whether that standard should be different when the witness has pled guilty rather than being convicted by verdict; and (3) whether the privilege can be asserted after sentencing and, if so, under what circumstances."

The Fifth Amendment to the U.S. Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. The privilege against self-incrimination protects individuals from making factual disclosures that are testimonial, compelled, and incriminating in nature. *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177 (2004). While the Fifth Amendment's self-incrimination clause must be liberally construed, *Hoffman v. United States*, 341 U.S. 479 (1951), assertion of the privilege must nonetheless be timely and affirmative or else it is waived. *Roberts v. United States*, 445 U.S. 552 (1980).

The Court observed that the privilege includes two distinct protections against self-incrimination: (1) that criminal defendants not to be compelled to testify at their own trial and (2) that persons not be compelled to answer questions that may incriminate them in future criminal proceedings. *McCarthy v. Arndstein*, 266 U.S. 34 (1924). This includes witnesses called to testify "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory" when the answer could subject them to criminal liability. *Kastigar v. United States*, 406 U.S. 441 (1972).

The Court explained that the scope of the privilege against self-incrimination depends on the person asserting it: "While defendants can invoke a blanket privilege not to testify at their own trial, a compelled witness may only assert the privilege on a question-by-question basis and must establish a legitimate risk of incrimination to justify silence." 3 Crim. Prac. Manual § 88:9. A witness establishes a legitimate risk of self-incrimination by showing a "real and appreciable" danger "with reference to the ordinary operation of law in the ordinary course of things; not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct."

*Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472 (1972); *Marchetti v. United States*, 390 U.S. 39 (1968); *Brown v. Walker*, 161 U.S. 591 (1896).

The danger of self-incrimination extends beyond just testimony that may provide evidence for a criminal prosecution and conviction; it also extends to other "adverse consequences." *Mitchell v. United States*, 526 U.S. 314 (1999). For example, in *Mitchell*, the defendant pleaded guilty to her role in a cocaine distribution conspiracy but refused to testify about the specifics of her conduct at sentencing. The U.S. District Court ruled that she lost her privilege against self-incrimination by pleading guilty and then imposed a harsher sentence based on her refusal to testify. The Third Circuit affirmed, holding that a guilty plea serves as a permanent waiver of the Fifth Amendment privilege. It concluded that the privilege does not protect against the possibility of an increased sentence after pleading guilty. The U.S. Supreme Court rejected the Third Circuit's position and reversed, reasoning that the privilege must be available at least through sentencing on a criminal conviction.

The Court went on to explain that the privilege is extinguished only in "cases in which the sentence has been fixed and the judgment

# Prison Education Guide

## by Christopher Zoukis

This exceptional book is the most comprehensive guide to correspondence programs for prisoners available today. *Prison Education Guide* provides the reader with step-by-step instructions to find the right educational program, enroll in courses, and complete classes to meet their academic goals.

This guide is the latest and best resource on the market for the incarcerated nontraditional student. It includes a detailed analysis of the quality, cost, and course offerings of all correspondence programs available to prisoners.

*"Education is always important but it is even more so for the more than two million Americans who live behind bars. When one's body is locked up, the freedom and development of one's mind becomes a powerful form of resistance and self-preservation. This book is an invaluable tool in the struggle for knowledge behind bars."*

— CHRISTIAN PARENTI



PRISON
EDUCATION
GUIDE

CHRISTOPHER
ZOUKIS

**Price: $24.95**
*(shipping included)*

**280 pages**

*Order by mail, phone, or online.*

Amount enclosed for *PEG* _____ By: ☐ check  ☐ credit card  ☐ money order

Name: _____  DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____  State: _____  Zip: _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG  •  WWW.CRIMINALLEGALNEWS.ORG

of conviction has become final." *Mitchell.* That is, the risk of self-incrimination is eliminated when "no adverse consequences can be visited upon the convicted person by reason of further testimony." *Id.* Consequently, a guilty plea does not constitute a "broad waiver" of the privilege against self-incrimination because it does not eliminate the risk of further incrimination. *Id.*

Notably, the Kansas Supreme Court previously determined that a plea does constitute a broad waiver of the privilege following a guilty plea, holding that it "terminates absolutely upon sentencing, rather than when there is no longer a legitimate risk of incrimination." *State v. Longobardi*, 756 P.2d 1098 (Kan. 1988). The state Supreme Court ruled that a defendant does not have the right to assert the privilege and refuse to testify at a co-defendant's trial where he pleaded guilty and had been sentenced, despite a pending appeal therefrom, but does retain the right to refuse to testify if he was convicted following a jury trial and was appealing the verdict when called to testify against a co-defendant. *State v. Delacruz*, 411 P.3d 1207 (Kan. 2018) (jury verdict case); *State v. Bailey*, 255 P.3d 19 (Kan. 2011) (guilty plea case).

Because these cases are entirely inconsistent with the U.S. Supreme Court's interpretation of the Fifth Amendment privilege, the Kansas Supreme Court overruled them. Rather than relying on a particular procedural point in a case for determining when a conviction extinguishes the defendant's privilege against self-incrimination concerning that offense, the Court instead announced the adoption of an objective test that focuses on "whether the testimony sought exposes the witness to a legitimate risk—meaning a real and appreciable danger—of incrimination, not a hypothetical or speculative one. The witness' fear of self-incrimination must be objectively reasonable and the threat discernible for the privilege to apply."

Adoption of this test means that the privilege against self-incrimination concerning the crime for which a defendant has been convicted extends beyond sentencing and remains "available while a defendant challenges their conviction on direct appeal or until the time for such appeal has expired," the Court stated. This is the majority rule adopted by most state and federal courts. Several other courts have likewise held that the privilege remains intact where the defendant filed a motion to withdraw their guilty plea and was appealing an adverse ruling.

Similarly, the Court also adopted this rule. Thus, the Court held that defendant-witnesses have a valid basis for asserting the privilege against self-incrimination and may properly refuse to testify where they are appealing either the conviction itself or the denial of a motion to withdraw a guilty plea, as long as "the testimony sought exposes the witness to a legitimate risk of incrimination."

This privilege against "coercive incrimination" concerning a defendant's conviction only "fades away when the direct appeal becomes final," instructed the Court. A conviction does not become final when "(1) the judgment of conviction has been rendered, (2) the availability of an appeal has been exhausted, and (3) the time for any rehearing or final review has passed." *State v. Heath*, 563 P.2d 418 (Kan. 1977). That's because Kansas law also requires the appellate court to issue a mandate following an appeal, which then becomes part of the district court's final judgment. *See* Kan. S. Ct. Rule 7.03(b)(1)(C); K.S.A. 60-2106(c). Thus, the Court stated that "a judgment on appeal is not considered final until the mandate has issued."

And what does all this mean for Hutto? Simple—he had a valid basis for asserting his privilege against self-incrimination when called to testify against his co-defendant, according to the Court. Hutto filed a motion to withdraw his guilty plea to two counts of felony murder and appealed an adverse ruling on that motion. Although the Kansas Supreme Court issued an opinion affirming the denial of his motion when the State sought his testimony, the deadline for Hutto to file a motion for rehearing had not expired, and the mandate had not issued. Thus, the Court ruled that his direct appeal was not final.

Hutto's risk of self-incrimination was also sufficient to support his assertion of the privilege against self-incrimination. As the Court explained, "compelling him to explain in detail what he did to the victims to cause them to die—an explanation that goes far beyond a guilty plea limited to a factual basis establishing the elements of the crime—created a legitimate risk of compelled incrimination if his request [to withdraw his plea] was granted." Thus, the Court ruled that "Hutto properly invoked the Fifth Amendment privilege, and the district court could not punish him for his refusal to testify."

## Conclusion

Accordingly, the Court reversed the district court's contempt finding and vacated its sanction sentencing Hutto to six months in jail. See: *State v. Showalter*, 553 P.3d 276 (Kan. 2024).

*Writer's note*: The Court refused to address Hutto's argument that the availability of filing a habeas corpus petition also supported finding a valid basis upon which he could have asserted the Fifth Amendment privilege against self-incrimination, but the Court refrained from addressing this issue because there was no evidence in the record that he had filed such a petition. As the Court explained, "A hypothetical or speculative danger of self-incrimination is not enough to invoke the privilege." Nonetheless, the Court's analysis strongly suggests that it would hold that a defendant-witness' pending habeas petition or an appeal from the denial thereof does provide a basis for refusing to testify concerning the criminal conviction challenged therein.

*Editor's note*: Anyone interested in the issue of a defendant-witness being compelled to testify after having pleaded guilty—but prior to the conviction being final—and having invoked his Fifth Amendment privilege against compelled self-incrimination is strongly encouraged to read the Court's full opinion, which includes a thorough and instructive discussion of the issue with respect to both federal and Kansas case law. ◪

# Stop Prison Profiteering:
## Seeking Debit Card Plaintiffs

The Human Rights Defense Center is currently suing NUMI in U.S. District Court in Portland, Oregon over its release debit card practices in that state. We are interested in litigating other cases against NUMI and other debit card companies, including JPay, Keefe, EZ Card, Futura Card Services, Access Corrections, Release Pay and TouchPay, that exploit prisoners and arrestees in this manner. If you have been charged fees to access your own funds on a debit card after being released from prison or jail within the last 18 months, we want to hear from you.

Please contact HRDC Legal Team at
HRDCLegal@humanrightsdefensecenter.org
Call (561) 360-2523
Write to: HRDC, SPP Debit Cards,
PO Box 1151, Lake Worth Beach, FL 33460

# First Circuit Holds Government Breached Plea Agreement by Implicitly Arguing for Upward Variant Sentence by Including Pictures and Video of Defendant That Allegedly Depict His Criminal Tendencies in Sentencing Memo

### by Sam Rutherford

The U.S. Court of Appeals for the First Circuit held that the Government implicitly breached its plea agreement with the defendant where it agreed to recommend a sentence no higher than the top-end of the sentencing Guidelines range by submitting a sentencing memorandum detailing the defendant's criminal conduct unrelated to the current case. The U.S. District Court for the District of Puerto Rico latched onto this submission as justification for not only imposing a significant upward variant sentence for the current offense but also an extremely harsh consecutive sentence when revoking the defendant's supervised release for a prior conviction.

## Background

Yavier Mojica-Ramos ("Mojica") was convicted of possession of a firearm in furtherance of drug trafficking in 2013. He was released from prison in 2018 and began serving the five-year supervised released portion of his sentence.

On October 23, 2020, during the height of the COVID-19 pandemic, undercover Puerto Rico Police Bureau officers were monitoring for violations of an executive order that required wearing facemasks in public places. The officers stopped Mojica for not wearing a facemask. During this encounter, the officers discover two Glock pistols modified to be machine guns, 62 rounds of ammunition, and some narcotics in a bag Mojica was carrying. He was arrested and charged in federal court.

In 2021, Mojica entered into a plea agreement with the Government in which he agreed to plead guilty to possessing two machine guns in exchange for the Government's promise to recommend a sentence no higher than the top-end of the sentencing Guidelines range, which was calculated as 36-46 months in prison. The District Court accepted this plea and scheduled a sentencing hearing.

Prior to sentencing, the Government submitted a lengthy memorandum requesting a sentence of 46 months. The memorandum, however, also included 250 photos extracted from Mojica's cellphone depicting numerous firearms and large quantities of drugs. The Government submitted a video from Mojica's phone showing someone who looked like him recklessly brandishing an assault rifle. The Government said it submitted this evidence to prove that Mojica is "an individual with a penchant for high-capacity firearms, drugs, and criminal activity" and requested that the District Court consider it as "additional information" of his criminal tendencies. The Government specifically stated that the "danger to the community and the serious nature of the offense should be considered exceptional in this case."

Mojica's attorney filed a motion to compel specific performance of the plea agreement, arguing that the Government had implicitly breached the agreement by advocating for an upward variant sentence in its sentencing memorandum. The Government, for its part, argued that all it had done was candidly provide the court with "information relevant to the imposition of a sentence."

The District Court denied Mojica's motion, ruling that the Government did not breach its agreement because it specifically recommended a sentence of 46-months. The court also ruled that the cellphone photos and video were sufficiently authentic and reliable for consideration at sentencing, and they were relevant to sentencing because they suggest "a lack of respect for the law and a threat to public safety."

At sentencing, Mojica's attorney requested a sentence at the low-end of the range, 37-months, and detailed mitigating factors to support this request. The Government formally requested a sentence of 46-months but then immediately discussed how Mojica's conducted was "part of a broader problem here in Puerto Rico where, frankly speaking, armed violent crime is a disease." The Government also cited high murder rates in Puerto Rico and commented that Mojica is a repeat firearm offender.

Unsurprisingly, the District Court rejected both sentencing recommendations and imposed an upward variant sentence of 72 months. The court then revoked Mojica's supervised release for the 2013 conviction and imposed a statutory maximum sentence of 60 months consecutive to the 72-month term, resulting in a total sentence of 11 years in prison.

Mojica's lawyer objected to these sentences as being both procedurally and substantively unreasonable, but the court rejected this argument. It clarified that the basis for its sentence was the information provided by the Government in its sentencing memorandum. The court expressly stated that the Government's information proved that Mojica's prior prison term "did not serve the objective of punishment or deterrence," so an upward variant sentence was necessary.

Mojica timely appealed, and the First Circuit reversed and remanded for a new sentencing hearing in both cases before a different judge.

## Analysis

The sole issue on appeal was whether the Government had implicitly breached the plea agreement by submitting the extraneous evidence of Mojica's additional criminal conduct in its sentencing memorandum and then referencing that information in relation to Puerto Rico's high crime rate at the sentencing hearing. Because Mojica's attorney had astutely objected to the Government's post-plea conduct and filed a motion to compel specific performance of the plea agreement, the Court was permitted to review this claim de novo as a question of law for "plenary review." *United States v. Gonczy*, 357 F.3d 50 (1st Cir. 2004).

"[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257 (1971). The Court observed that technical compliance with the terms of the agreement is not sufficient; instead, the Government's "overall conduct" must be "reasonably consistent with making such a recommendation." *United States v. Canada*, 960 F.2d 263 (1st Cir. 1992).

In the present case, the Government argued that the sentencing memorandum and related evidence from Mojica's cellphone did

not breach the plea agreement because the submission was consistent with its obligation to provide relevant sentencing information to the court. Although acknowledging the Government's duty to provide the court with information that has "an easily discernible relationship to the offense conduct," *United States v. Saxena*, 229 F.3d 1 (1st Cir. 2000), and its right to rebut "factual assertions made by defense counsel," *United States v. Miranda-Martinez*, 790 F.3d 270 (1st Cir. 2015), the Government may not present this information in a way that "subverts" the plea agreement, the Court explained.

In fact, the Government may not discharge its plea obligations in an "impermissibly equivocal, apologetic, or begrudging" manner. *United States v. Davis*, 923 F.3d 228, 239 (1st Cir. 2019). Nor may the Government use its duty of candor to the court "as an instrument for thwarting" their plea agreement obligations. *Saxena*. Therefore, "when a prosecutor … gratuitously offers added detail garbed in implicit advocacy, a court might well find that the prosecutor is actually seeking a result in a manner that breaches the agreement." *Miranda-Martinez*.

This is exactly what occurred in Mojica's case, the Court noted, stating that even if it accepted the Government's contention that it was required to disclose the cellphone photos and video to the District Court, it nonetheless overstepped the bounds of permissible advocacy by describing Mojica's conduct as "exceptional." The Court stated that the Government certainly knew that describing criminal behavior as "exceptional" is essentially the same as requesting an upward variant sentence, since such sentences must be based on conduct that "falls outside the 'heartland' to which the Commission intends individual Guidelines to apply," *Rita v. United States*, 551 U.S. 338 (2007), or where the offense involves "idiosyncratic facts," *United States v. Bruno-Campos*, 978 F.3d 801 (1st Cir. 2020), or "especially heinous" conduct. *United States v. Rivera-Morales*, 961 F.3d 1 (1st Cir. 2020).

The Government's description of Mojica's offense as "exceptional" and his "penchant" for crime "implied" that the Government believed the case warranted an upward variant sentence, according to the Court. And while the Government was permitted to explain the basis for its high-end sentencing recommendation, it "went beyond presenting pertinent information in an objective manner to gratuitously framing Mojica's case as exceptional or extraordinary." Thus, the Court concluded

that this was an implicit breach of the plea agreement.

Moreover, the Government's sentencing memorandum did not merely draw facts and law to the court's attention as the law permits. *United States v. Clark*, 55 F.3d 9 (1st Cir. 1995). Instead, the Government unabashedly stated that it provided the cellphone photos and video as "additional evidence" to show Mojica's "likely" participation in other criminal conduct. Of course, the Government was well-aware that uncharged criminal conduct provides the basis for an upward variant sentence under 18 U.S.C. § 3553(a), *United States v. Gallardo-Ortiz*, 666 F.3d 808 (1st Cir. 2012), so it impliedly breached the plea agreement by advocating for such a sentence in its sentencing memorandum, the Court reasoned. Notably, however, the Court stated that the Government's conduct was particularly egregious in this instance by failing to provide "any corroborating evidence that Mojica was involved in the alleged firearm and drug crimes depicted in the cellphone content."

Thus, despite telling the court that it was requesting a within-guidelines sentence, under the totality of circumstances here, the Court determined that the substance of the Government's presentation could only be understood as emphasizing Mojica's wrongdoing and advocating for the imposition of a higher sentence than the agreed-upon term, which unquestionably amounted to an implicit breach of the plea agreement. *Gonczy*.

The final issue was determining the correct remedy. Mojica was certainly entitled to resentencing on the most recent machine gun conviction due to the Government's breach of the plea agreement, but what about the sentence he received for his revoked community supervision in the 2013 case? The Court held that this sentence too must be vacated because it could not "calculate how the government's error and breach may have affected the perceptions of the sentencing judge." *United States v. Alcala-Sanchez*, 666 F.3d 571 (9th Cir. 2012). Although the Court refused to order any particular sentence on remand, it did instruct that Mojica must be resentenced in both cases by a different judge. *See Clark* and *Canada*.

## Conclusion

Accordingly, the Court vacated Mojica's sentences for the unlawful possession conviction and the supervision revocation and remanded both cases for resentencing before a different judge. See: *United States v. Mojica-Ramos*, 103 F.4th 844 (1st Cir. 2024).

*Writer's note*: This is yet another case involving U.S. District Judge Francisco A. Besosa, who is infamously pro-government and known for imposing harsh sentences. Judge Besosa is so notoriously anti-defendant that in one recent appeal the defendant attempted to avoid plain error review by pointing to the judge's long track record of refusing to hold the government to the promises it makes in plea agreements as justification for the defendant's failure to object to the government's breach its agreement at sentencing. *United States v. Cortés-López*, 101 F.4th 120 (1st Cir. 2024). The First Circuit also reversed the sentence imposed by Judge Besosa in that case and remanded it for resentencing before a different judge. Defendants likely to be sentenced by Judge Besosa would be well-advised to negotiate plea agreements that contain great specificity concerning what the government may and may not do at sentencing and that limit the information that may be presented to the court.

Additional source: *United States v. Mojica-Ramos*, 585 F. Supp. 3d 171, *reconsideration denied*, 2022 U.S. Dist. LEXIS 33630 (D.P.R. 2022). 🔥

## If You Write to *Criminal Legal News*

We receive numerous letters from prisoners every month. If you contact us, please note that we are unable to respond to the vast majority of letters we receive.

In almost all cases we cannot help find an attorney, intervene in criminal or civil cases, contact prison officials regarding grievances or disciplinary issues, etc. We cannot assist with wrongful convictions, and recommend contacting organizations that specialize in such cases, such as the Innocence Project (though we can help obtain compensation after a wrongful conviction has been reversed based on innocence claims).

Please do not send us documents that you need to have returned. Although we welcome copies of verdicts and settlements, do not send copies of complaints or lawsuits that have not yet resulted in a favorable outcome.

Also, if you contact us, please ensure letters are legible and to the point—we regularly receive 10- to 15-page letters, and do not have the staff time or resources to review lengthy correspondence. If we need more information, we will write back.

While we wish we could respond to everyone who contacts us, we are unable to do so; please do not be disappointed if you do not receive a reply.

# California Supreme Court Announces Retroactivity of 2022 Version of Penal Code § 1170 to Upper-Term Sentences Imposed Before Its Enactment

### by Sam Rutherford

THE CALIFORNIA SUPREME COURT held that the 2022 amendments to Penal Code § 1170, which limits a trial court's ability to impose an upper-term sentence unless it finds aggravating factors justify the sentence and also requires that those aggravating factors either be stipulated to by the defendant or proven to a jury beyond a reasonable doubt, apply retroactively to cases on direct appeal. The Court further held that sentences imposed in violation of the amended statutory provision must be reversed unless the reviewing court can say that the sentencing error was harmless beyond a reasonable doubt and that the record clearly indicates the sentencing court would have imposed the same sentence had it been aware of the amended statute's limitations on its sentencing discretion.

## Background

Deandre Lynch was convicted by a jury of three counts of domestic violence resulting in a traumatic condition and one count of simple assault, all committed against his former girlfriend. Following the verdict, a presentence report was prepared that listed Lynch's extensive criminal history. The report also noted that numerous aggravating circumstances set out in Cal. Rules of Court 4.421 might apply to Lynch's sentence.

In April 2021, the trial court imposed a total sentence of 15 years and four months in prison. The court arrived at this sentence by imposing an upper-term sentence of five years on the first domestic violence conviction and consecutive one year, four-month sentences on the remaining two convictions. The sentence was then doubled under California's Three Strikes law.

The trial court relied on eight aggravating factors to justify the upper term sentence: (1) the crimes involved a high degree of cruelty, viciousness, and callousness (Rule 4.421(a)(1)); (2) the victim was particularly vulnerable (Rule 4.421(a)(3)); (3) Lynch used a weapon when committing the crimes (Rule 4.421(a)(2)); (4) his conduct and prior record indicate a serious danger to society (Rule 4.421(b)(1)); (5) his prior convictions were numerous (Rule 4.421(b)(2)); (6) he had served prior prison terms (Rule 4.421(b)(3)); (7) he was on parole

at the time he committed the crimes (Rule 4.421(b)(4)); and (8) his prior performance on parole was unsatisfactory (Rule 4.421(b)(5)). The court found no circumstances in mitigation.

In *Cunningham v. California*, 549 U.S. 270 (2007), the U.S. Supreme Court held the Sixth Amendment requires that any fact potentially increasing a defendant's sentence under California's determinate sentencing scheme "must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." Two months after Lynch's sentencing hearing, Cal. Penal Code § 1170(b) was amended to prohibit imposition of an upper-term sentence unless aggravating circumstances justify that term and the facts underlying any such circumstance, other than a prior conviction, "have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." Cal. Penal Code § 1170(b)(2) (as amended by Stats. 2021, ch. 731, § 1.3.).

On appeal, Lynch argued that he was entitled to resentencing under this amendment because the jury did not find any of the facts that the trial court relied on to impose an upper-term sentence. In a 2-1 opinion, the California Court of Appeal affirmed. It held that two of the eight aggravating factors, Lynch's use of a weapon and his prior convictions, were proved in compliance with the Sixth Amendment and the amended version of § 1170(b). The Court of Appeal ruled that the failure to prove the remaining six aggravating factors in compliance with the amended statute was an error of state law subject to harmless error review under the "reasonably probable" standard set forth in *People v. Watson*, 299 P.2d 243 (Cal. 1956), and that under this standard, it was likely that Lynch would have received the same sentence even if the trial court relied only on the two appropriately proven aggravators.

The California Supreme Court granted Lynch's petition for discretionary review.

## Analysis

The Court addressed two issues on appeal. First, it had to decide whether 2022 statu-

tory amendments to California's determinate sentencing scheme applied retroactively to Lynch's case. And second, if the answer to the first question was yes, then what standard of harmless error review applies to sentences imposed in violation of the amended statutes.

Turning to the retroactivity question, the Court recognized that the California Legislature amended § 1170 "'so that (1) the middle term [is] no longer the presumptive term absent aggravating or mitigating facts found by the trial judge; and (2) a trial judge [has] the discretion to impose an upper, middle or lower term based on reasons he or she states.'" Quoting *People v. Wilson*, 164 Cal. App. 4th 988 (2008). However, effective January 1, 2022, the Legislature again amended § 1170 to provide that a trial court "shall," in its discretion, impose a sentence "not to exceed the middle term." § 1170(b)(1). Trial courts may impose an upper-term sentence only if aggravating circumstances justify the sentence, and the facts underlying the circumstances have either been stipulated to by the defendant or proven to a jury beyond a reasonable doubt. § 1170(b)(2). A defendant's prior convictions are exempt from this requirement. § 1170(b)(3). These amendments were made so that California's determinate sentencing law would comply with *Cunningham*.

Although the Legislature did not expressly state whether the 2022 amendments apply retroactively to sentences handed down before the statute's effective date, numerous California Courts of Appeal have held that the amendments are "ameliorative" under the decision in *In re Estrada*, 408 P.2d 948 (Cal. 1965), and therefore apply to any cases pending on direct appeal on the day the 2022 amendments became law. (Collecting cases). The Attorney General did not dispute these holdings in Lynch's case, and the Court accepted the concession. Thus, the Court held that the amended version of § 1170 applied to Lynch's sentence.

The next issue was what standard of review applies to sentences imposed in violation of § 1170, as amended. Lynch argued that such sentences should automatically result in a new sentencing hearing without an individualized assessment of prejudice, but the

Court rejected this approach, reasoning that the sentences imposed in violation of the Sixth Amendment jury trial guarantee are subject to harmless error review. *See Washington v. Recuenco*, 548 U.S. 212 (2006) (rejecting this same argument, holding the failure to submit a sentencing factor to the jury is not a structural error). The Court saw no reason to depart from this settled precedent despite Lynch's arguments to the contrary.

But the question remained as to the appropriate test for harmlessness. The Court of Appeal affirmed Lynch's sentence under *Watson*'s "reasonably probable" harmless error standard applicable to non-constitutional errors, reasoning that a violation of the amended version of § 1170 is a violation of California statutory law. The Court rejected this approach because the "2022 amendment of section 1170(b)(1) and (2) effectively codifies the holding in *Cunningham*" and the failure to comply with its requirements is in essence a violation of the U.S. Constitution. Consequently, the Court determined that a "prejudice inquiry under *Watson* is inadequate to assess the effect of a failure to honor the Sixth Amendment's jury trial right."

Instead, the Court explained that Sixth Amendment violations under *Cunningham*, like all federal constitutional errors, must be reviewed under the familiar harmless error standard announced in *Chapman v. California*, 386 U.S. 18 (1967). "This 'stricter' standard of review requires reversal unless the error is 'harmless beyond a reasonable doubt.'" *People v. Hendrix*, 515 P.3d 22 (Cal. 2022) (quoting *People v. Dominguez*, 140 P.3d 866 (Cal. 2006)).

In assessing prejudice under *Chapman*, the Court held: "[U]nder the current statute, a Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established. The violation is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements." The Court instructed that a defendant is entitled to resentencing whenever this test is not met. In doing so, it expressly overturned several cases that are inconsistent with the Court's opinion. (See opinion for citations.)

The Court went one step further for cases like Lynch's where the trial court imposed an upper term based on some valid and some invalid aggravating factors prior to the amended version of § 1170 taking effect. Relying on its previous decisions in *People v. Gutierrez*, 324 P.3d 245 (Cal. 2014), and *People v. Salazar*, 538 P.3d 688 (Cal. 2023), the Court held that resentencing is required unless the record "clearly indicates" the trial court would have imposed the same sentence had it understood the limited nature of its sentencing discretion to impose an upper-term sentence under the amended version of § 1170.

Applying both of these standards to Lynch's case required resentencing, the Court stated. First, the failure to prove all eight of the aggravating factors in compliance with the amended version of § 1170 required resentencing under *Chapman* because the Court could not "find the omission of a jury trial harmless beyond a reasonable doubt as to *every* aggravating fact relied upon by the trial court to impose an upper term."

Lynch was likewise entitled to resentencing under the *Gutierrez* standard because the record did "not necessarily speak to how the court would have exercised its discretion under the weight of the presumptive middle term maximum sentence that currently exists." While the record showed that the trial court thought an upper-term sentence was "appropriate" when it believed it had unbridled discretion to impose any sentence under the statutory maximum under the prior statute, the Court stated that it was "speculative" to suggest the trial court would have found the aggravating factors sufficient to "justify" departing from the legislatively mandated middle-term sentence under the amended statute.

The Court therefore held that Lynch must be resentenced under the amended version of § 1170 and that "proceedings on remand are to be conducted in accordance with the current statutory requirements and the defendant given the opportunity for the jury trial, of which he was deprived." The Court also clarified that "the parties remain free to introduce at trial all relevant evidence to support or contest the factual support for the aggravating circumstances set out in the California Rules of Court. The court may rely on any properly proven aggravating facts, including prior convictions or facts necessarily found by the jury to support a verdict on underlying counts and enhancements. The court retains its discretion to impose an upper term sentence if it concludes that one or more properly proved circumstances justify such a sentence."

## Conclusion

Accordingly, the Court reversed Lynch's sentence and remanded the case to the trial court for further proceedings in accordance with its opinion. See: *People v. Lynch*, 552 P.3d 877 (Cal. 2024).

*Editor's note*: Anyone interested in the issues discussed in this case is strongly encouraged to read the Court's full opinion, which thoroughly and meticulously examines the issues in far greater detail than is possible in a brief summary of the opinion. ⚑



**Freebird Publishers**
WIN YOUR CASE
LAW / LEGAL BOOKS

INEFFECTIVE ASSISTANCE... $ 36.99
§2254 PRO SE GUIDE WINNING RELIEF... $ 42.99
PRISON LEGAL GUIDE... $ 33.99
HABEAS CORPUS MANUAL... $ 32.99
GRANTED PRO SE GUIDE PAROLE... $ 31.99
PRO SE SECTION §1983... $ 32.99
POST-CONVICTION RELIEF 7 BOOK SERIES
BOOKS SOLD SEPARATELY... $ 28.99 EACH
SECRETS EXPOSED * ADVANCING YOUR CLAIM *
THE APPEAL* WINNING CLAIMS * THE APPEAL *
SECOND LAST CHANCE * ADVOCATE
Prices include S/H with tracking

**FREEBIRD PUBLISHERS**
221 PEARL ST., STE. 541, NORTH DIGHTON, MA 02764
FREEBIRDPUBLISHERS.COM * AMAZON.COM
TEXT 774-406-8682

# Colorado Supreme Court Announces When Deciding Defendant's Pro Se Motion Requesting Counsel on Postconviction Review, Trial Court Must Either Deny Entire Motion or Permit All Claims If Any Have Arguable Merit

*by Sam Rutherford*

THE SUPREME COURT OF COLORADO issued an opinion defining the scope of a defendant's pro se Crim. P. 35(c) motion containing a request for counsel on postconviction review, holding that the trial court has only two choices: (1) determine none of the claims has arguable merit and deny the motion in its entirety or (2) determine at least one claim has arguable merit and grant the request for postconviction counsel and not deny any of the claims, i.e., not limit the scope of postconviction counsel's representation to only arguably meritorious claims.

## Background

Francine Erica Segura and two codefendants committed an armed home invasion robbery. Segura was convicted of multiple related offenses following a jury trial and sentenced to 111 years in prison. Her convictions and sentence were affirmed on direct appeal, but the trial court later reduced Segura's sentence to 73 years.

Segura then filed a pro se motion for postconviction relief pursuant to Rule 35 of the Colorado Rules of Criminal Procedure ("Rule 35") in the trial court, raising 11 ineffective assistance of trial counsel claims. Segura, who was in prison and indigent, also requested that the trial court appoint counsel to represent her. The trial judge reviewed Segura's pro se motion, concluding that 10 of her 11 claims lacked merit and dismissed them accordingly.

As to the one remaining claim, the court found it arguably meritorious and forwarded Segura's pro se motion to the prosecutor's office and the Office of the Public Defender ("OPD") for further review and briefing. The OPD subsequently determined it could not represent Segura due to a conflict of interest, so an attorney from the Office of Alternate Defense Counsel ("OADC") was assigned to represent her. The OADC attorney briefed only the one claim that survived the trial court's initial screening of Segura's motion. The trial court held an evidentiary hearing on this claim and denied it on the merits.

Segura timely appealed, and the Court of Appeals affirmed in part and reversed in part. The appellate court affirmed the denial of the one claim the trial judge found initially meritorious but held that the trial court violated the plain language of Rule 35 by limiting the OADC attorney's representation to only the claim the trial court determined was arguably meritorious. Instead, the trial court should have appointed counsel to represent Segura without limitation with respect to her claims and then permitted the attorney to decide which claims to pursue on Segura's behalf, according to the appellate court.

The prosecution sought and was granted discretionary review in the Colorado Supreme Court, which affirmed in a unanimous opinion.

## Analysis

The Court granted certiorari review to determine whether the trial court erred by limiting postconviction counsel's representation of Segura to only the one claim it found arguably meritorious. This issue turned on the proper construction of Rule 35, which is reviewed de novo. *Hunsaker v. People*, 500 P.3d 1110 (Colo. 2021).

The Court stated that court rules are interpreted like statutes, meaning that if the plain language of the rule is unambiguous, the reviewing court must apply it as written. *People v. Steen*, 318 P.3d 487 (Colo. 2014). Or, as the Court elegantly explained, "[w]hen a rule 'is as clear as a glass slipper and fits without strain, courts should not approve an interpretation that requires a shoehorn.'" Quoting *Demko v. United States*, 216 F.3d 1049 (Fed. Cir. 2000). Instead, courts "simply apply the rule—i.e., 'merely to put [the glass slipper] on the foot where it belongs.'" Quoting *Lexington Ins. Co. v. Precision Drilling Co.*, 830 F.3d 1219 (10th Cir. 2016).

Based on the facts of the present case, the Court stated that Rule 35 unambiguously requires the trial court to appoint counsel for Segura without limiting the scope of postconviction counsel's representation. Rule 35(c)(3)(I)-(IX) delineates the procedures that must be followed for filing and resolving postconviction motions. Under subsection (c)(3)(IV), a trial court may deny a pro se motion without forwarding a copy to the prosecutor's office or the OPD if it concludes that the motion, the record, and the file show the defendant is not entitled to relief on any of the claims raised. But, under subsection (c)(3)(V), if the trial court determines that the pro se motion contains at least one claim with arguable merit and the defendant requests the appointment of counsel, it must forward the entire motion to the prosecutor's office and the OPD. That is, the trial court may not forward just the claim(s) it believes has arguable merit, the Court instructed.

The Court then explained the procedure the OPD must follow once it receives a non-frivolous postconviction motion: OPD must "file a response within forty-nine days indicating whether it has a conflict of interest and, if not, whether it intends to enter its appearance and whether it needs more time to investigate the defendant's claims. If the



**The Best 500+ Non-Profit Organizations for Prisoners & Their Families (7th edition)**

Only $19.99

Order from: **Prison Legal News, POB 1151**
**Lake Worth Beach, FL 33460**

561-360-2523

*Add $6 shipping for all book orders under $50.*

OPD enters its appearance, it must include in its response any additional claims that have arguable merit." Citing Rule 35(c)(3)(V). The trial court must then hold an evidentiary hearing on the claims raised by appointed counsel unless they can be resolved on the pleadings, the Court instructed.

But what the trial court may not do is "restrict the scope of postconviction counsel's representation," stated the Court. Instead, when, as in Segura's case, "a defendant files a pro se Crim. P. 35(c) motion that contains a request for counsel," the trial court can either deny the entire motion as frivolous or, if "at least one claim has arguable merit," the court "must grant the request for postconviction counsel and forward a complete copy of the motion to the prosecution and the OPD. The OPD must then determine which claims (if any) lack arguable merit and should be abandoned, which arguably meritorious claims (if any) should be supplemented, and which new claims (if any) have arguable merit and should be added," the Court instructed.

Because the trial court did not follow this procedure in Segura's case, the Court held that the trial court violated the plain language of Rule 35. This error was not harmless because the prosecution failed to raise that argument.

### Conclusion

Accordingly, the Court affirmed the Court of Appeals' decision vacating the trial court's order denying Segura's 10 uncounseled postconviction claims and remanded the case for further proceedings consistent with its opinion, i.e., appointed counsel must have unlimited discretion to decide which claims, including ones not raised by Segura, to pursue. See: *People v. Segura*, 558 P.3d 234 (Colo. 2024). 🪶

# Oregon Supreme Court Announces 60-Day Limit on Pretrial Custody Applies to Retrials

## *by Matt Clarke*

THE SUPREME COURT OF OREGON HELD that the provision of ORS 136.290 limiting a criminal defendant's pretrial custody to no more than 60 days also applies to retrials.

Anthony Lee Benjamin IV was tried for second-degree murder. A jury acquitted him of that charge but found him guilty of the lesser-included offense of first-degree manslaughter. The court sentenced him to 200 months' imprisonment.

In federal court, Benjamin successfully sought habeas corpus relief based on ineffective assistance of counsel. "The federal court's order terminated the state's authority to continue to hold defendant in custody for the purpose of serving his manslaughter sentence. Therefore, the state could not continue to hold defendant in custody unless it chose to retry him and hold him pending the retrial."

Benjamin was transferred into the custody of the Multnomah County Sheriff to await retrial. The trial court determined that he was indigent and set his bail at $500,000. After being held in excess of 60 days, Benjamin filed motions for his release pursuant to the 60-day limit under ORS 136.290. The court denied the motions, ruling that the 60-day limit does not apply to retrials. With the assistance of Portland attorney Megan E. McVicar, Benjamin filed a petition for a writ of habeas corpus in the Oregon Supreme Court.

While the petition was pending, Benjamin "pleaded no contest to the manslaughter charge and the trial court sentenced him to 120 months in prison, which was less time than defendant had already served for that offense. As a result, no trial was held and defendant was released from custody." Normally, this would moot his habeas action, but the Supreme Court exercised its discretion to proceed pursuant to ORS 14.175 because the case contained issues that were "capable of repetition" yet "evading judicial review." *Couey v. Atkins*, 355 P.3d 866 (Ore. 2015).

The Court noted that, under the general pretrial release statutes, ORS 135.230 to 135.295, a court must determine the terms of release—"security," "conditional," or personal recognizance—for a defendant who is eligible for release. All persons are eligible for release unless charged with murder, treason, or a violent felony and the court makes certain findings pursuant to ORS 135.240(2), (4) which was not done in this case. Further, the court must impose the "least onerous condition reasonably likely to ensure the safety of the public and the victim and the person's later appearance." ORS 135.245(3).

"In addition to the general pretrial release statutes, the legislature has enacted the statute at issue in this case, ORS 136.290, which establishes a 60-day limit on pretrial custody and a related statute, ORS 136.295, which sets out exception to the 60-day limit, identifies periods that do not count toward the limit, and provides for extensions of the limit," the Court observed. The Court stated that, taken together, the statutes require that a defendant be released on personal recognizance, in the custody of a third party, or "upon whatever additional reasonable terms and conditions" if trial is not commenced within 60 days of the person being taken into custody.

The State argued that ORS 136.290 does not apply to retrials because a person being retried is not "arrested," as provided in the statute. Following a long and detailed analysis of the statute's text, the Court disagreed.

Similarly, after an extensive discussion of the text, context, and legislative history of the statute, the Court held that it clearly places a 60-day limit on pretrial custody and contains no exception for retrials, meaning that the limit also applies to retrials. The Court instructed that on retrial, custody begins when the previous sentence is voided. From that point, the defendant is in custody, and the 60-day limit applies. Thus, the Court held the trial court erred in ruling that the 60-day limit does not apply to retrials and denying the defendant's motions for release.

Accordingly, because the defendant had already served his time and was released, the Court denied his habeas petition as moot. See: *Benjamin v. O'Donnell*, 557 P.3d 1089 (Ore. 2024).

*Editor's note*: Anyone with an interest in the fine details of the Court's statutory interpretation of ORS 136.290 based on the text of the statute, its context and related statutes, and legislative history—that is, the methodology set forth in *State v. Gaines*, 206 P.3d 1042 (Ore. 2009)—is encouraged to read the Court's full opinion. 🪶

# Recovering Deleted Messages

### by Michael Dean Thompson

It should come as no surprise that anything you delete on your device is not necessarily gone. Cops using forensic software can often look into a device's primary storage (as well as cloud storage) and pull up information that the user may have believed was permanently deleted long ago. That capability extends beyond images and documents. It can include items stored in databases like text messages and emails.

Two employees of the forensic software company Cellebrite highlighted the issue in a recent article in the industry magazine *Forensic*. The problem arises in how storage systems allocate space under the covers. Whether the storage is a file system or a database, with rare exceptions, that system will allocate space in discreet units, often called pages, such as 1024 bytes (1 KB), 2048 bytes (2 KB), 4096 (4 KB), or some other similar chunk. Data is then stored within the next available page as needed. When the data is deleted, the associated headers (rows of data that describe the information and point to the page(s) involved) and pages (if every datum on the page is deleted) are marked as deleted but not actually removed.

The article describes the process as the deleted data being moved into free pages. The process differs by the storage system so that this may be an accurate description for the software they describe, but it is unnecessary work to move deleted data to alternative locations to await intentional removal. Instead, deleted pages are generally reallocated only as needed, which may not be for a very long time—depending on the number of allocated pages.

Various storage systems have tools to overwrite deleted pages and reorganize them. Most PC users have seen this with "Defrag." For the database software highlighted in the article, SQLite, there is the command VACUUM that will purge the deleted data, though that may not be available to the end user. Note that for most tools, the deleted data purge is an effect of reorganizing the page layout rather than an actual intent to permanently remove deleted data.

Forensic tools like Cellebrite do not generally access storage through that storage system's software. For example, it may not use SQLite's tools to look at the underlying information. Rather, the forensic tools look directly at the underlying file structure or the raw data. This gives them significant access to data that would not be visible otherwise, along with a unique viewport into the data. There may be times that they cannot see the metadata (who sent what, when), but the content of one or more messages is merged together, a kind of inverse of what's often seen described regarding police surveillance of consumer communications.

Even with great storage hygiene, some clues may still exist that a message has been deleted. A messaging system may use sequential numbering to uniquely identify a message. In these cases, a numeric skip—say, from 29 to 31—may indicate that message number 30 was deleted while the dates and times of the surrounding messages provide temporal boundaries for when the message was sent or received.

Maybe it is natural that a Cellebrite evangelist would see message deletion as a nefarious act of someone intent on hiding a crime. But privacy is important to everyone. Prosecutors and spouses alike have long histories of intentionally misrepresenting meanings to satisfy their purposes. Being aware of the limits of even the best data hygiene practices can at least inform the user of the potential limits to private speech. 🔥

Source: *Forensic*

---

# Ninth Circuit Holds District Courts Have No Authority Under Rule 4 of Rules Governing § 2254 Cases to Dismiss Habeas Petition on the Merits

### by Sam Rutherford

The U.S. Court of Appeals for the Ninth Circuit delineated the scope of U.S. District Courts' authority to summarily dismiss a state prisoner's habeas corpus petition under Rule 4 of the Rules Governing Section 2254 Cases in the U.S. District Courts ("Rule 4"), holding that the U.S. District Court for the District of Montana erred in dismissing the defendant's petition on the merits because courts have no authority under Rule 4 to dismiss a petition on that basis. They may do so only if the petition is "facially defective" or "clearly not cognizable."

Patrick Neiss was convicted in Montana state court of deliberate homicide and evidence tampering based on circumstantial evidence. He filed a pro se federal habeas petition under 28 U.S.C. § 2254, claiming ineffective assistance of trial and appellate counsel. Neiss argued that his trial counsel failed to challenge the particularity of a search warrant, which led to the discovery of silencer-related internet searches on his computer, and that his appellate counsel failed to raise this issue on appeal.

The District Court dismissed Neiss' petition under Rule 4 without calling for an answer from the State. The court ruled that Neiss could not succeed on the merits of his ineffective assistance claims but did not find that the petition was either procedurally barred or patently frivolous. Neiss timely appealed, and the Ninth Circuit granted him a certificate of appealability only on the issue of whether his petition was properly dismissed under Rule 4.

Rule 4 authorizes a District Court to dismiss a habeas petition prior to the State submitting an answer "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." The Advisory Committee Note to Rule 4 states that the summary dismissal of a habeas petition "may be called for on procedural grounds, which may avoid burdening the respondent with the necessity of filing an answer on the substantive merits of the petition."

The Ninth Circuit has held summary dismissal under this rule, as defined by the Advisory Committee Note, is appropriate only if

the petition is "facially defective." Quoting *Boyd v. Thompson*, 147 F.3d 1124 (9th Cir. 1998). A state prisoner's habeas petition may be dismissed under this standard only when the face of the petition reveals that the petitioner's federal claims are procedurally defaulted, have not been exhausted in stated court, or are untimely. *See Valdez v. Montgomery*, 918 F.3d 687 (9th Cir. 2019) (facially untimely); *Boyd* (procedurally defaulted); *O'Bremski v. Maass*, 915 F.3d 418 (9th Cir. 1990) (failure to exhaust state remedies).

A habeas petition may also be summarily dismissed under Rule 4 if it asserts "claims that are clearly not cognizable." *Clayton v. Biter*, 868 F.3d 840 (9th Cir. 2017). But the U.S. Supreme Court and Ninth Circuit have long held that summary dismissal is appropriate under this standard only when the claims raised in the habeas petition are "vague," "conclusory," "palpably incredible," or "patently frivolous or false." *Blackledge v. Allison*, 431 U.S. 63 (1977); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990). The rule permits summary dismissal when the prisoner fails to state a federal claim but not when the prisoner alleges facts that, if true, could support granting relief. *Clayton*;

*United States v. Withers*, 638 F.3d 1055 (9th Cir. 2011); *Gutierrez v. Griggs*, 695 F.2d 1195 (9th Cir. 1983).

The Court noted that every other circuit has interpreted Rule 4 in the same manner. *See Moran v. Vose*, 816 F.2d 35 (1st Cir. 1987) (per curiam); *Ron v. Wilkinson*, 565 F.2d 1254 (2d Cir. 1977); *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993); *O'Blasney v. Solem*, 774 F.2d 925 (8th Cir. 1985).

In other words, federal claims that are not procedurally barred may be dismissed under Rule 4 only if they are "frivolous or incredible." A claim meets this standard only when it is "[l]acking a legal basis or legal merit; manifestly insufficient as a matter of law." Definition of "frivolous," *Black's Law Dictionary* (12th ed. 2024). As the Court explained, "the standard is not whether the claim will ultimately—or even likely—succeed or fail, but rather, whether the petition states a cognizable, non-frivolous claim." *Hendricks*.

Turning to the present case, the Court concluded that the District Court misapplied Rule 4. To begin with, the Court did not find, and the State did not argue, that his claims were procedurally barred. Neiss raised his

ineffective assistance claims in state court both on direct appeal and postconviction review, and the Montana Supreme Court rejected them in a divided opinion. He then filed a timely, properly formatted habeas petition in the District Court asserting these same claims. The petition was therefore not subject to summary dismissal as being "facially defective," according to the Court.

Next, Neiss' ineffective assistance claims also were not frivolous, the Court determined. When the Montana Supreme Court rejected them on postconviction review, one Justice dissented and believed that he was entitled to relief. This fact, according to the Court, demonstrates that his petition was not frivolous because "jurists can disagree about the merits of his claim." Thus, the Court held that because Neiss' petition was not procedurally barred and alleged "a cognizable, non-frivolous claim," the District Court erred by summarily dismissing it on the merits under Rule 4.

Accordingly, the Court reversed the judgment of the District Court and remanded the case for further proceedings consistent with its opinion. See: *Neiss v. Bludworth*, 114 F.4th 1038 (9th Cir. 2024).

# Scent of Death Evidence Admitted at Indiana Murder Trial

### *by Sam Rutherford*

IN MAY 2024, JOHN HALLETT, 54, OF Michigan City was found guilty of murdering his roommate and then dismembering the body. Prosecutors obtained the conviction by relying on novel "scent of death" evidence to prove Hallett had stored the remains in his basement before throwing them in the trash.

In 2017, Hallett choked his roommate, Paul Gonzales, 64, to death and then left his body on the basement floor of their residence for several months. Hallett then dismembered the corpse with a hacksaw and disposed of the remains in municipal trash cans. The body likely ended up in a landfill and was never recovered.

Five years later, Hallett contacted police and confessed to the killing. Without a body, however, police were concerned they wouldn't get a conviction. They had to find a way to prove that Hallett stored a corpse in his basement. Cadaver dogs were previously alerted to signs of decomposition in the basement, but that evidence needed to be confirmed.

An officer with the Michigan City Police Department contacted forensic scientist and

professor John Goodpaster for help. Goodpaster specializes in what he calls "chemistry for the public interest." He is a professor in the Department of Chemistry and Chemical Biology as well as the Forensics and Investigative Sciences program, both at Indiana University.

Goodpaster has developed a method for determining whether a body was left to decompose at a particular location. It's called scent of death. As a body decomposes, it emits various chemical compounds that smell like a potpourri of cabbage, garlic, overripe cheese, and decaying fish.

Police pulled up fragments of the basement floor where they believe Hallett stored the corpse, as well as other pieces of the floor as control samples. Goodpaster used a gas chromatography-mass spectrometry, a highly sensitive instrument used for detecting compounds at low concentrations, on the fragments.

He found carboxylic acids compounds, consistent with decomposition, in some of the concrete samples. According to Goodpaster, the concrete had no noticeable scent, since

several years had passed. However, in an effort to clean up, Hallett painted the concrete floor, which may have sealed in the compounds and enabled Goodpaster to detect them.

Prosecutors then had to convince the trial court to admit this evidence. The judge held an hour-long *Daubert* hearing, named for the landmark decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), in which the U.S. Supreme Court enunciated a legal test many courts rely on to determine whether novel scientific evidence is admissible.

The judge ultimately ruled that scent of death evidence satisfies this standard and permitted Goodpaster to testify about his findings at Hallett's trial. According to Goodpaster, "That set the precedent in the state of Indiana."

Hallett was sentenced to 65 years in prison for the murder. He is likely to appeal the conviction by challenging the admission of scent of death evidence at trial.

Sources: *wsbt.com, news.iu.edu*

# Georgia Supreme Court Grants Habeas Relief Where Both Trial and Appellate Counsel Provided Ineffective Assistance by Failing to Challenge Indictment for Residential Burglary That Failed to Allege Defendant Illegally Entered a 'Dwelling'

*by Anthony W. Accurso*

THE SUPREME COURT OF GEORGIA unanimously granted a defendant's habeas petition on the ground both his trial and appellate lawyers provided ineffective assistance of counsel based on the fact his first-degree burglary conviction was improper where the building he robbed was not "the dwelling of another" but rather a business.

On the evening of June 12, 2013, Alfred Moore and an accomplice dressed as police officers and knocked on the door of a building on Log Cabin Drive in Macon. The building was originally designed as a residential home but was used as the office for several restaurants owned by Luis Rodriguez. Moore and his accomplice presented a fake search warrant and, once inside the office, bound Rodriguez and his administrative assistant at gunpoint. They proceeded to steal $2,600 and fled.

In October 2013, Moore, along with his co-defendant, was indicted for first-degree burglary, two counts each of armed robbery, aggravated assault, false imprisonment, impersonating an officer, and possession of a firearm during the commission of a felony. In the indictment, the count titled "Burglary in the First Degree, OCGA § 16-7-1 (b)" alleged that Moore "without authority and with the intent to commit [a]rmed [r]obbery, a felony therein, enter[ed] the business of Luis Rodriguez…."

At trial, the prosecution presented Rodriguez and his assistant, who identified Moore and the accomplice as the robbers. During closing arguments, the court explained that armed robbery is a felony and instructed, "It's only necessary that the evidence show beyond a reasonable doubt that [Moore] did, without authority, enter the place described in the [i]ndictment with the intent to commit the alleged felony, that being [a]rmed [r]obbery."

Trial counsel did not challenge this statement that made no reference to a dwelling. Moore was convicted and sentenced to 45 years in prison, including 20 years for the first-degree burglary conviction.

On direct appeal, appellate counsel failed to raise the issue of whether the indictment alleged sufficient facts to convict Moore of first-degree burglary and to object to the improper standard for convicting him on this count.

In March of 2020, Moore filed a habeas motion on the ground that OCGA § 16-7-1(b) provides, in part, that a person commits the crime of first-degree burglary when he, without authority and with the intent to commit a felony, enters a "dwelling house of another" or a building "designed for use as the dwelling of another," yet the indictment alleged that he committed first-degree burglary only by "enter[ing a] business."

Since the first-degree burglary count did not allege that Moore entered a "dwelling house" or a building designed for use as a "dwelling," Moore argued that the count failed to allege all the essential elements of first-degree burglary, and his appellate counsel should have raised the issue of his trial counsel's failure to object to that failure. He did acknowledge that the prosecution alleged sufficient facts to meet the basic elements of second-degree burglary, which carries a maximum of five years in prison.

Moore's habeas petition was denied, and he timely appealed.

The Court began its analysis by noting the standard for ineffective assistance, where Moore "must show that appellate counsel performed deficiently—i.e., that she 'performed [her] duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms'—and that the deficiency prejudiced Moore's direct appeal—i.e., that but for counsel's unprofessional errors, the result of Moore's direct appeal would have been different." *Strickland v. Washington*, 466 U.S. 668 (1984); *Cartwright v. Caldwell*, 825 S.E.2d 168 (Ga. 2019).

An indictment must "contain every allegation essential to constitute the crime." *Sanders v. State*, 869 S.E.2d 411(Ga. 2022). A necessary element of the charged crime of first-degree burglary is that the defendant entered or remained within a "dwelling house" or building designed for use as a "dwelling." *Dupree v. State*, 815 S.E.2d 899 (Ga. 2018).

Turning to the present case, the Court noted that the indictment omitted any reference to a "dwelling house" or a building designed for use as a "dwelling," so it failed to allege an essential element of first-degree burglary. Because the indictment failed to allege all the essential elements of first-degree burglary, it was subject to a "special demurrer," which "challenges the sufficiency of the form of the indictment." *Kimbrough v. State*, 799 S.E.2d (Ga. 2017). A special demurrer must be filed within 10 days of arraignment, unless the time for filing is extended by the trial court. OCGA § 17-7-110. But trial counsel never filed a special demurrer.

The Court concluded that "[t]rial counsel's failure to raise the issue of the defective first-degree burglary count by special demurrer was not a reasonable trial tactic or strategy," and "the requirement in OCGA § 16-7-1(b) that the defendant entered or remained within a type of 'dwelling' of another person was not difficult to discern…." Thus, the Court determined that Moore met his burden of establishing trial counsel performed deficiently.

As for prejudice, the Court wrote, "[a]bsent trial counsel's failure to file a special demurrer, it is reasonably probable that the result of the trial would have been more favorable to Moore" because, "had counsel filed a timely special demurrer before trial … the trial court should have granted it." Thus, Moore also satisfied his burden of establishing that but for counsel's deficient performance "it is reasonably probable that the result of the trial would have been more favorable to Moore," the Court concluded.

Because Moore met his burden of proving that his trial counsel provided constitutionally ineffective assistance, the Court concluded that any deficiency in appellate counsel's failure to raise the ineffectiveness-of-trial-counsel claim prejudiced his appeal as well. Thus, the Court held that the habeas court erred in denying relief.

Accordingly, the Court reversed the habeas court and remanded the case with directions to enter an order vacating the first-degree conviction and to grant other appropriate relief consistent with its opinion. See: *Moore v. White*, 2024 Ga. LEXIS 243 (2024).

# THE PLRA HANDBOOK

**Law and Practice under the Prison Litigation Reform Act**

## By John Boston
### Edited by Richard Resch

*The PLRA Handbook* is the best and most thorough guide to the PLRA in existence and provides an invaluable roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims.

Anyone involved in federal court prison and jail litigation needs *the PLRA Handbook* – lawyers, judges, court staff, academics, and especially, pro se litigants.

Although *the PLRA Handbook* is intended primarily for litigators contending with the barriers the PLRA throws up to obtaining justice for prisoners, it'll be of interest and informative for anyone wishing to learn how the PLRA has been applied by the courts and how it has impacted the administration of justice for prisoners. It is based primarily on an exhaustive review of PLRA case law and contains extensive citations.

John Boston is best known to prisoners around the country as the author, with Daniel E. Manville, of the *Prisoners' Self-Help Litigation Manual* – commonly known as the "bible" for jailhouse lawyers and lawyers who litigate prison and jail cases. He is widely regarded as the foremost authority on the PLRA in the nation.

*"If prisoners will review The PLRA Handbook prior to filing their lawsuits, it is likely that numerous cases that are routinely dismissed will survive dismissal for failure to exhaust."*

*— Daniel E. Manville, Director, Civil Rights Clinic*

---

***THE PLRA HANDBOOK***

Paperback, 576 pages

**Prisoners: $84.95**

**Professionals: $224.95**

*(includes shipping)*

**Order by mail, phone, or online.** Amount enclosed _____

By: ☐ check  ☐ credit card  ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Human Rights Defense Center** PO Box 1151 • Lake Worth Beach, FL 33460
**Dedicated to Protecting Human Rights** Tel 561-360-2523 • www.prisonlegalnews.org

# Washington Supreme Court Declines to Expand Scope of Attenuation Doctrine Under State Constitution and Reverses Murder Conviction Based on Unlawfully Seized Evidence

*by Sam Rutherford*

THE SUPREME COURT OF WASHINGTON clarified the scope of the attenuation doctrine under Article I, § 7 of the Washington Constitution, holding that the doctrine applies only when an event supersedes the original tainted police conduct to produce new evidence used in a warrant application but not when only a new reason for using the illicitly obtained evidence emerges. In so ruling, the Court overturned a defendant's murder conviction and remanded for a new trial.

## Background

On June 3, 2017, King County Sherriff's Office ("KCSO") Deputy Alexander Hawley observed a man get into the passenger seat of a silver Chrysler Sebring with tinted windows in Burien, Washington. The car drove less than a block, after which it stopped, and the man got out of the passenger side, placing something in his pocket.

Hawley followed the Chrysler and pulled it over. This traffic stop was later ruled unlawful because it was conducted without reasonable suspicion of criminal activity. As a result of the stop, Hawley learned the vehicle was driven by Malcom Otha McGee. Hawley obtained McGee's phone number and also seized drugs and other items associated with drug dealing from the vehicle. During questioning, McGee admitted to Hawley that he and the man seen exiting his vehicle, later identified as Keith Ayson, had a drug-dealing relationship. McGee claimed Ayson was his drug dealer. Hawley told McGee he would not arrest him for drug dealing in exchange for his agreement to work as a confidential information. McGee agreed but never followed through with the arrangement. Hawley released McGee without arresting him.

Hawley then returned to the area where he first observed the silver Chrysler and located Ayson sitting behind a local business. Hawley informed Ayson of his conversation with McGee. Ayson denied being a drug dealer and instead said that he had been buying crack cocaine and marijuana from McGee, whom he knew as TJ, for about two months. Hawley concluded that he had been duped by McGee and recorded his interactions with McGee and Ayson in a police report, which included McGee's phone number.

The next day, June 4, a 911 caller reported hearing gunshots near his home. The caller and his friend reported seeing a silver Chrysler parked at a dead-end near the house. They observed two Black men walking near the vehicle prior to hearing the gunshots and then saw the vehicle drive off. Police investigated but found nothing that day.

About five weeks later, on July 11, the same 911 caller found a decomposing body in a wooded area near the dead-end. The person had been shot multiple times. The body was later identified as Ayson. Police found a cellphone on Ayson's body but were unable to obtain any information from it other than its phone number.

KCSO Detective Michael Glasgow was assigned to investigate the homicide. He searched Ayson's name in a police database and located Hawley's report about his June 3 traffic stop of and interaction with McGee and Ayson. Glasgow used the information gleaned from this report to identify McGee as a potential suspect. Glasgow applied for search warrants of McGee and Ayson's cellular service providers. The warrant relied heavily on information from Hawley's unlawful traffic stop. Cellphone records showed McGee had made two calls to Ayson on June 4, and cell-site location data placed them in the same vicinity.

Police used the evidence obtained from the first warrant, as well as information from the tainted traffic stop, to secure other search warrants that led to additional evidence implicating McGee in Ayson's murder. McGee was arrested and charged with Ayson's murder and for drug dealing based on Hawley's traffic stop. His defense attorney moved to suppress all evidence seized by Hawley during the traffic stop as well as evidence seized pursuant to warrants obtained based on evidence acquired during Hawley's unlawful detention and questioning of McGee.

The trial court agreed that Hawley's traffic stop on June 3 was unlawful and suppressed the drug evidence seized as a result, dismissing the drug dealing charge against McGee. But the trial court refused to suppress the evidence seized pursuant to the warrants obtained based on information acquired during that tainted traffic stop, ruling that Ayson's murder sufficiently attenuated the traffic stop from the warrant applications.

McGee was subsequently convicted of Ayson's murder and sentenced to 358 months in prison. The Court of Appeals reversed his conviction, ruling that the trial court erred in admitting evidence obtained through the search warrants because they were based on evidence acquired during the unlawful traffic stop.

The State sought and was granted discretionary review in the Washington Supreme Court.

## Analysis

The Court framed the legal issue in the case as follows: "whether our attenuation doctrine allows police to apply for a warrant using tainted evidence when a new circumstance—here, an independent criminal act—lends new significance to the knowledge they gained from that evidence." The Court's answer was "no."

Article I, § 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The State did not dispute that Hawley's traffic stop of McGee on June 3 was unlawful and that all the evidence and information Hawley acquired as a result of that stop was obtained in violation of Article I, § 7. The State also did not dispute that probable cause for the warrants Glasgow subsequently obtained to locate evidence linking McGee to Ayson's murder were based entirely on evidence derived from the traffic stop. Despite these concessions, the State contended that the evidence seized pursuant to the warrants was nonetheless admissible under the attenuation doctrine.

Typically, evidence derived from a violation of either the Fourth Amendment to the U.S. Constitution or Article I, § 7 is suppressed, the Court stated. However, unlike the Fourth Amendment exclusionary rule that has many exceptions, the Article I, § 7 exclusionary rule is "nearly categorical," according

to the Court. *State v. Winterstein*, 220 P.3d 1226 (Wash. 2009). In fact, the Washington Supreme Court has recognized only two exceptions to the exclusionary rule under the state Constitution—(1) the independent source doctrine, not at issue in McGee's case, and (2) the attenuation doctrine. *See State v. Gaines*, 116 P.3d 993 (Wash. 2005) (recognizing the independent source exception); *State v. Mayfield*, 434 P.3d 58 (Wash. 2019) (recognizing the attenuation doctrine but narrower in scope than federal counterpart). The Court explained that this is so because, unlike the Fourth Amendment exclusionary rule whose primary purpose is to deter police misconduct, the main purpose of Washington's exclusionary rule is to protect individual privacy rights. *See* Justice Charles W. Johnson & Justice Debra L. Stephens, *Survey of Washington Search and Seizure Law: 2019 Update*, 42 Seattle Univ. L. Rev. 1277, 1455 (2019).

Unlawfully seized evidence is admissible under Washington's attenuation doctrine only when a "superseding cause" has truly severed the connection between an illegal search and the discovery of evidence. *Mayfield*. The Court defined superseding cause as an "'unforeseeable intervening circumstance that genuinely severs the chain of causation between official misconduct and the discovery of evidence,' giving law enforcement a new, legal basis upon

which to conduct their search or seizure." *Id.* (cleaned up). This superseding cause must "occur between the misconduct and the discovery of evidence to be used." *Id.*

The State asked the Court to reformulate Washington's attenuation doctrine so that it applies whenever a superseding event occurs after an unlawful search but before the State seeks to use the unlawfully seized evidence—in this case, McGee's murder of Ayson. The Court, however, rejected this approach because it would water down Washington's strict exclusionary rule by allowing police to unlawfully gather evidence and then keep that evidence on hand in hopes that it will become relevant in solving some future crime. Such an approach is inconsistent with Article I, § 7 because "it fails to deter downstream privacy violations," the Court reasoned.

Consequently, the Court concluded that Washington's attenuation doctrine did not justify the State's use of evidence unlawfully seized from McGee. Hawley indisputably violated his privacy rights under Article, § 7 by conducting the traffic stop and obtaining evidence—namely, McGee's phone number, the make of his car, the allegation that he was a drug dealer, and his association with Ayson—whose relevance did not become apparent until after Ayson's murder. The police then relied on the fruits of Hawley's

unlawful detention to obtain search warrants and additional evidence linking McGee to Ayson's murder. Thus, the Court ruled that none of this evidence was admissible under the attenuation doctrine because the State failed to establish "any superseding event that produced new *evidence* used in the warrant application, only a new *reason* to make the illegally obtained evidence useful."

### Conclusion

Accordingly, the Court affirmed the Court of Appeals' decision reversing McGee's murder conviction and remanding for a new trial at which the State will be prohibited from using any evidence derived from the unlawful traffic stop predating Ayson's death. See: *State v. McGee*, 2024 Wash. LEXIS 541 (2024).

*Writer's note*: This case was decided under the Washington Constitution, not the Fourth Amendment. The evidence seized from McGee during the traffic stop on June 3, 2017, would have been admissible under the Fourth Amendment's formulation of the attenuation doctrine. Therefore, readers should only rely on this decision outside Washington if their respective state's constitution has been, or can be, interpreted as providing greater privacy protections than the Fourth Amendment.

# Las Vegas Jury Finds Detectives Fabricated Evidence Against Woman Who Spent 15 Years in Prison for Murder and Awards Her $34 Million

*by James Mills*

A Nevada jury ruled that two Las Vegas homicide detectives fabricated evidence against a local woman in a 2001 murder. Kirstin "Blaise" Lobato was awarded more than $34 million in a verdict which was read aloud on December 12, 2024.

The jury awarded Lobato $34 million in compensatory damages and $20,000 in punitive damages. She gasped upon hearing the verdict and began crying and embracing her attorneys.

She spoke to reporters outside the courthouse while smiling widely. "It's been an uphill battle with many, many obstacles" she said. "I'm happy that it's all finally finished."

The jury found that Las Vegas Metro-

politan Police Department Detectives Thomas Towsen and James Rochelle fabricated evidence against Lobato, intentionally inflicting "emotional distress."

She served 15 years in prison and was only released in 2018, after the district attorney's office declined to bring her to trial for a *third* time. A judge vacated her second conviction, ruling that she had received ineffective assistance of counsel, after new evidence was presented showing that Lobato had been at her parents' home in Panaca, Nevada, when Bailey was killed. Panaca is located more than 100 miles away from Las Vegas. On October 30, 2024, a court issued a certificate

of innocence, declaring Lobato innocent of Bailey's murder.

Lobato's attorneys accused both detectives of framing her for the murder of Duran Bailey who was found dead in 2001, beaten and mutilated. In their closing arguments, Lobato's attorneys claimed that either the detectives knew that Lobato was innocent or were indifferent to the possibility of her innocence. In either case, they violated evidentiary rules. "What happened to Blaise Lobato is unjust, and we're asking you to right that injustice," one of her attorneys said in closing.

Source: *reviewjournal.com*

# Why Aren't Eligible Individuals Taking Advantage of Expungement Laws?

*by Michael Dean Thompson*

THE MAJORITY OF STATES ACROSS THE U.S. now allow people who have been convicted of some felonies to have the record of their conviction removed. The complete expungement of felony records allows the convicted person to live as if the conviction never occurred. However, very few people seem to be taking advantage of this process. Instead, only between one and six percent of people eligible to clean their records of their felony conviction do so. A recent study in the *Indiana Law Journal* examined expungement laws and practices across the country in an attempt to discover why that might be.

The immediate consequence of a felony conviction is obvious. But beyond the sentence, there exist a significant number of collateral consequences that extend the effective punishment well beyond the sentence. For many, it can mean the explicit loss of voting rights, diminished access to federal benefits like SNAP, and restricted access to occupational licenses. Furthermore, a felony record permits employers to legally discriminate against a person. By one estimate, these systemic hurdles prevent up to 1.7 million people from joining the workforce.

Rather than creating laws that bar discrimination against the formerly incarcerated, legislatures have taken a more haphazard approach. States that allow felony expungement may not restore voting rights or the right to own a gun. They may eliminate the open record of the conviction but leave the arrest record visible. And while they may prevent the government's dissemination of the information, they may do nothing to stop private data brokers from doing so. Furthermore, the states vary on which felonies are eligible for expungement.

States also tend to take the stance that expungement is an affirmative right. Rather than taking place automatically after the successful completion of the sentence and its associated waiting period, expungement requires that the affected individuals actively seek out the remedy. That also means that to achieve expungement, the individual must enter into the often adversarial systems in which a prosecutor may challenge the expungement. Most of the people eligible for expungement who attempt to clear their felonies will do so without representation. The *pro se* applicants must clear significant hurdles that can challenge even practicing attorneys. As a result, the *pro se* petitioner can find the entire process both emotionally and financially daunting.

## Statute Complexity

The study first examined the statutes of the states that allow expungement of felony records. The goal was to determine the complexity of the law itself and the language used to express it. In effect, whether the law would be comprehensible to the person seeking to clear their record such that they can perform the necessary steps to achieve it. They found that the vast majority of statutes were not comprehensible to both lay people and even law students.

The team examined the readability of statutes using the Flesch-Kincaid Grade Level Formula. The formula works by measuring the length of the sentences as well as the length of the words. The assumption is that longer sentences are more difficult to parse and longer words tend to be less common. As the average American reads at the seventh or eighth grade level, statutes with higher grade level assessments can become unreadable. The study targeted statutes written at the twelfth-grade reading level.

The study also judged the complexity of the language itself. They did this by asking law students to review the statutes and identify the number of readings it took to understand the text. A statute that was able to be understood in fewer than five readings was deemed readable. That is a bit more permissive than the federal Plain Writing Act, which defines plain writing as "communication your audience can understand the first time they read or hear it."

The study found that the statutes were not comprehensible. Eleven of the 32 states that allow for some felony expungement scored at grade 18 or higher—the equivalent of a graduate degree. Only eight states scored below a twelfth-grade level. In addition, seven states required eight or more readings by the law students to understand them. New York took nine reads by a student and scored at grade level 20, making it one of the least comprehensible statutes in existence. Interestingly, Rhode Island scored a reading level of 22 while it was parsed by the students in just five passes. The researchers believed its high score on the reading level was likely due to its reliance on lengthy sentences. One such sentence was 157 words long that described what a successful expungement might do. North Dakota, on the other hand, scored as the most readable in terms of both grade level and complexity. It therefore illustrated how expungement statutes do not need to be overly complex as expungements generally deal with binary conditions (if this is true, then X) and numbers (e.g., five years).

## Self-Help Tools

The study followed up by looking at how much instruction is available to an applicant. They specifically looked for material generated by the courts rather than legal-aid offices and private attorneys, as well as forms that an applicant could understand and fill out. Much like the statutes, they looked to determine complexity by evaluating grade level and readability of the self-help instructions and forms. Of particular interest was whether the documents simply regurgitate the complex statute language or whether they had re-phrase it to be easier to read and understand.

More than two-thirds of the 32 states offer online self-help instructions. Twenty-one states provide forms to facilitate the process, 11 of which are readable at an eighth-grade level or lower. Two states find it useful to offer a form without self-help instructions while three states offer self-help but fail to offer forms.

With regard to the most accessible self-help, Michigan stands out to the study authors. The form petition is clear and uses plain language at a seventh-grade level, including simple, understandable check boxes. The authors highlighted one such check box: "I am requesting only one felony to be set aside. At least five years have passed since sentence was imposed or discharge from imprisonment, probation, or parole for the conviction, whichever is later. I have not been convicted of any offense during that time."

Colorado likewise merits praise with its

short sentences presenting Yes/No questions that are easy enough to understand. New Hampshire, in contrast, provides a form that has a reading level of grade 14 that is difficult to parse.

There are seven states that offer no form or self-help. Among those is North Dakota, the state with the most readable statute. For the formerly incarcerated seeking to expunge their criminal records, the path forward is unclear. They will likely struggle with determining how to format the request as well as exactly how to present the pertinent facts.

## Criminal Records

The applicant's criminal record is key among the facts that any form or request requires. These data are often scattered across a variety of agencies. The typical petition includes information like the qualifying offense; whether the waiting period has been met; whether there have been more arrests since then; and whether all offense-related restitutions, fines, and fees have been paid.

The FBI record of arrests and prosecutions ("FBI RAP") report is considered to be "the most comprehensive picture of one's criminal history," according to the study's authors. Sadly, beyond the FBI RAP and commercial third-party background checking organizations, there are no other centralized resources for gathering the information across the various jurisdictions. Most of the self-help tools provided by the states also recommend using FBI RAP, even to the point of requiring it as part of the request.

FBI RAP has problems, though. It turns out that states do not always share the appropriate data. A VERA study in 2023 found significant differences between state and FBI Uniform Crime Report data. It turns out that only 8 in 10 agencies actually submit to the Uniform Crime Report. A higher percentage, 93.5%, of agencies in 2022 submitted to the National Incident-Based Reporting System and Summary Reporting System, upon which the RAP also relies. Nevertheless, FBI RAP does not provide any information necessary for completing two of the four data requirements (whether the waiting period has expired and whether the associated fines and fees have been paid), leaving the applicant to search for the data they need to complete the request. The National Crime Center Information Center sometimes reports on sentence completion, satisfying the wait period requirement, but the reports are unavailable to private lawyers and *pro se* applicants.

## Procedures and Applicants

It is not enough to submit a form and all the associated documentation to obtain an expungement. Challenges can arise in knowing to whom the petition should be served, how the hearing might progress, and how much the effort will cost. These unknowns can often be inscrutable to applicants, providing further hurdles that seem insurmountable.

The typical procedure for expungement petitions—in about two-thirds of the states—the petitioner must serve the prosecution. In some states, the petitioner is also required to serve the appropriate law enforcement agencies. In Minnesota, the petitioner is required to serve any agency and jurisdiction with records that would be affected by the order. In New Jersey, seven separate agencies must be served.

It may not always be clear what an petitioner should expect at a hearing. The rules affecting who can participate, what types of evidence are admissible, and who is allowed to speak can vary considerably. Sadly, the majority of states do not mention the hearing proceedings within the governing law. No state has published a comprehensive set of hearing rules. That can result in a haphazard approach to hearings that differs by county in a single state. Even the burden of proof can vary by state—from a "clear and convincing" standard in North Dakota to one that is completely undefined in New Mexico. It would be of little consequence if hearings were rarely held, but that is not the case. All but six states mandate a hearing in all cases or when prosecutors object.

Hearing procedures can vary dramatically. Each court can differ in the evidence it accepts and in what order the procedures run. Some judges require the petitioner to testify in court, which may run afoul of the petitioner's Fifth Amendment rights. Others may allow prosecutors to submit evidence that the petitioner has not seen and may not be prepared to address. In Nevada, for example, the legislature made no effort to standardize the procedural or evidentiary rules for the hearing.

A petitioner who has surmounted these challenges must then find a way to pay the fees associated with the expungement. These fees serve only to block otherwise eligible petitioners from receiving an expungement order. This is the reason the study found that income serves as a barrier, blocking the very purpose of expungement—to improve access to better wages.

A separate fee sometimes arises once an expungement has been granted. This is at least somewhat more reasonable, as the petitioner pays that fee only if they are successful. For example, in the case of Rhode Island, there is no filing fee, but there is a processing fee of $100 upon a successful expungement. Other states require both fees to be paid with neither fee being insubstantial.

## Implications of the Uptake Gap

The barriers to successful expungement often originate from legislatures that have created laws without regard to how they will be implemented. This leaves the courts and agencies to administer statutes that are vague or unreasonably difficult to implement. Additionally, the statutes do not seem to consider that most of those who wish to take advantage of the expungement policies will do so *pro se*. These statutes are often difficult to understand, even for law students, because they require a reading-proficiency level well above that of the average American. And those applicants who somehow manage to successfully navigate their way through the statutes and self-help forms (if even offered), gather the requisite information and reports, corral the necessary witnesses, and pay the associated fees may still find themselves in a hearing without defined rules and procedures and facing a hostile prosecutor without the benefit of an attorney. It's little wonder that the expungement rate is so abysmally low.

The intent of the expungement laws is to enable those who qualify to throw off the yoke of their previous failures. As Delaware's expungement law aptly puts it: "The General Assembly finds that a criminal history is a hindrance to a person's present and future ability to obtain employment, housing, education, or credit. This subchapter is intended to protect persons from unwarranted damage which may occur when the existence of a criminal history continues indefinitely."

It is great that states are taking this seriously and expanding the list of offenses that can be expunged. However, if they desire to see the statutes actually help fulfill their stated purpose, more attention must be paid to the *pro se* petitioner. Better still, make expungement an automatic process, requiring no action from the individual beyond meeting the statutory criteria. That would ensure a 100% success rate. ◆

Source: *Indiana Law Journal*

# Maryland Supreme Court Announces New Constitutional Rule Requiring Voir Dire Questions Related to Child-Witness Credibility and Abrogates Prior Inconsistent Case Law

*by Sam Rutherford*

THE SUPREME COURT OF MARYLAND announced a new rule of constitutional law permitting defendants to ask potential jurors during jury selection whether they are predisposed to believe or disbelieve a child-witness whenever (1) grounds exist to reasonably conclude that jurors may be more or less likely to believe the child's testimony based solely on the child's age and (2) when the child's testimony is important to the case. In so holding, the Court partially abrogated its prior decision in *Steward v. State*, 923 A.2d 44 (Md. 2007). The Court also took the opportunity to clarify the law related to voir dire in Maryland.

## Background

In May 2022, Charles Mitchell was convicted of sexually abusing his minor daughter and sentenced to 25 years in prison, with all but five years suspended. No one witnessed the alleged abuse, and the defense theory was that an adult had coached Mitchell's 10-year-old daughter to testify against him.

During jury selection, defense counsel asked the trial court to ask potential jurors the following question: "Do you have any concerns about a child testifying? Does anyone not believe that a child is capable of lying about a serious crime like this?" The trial court agreed to ask the first part of the question but refused to ask the second part. However, the court did ask whether potential jurors would give more or less "weight to the testimony of a police officer merely because the witness is a police officer?" No prospective juror answered affirmatively to these questions.

Mitchell timely appealed his conviction, arguing that the trial court violated his right to a fair and impartial jury by refusing to ask during voir dire whether any of the prospective jurors were more or less likely to believe a child-witness based solely on his or her age. The Maryland Appellate Court affirmed. Although acknowledging that trial judges must ask voir dire questions designed to reveal a specific cause for disqualification, the Maryland Supreme Court held in *Steward* that questions concerning the credibility of child-witnesses do not support disqualification for cause and therefore need not be asked.

The Maryland Supreme Court granted discretionary review and reversed.

## Analysis

The Court began its analysis by noting that the "Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee criminal defendants the right to a fair and impartial jury," and this right means "that members of the jury not hold biases that are directly related to the defendant, the crime(s) with which the defendant is charged, or the witnesses who will testify in the case."

"The primary mechanism to identify such disqualifying biases among potential jurors is voir dire," the Court stated. *Curtin v. State*, 903 A.2d 922 (Md. 2006). But Maryland has a somewhat unique limited voir dire system—while it is designed to ferret out "the existence of specific cause for disqualification," it is not intended to facilitate an attorney's "intelligent exercise of peremptory challenges." *Pearson v. State*, 86 A.3d 1232 (Md. 2014). That is, trial judges, not the attorneys, ask voir dire questions during jury selection, and they have broad discretion in the types of questions asked. While attorneys may propose specific questions, judges are only required to ask those questions "reasonably likely to reveal specific cause for disqualification." *Kazadi v. State*, 223 A.3d 554 (Md. 2020).

"There are two categories of specific cause for disqualification: (1) a statute disqualifies a prospective juror; or (2) a collateral matter is reasonably liable to have undue influence over a prospective juror." Quoting *Collins v. State*, 205 A.3d 1012 (Md. 2019). The second category comprises "biases directly related to the crime, the witnesses, or the defendant." *Id.* The question presented in the present case was whether Mitchell's proposed question about child-witness testimony falls within this second category.

In *Steward*, the Maryland high court held that trial judges are not required to ask voir dire questions such as "How many of you believe children always tell the truth?"; "Do you believe children are more or less honest than adults?"; or "Would you automatically believe an adult over a child or a child over an adult who testifies?" It reasoned that such questions do not fall "within the mandatory areas of inquiry" because they are not "reasonably likely to reveal cause for disqualification and none of them dealt specifically with the



# DIRECTORY OF FEDERAL PRISONS

## The Unofficial Guide to Bureau of Prisons Institutions

### BY CHRISTOPHER ZOUKIS

The Directory of Federal Prisons is the most comprehensive guidebook to Federal Bureau of Prisons facilities on the market. Not simply a directory of information about each facility, this book delves into the shadowy world of American federal prisoners and their experiences at each prison, whether governmental or private. What sets the Directory of Federal Prisons apart from other prison guidebooks is the first-hand validation of information.

**Price: $99.95** *(shipping included)*

Name _____ DOC/BOP # _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____

**Prison Legal News • PO Box 1151, Lake Worth Beach, FL 33460**
**Tel. 561-360-2523 • www.prisonlegalnews.org**

facts of the case, the crime, the witnesses, or [the defendant] himself."

Mitchell argued, and the Court agreed, that *Steward* was wrongly decided and should be overruled based on its lack of "specific reasoning" rejecting the proposed questions and because of significant changes in the law governing voir dire.

To begin with, the Court explained that Maryland courts have long held that trial judges must ask potential jurors if they will give more or less weight to witness testimony based solely on the status of the witness. *Langley v. State*, 378 A.2d 1338 (Md. 1977), for example, held that judges must ask jurors whether they would give "greater weight" to a police officer's testimony at least when such testimony is central to the prosecution's case. Similarly, in *Bowie v. State*, 595 A.2d 448 (Md. 1991), the court held that judges must ask jurors whether they would view a witness' testimony with "more skepticism" simply because they were called by the defense. Judges must also ask jurors about "racial bias." *Hill v. State*, 661 A.2d 1164 (Md. 1995). And finally, judges must ask questions designed to identify jurors who would "prefer the testimony of State's witnesses over defense witnesses." *Marquardt v. State*, 882 A.2d 900 (Md. 2005).

Maryland appellate courts have recognized that this line of authority "stands broadly for the proposition that if a potential juror is likely to give more credibility to a specific witness based on that witness's occupation, status, category, or affiliation then, upon request, the trial judge must ask a voir dire question that seeks to uncover that bias," the Court stated. *Thomas v. State*, 165 A.3d 368 (Md. 2017). The Court declared that because *Steward* failed to grapple with this pre-existing precedent, it was wrongly decided and must be overruled. The subsequent decisions in *Thomas* and *Moore* made the necessity of abrogating *Steward* all the more apparent.

Thus, the Court announced that moving forward, trial judges in Maryland are required to ask voir dire "questions designed to uncover prejudgment of credibility with respect to statuses, categories, occupations, and affiliations of witnesses … when the court reasonably determines that such bias could affect the fairness of the trial." The Court instructed that such questions are required in two circumstances: (1) "there must be a qualifying witness, one, who, because of occupation or category, may be favored, or disfavored, simply on that basis" and (2) "where the bias relates to a witness's status—such as the status of being a child—the witness's testimony must be important to the case."

With this new rule in mind, the Court turned to the facts in Mitchell's case. His appellate attorney cited both scientific studies and anecdotal evidence suggesting that some jurors may automatically credit child-witness testimony based solely on the child's age, while others may find such testimony automatically suspect. The State did not meaningfully dispute this evidence. Thus, the Court held that Mitchell was entitled to a new trial because the "trial court abused its discretion by not asking a proper and effective voir dire question aimed at uncovering such disqualifying bias."

### Conclusion

Accordingly, the Court reversed Mitchell's conviction and remanded the case for a new trial. See: *Mitchell v. State*, 321 A.3d 116 (Md. 2024).

*Editor's note*: Anyone interested in the issue of voir dire involving child-witnesses is encouraged to read the Court's full opinion. ◢

# PLN & CLN Subscription Bundles
## STAY INFORMED AND SAVE MONEY
### *Pricing Effective as of 6/30/2023*

☐ 1 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $74.00 ($10.00 Savings), Professionals/Entities - $170.00 ($22.00 Savings)

☐ 2 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $148.00 ($20.00 Savings), Professionals/Entities - $338.00 ($46.00 Savings)

☐ 3 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $222.00 ($30.00 Savings), Professionals/Entities - $508.00 ($68.00 Savings)

☐ 4 Year PLN & CLN Subscription Bundle
Prisoners/Individuals - $296.00 ($40.00 Savings), Professionals/Entities - $676.00 ($92.00 Savings)

Name: _____ Amount enclosed: _____

DOC/BOP Number: _____ Facility: _____

Address: _____

City: _____ State: _____ Zip_____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

# California Court of Appeal Announces Postconviction Discovery Permitted in Resentencing Under Penal Code § 1172.6 for Felony Murder and Natural and Probable Consequences Murder Convictions

*by Sam Rutherford*

THE COURT OF APPEAL OF CALIFORNIA, Second Appellate District, held that defendants are entitled to conduct discovery in preparation for an evidentiary hearing held in response to a petition for resentencing pursuant to Penal Code former §1170.95 (now § 1172.6).

Leonardo Garcia was convicted of second-degree murder and attempted premeditated murder under the natural and probable consequences doctrine as a form of aiding and abetting and sentenced to 120 years to life in prison. He filed a petition for resentencing pursuant to § 1172.6. The trial court found that Garcia stated a prima facie case for relief, appointed counsel, issued an order to show cause, and set the matter for an evidentiary hearing. Garcia's attorney subpoenaed the Los Angeles Police Department ("LAPD") for contact information of two witnesses, but the trial court granted the LAPD's motion to quash, ruling that § 1172.6 does not allow for postconviction discovery. Garcia then filed a petition for a writ of mandate challenging this decision.

Deciding whether Garcia was entitled to conduct discovery prior to a § 1172.6 evidentiary hearing required the Court to review the purpose of such hearings. As the Court explained, "Senate Bill No.1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony-murder rule." *People v. Curiel*, 538 P.3d 993 (Cal. 2023). Senate Bill 1437 also created a procedure "now codified in section 1172.6 for an individual convicted of felony murder or murder under the natural and probable consequences theory to petition the sentencing court to vacate the conviction if the individual could not have been convicted of murder under Senate Bill 1437's changes to sections 188 and 189," the Court explained.

The Court stated that if a defendant, such as Garcia, makes a prima facia showing that he or she is entitled to relief, the trial court "must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and resentence the petitioner on any remaining counts." § 1172.6, subds. (c) & (d)(1). The prosecution must prove beyond a reasonable doubt that the defendant "is guilty of murder, attempted murder, or manslaughter on a still-valid theory." § 1172.6, subd. (d)(3). To make this determination, the trial court "'may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion…. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens,'" according to the Court. § 1172.6, subd. (d)(3).

In Garcia's case, the trial court determined that pre-hearing discovery is not permitted because resolution of a § 1172.6 petition is limited to "the facts presented at trial." However, the Court stated that case law clearly holds otherwise: "While the hearing does not 'permit wholesale relitigation of findings supporting murder convictions in the context of section 1172.6 resentencing,'" it "does provide an opportunity for the prosecution and the petitioner to present evidence 'with respect to issues not previously determined.'" *People v. Strong*, 514 P.3d 265 (Cal. 2022); *People v. Farfan*, 71 Cal. App. 5th 942 (2021). Thus, the Court ruled that the trial court's contrary ruling was clearly erroneous.

Consequently, the Court reasoned that postconviction discovery is necessary so that the petitioner can defend against new theories of liability and to argue new or additional evidence at the evidentiary hearing. Nothing in the plain language of § 1172.6 or its legislative history demonstrates that the Legislature intended to bar pre-hearing discovery. Instead, "the statute expressly confers the right to introduce new or additional evidence at the evidentiary hearing," and it would be "incongruous" to deny a defendant the right to conduct discovery to obtain such evidence, the Court stated.

As such, discovery must be permitted in § 1172.6 cases on the same basis as it is permitted in a habeas corpus proceeding, according to the Court. In habeas cases, discovery is permitted once the trial court issues an order to show cause, the "'precise nature and scope'" of which is resolved "'on a case-by-case basis,'" explained the Court. *In re Scott*, 61 P.3d 402 (Cal. 2003); *Jimenez v. Superior Court*, 40 Cal. App. 5th 824 (2019). The Court instructed that "although section 1172.6 lacks express statutory authority for discovery, a petitioner may seek *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] and *Pitchess* [*v. Superior Court*, 522 P.2d 305 (Cal. 1974)] discovery after an order to show cause has issued in preparation for the evidentiary hearing." *See People v. Nuno*, 105 Cal. App. 5th 1030 (2024).

When a court schedules an evidentiary hearing on a § 1172.6 petition, it creates a "cause" or case, which it has plenary authority to resolve by "all means necessary" under the Code of Civil Procedure § 187 which includes authorizing pre-hearing discovery, according to the Court. While the "'bare filing'" of a resentencing petition does not "'trigger a right to unlimited discovery,'" the issuance of a show cause order creates "precisely such a 'cause of proceeding which would confer discovery jurisdiction,'" the Court stated. *People v. Gonzalez*, 800 P.2d 1159 (Cal. 1990). Thus, the Court ruled that "a trial court has jurisdiction to order postconviction discovery once an order to show cause is issued" in a § 1172.6 resentencing case.

Turning to the present case, the Court held that the trial court abused its discretion by granting LAPD's motion to quash Garcia's subpoena based on "an incorrect reading of the statute to limit evidence at the evidentiary hearing to the evidence presented at trial"

and by hindering his ability "ability to defend against potential valid theories of liability at the evidentiary hearing." This error warranted reversal because the two witnesses Garcia sought contact information for might "have information about Garcia's conduct and intent prior to and during the shooting, which would be relevant to whether Garcia could now be convicted of murder as a direct aider and abettor or under an implied malice theory," the Court explained.

Accordingly, the Court granted Garcia's petition for writ of mandate, vacated the trial court's order quashing his attorney's subpoena, and remanded the case for further proceedings consistent with its opinion. See: *Garcia v. Superior Court*, 2024 Cal. App. LEXIS 739 (2024).

*Editor's note*: Anyone interested in the issue of the right to and scope of discovery in connection with resentencing under § 1172.6 is strongly encouraged to read the Court's full opinion.

# Eleventh Circuit Announces Defendant Must Know Leaving Residential Facility Without Permission Is 'Unlawful' for Escape Conviction Under 28 U.S.C. § 4082(a)

*by Matt Clarke*

THE U.S. COURT OF APPEALS FOR THE Eleventh Circuit reversed a federal criminal defendant's escape conviction for leaving a residential reentry facility without authorization after holding that, contrary to the positions of both the U.S. District Court for the Northern District of Florida and the prosecutor, the Government was required to prove that the defendant knew his conduct was "unlawful" when he left the facility in order to secure a conviction under 28 U.S.C. § 4082(a).

Frederick Bush left the Keeton Residential Reentry Center in Tallahassee, Florida, before his required term had expired. He was indicted for a single count of "knowingly escap[ing] from custody … by willfully failing to remain within the extended limits of his confinement and failing to remain at" Keeton. Importantly, the indictment cited both § 751(a) and § 4082(a), which states that the "*willful* failure of a prisoner to remain within the extended limits of his confinement, or to return within the time prescribed … shall be deemed an escape." (emphasis supplied)

Representing himself at trial, Bush testified that Keeton employees had mistreated him and his family and retaliated against him, which caused him to leave the facility in a state of mental distress and without the knowledge that he was committing a crime or the intent to commit a crime. He also testified that he would not have left the facility had he known he was committing a crime by doing so.

The District Court repeatedly interrupted Bush and his witnesses to advise the jury that all the prosecution had to prove was whether Bush "was lawfully in the custody of a federal facility, whether he left the facility knowing that he didn't have permission and wasn't allowed to leave." That is, the court instructed the jury that it was irrelevant whether Bush knew his leaving the facility without permission was "unlawful."

Bush objected to the court's proposed instructions, arguing "that the offense's knowledge element required proof that he knew his conduct amounted to escape," i.e., that his actions were "unlawful." The court responded by saying, "You are wrong about that, and you can tell it to the appellate court."

Following his conviction, sentencing, and the appointment of Tallahassee Federal Public Defender Joseph DeBelder to represent him on appeal, Bush did just that. The Eleventh Circuit did not rule on whether the standard of review should be de novo or for plain error because it determined that Bush could satisfy both standards.

The Court observed that, § 751(a) prohibits an "escape or attempt to escape from … custody" and requires only proof that "a defendant knew his actions would result in his leaving physical confinement without permission." *Unites States v. Bailey*, 444 U.S. 394 (1980). However, the indictment cited both § 751(a) and § 4082(a) in a single count. That required the prosecution to prove the elements of both offenses to obtain a conviction, and § 4082(a) requires that Bush's actions be "willful."

The Court noted that it's never addressed the "willful" requirement in § 4082(a), but there is guidance on the use of that term in the statute in other contexts. In a Fifth Circuit case involving the sufficiency of the evidence under § 751(a) and § 4082(a), the court explained that the prosecution "must show that the accused failed to return 'knowingly,' 'willfully,' and 'unlawfully.'" *United States v. Brackett*, 582 F.2d 1027 (5th Cir. 1978). Similarly, the U.S. Supreme Court has addressed the term "willful" in other contexts and statutes and has held that although willfulness doesn't require that the defendant was aware of the specific statute he was violating, it does require proof that he was aware that his conduct was unlawful. *Bryan v. United States*, 524 U.S. 184 (1998). Finally, the Eleventh Circuit Pattern Jury Instructions define a "willful" act as one "committed voluntarily and purposely, with the intent to do something that law forbids; that is, the bad purpose to disobey or disregard the law." Pattern Crim. Jury Instr. 11th Cir. BI B9.1A (2020).

Based on the foregoing sources, the Court concluded that under § 4082(a), "willful" requires that the prosecution prove the defendant acted "unlawfully." The Court determined that the District Court's jury instruction failed to include the necessary mens rea element of the offense by failing to specify that Bush must have had the intent to act unlawfully when he left the facility without permission. Thus, the Court held that the District Court erred and that the error was plain. *Neder v. United States*, 515 U.S. 506 (1995) (stating that "a jury instruction that omits an element of the offense" charged is indisputably "error"). The Court further held that the erroneous jury instruction was likely responsible for an "incorrect verdict." *United States v. Whyte*, 928 F.3d 1317 (11th Cir. 2019) (explaining plain error standard, i.e., "(1) error, (2) that is plain, and (3) that affects substantial rights").

Accordingly, the Court vacated and remanded for a new trial. See: *United States v. Bush*, 110 F.4th 1246 (11th Cir. 2024).

# Federal Law Enforcement Using Banks to Circumvent Warrant Requirement in Surveilling Sensitive Financial Data of Americans

*by James Mills*

FEDERAL LAW ENFORCEMENT AGENCIES have been gathering sensitive financial information of American citizens by manipulating the Suspicious Activity Report ("SAR") system, according to the House Judiciary Committee. The Committee accuses the FBI, in particular, of treating financial institutions "as de facto arms of law enforcement."

The Subcommittee on the Weaponization of the Federal Government declared, in its recently-released report, that the FBI "has manipulated" the SAR filing process in order to issue requests and gather financial information about citizens considered to be "suspicious." The report notes that, with rare exception, federal law generally forbids law enforcement from inquiring into customers' financial details without some form of legal process. "The FBI circumvents this process by tipping off financial institutions to 'suspicious' individuals and encouraging these institutions to file a SAR—which does not require any legal process—and thereby provide federal law enforcement with access to confidential and highly sensitive information," according to the Subcommittee.

The Bank Secrecy Act (1970) requires that any request for customer information be made with a warrant. This recent practice of using the SAR filing process is essentially an end-run around that requirement. Rather than waiting for law enforcement agencies to investigate suspects and develop probable cause, the agencies provide lists of names to banks and require *them* to submit paperwork for any transactions or customer changes that involve those names.

According to the report, "all too often the FBI appeared to receive no pushback" from the banks. "By providing financial institutions with lists of people that it views as generally 'suspicious' on the front end, the FBI has turned this framework on its head and contravened the Fourth Amendment's requirements of particularity and probable cause."

Beginning in the aftermath of the events at the Capitol on January 6, the FBI apparently has even asked banks to provide information regarding customer transactions using search terms like "MAGA" and "Trump" and (mysteriously) "Dick's Sporting Goods," among others. Incredibly, the FBI has warned that purchases of "religious texts" could be linked to "extremism."

In the words of the report, the FBI and other agencies are overstepping their bounds "by deploying financial institutions as arms of federal law enforcement, directing financial institutions to profile Americans using the typologies it distributes." This will "erode any remaining semblance of financial privacy in the United States," according to the report. It also adds further credence to the belief held by a growing number of Americans that the FBI has been weaponized to go after political opponents and those whose only "crime" is that of wrongthink. ◗

Source: *yahoo.com*

---



"…an essential resource…"
—Peter Schmidt, Publisher, *Punch & Jurists*

The **HABEAS CITEBOOK:** Ineffective Assistance of Counsel

2nd EDITION

By **BRANDON SAMPLE & ALISSA HULL**

Edited by **SUSAN SCHWARTZKOPF**
Foreword by **ELIZABETH ALEXANDER**

"…handy and easy-to-use… " —Kent Russell

## The Habeas Citebook *(2nd edition)*
### by Brandon Sample and Alissa Hull

The second edition of *The Habeas Citebook* is now available! Published by Prison Legal News, it is designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief.

This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel. It will save litigants thousands of hours of research and it focuses on the winning cases criminal defendants need to successfully challenge their convictions.

Well organized into 52 concise chapters, this easy-to-use book puts the law at the reader's fingertips.

**Price: $49.95**
*(shipping included)*
**275 pages**
*Order by mail, phone, or online.*

Amount enclosed for *Habeas Citebook* _____ By: ☐ check ☐ credit card ☐ money order

Name: _____ DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____ State: _____ Zip: _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG • WWW.CRIMINALLEGALNEWS.ORG

---

# Seventh Circuit Announces Maximum Revocation Sentence for Violation of Supervised Release Based on Classification of Underlying Offense at Time of Conviction, Not at Time of Revocation

*by Sam Rutherford*

THE U.S. COURT OF APPEALS FOR THE Seventh Circuit held that the maximum sentence a defendant may receive when his or her supervised release is revoked is determined by the classification of the underlying offense at the time of conviction, not the classification of the underlying offense when the revocation occurs.

## Background

Shannon Cotton was convicted of two counts of violating 21 U.S.C. § 841(a)(1), (b)(1)(B) for distributing and possessing with intent to distribute at least five grams of cocaine. Due to his prior felony convictions for possessing and delivering cocaine in Illinois state court, Cotton faced a mandatory minimum of 10 years and a maximum of life in prison. The U.S. District Court for the Central District of Illinois sentenced him to 262 months (almost 22 years) and eight years of supervised release.

In 2010, Congress passed the Fair Sentencing Act, which altered the threshold amount of crack cocaine required to trigger statutory maximum and minimum sentences under § 841 from 5 to 28 grams. The Act, however, was not retroactive and did not benefit Cotton.

But the First Step Act, passed in 2018, did. Under that law, District Courts were given discretion to resentence defendants "as if" the new penalties in the Fair Sentencing Act were in effect when the underlying offense was committed. Cotton's sentence was reduced from 262 to 188 months under this provision, and he was released from prison in the fall of 2020 to begin serving his term of supervised release.

Cotton struggled with substance abuse and maintaining law abiding behavior once released. His probation officer petitioned the District Court to revoke his supervised release based on positive drug tests and being caught possessing a large quantity of marijuana.

Prior to the revocation hearing, the parties disputed the maximum sentence Cotton faced for violating the conditions of his supervised release. Cotton believed that his maximum sentence was two years based on the classification of his § 841 convictions under existing law. The probation department and Government believed the classification of Cotton's offenses should be determined based on the law in effect in 2007, which resulted in a maximum revocation sentence of 5 years.

The District Court sided with Cotton and imposed a two-year sentence followed by three years of supervised release. The Government timely appealed.

## Analysis

The Court stated that the resolution of the Government's appeal turned on a proper construction of 18 U.S.C. § 3583(e)(3), which provides that the District Court may revoke a defendant's supervised release and impose a prison sentence of no "more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case." Under 18 U.S.C. § 3559(a)(1)-(4), any crime carrying a maximum penalty of life is a class A felony, any crime with a maximum sentence of at least 25 years is a class B felony, a crime with a maximum of 10 to 25 years is a class C felony, and a crime with a maximum sentence of less than 10 years is a class D felony.

The focus of the parties' dispute was what class felony § 841 should be treated as for sentencing purposes, i.e., the felony class in 2007 when Cotton was convicted or what the felony class would be under current law, the Court stated. As noted above, Cotton's § 841 convictions originally carried a maximum sentence of life, making them class A felonies with a maximum revocation sentence of five years. But under the Fair Sentencing Act and other judicial decisions holding that Cotton's prior Illinois offenses no longer qualify him for career offender enhancement—both of which the District Court was permitted to consider when it resentenced Cotton under the First Step Act—his maximum sentence for the § 841 convictions is 20 years, making them class C felonies with a maximum revocation

sentence of only two years. In Cotton's view, the District Court correctly determined that the law as it exists today should be used to classify his prior convictions.

The Court, however, rejected this approach and instead sided with the Government, holding that the plain language of § 3583(e)(3) requires the District Court to determine the classification of Cotton's underlying convictions based on the law as it existed when he was originally convicted and sentenced in 2007. This is so, the Court reasoned, because the statute uses the past-tense phrase "the offense that resulted in the term of supervised release" to determine maximum revocation sentence. Cotton's supervision "resulted" from his 2007 § 841 convictions, which were class A felonies at the time.

Thus, the Court held that the District Court erred in setting Cotton's maximum revocation sentence at two rather than five years, requiring a new revocation hearing. But the Court explained that this does not mean the District Court is required to impose the maximum revocation sentence. On remand, "the district court may consider intervening changes in law since the time of Cotton's original sentencing in 2007 and the reduction he received under the First Step Act" and may impose "a reasonable revocation sentence below that upper limit" after considering the factors set forth in 18 U.S.C. § 3553(a), the Court stated.

## Conclusion

Accordingly, the Court vacated the District Court's revocation sentence and remanded Cotton's case for resentencing consistent with its opinion. See: *United States v. Cotton*, 108 F.4th 987, *rehearing en banc denied*, 2024 U.S. App. LEXIS 25339 (7th Cir. 2024). ◼

---

**Merriam-Webster's Dictionary of Law**
Thousands of clear, concise definitions. See page 53 for ordering information.

# Sixth Circuit Announces Ohio's Standard for Judicial Bias Contrary to Clearly Established Federal Law, Holds Trial Judge Unconstitutionally Biased in Capital Case and Defendant Denied Right to Present Mitigating Evidence, Grants Habeas Relief

*by Sam Rutherford*

THE U.S. COURT OF APPEALS FOR THE Sixth Circuit granted an Ohio death row prisoner habeas relief on his claims that the trial judge who sentenced him to death was unconstitutionally biased and improperly excluded mitigation evidence during resentencing proceedings. Notably, the Court observed at the outset of its opinion that the writ of habeas corpus is an "extraordinary remedy that 'guard[s] against extreme malfunctions in the state criminal justice systems,'" *Harrington v. Richter*, 562 U.S. 86 (2011), and it took the unusual step of characterizing the current case as "the epitome of such and extreme judicial malfunction."

## Background

Nathaniel Jackson and Donna Roberts conspired to kill Roberts' former husband, Robert Fingerhut, in 2001. They were both convicted of aggravated murder and related offenses and, in 2002, were sentenced to death. Jackson's convictions and sentence were affirmed on appeal, and his state court petition for post-conviction relief was denied.

Roberts fared better on appeal. Her lawyer discovered that the trial judge, Trumbull County Court of Common Pleas Judge John M. Stuard, had multiple ex parte communications with the prosecutor concerning Roberts' sentence and had the prosecutor draft an opinion on the judge's behalf imposing the death penalty. This was a violation of Ohio law, which requires that judges independently weigh and consider aggravating and mitigating evidence before imposing the death penalty, so the Ohio Supreme Court overturned Roberts' death sentence.

Judge Stuard subsequently admitted he followed the same procedure in Jackson's case but nonetheless refused to grant him a new sentencing hearing. Jackson then requested that the Ohio Supreme Court remove Judge Stuard from his case, but the request was denied. Meanwhile, Jackson appealed Judge Stuard's order denying a new sentencing hearing. The Ohio Court of Appeals reversed Jackson's death sentence and ordered Judge Stuard to "personally review and evaluate the appropriateness of the death penalty, prepare an entirely new sentencing entry … and conduct whatever other proceedings are required by law and consistent with this opinion."

On remand, Judge Stuard permitted Jackson to make an allocution but excluded three volumes of mitigation evidence not previously considered at the first sentencing proceeding. This mitigation evidence consisted of statistics on Ohio death-row prisoners, affidavits from Jackson's family members, his own affidavit expressing dissatisfaction with his trial counsel, psychological information showing his intellectual disabilities, his school records, and his criminal history. Despite the substantial amount of new mitigation evidence, Judge Stuard reviewed only the stale, 10-year-old record made during Jackson's first mitigation hearing.

Judge Stuard again imposed the death penalty and, just a few hours after the sentence was pronounced, issued a written opinion nearly identical to the one found invalid by the Ohio appellate court. The only differences between the original and new order were a few introductory paragraphs explaining the additional procedural history, the correction of some typographical and grammatical errors, and slight alterations to paragraphs describing the trial evidence. In fact, the new order did not even mention Jackson's new allocution or his request to admit additional mitigation evidence.

Jackson again appealed, arguing that Judge Stuard was biased and erred in denying him the opportunity to present additional mitigation evidence. The Ohio Supreme Court rejected these claims and affirmed the death sentence. *State v. Jackson*, 73 N.E.3d 414 (Ohio 2016) ("*Jackson II*").

Jackson then filed a petition for writ of habeas corpus in the U.S. District Court for the Northern District of Ohio, raising 37 grounds for relief. The District Court granted relief on one claim, ruling that Judge Stuard violated Jackson's Eighth Amendment right to present mitigation evidence at his resentencing hearing and that the Ohio Supreme Court's rejection of this claim was an unreasonable application of U.S. Supreme Court case law. Jackson and the State timely appealed.

## Analysis

The Court granted habeas relief on two claims, holding that: (1) Judge Stuard was unconstitutionally biased in violation of the Fourteenth Amendment and (2) Jackson was denied the opportunity to present additional, relevant mitigation evidence at his resentencing hearing in violation of the Eighth Amendment.

The Court observed that, typically, state prisoners are only entitled to habeas relief when the last reasoned state court opinion rejecting their federal constitutional claims resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court decision is contrary to Supreme Court case law when it applies a rule different from the law set forth in controlling Supreme Court cases, or if it decides a case differently than the Supreme Court on materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685 (2002). Furthermore, a state court decision is an unreasonable application of Supreme Court case law if it identifies the correct legal standard governing a constitutional claim but unreasonably applies it to the facts of a prisoner's case. *Williams v. Taylor*, 529 U.S. 362 (2000).

The Court held that Jackson was entitled to relief on his judicial bias claim because the

Ohio Supreme Court opinion rejecting it was contrary to federal law. The Fourteenth Amendment has long guaranteed litigants the right to a fair, unbiased judge, i.e., it's "clearly established." *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); *Bracy v. Gramley*, 520 U.S. 899 (1997); *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971); *In re Murchison*, 349 U.S. 133 (1955). The standard for assessing the risk of judicial bias under federal law is an "objective" one, requiring recusal when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton*. In making this determination, the court "asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Id.*

Jackson contended that he was denied a fair and impartial judge under this objective standard based on Judge Stuard's improper ex parte communications and collaboration with the prosecutor; refusal to recuse himself; statements on the record expressing disagreement with the necessity of resentencing; refusal to consider Jackson's mitigating evidence at resentencing; and issuance of a second sentencing opinion mirroring the original, tainted one mere hours after the resentencing hearing. The Ohio Supreme Court rejected his judicial bias claim under Ohio law's subjective standard for determining judicial bias. Under Ohio's subjective standard, Jackson was required to show "that Judge Stuard had actual bias and acted with 'ill will' or formed 'a fixed anticipatory judgment' against him." *Jackson II* (quoting *State ex rel. Pratt v. Weygandt*, 132 N.E.2d 191 (Ohio 1956)). However, the Court held that "Ohio law's subjective judicial-bias standard is contrary to clearly established federal law."

The Court stated that because the Ohio Supreme Court applied governing law that is contrary to U.S. Supreme Court case law, the state court's decision is contrary to clearly established federal law. *See* § 2254(d)(1); *see also Bell*. Because the Ohio Supreme Court applied the wrong legal standard to Jackson's judicial bias claim, the Court was free to review it de novo. *See Panetti v. Quarterman*, 551 U.S. 930 (2007); *Issa v. Bradshaw*, 904 F.3d 446 (6th Cir. 2018).

Turning to the merits, the Court had little trouble concluding that Judge Stuard violated the Fourteenth Amendment. As the Court explained, Judge Stuard engaged in multiple ex parte communications with the prosecutor and had him "ghost write" an opinion imposing the death penalty. The judge then downplayed his conduct and refused to accept responsibility for it. Years later, he expressed disagreement with the need for a resentencing hearing, re-imposed the death penalty on Jackson without permitting him to present any new evidence, and then re-issued a nearly identical, tainted opinion originally authored by the prosecutor. The Court concluded that the foregoing facts established sufficient bias under an objective standard because "Judge Stuard essentially allowed the prosecution to 'act[] as both accuser and judge in [Jackson's] case.'" *Williams v. Pennsylvania*, 579 U.S. 1 (2016).

The Court also determined that the Ohio Supreme Court's opinion rejecting Jackson's mitigation evidence claim is both contrary to

# CLASS ACTION LAWSUIT CHALLENGING THE HIGH PRICES OF PHONE CALLS WITH INCARCERATED PEOPLE

Several family members of incarcerated individuals have filed an important class action lawsuit in Maryland. The lawsuit alleges that three large corporations – GTL, Securus, and 3CI – have overcharged thousands of families for making phone calls to incarcerated loved ones. Specifically, the lawsuit alleges that the three companies secretly fixed the prices of those phone calls and, as a result, charged family members a whopping $14.99 or $9.99 per call. The lawsuit seeks to recover money for those who overpaid for phone calls with incarcerated loved ones.

## If you paid $14.99 or $9.99 for a phone call with an incarcerated individual, you may be eligible to participate in this ongoing lawsuit.

Notably, you would not have to pay any money or expenses to participate in this important lawsuit. The law firms litigating this case—including the Human Rights Defense Center—will only be compensated if the case is successful and that compensation will come solely from monies obtained from the defendants.

If you are interested in joining or learning more about this case, please contact the Human Rights Defense Center at (561)-360-2523 or info@humanrightsdefensecenter.org.

*ADVERTISING MATERIAL*

**Sixth Circuit (cont.)**

and an unreasonable application of Supreme Court case law. As the Sixth Circuit previously recognized, the decisions in *Lockett v. Ohio*, 438 U.S. 586 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Skipper v. South Carolina*, 476 U.S. 1 (1986), and their progeny establish that defendants must be permitted to present and courts must consider any and all relevant mitigating evidence that is available at capital resentencing hearings, including new evidence developed since the initial sentencing hearing. *Davis v. Coyle*, 475 F.3d 761, 774 (6th Cir. 2007). Here, Jackson attempted to present three volumes of such evidence, but Judge Stuard refused to consider it at all.

The Ohio Supreme Court rejected Jackson's mitigation claim by reasoning that the Eighth Amendment does not guarantee a capital defendant the "categorical constitutional right to introduce new mitigation evidence that is discovered after a sentencing hearing in which the defendant was given an opportunity to present all the mitigation evidence

he desired." However, the Court declared that this decision is completely inconsistent with the Supreme Court's "purposely broad" Eighth Amendment jurisprudence and "violates the principle clearly defined by *Lockett*, *Eddings*, and *Skipper*." It held that the *Lockett* line of cases "clearly established that capital defendants have a right to present during their sentencing proceedings 'any and all relevant mitigating evidence that is available.'"

Based on the foregoing clearly established federal law, Jackson was entitled to present any and all relevant mitigation evidence at his resentencing hearing, but Judge Stuard categorically refused to allow him to do so. The fact that Jackson had been previously sentenced to death was irrelevant because that sentence had been vacated. The Court stated that at the new hearing, "Judge Stuard was tasked with determining whether the death penalty or life in prison was the appropriate sentence, given all the relevant circumstances—both aggravating and mitigating. But Judge Stuard refused to allow Jackson to present all the relevant mitigating circumstances." Thus, the Court held that Jackson's Eighth Amendment rights were violated and

is entitled to habeas relief on his mitigating-evidence claim.

### Conclusion

Accordingly, the Court affirmed the District Court's grant of habeas relief on the mitigating-evidence claim, reversed its denial of the judicial-bias claim, and remanded for further proceedings consistent with its opinion. See: *Jackson v. Cool*, 111 F.4th 689, *rehearing en banc denied*, 2024 U.S. App. LEXIS 22733 (6th Cir. 2024).

The Sixth Circuit subsequently granted Ohio's motion to stay the mandate, so it could seek certiorari review in the U.S. Supreme Court. The Court ruled that the mandate should issue promptly once the "Supreme Court disposes of the case." *Jackson v. Cool*, 2024 U.S. App. LEXIS 25389 (6th Cir. Oct. 7, 2024).

*Editor's note*: Anyone interested in either mitigating-evidence claims or judicial-bias claims pursuant to 28 U.S.C. § 2254 is encouraged to read the Court's full opinion, which contains extensive discussions of both types of claims as a basis for habeas relief. ◾

# DNA on Fired Cartridge Casings: Promising Advances to Link Suspects to Crime Scenes

DNA ANALYSIS OF FIRED CARTRIDGE casings has been studied since the early 2000s and continues to be an emerging field in forensic investigations. While cartridge casings have been traditionally examined for fingerprints and tool marks, recent advancements in collection, packaging, and processing methods have opened new possibilities for recovering usable DNA profiles from these common items of evidence.

Early attempts to recover DNA from cartridge casings met with limited success. In a November 2022 *Forensic Science International* paper, the authors speculated that forensic DNA analysis of cartridges and fired cartridge casings was challenging due to "the heat and pressure generated during the firing of a weapon as well as metal ions from the casings that have been suggested to initiate

DNA degradation and inhibit polymerase chain reaction (PCR) during the DNA profiling process."

However, recent studies and technological advancements have significantly improved the potential for obtaining usable DNA profiles from these challenging samples and are removing barriers to the analysis of cartridge casings recovered from crime scenes. Key improvements include enhanced extraction and amplification methods that allow for the detection and analysis of smaller quantities of DNA. Modified protocols to handle low-template DNA samples are another improvement that some labs have implemented. In a third improvement, probabilistic genotyping software allows the analysis of challenging samples that contain complex, low-level and mixed DNA profiles. Lastly, new collection

devices and extraction protocols allow maximum DNA recovery from metal surfaces of cartridge casings, including techniques like soaking and sonication to dislodge cellular material.

The importance of proper handling and packaging of evidence is crucial. Improper handling, packaging, and transport of casings significantly impacts DNA recovery. Placing casings in paper envelopes or cardboard boxes can lead to DNA transfer and loss. To address this issue, manufacturers have developed specialized tools and packaging solutions, such as the Case Grabber, which ensures safe collection, packaging, and transport of casings.

The author of the paper "Collecting, Transporting and Processing DNA on Fired Cartridge Casings" cites the following best practices for crime scene investigators to

maximize the chances of recovering usable DNA from fired cartridge casings:

**Prompt Collection:** Casings should be collected as soon as possible to minimize DNA degradation.

**Proper Handling and Packaging:** Use appropriate personal protective equipment and avoid touching the surfaces of the casings. Consider picking up the casing from the inside and using packaging materials that prevent contact with the casing's outer surface.

**Effective Swabbing:** A double swab technique, using one wet followed by one dry sterile swab, can effectively sample the entire surface of the casing.

**Optimized Laboratory Techniques:** Labs should use DNA extraction methods optimized for low-template samples and highly sensitive PCR amplification kits designed for touch DNA samples.

**Probabilistic Genotyping Software:** This software can help maximize the evidentiary value of complex, low-level DNA profiles.

The future of DNA analysis on cartridge casings is encouraging. As technology continues to advance, the potential for recovering DNA from cartridge casings is expected to improve further. Promising areas of research include techniques that allow for direct DNA amplification from the evidence item, bypassing the extraction step.

The ability to link a suspect directly to a crime scene through DNA on a fired cartridge casing can be a game-changer in forensic investigations. While not every casing will yield a usable profile, the potential to uncover critical evidence justifies the effort of routine DNA swabbing of these small but potentially significant pieces of evidence. 🔥

Sources: *Forensic Magazine, Forensic Science International November 2022*

# Understanding Timestamps in Digital Forensics

### *by Michael Dean Thompson*

MODERN COMPUTING SYSTEMS constantly record when a specific event occurs. A common example of this is the timestamp applied to a document file that indicates when the file was last updated. But the timestamps can be more pernicious. Within the files can be more timestamps that give even more information. Consider an image file that stores an internal marker of the date and time the image was created, which may differ from the creation date stored in the file system. That difference offers a big clue that the file was copied from another source. Additional log files may be present that track unique events, as in the case of vehicle telemetry that keeps the times and locations of brake usage, door openings and closings, and more.

Timestamps can come in many different formats, though some standards do exist. The format chosen depends on the operating system as much as the granularity necessary to record the event. Often, developers will choose to uniquely identify an event based on the timestamp, which may require millisecond (1/1,000 of a second) to nanosecond (1/1,000,000,000 of a second) resolution. This happens most often in databases and may be present in email systems and instant messaging platforms. Chrome may store any browser-related data with microsecond (1/1,000,000,00 of a second) resolution. Such high definition for a software that is unlikely to make its own microsecond comparisons against a timestamp may be doing so largely for forensic purposes as accessing a given web resource at a specific time can single out one device over another when compared to the web resources' own logs.

Timestamps also have unique calculation requirements. Log files are often in human-readable formats like "11/17/2024 8:10:15.1234." Others are complex binary strings. The WebKit/Chrome timestamps track the number of microseconds that have passed since January 1, 1601. A significant number of operating systems use Unix timestamps. Unix is an OS developed in the 70s, and the timestamp accordingly tracks seconds since January 1, 1970. The MacOS and iOS operating systems use Cocoa timestamps ("Mac absolute time") to track the number of seconds since January 1, 2001. Nevertheless, nonstandard timestamps are generally not difficult to decode, since they tend to require some sortability and the stamp can often be compared against the software's output.

Many common timestamp formats track time using Coordinated Universal Time ("UTC"). So, a timestamp stating 6:00 p.m. in the binary format would be adjusted for the local time zone for the user in the Central time zone to 12:00 p.m. Yet, again, this is not always the case. Using UTC as a standard helps to alleviate time zone challenges for tracking events across time boundaries, especially when the user need not make explicit adjustments to how a device reports the time, e.g., the phone company automatically adjusts the device's time and time zone.

Just shy of possessing forensic software, it can be next to impossible to know where all the timestamps are being stored. For example, Windows allows for data to be stored in secondary data streams that the end user will likely never see. The timestamps may provide developers clues that events occurred out of order and aid in debugging the code. Or they may be recorded solely for investigative purposes such as within a digital photo that identifies the time the photo was taken as well as the identity of the device that took it. But whatever the reason for the timestamp's existence, it can be used by investigators to build a timeline of events in support of the theory of a case. 🔥

Source: *Forensicmag.com*

**Writing to Win: The Legal Writer**
Need to write better? *Writing to Win* will teach you the basics of how to compose clear and convincing written and oral legal arguments! 270 pages packed with solid, practical advice and tips. $19.95 from the Book Store! See page 53 for more information.

# Protect Yourself Against Police Invasion of Your Cellphone

*by Douglas Ankney*

In *Riley v. California*, 573 U.S. 373 (2014), the U.S. Supreme Court recognized the reality that the amount of data people keep on their cellphones is almost beyond measure. The *Riley* Court ruled that police must comply with the Fourth Amendment warrant requirement—both the "probable cause" and the "particularity" clauses—before searching your device. When lawful process is observed, they are not to examine its contents without a warrant after seizure.

But as is common knowledge, the police consistently fail to respect people's constitutional rights. Therefore, the better practice is to arm ourselves with password protection of a locked cellphone. Under the Fifth Amendment, we do not have to provide police with our passcodes unless, and until, the government overcomes our privilege against compelled self-incrimination. This right dates back to fourth-century thinker Saint John Chrysostom, who argued that no one should be required to confess their sins publicly as it discourages people from confessing at all.

By the seventeenth century, English common law clarified that persons have a right not to be interrogated under oath. The right achieved widespread recognition after the infamous Star Chamber sentenced prominent natural rights thinker John Liburne to approximately 500 lashes because he refused to testify against himself. While the Star Chamber was abolished just four years later, the right to be free from forced self-incrimination lived on as testament to one of the "truths we hold self-evident."

When police seize your cellphone, the issue is not whether you think you have nothing to hide. Police are rewarded by their superiors for finding evidence of crimes and for making arrests—often for things the unsuspecting person does not even comprehend as being a crime. Their bosses do not encourage the police to respect the Constitution. Consequently, when police seize your cellphone, they should not be permitted to see anything past your locked screen unless, and until, proper legal process is observed.

Do not provide police an unlocked cellphone or your passcode in reliance upon your Fourth Amendment protections. Once police have an unlocked cellphone in their possession, they can (and apparently often do) scour those cellphones in "off-the-record" unlawful searches.

Trial courts are then known to permit otherwise unlawfully seized evidence into trial based upon one or more of the numerous exceptions to the warrant requirement. But even if a prosecutor is unable to get the unlawfully seized evidence admitted at your trial, the collateral damage done to you manifests itself in diverse ways. While all of those possible avenues of harm to you cannot be recounted here in this short article, one example is the effect such evidence has upon you at the time of sentencing in the event that you are found guilty of any offenses based upon other lawful evidence.

For example, under the legal principle known as "uncharged conduct sentencing" and "acquitted conduct sentencing," the judge imposing the sentence may consider unlawfully seized evidence when determining the severity of your sentence for your current conviction, based upon the preponderance of the evidence that you "probably committed other crimes." (See: *CLN*, March 2022, p.1.)

Additionally, armed with unlawfully seized evidence, police and prosecutors can pressure you into falsely confessing to crimes you did not commit by threatening to charge you with much higher-grade crimes carrying significantly more punishment. This tactic, known as "coercive plea bargaining," underpins criminologists' estimates that each year somewhere between two and eight percent of people who plead guilty are factually innocent of the crimes to which they pleaded guilty. These are just two of the many routes unlawfully seized evidence harms you and benefits the government prosecuting you.

When police do not have your passcode, the dynamic dramatically changes. The police must then align themselves a little more with the constitutional rules of fair play, e.g., convince a magistrate they have reason to support a probable belief that there is evidence of particular crimes located in specific files on your phone and secure a warrant to search those files for that evidence.

Should police secure that warrant, you would, in most instances, be required to surrender your passcode. However, even then, to safeguard yourself, you may petition the court that your attorney be present when the search of the phone is conducted to ensure that only those files authorized by the warrant are searched. ◣

Source: *reason.com*

# PLN Needs Your Photos, Videos, Verdicts and Settlements!

We are expanding the multimedia section on PLN's website, and need more prison and jail-related content! We know many of our readers have pictures and videos related to prison and criminal justice topics, and we'd like to post them on our site. We are seeking *original* content only – photos or video clips that you have taken yourself.

Please note that we are *not* seeking articles, editorials, poems or other written works; only photos and videos. They can be taken inside or outside of prison, but must relate to prisons, jails or criminal justice-related topics. By sending us multimedia content, you are granting us permission to post it on our website. Please send all submissions via email to:

**CONTENT@PRISONLEGALNEWS.ORG**

Please confirm in your email that the photos or videos are your original content, which you produced. Also please provide some context, such as where and when they were taken. Your name will not be posted online or otherwise disclosed. Please spread the word that PLN needs photos and videos for our website.

_____

We also need verdicts and settlements in cases won by the plaintiff. Note that we are *only* seeking verdicts, final judgments or settlements – not complaints or interim orders in cases that are still pending. If you've prevailed in court against prison or jail staff, please send us a copy of the verdict, judgment or settlement and last complaint so we can post them on our site and potentially report the case in PLN. If possible, please e-mail your submissions; we cannot return any hard copy documents. Send to:



**Prison Legal News**
PO Box 1151
Lake Worth Beach, FL 33460
content@prisonlegalnews.org

# NEWS IN BRIEF

**Alabama:** A former Huntsville, Alabama police officer, William "Ben" Darby, was sentenced again on October 26, 2024, to 25 years for the fatal shooting of a suicidal man in 2018, according to the *Slate Report*. Darby was convicted for the second time in May 2024 of shooting Jeffrey Parker, who had called 911 expressing suicidal intentions and was holding a gun to his own head. The shooting, captured on police body camera footage, has been highly controversial and contested. Darby claimed he feared for the safety of his fellow officers, but prosecutors argued that he escalated the situation and used excessive force. The victim's family and friends have expressed anger and disbelief, questioning the need for lethal force when Parker posed no immediate threat to others. It was the second conviction for Darby in the Parker shooting. In 2021, he was convicted then spent 20 months in prison before his conviction was overturned by a court of appeals in March 2023. A civil case brought forth by Parker's family is now proceeding under U.S. District Judge Liles Burke after being on hold for six years as the criminal case worked its way through the courts.

**California:** A former Los Angeles County Sheriff's Deputy, Remin Pineda, was sentenced to two years of probation for the fatal shooting of David Ordaz Jr., age 34, according to the *Los Angeles Public Press*. The lenient sentence, which includes community service and psychological counseling, has sparked outrage from Ordaz's family and community members. The sentence was issued after Pineda agreed to plead guilty to two felonies of assault with a firearm and assault under color of authority. Ordaz, who was experiencing a mental health crisis, was shot 12 times by multiple deputies in March 2021. His sister had called 911 for help because Ordaz was threatening suicide and holding a knife. As the incident unfolded, two deputies in the group fired beanbag rounds at Ordaz, with deputies Pineda, Navarrete, Trujillo, and Romero following seconds later with gunshots. Pineda kept firing after the other deputies stopped shooting, even as Ordaz Jr., lay on the ground motionless. Pineda was the only deputy charged in the death of Ordaz. Not surprisingly, the judge who approved the plea deal, Mark S. Arnold,

is a former sheriff's deputy himself. The Ordaz family expressed disappointment and anger with the sentence, arguing that it does not reflect the gravity of the crime. They have called for a trial and a more substantial punishment for Pineda.

**Colorado:** A former Aurora Police Department (APD) officer, Douglas Harroun, has been partially acquitted in a controversial on-duty shooting that left a man seriously injured, according to *KUSA*. A jury found Harroun, 33, not guilty of first-degree assault but hung on a charge of second-degree assault. The District Attorney's Office plans to retry the second charge in January 2025. The shooting occurred on December 31, 2022, when Harroun and another officer responded to a domestic disturbance call. Upon arriving at the scene, they encountered Duvan Jamir Fernandez Zuluaga and several others in a basement. Body camera footage shows that after the primary suspect was handcuffed, Zuluaga began walking towards the stairs. Harroun allegedly ordered Zuluaga to "get back" before shooting him at point-blank range, knocking him to the floor. Duvan underwent extensive surgery on his right ankle and months of rehabilitation after the event. This is not the first time Harroun has faced legal trouble. In a separate incident, he was charged with multiple counts of assault for allegedly attacking a disabled woman. On September 27, 2024, he pleaded guilty to a reduced charge of reckless endangerment and was sentenced to two years of probation.

**Colorado:** Linda Stanley, the former District Attorney for Colorado's 11th Judicial District, was disbarred in October 2024 for serious misconduct related to the high-profile Barry Morphew murder case. Stanley's actions, which included inappropriate media comments, failure to supervise prosecutors, discovery violations, and a retaliatory investigation against a judge, led to the dismissal of the charges against Morphew. In the wake of Stanley's disbarment, which took effect on November 1, 2024, Judge Amanda Hunter appointed Jeff Lindsey, a former prosecutor and current candidate for the position, as the interim District Attorney. Lindsey, who was set to assume the role in January, will now take over immediately.

Stanley's disbarment made Colorado legal history, marking the first time a sitting district attorney has been involuntarily removed from office. In an effort to remain in office until January, Stanley had requested a delay of her disbarment. On October 18, Colorado's Supreme Court denied her request. The court rejected arguments that immediate disbarment would harm the public and disrupt the work of the DA's office. Despite Stanley's claims, the court ruled that elected officials are not exempt from professional standards.

**Illinois:** On August 27, 2024, an unnamed judge of the Eleventh Judicial Circuit Court dismissed Chelsey Lowe's case from a 2022 incident involving controversial cop Sean Grayson, 30, a former Logan County Sheriff's Deputy. *Illinois Public Media* reported that just a few months earlier, Lowe had been convicted of charges including possession of meth and faced a potential prison sentence of up to 20 years. Lowe alleged that Grayson acted inappropriately during her arrest and detention, including ordering her to remove drugs and expose her body. Despite filing a complaint, the Logan County Sheriff's Office (LCSO) deemed the allegations "unfounded." The reason why Lowe's case was dropped was not mentioned for the record. Grayson came into the national spotlight after killing Sonya Massey in July 2024. Massey, an unarmed Black woman and mother of two, was shot in the head by Grayson in her home. *ABC News* discovered shortly after Massey's death that Grayson had worked for six law enforcement agencies over the last four years. Grayson's history of misconduct, including two DUIs, a discharge from the Army for misconduct, a spotty work history, questionable reports and arrests, involvement in a high-speed chase and dropped cases, has put LCSO in the hot seat.

**Iowa:** KTIV out of Sioux City reported that on November 8, 2024, former Plymouth County Sheriff's Deputy was sentenced to no more than 15 years in prison for a string of crimes, including theft and unlawful possession of prescription drugs. This sentencing follows Aaron Leusink's guilty plea in July 2024, when he admitted to multiple charges, including burglary, theft, misconduct while in office, and drug possession.

---

## News in Brief (cont.)

As part of the plea agreement, one charge of second-degree burglary was dismissed, and Leusink was ordered to pay $760.50 in restitution to the crime victim compensation program. This sentencing is the second related to the 45-year-old's criminal activities, which began with a string of burglaries and thefts between 2017 and 2020 to obtain prescription drugs from homes, pharmacies, and the sheriff's office, including evidence pills. In June 2022, Leusink received his first sentence of 40 years in prison which was vacated in November 2020 after the court determined his defense attorney had provided ineffective counsel. Leusink had originally pleaded guilty to eleven counts of stealing prescription painkillers in April 2022. However, after the vacating of his 2020 conviction, the court granted him a new trial, which led to the 2024 sentencing.

**Mississippi:** *NBC News* reported that Jackson Mayor Chokwe Antar Lumumba pleaded not guilty to federal bribery charges on November 7, 2024, stemming from a scheme involving a proposed hotel project. The indictment alleges that Lumumba, along with Hinds County District Attorney Jody Owens and former City Council President Aaron Banks, conspired to accept bribes from undercover FBI agents posing as developers. The charges outline the corruption: manipulating the bidding process, accepting bribes, and using political influence to benefit the developers. The indictment details specific instances of the bribery including a trip to Florida where Lumumba allegedly accepted $50,000. The indictment also details how Owens allegedly used his position to facilitate the scheme and leverage his influence over city council members. The trial is scheduled for January 6, 2025, just days before the qualifying period for the city's mayoral election. The poorest state in the nation has a history of public corruption, including a high-profile welfare fraud case that led to multiple convictions. Despite the serious allegations, Lumumba intends to continue serving as mayor and is running for re-election.

**Missouri:** Two former law enforcement members have been indicted on federal charges for allegedly abusing their authority to search the cell phones of multiple women—one from the Florissant Police Department and the other from the Missouri State Highway Patrol (MSHP). The U.S. Attorney's Office, Eastern District of Missouri, reported that Julian Alcala, a former Florissant police officer, was indicted on November 14, 2024, on charges of destroying records and deprivation of rights under color of law. He is accused of searching the cell phones of 20 women between February and May 2024, supposedly to verify insurance information or vehicle registration. However, the indictment alleges that Alcala used this pretext to search for nude photos, taking pictures of the images with his personal phone or forwarding videos to his personal phone. In a similar case, David McKnight, a former MSHP trooper in Cape Girardeau County, was indicted on November 12, 2024. He faces charges of destroying records and deprivation of rights for allegedly searching the cell phones of nine women between



# Criminal Legal News

*Criminal Legal News* is the sister publication of *Prison Legal News.* Both are published monthly by the Human Rights Defense Center, Inc. Same timely, relevant, and practical legal news and features as *PLN,* BUT *CLN* provides legal news you can use about the criminal justice system prior to confinement and post-conviction relief. Coverage includes:

- **Criminal Law & Procedure**
- **Prosecutorial/Police Misconduct**
- **Ineffective Counsel**
- **Militarization of Police**
- **Junk Science**
- **False Confessions**
- **Witness Misidentification**
- **Post-Release Supervision**
- **Due Process Rights**

- **Police Brutality**
- **Habeas Corpus Relief**
- **Sentencing Errors & Reform**
- **Surveillance State**
- **Wrongful Convictions**
- **Search & Seizure Violations**
- **Paid/Incentivized Informants**
- **Police State in America**

Between the two publications, every possible interaction with the criminal justice system is reported, analyzed, and exposed.

*"STOP RESISTING" and subscribe today!*

Subscriptions to *CLN* are $48/year for prisoners/individuals and $96/year for professionals/entities. To subscribe, send payment to: Criminal Legal News, P.O. Box 1151, Lake Worth Beach, FL 33460; (561) 360-2523. www.criminallegalnews.org

September 2023 and August 2024. Both officers' alleged actions are an abuse of power and a violation of the Fourth Amendment's protection against unreasonable searches and seizures.

**Missouri:** *KMBC* reported that police shot and killed Maria Pike and her two-month-old daughter, Destiny, in their Independence apartment on November 7, 2024. Police have yet to identify the killer cop or release any body camera footage of the incident. Independence Police Chief Adam Dustman said the officer who opened fire followed training because Pike allegedly had a knife. The family and eyewitnesses vehemently disagree with the police department's version of events. Mitchell Holder, Destiny's father and Maria's partner, witnessed the shooting and insists Maria had nothing in her hands. The tragedy began when Holder's mother called the police for a welfare check on the infant after an alleged altercation with her daughter-in-law. Despite having a mental health responder on-site, police rushed the apartment with guns drawn, even entering the wrong apartment initially in such a hurry that they held neighbor Bug Arnold at gunpoint. When the officers found the correct apartment, Holder recalled seeing his daughter shot. "I know she died instantly," the young father said. "It looked like her head exploded. Her blood splattered across my glasses and all over me." Family and community members are outraged by the killings and the lack of transparency from police. A vigil was held on November 15 demanding justice and calling for the release of body camera footage. Chief Adam Dustman has stood by his officer's decision. Three officers, including the officer who fired their gun, are on administrative leave while the investigation continues. Blue Springs Police Department Capt. Kyle Flowers is heading up the eastern Jackson County Police Incident Investigation Team that will look into the tragic use of force. The aunt of the murdered baby posted a GoFundMe page to collect $7,000 dollars for the infant's funeral.

**New York:** *WABC-TV* reported that a Rockville Centre police detective, John Murphy Jr., was charged with a hate crime on November 13, 2024, after allegedly harassing and assaulting a Black cell phone company worker in Manorville, New York. The incident, captured on video, shows Murphy, 40, using racial slurs and physically attacking field tech engineer Derick Anhwere, after kicking the technician's car, ripping off the amber light on top and throwing it at him. Murphy, who was off-duty at the time, allegedly identified himself as a law enforcement officer and refused to acknowledge the worker's identification. The charges against Murphy include criminal mischief as a hate crime and aggravated harassment. He has been suspended from the Rockville Centre Police Department pending the outcome of the case. This incident has sparked outrage and condemnation from local officials, who have emphasized zero tolerance for hate crimes. Suffolk County District Attorney Ray Tierney and County Executive Ed Romaine have vowed to pursue the case to the fullest extent of the law.

**Ohio:** A jury in Columbus, Ohio, award-

# Great Self-Help Books



Encyclopedia of
Everyday Law
**$34.99**



Criminal Law
A Desk Reference
**$44.99**



Represent Yourself
in Court
**$39.99**



Win Your Personal
Injury Claim
**$34.99**

**Order from Prison Legal News**
Add $6 shipping for orders under $50

**Prison Legal News**
PO Box 1151
Lake Worth Beach, FL 33460
Phone: 561-360-2523
www.prisonlegalnews.org



Criminal Law Handbook
**$49.99**



Legal Research
**$49.99**



Deposition Handbook
**$34.99**

**NOLO** YOUR LEGAL COMPANION

**News in Brief (cont.)**

ed $1.6 million on November 15, 2024, to a former Alcohol, Tobacco, Firearms and Explosives agent, who was wrongfully detained and assaulted by two City of Columbus Division of Police officers in 2020. The incident occurred when agent James Burk, on-duty and properly identified, responded to a call to retrieve an illegally owned shotgun. Upon arrival, he was immediately confronted by Officers Joseph Fihe and Kevin Winchell, who drew their weapons and ordered him to the ground. Despite Burk's repeated assertions of his federal agent status, the officers tased and handcuffed him. After the unwarranted assault, Burk's lawyers said he discovered Fihe and Winchell made him a target of ridicule using evidence from the incident. "Defendants shared body camera footage of the incident broadly within the Columbus Police Department and others outside CPD," the complaint read. "The footage was shared not for any proper purpose, but rather to ridicule and embarrass Agent Burk." The officers' actions were deemed excessive and unjustified, especially considering Burk's cooperation and clear identification. The jury determined that the officers' conduct directly caused Burk to suffer post-traumatic stress disorder and other significant harm.

**Pennsylvania:** The *North Central Pennsylvania* website reported that former Williamsport Bureau of Police officer Eric Bradley Derr, 40, avoided prison time on November 13, 2024, despite being convicted of 28 felonies for abusing Pennsylvania's Justice System Network (JNET). He was sentenced to probation, with the first year under house arrest. Derr used the system 93 times to illegally search information on 28 women, including co-workers and acquaintances, over several years. JNET was designed for authorized use by law enforcement and other agencies to streamline information sharing. Misuse of the platform violates confidentiality agreements and can result in severe penalties, including termination and legal action. Derr had signed such agreements and passed a JNET training exam in 2013, but investigators found he used the system for personal reasons. Derr's offenses included stalking and intimidating women, sharing explicit images of himself in uniform, and abusing his authority to manipulate personal relationships. His actions extended to searches of co-workers'

romantic partners, courthouse employees, and even a relative's acquaintances. Officer Ericka Heath, a colleague with seven years of experience in Lycoming County law enforcement, defended Derr. Heath alleged that other officers similarly misuse JNET, suggesting Derr's convictions were a targeted attack. Williamsport Police Chief Justin Snyder said his department strictly followed JNET policies and promised to address any violations swiftly. The case raises questions about oversight, however, as Derr's abuses persisted unchecked for years.

**Pennsylvania:** The state Supreme Court suspended a public defender on November 7, 2024, the *Eries Times-News* reported. Nathaniel Edmond Strasser has been suspended for a year and a day after appearing in court under the influence of cocaine two years ago. Strasser, 45, a lawyer since 2007, is also a former assistant district attorney for Erie County. Strasser was not charged criminally for his cocaine-fueled court appearance. The incident occurred during a 2022 preliminary hearing, where Strasser exhibited signs of drug use, including dilated pupils and a bleeding nose. A drug test later confirmed cocaine use. Despite these clear indications of impairment, Strasser maintained that the drug had a positive impact on his performance and argued during disciplinary proceedings that cocaine enhanced his cognitive abilities. The disciplinary board rejected Strasser's claims, citing his lack of remorse and failure to acknowledge the harm caused by his actions. The board also dismissed his request to reopen the case to present evidence of past substance abuse treatment. Strasser has worked in private practice during the disciplinary proceedings.

**South Dakota:** The state Supreme Court overturned an aggravated assault conviction on October 24, 2024, due to the ineffective performance of a court-appointed attorney, the *South Dakota Searchlight* reported. The case involved Christopher Schocker, 59, who was convicted in 2019. Schocker had a heated argument with a game warden after the warden seized a poached deer. Schocker refused to cooperate, cursed at the warden, and even approached him with a knife, though he eventually put it down. Despite initial charges related to firearm possession, he was ultimately convicted of aggravated assault and sentenced to 25 years in prison, with 15 years suspended. Schocker appealed the conviction to the state Supreme Court, claiming insufficient evidence. The appeal argued that the

original attorney, Robert Doody, had missed a crucial defense: Schocker was holding the knife to cut a legitimate tag off the poached deer, not to threaten the officer. The appeal also argued that Doody had failed to interview key witnesses and did not adequately communicate with his client. The Supreme Court agreed and found that Doody's performance fell below the standard of reasonable legal assistance. The October decision comes as broader efforts to address the issue of ineffective public defense in South Dakota are occurring. The state has established a statewide public defender's office to improve representation for indigent defendants. Rural areas, where resources and qualified attorneys are limited, present the most challenges to securing adequate defense.

**Tennessee:** A former McNairy County Sheriff's Deputy has been charged with multiple felonies after fatally shooting seven dogs while responding to an animal welfare call. On November 4, 2024, Connor Bracking, 24, responded to a home in Bethel Springs to assess the condition of several dogs according to *WBBJ* out of Jackson. Despite releasing one dog to the homeowner, the deputy with one month on the job proceeded to shoot and kill the remaining seven dogs, both inside and outside the trailers where the owner lived. The Tennessee Bureau of Investigation (TBI) launched an investigation into the incident after receiving a request from the local District Attorney. Based on the evidence, including body camera footage, Brackin was charged with seven counts of aggravated cruelty to animals and eight counts of reckless endangerment. The willful destruction of animals has sparked outrage and raised serious concerns about police use of force. McNairy County Sheriff Guy Buck said the decision made by the deputy was one that should have never been made. The McNairy County Sheriff's Department has condemned Brackin's actions and emphasized that his decision-making was both illegal and unjustified. Brackin was scheduled to appear in court on November 21, 2024. ◪

**Roget's Thesaurus**
Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. $9.95
See page 53 for ordering information.

# Human Rights Defense Center Book Store

FREE SHIPPING on all book orders OVER $50 (effective 9-21-2022 until further notice). $6.00 S/H applies to all other book orders.

**Prison Profiteers: Who Makes Money from Mass Incarceration,** edited by Paul Wright and Tara Herivel, 323 pages. **$24.95**. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. Prison Profiteers is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how. **1063**

**Prison Education Guide,** by Christopher Zoukis, PLN Publishing (2016), 269 pages. **$24.95**. This book includes up-to-date information on pursuing educational coursework by correspondence, including high school, college, paralegal and religious studies. **2019**

**The Habeas Citebook: Ineffective Assistance of Counsel, 2nd Ed. (2016)** by Brandon Sample, PLN Publishing, 275 pages. **$49.95**. This is an updated version of PLN's second book, by former federal prisoner Brandon Sample, which extensively covers ineffective assistance of counsel issues in federal habeas petitions. **2021**

**Prison Nation: The Warehousing of America's Poor,** edited by Tara Herivel and Paul Wright, 332 pages. **$54.95**. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S. **1041**

**The Celling of America, An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$24.95**. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system. **1001**

**The Criminal Law Handbook: Know Your Rights, Survive the System**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, 16th Ed, Nolo Press, 648 pages. **$39.99**. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy-to-understand question-and-answer format. **1038**

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, 10th Ed, Nolo Press, 600 pages. **$39.99**. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. **1037**

**Writing to Win: The Legal Writer**, by Steven D. Stark, Broadway Books/Random House, 303 pages. **$19.95**. Explains the writing of effective complaints, responses, briefs, motions and other legal papers. **1035**

**The Blue Book of Grammar and Punctuation**, by Jane Straus, 201 pages. **$19.99**. A guide to grammar and punctuation by an educator with experience teaching English to prisoners. **1046**

**Legal Research: How to Find and Understand the Law**, 19th Ed., by Stephen Elias and Susan Levinkind, 368 pages. **$49.99**. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises. **1059**

**All Alone in the World: Children of the Incarcerated**, by Nell Bernstein, 303 pages. **$19.99**. A moving condemnation of the U.S. penal system and its effect on families" (Parents' Press), award-winning journalist Nell Bernstein takes an intimate look at parents and children—over two million of them - torn apart by our current incarceration policy. **2016**

**Blue Collar Resume**, by Steven Provenzano, 210 pages. **$16.95**. The must have guide to expert resume writing for blue and gray-collar jobs. **1103**

**Protecting Your Health and Safety**, by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00**. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation. **1060**

**Spanish-English/English-Spanish Dictionary**, 2nd ed., Random House. 694 pages. **$15.95**. Has 145,000+ entries from A to Z; includes Western Hemisphere usage. **1034a**

**The Merriam-Webster Dictionary**, 2016 edition, 939 pages. **$9.95**. This paperback dictionary is a handy reference for the most common English words, with more than 75,000 entries. **2015**

**Roget's Thesaurus**, 709 pages. **$9.95**. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words. **1045**

**Beyond Bars, Rejoining Society After Prison**, by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 224 pages. **$14.95**. Beyond Bars is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more. **1080**

**Directory of Federal Prisons: The Unofficial Guide to Bureau of Prisons Institutions**, by Christopher Zoukis, 764 pages. **$99.95**. A comprehensive guidebook to Federal Bureau of Prisons facilities. This book delves into the shadowy world of American federal prisoners and their experiences at each prison, whether governmental or private. **2024**

**Merriam-Webster's Dictionary of Law**, 634 pages. **$19.95**. Includes definitions for more than 10,000 legal words and phrases, plus pronunciations, supplementary notes and special sections on the judicial system, historic laws and selected important cases. Great reference for jailhouse lawyers who need to learn legal terminology. **2018**

**The Best 500+ Non-Profit Organizations for Prisoners and Their Families**, 5th edition, 170 pages. $19.99. The only comprehensive, up-to-date book of non-profit organizations specifically for prisoners and their families. Cross referenced by state, organization name and subject area. Find what you want fast! **2020**

**Deposition Handbook**, by Paul Bergman and Albert Moore, 7th Ed. Nolo Press, 440 pages. **$34.99**. How-to handbook for anyone who conducts a deposition or is going to be deposed. **1054**

**Please Note**: Book orders are mailed via the U.S. Postal Service with delivery confirmation. PLN does not assume responsibility to replace book orders once their delivery to the destination address (facility) is confirmed by the postal service. If you are incarcerated and placed a book order but did not receive it, please check with your facility's mailroom before checking with us. If books ordered from PLN are censored by corrections staff, please file a grievance or appeal the mail rejection, then send us a copy of the grievance and any response you received

**Prisoners' Self-Help Litigation Manual**, updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 928 pages. **$69.95**. The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Includes detailed instructions and thousands of case citations. Highly recommended!    **1077**

**How to Win Your Personal Injury Claim**, by Atty. Joseph Matthews, 9th edition, NOLO Press, 411 pages. **$34.99**. While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.    **1075**

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits**, by Lewis Laska, 336 pages. **$39.95**. Written for victims of medical malpractice/neglect, to prepare for litigation. Note that this book addresses medical malpractice claims and issues in general, not specifically related to prisoners.    **1079**

**Disciplinary Self-Help Litigation Manual**, by Daniel Manville, 355 pages. **$49.95**. By the co-author of the Prisoners' Self-Help Litigation Manual, this book provides detailed information about prisoners' rights in disciplinary hearings and how to enforce those rights in court. Includes state-by-state case law on prison disciplinary issues. This is the third book published by PLN Publishing.    **2017**

**The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act,** by John Boston, 576 pages. **Prisoners - $84.95, Lawyers/ Entities - $224.95**. This book is the best and most thorough guide to the PLRA provides a roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims.    **2029**

**Everyday Letters for Busy People: Hundreds of Samples You Can Adapt at a Moment's Notice**, by Debra May, 287 pages. **$21.99**. Here are hundreds of tips, techniques, and samples that will help you create the perfect letter.    **1048**

**Federal Prison Handbook**, by Christopher Zoukis, 493 pages. **$74.95**. This leading survival guide to the federal Bureau of Prisons teaches current and soon-to-be federal prisoners everything they need to know about BOP life, policies and operations.    **2022**

**Locking Up Our Own, by James Forman Jr.**, 306 pages. **$19.95**. In Locking Up Our Own, he seeks to understand the war on crime that began in the 1970s and why it was supported by many African American leaders in the nation's urban centers.    **2025**

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.**, by Mumia Abu-Jamal, 286 pages. **$16.95**. In Jailhouse Lawyers, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned advocates who have learned to use the court system to represent other prisoners—many uneducated or illiterate—and in some cases, to win their freedom.    **1073**

**The Habeas Citebook: Prosecutorial Misconduct**, by Alissa Hull, 300 pages. **$59.95**. This book is designed to help pro se litigants identify and raise viable claims for habeas corpus relief based on prosecutorial misconduct. Contains hundreds of useful case citations from all 50 states and on the federal level.    **2023**

**Arrest-Proof Yourself,** Second Edition, by Dale C. Carson and Wes Denham, 376 pages. **$16.95**. What do you say if a cop pulls you s to search your car? What if he gets up in your face and uses a racial slur? What if there's a roach in the ashtray? And what if your hot-headed teenage son is at the wheel? If you read this book, you'll know exactly what to do and say.    **1083**

**Caught: The Prison State and the Lockdown of American Politics**, by Marie Gottschalk, 496 pages. **$27.99**. This book examines why the carceral state, with its growing number of outcasts, remains so tenacious in the United States.    **2005**

**Encyclopedia of Everyday Law**, by Shae Irving, J.D., 11th Ed. Nolo Press, 544 pages. **$34.99**. This is a helpful glossary of legal terms and an appendix on how to do your own legal research.    **1102**

**\* ALL BOOKS SOLD BY PLN ARE SOFTCOVER / PAPERBACK \***

## To Pay by Credit Card, Go to Our Website: www.criminallegalnews.org or Call Us at 561-360-2523

### Subscription Rates

|                          | 1 Year | 2 Years | 3 Years | 4 Years |
|--------------------------|--------|---------|---------|---------|
| **Prisoners/Individuals** | **$48** | **$96** | **$144** | **$192** |
| **Professionals** <br>(attorneys, agencies, libraries) | **$96** | **$192** | **$288** | **$384** |

<u>Mail Payment and Order to:</u>

Human Rights Defense Center
PO Box 1151
Lake Worth Beach, FL 33460

Please Change my Address to what is entered below: ☐

**Ship Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

### Subscription Bonuses

2 year subscription include 2 extra issues
3 year subscription include 4 extra issues
4 year subscription include 6 extra issues
(All subscription rates and bonus offers are valid as of 1/1/2022)

### Subscribe to Criminal Legal News

6 month subscription (prisoners only) - $28   _____

1 yr subscription   _____

2 yr subscriptions (2 bonus issues)   _____

3 yr subscriptions (4 bonus issues)   _____

4 yr subscriptions (6 bonus issues)   _____

Single back issue or sample copy of CLN - $6.00   _____

### Book Orders

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

Add $6.00 S/H to BOOK ORDERS under $50   _____

**FL residents ONLY add 7% to Total <u>Book</u> Cost**   _____

**TOTAL Amount Enclosed:**   _____

**\* NO REFUNDS on CLN subscription or book orders after orders have been placed. \***
**\* We are not responsible for incorrect addresses or address changes after orders have been placed. \***

*Introducing the latest in the Citebook Series from Prison Legal News Publishing*



# The Habeas Citebook: Prosecutorial Misconduct

**By Alissa Hull**
**Edited by Richard Resch**

*The Habeas Citebook: Prosecutorial Misconduct* is part of the series of books by Prison Legal News Publishing designed to help pro se prisoner litigants and their attorneys identify, raise and litigate viable claims for potential habeas corpus relief. This easy-to-use book is an essential resource for anyone with a potential claim based upon prosecutorial misconduct. It provides citations to over 1,700 helpful and instructive cases on the topic from the federal courts, all 50 states, and Washington, D.C.  It'll save litigants hundreds of hours of research in identifying relevant issues, targeting potentially successful strategies to challenge their conviction, and locating supporting case law.

The Habeas Citebook: Prosecutorial Misconduct *is an excellent resource for anyone seriously interested in making a claim of prosecutorial misconduct to their conviction. The book explains complex procedural and substantive issues concerning prosecutorial misconduct in a way that will enable you to identify and argue potentially meritorious claims. The deck is already stacked against prisoners who represent themselves in habeas. This book will help you level the playing field in your quest for justice.*

—Brandon Sample, Esq., Federal criminal defense lawyer, author, and criminal justice reform activist

***The Habeas Citebook: Prosecutorial Misconduct***

Paperback, 300 pages

**$59.95**

*(includes shipping)*

**Order by mail, phone, or online.**  Amount enclosed _____

By: ☐ check    ☐ credit card    ☐ money order

Name: _____

DOC/BOP Number: _____

Institution/Agency: _____

Address: _____

City: _____ State: _____ Zip: _____

**Human Rights Defense Center**
**Dedicated to Protecting Human Rights**
PO Box 1151 • Lake Worth Beach, FL 33460 • Phone # 561-360-2523
WWW.PRISONLEGALNEWS.ORG  •  WWW.CRIMINALLEGALNEWS.ORG



## Criminal Legal News
PO Box 1151
Lake Worth Beach FL 33460

**CHANGE SERVICE REQUESTED**

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

### 1/25 — Subscription Renewal
The above mailing address for CLN subscribers indicates how many issues remain on the subscription. For example, if it says "10 LEFT" just above the mailing address, there are 10 issues of CLN remaining on the subscription before it expires. IF IT SAYS "0 LEFT," THIS IS YOUR LAST ISSUE. Please renew at least 2 months before the subscription ends to avoid missing any issues.

### Change of Address
If you move or are transferred, please notify CLN as soon as possible so your issues can be mailed to your new address! CLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



www.criminallegalnews.org

# Criminal Legal News is online!

Full issues of CLN are available on our website at www.criminallegalnews.org.

In addition to the content available in CLN's print issues, our website contains updated criminal justice related news stories, subscribing and book ordering information, ability to search all past articles, HRDC Litigation Project information, and much more!

Visit us online today for all your criminal justice related news and information!

THIRD EDITION

# PRISONERS' GUERRILLA HANDBOOK

## TO CORRESPONDENCE PROGRAMS

### IN THE UNITED STATES & CANADA

By JON MARC TAYLOR, PhD

Edited by Susan Schwartzkopf, MA

Foreword by Rev. Vivian Nixon

## HIGH SCHOOL • VOCATIONAL • PARALEGAL
## LAW • COLLEGE • GRADUATE COURSES

EXHIBIT

1-F

# Contents

**Publisher's Introduction**   5

**Foreword**   7

**About the Author**   10

**The Need for this Book**   14

**How to Use this Book**   17

How to Use the Outlines as an Evaluation Tool   17

Summation   24

**Factors in Selecting a Program**   25

**Accreditation**   27

**Diploma Mills**   30

**The Least Expensive Path to a Baccalaureate**   32

**Other College-Level Credit Sources**   36

**Managing Your Education**   42

How Independent Learning Works   47

Words to the Wise   48

Study Tips   48

Anti-Procrastination Tips   49

The Highly Productive Learner   49

Create Your Own University   51

**High School Outlines**   55

**Vocational Program Outlines**   73

**Paralegal Program Outlines**   121

**Undergraduate Programs (Colleges & Universities)**   136

**Graduate Program Outlines**   199

**Index**   215

Case No. 1:26-cv-01354-RMR-NRN    Document 2-1    filed 03/31/26    USDC Colorado
pg 420 of 436

# PROTECTING YOUR
# HEALTH & SAFETY

## A LITIGATION GUIDE FOR INMATES

WRITTEN BY ROBERT E. TOONE                    EDITED BY DAN MANVILLE



**SPLC** Southern Poverty Law Center

EXHIBIT

1-G

exhibitsticker.com

# PROTECTING YOUR
# HEALTH & SAFETY

## A LITIGATION GUIDE FOR INMATES

WRITTEN BY ROBERT E. TOONE                    EDITED BY DAN MANVILLE

**A PROJECT OF THE SOUTHERN POVERTY LAW CENTER**

**Protecting Your Health & Safety**
A Litigation Guide For Inmates

Second Edition, 2009

Copyright © 2009 by the Southern Poverty Law Center

*All rights reserved. No part of this publication may be reproduced, stored in a retrieval system or transmitted, in any form or by any means, electronic, mechanical, photocopy, recording, or otherwise, without the prior written permission of the publisher. Printed in the United States of America*

Design Director Russell Estes

# Contents

**PREFACE**                                                      13

**1 INTRODUCTION**                                              15
**A. What This Manual Does**                                    15
**B. How This Manual is Organized**                             16
**C. How This Manual is Written**                               17

**PART I**
**2 OVERVIEW OF THE LAW**                                       21
**A. Introduction: Rights and Duties**                          21
**B. Sources of Law That Give Inmates Rights**                  21
   1. The Federal Constitution                   21
   2. Federal Statutes                           22
   3. State Constitutions and Statutes           23
   4. Tort Law                                   24
   5. Regulations                                25
   6. International Human Rights Law              25

**3 FIRST AMENDMENT RIGHTS**                                    27
**A. Political Rights**                                         27
**B. Access to the Courts**                                     28
**C. Retaliation**                                              29
**D. Freedom of Religion**                                      29
**E. Family Relationships**                                     30
**F. Communicating With the Outside World**                     31
**G. Standard of Review of Prison Regulations**                 32
**H. Conclusion**                                               33

**4 DUE PROCESS RIGHTS**                                        35
**A. Liberty Interest**                                         35
**B. Loss of Property**                                         37
**C. Transfers**                                                37
**D. Programs, Work and Classification**                        38

**5 EQUAL PROTECTION**                                          39
**A. Equal Protection Tests**                                   39
   1. Strict Scrutiny                            39
   2. Intermediate Scrutiny                      40
   3. Rational Basis                             40
**B. Application of Equal Protection Standard**                 42
   1. Race                                       42
   2. National Origin                            42

3. Sexuality                                                      43
4. Gender                                                         43
5. Disability                                                     45
6. Religion                                                       46

**6 DELIBERATE INDIFFERENCE**                                     **47**
**A. Farmer v. Brennan**                                          **47**
**B. A Subjective Requirement: Actual Knowledge**                 **48**
**C. What Deliberate Indifference is Not**                        **49**
1. Less Than Intent to Hurt                                       49
2. More Than Negligence                                          50
**D. Proving What Officials Knew**                                **51**
**E. Reasonable Responses**                                       **53**

**7 EXCESSIVE FORCE AND OTHER ABUSE BY JAIL AND PRISON OFFICIALS** **55**
**A. Excessive Force**                                            **55**
1. Excessive Force During Arrest                                  55
2. Excessive Force Against Pretrial Detainees                     56
3. Excessive Force Against Convicted Inmates                      56
   *a. The Need for Force*                                        *57*
   *b. Was the Right Amount of Force Used?*                       *58*
   *c. The Extent of Injury/"De Minimis" Uses of Force*           *60*
   *d. The Extent of the Threat to the Safety of Staff and Inmates* *62*
   *e. Efforts Made to Temper the Severity of a Forceful Response* *62*
4. Failure to Stop Other Officials' Excessive Force               62
5. Corporal Punishment                                           63
6. Restraints                                                    64
7. Sexual Assault and Harassment                                 65

**8 PROTECTION FROM ASSAULT BY OTHER INMATES**                    **67**
**A. The Right to be Protected**                                  **68**
**B. Elements of a Failure-to-Protect Claim**                     **69**
1. Substantial Risk of Serious Harm                               69
2. Official's Knowledge of Risk                                   70
3. Official's Failure to Respond Reasonably                       71
4. Causation and Injury                                           72
**C. Typical Failure-to-Protect Claims**                          **73**
1. Victim is Unusually Vulnerable                                 73
2. Attacker is Unusually Dangerous                                74
3. Attacker Threatened Victim                                     76
4. Official Encouraged Attack                                     76
5. Guards Witness Attack, But Fail to Stop It                     77
6. Inmates Run the Place                                          78
7. Failure to Control Tools and Weapons                           79
8. Overcrowding and Understaffing                                 79

**9 MEDICAL CARE** — **81**
**A.  The Right to Medical Care** — **82**
**B.  Elements of Medical Care Claim** — **82**
  1.  Serious Medical Need — 83
  2.  Official's Knowledge of Need — 87
  3. Failure to Provide Treatment — 88
    *a. You are Denied Medical Attention* — *88*
    *b. Official's Delay in Getting You Medical Attention* — *89*
    *c. The Medical Treatment You Receive is Inadequate* — *90*
    *d. Officials Interfere With Your Prescribed Treatment* — *92*
    *e. Treatment After Release* — *93*
  4.  Causation and Injury — 93
**C.  Special Medical Needs** — **94**
  1. Infectious Diseases — 94
    *a. HIV/AIDS* — *95*
    *b. Hepatitis* — *96*
    *c. Tuberculosis* — *97*
    *d. Sexually Transmitted Diseases* — *98*
    *e. Staph Infection (Staphylococcus Aureus)* — *99*
  2. Chronic Diseases and Conditions — 100
  3. Disabled Inmates — 101
  4. Medical Diets — 103
  5. Drug and Alcohol Withdrawal — 103
  6. Pregnancy, Childbirth, and Abortion — 104
  7. Dental Care — 105
  8. Mental Health — 105
  9. Administration of Medication Without Your Consent — 107
**D.  Systemic Problems** — **107**

**10 CONDITIONS OF CONFINEMENT** — **111**
**A. The Constitutional Right to Humane Conditions** — **112**
**B. Elements of a Conditions Claim** — **113**
  1. Deprivation of a Basic Human Need — 113
  2. Official's Knowledge of Deprivation — 114
  3. Failure to Respond Reasonably — 116
  4. Causation and Injury — 117
**C. Basic Human Needs** — **118**
  1. Sanitation and Hygiene — 118
  2. Clothing and Bedding — 120
  3. Protection From Extreme Temperature — 121
  4. Clean Air — 122
  5. Clean Water — 123
  6. Lighting — 123
  7. Protection From Excessive Noise — 124

8. Accident Prevention 124
9. Exercise 125
10. Food 126
11. Living Space/Overcrowding 127

**PART II**

**11 OVERVIEW OF THE LEGAL SYSTEM** 133
**A. Federal And State Courts** 133
1. Federal Courts 133
*a. District Courts* *134*
*b. Courts of Appeals* *135*
*c. U.S. Supreme Court* *136*
2. State Courts 136
3. Deciding Between State and Federal Court 137
**B. Legal Citations** 138
**C. Legal Research** 139
1. Case Reporters 139
2. Statutory Codes 141
3. Digests, Legal Encyclopedias, and Legal Dictionaries 141
4. Treatises 141
5. Law Review Articles 142
6. Staying Focused 142
**D. Legal Writing** 143
1. General Principles 143
2. Technical Rules 145

**12 EXHAUSTION OF ADMINISTRATIVE REMEDIES** 149
**A. Understanding the Exhaustion Requirement** 149
**B. Tips on Exhausting** 150
1. Learning About Administrative Remedies 150
2. Timing 151
3. Content 152
**C. Proving Exhaustion** 153

**13 BASICS OF A FEDERAL LAWSUIT** 155
**A. Section 1983 and Bivens Lawsuits** 155
1. Violations 156
2. Plaintiffs 156
*a. Standing* *156*
*b. Joinder of Parties* *157*
3. Defendants 157
*a. Under Color of State Law* *158*
*b. Individual and Official Capacity* *159*
*c. Supervisory Liability* *160*
*d. Municipal Liability* *162*

*e. State and Federal Government Liability*     *162*
4. Remedies     163
   *a. Damages*     *163*
   *b. Injunctive and Declaratory Relief*     *169*
**B. Matching Your Facts to the Law**     **172**
1. Writing Your Facts Down     172
2. Creating an Evidence Chart     173
**C. Deciding Whether to File**     **176**
**D. Seeking Legal Representation**     **177**
**E. The Path of a Federal Lawsuit**     **179**
1. The Litigation Process     180
2. Keeping Your Lawsuit Moving     181

**14 FILING A COMPLAINT**     **185**
**A. Finding the Right District Court**     **185**
**B. Writing the Complaint**     **186**
1. Caption and Jury Demand     187
2. Statement of Jurisdiction     189
3. Statement of Venue     189
4. List of Parties     189
5. Exhaustion of Administrative Remedies     190
6. Factual Allegations     191
7. Causes of Action     196
8. Prayer for Relief     198
9. Signature     198
10. Verification     199
**C. Moving for a Preliminary Injunction**     **199**
**D. Moving for Appointment of Counsel**     **208**
**E. Moving to Proceed In Forma Pauperis**     **210**
1. Filing Fee     210
2. Why Apply for IFP Status?     211
3. The "Three Strikes" Provision     211
**F. Filing and Service**     **212**
1. Filing     212
2. Service     212

**15 INITIAL RESPONSES TO YOUR COMPLAINT**     **215**
**A. Initial Processing**     **215**
**B. District Court Screening**     **215**
**C. Waivers of Reply**     **217**
**D. Special Reports**     **218**
**E. Motions to Dismiss**     **219**
1. Procedure     219
   *a. Rule 12(B)(1): Subject-Matter Jurisdiction*     *219*

| | |
|---|---|
| *b. Rule 12(B)(6): Failure to State a Claim* | *220* |
| 2. Grounds for Dismissal | 221 |
| *a. Rule 12(B)(1) Grounds* | *221* |
| *b. Rule 12(B)(6) Grounds* | *222* |
| 3. Responding to a Motion to Dismiss | 224 |
| **F. Other Early Defense Motions** | **225** |
| **G. Amended And Supplemental Complaints** | **226** |
| **H. Answers** | **227** |
| | |
| **16 DISCOVERY** | **229** |
| **A. Informal Investigation** | **229** |
| **B. The Rule 26(f) Meeting** | **232** |
| **C. Automatic Disclosures** | **234** |
| 1. Initial Disclosures | 234 |
| 2. Disclosure of Expert Testimony | 235 |
| 3. Pretrial Disclosures | 236 |
| 4. SUPPLEMENTATION | 236 |
| **D. Planning Your Discovery** | **236** |
| 1. Identifying Your Weak Points | 236 |
| 2. The Scope of Discovery | 236 |
| 3. Organizing Your Discovery Requests | 238 |
| 4. Keeping Your Eye on the Clock | 239 |
| **E. Discovery Tools** | **239** |
| 1. Interrogatories | 239 |
| 2. Document Requests | 242 |
| 3. Inspection of Things and Places | 244 |
| 4. Depositions | 245 |
| 5. Requests for Admission | 248 |
| **F. Objections, Motions To Compel, And Protective Orders** | **249** |
| 1. Objections | 249 |
| 2. Privileges | 250 |
| 3. Motions to Compel | 251 |
| 4. Protective Orders | 252 |
| G. Responding To Defendants' Discovery Requests | 253 |
| | |
| **17 SUMMARY JUDGMENT** | **257** |
| **A. The Rule 56(c) Standard** | **257** |
| 1. Material Facts | 257 |
| 2. Genuine Issues | 258 |
| **B. Summary Judgment Procedure** | **259** |
| 1. Moving for Summary Judgment | 260 |
| 2. Responding to a Motion | 260 |
| *a. Facts* | *261* |
| *b. Law* | *262* |

| | |
|---|---|
| *c. Example* | *262* |
| 3. Requesting More Time for Discovery Under Rule 56(F) | 265 |
| **C. Seeking Summary Judgment** | **266** |
| **18 SETTLEMENTS AND TRIALS** | **269** |
| **A. Settlement** | **269** |
| 1. Settlement Strategy | 270 |
| 2. Damage Settlements | 271 |
| 3. Injunctive Settlements | 271 |
| **B. Trial** | **272** |
| 1. Pretrial Proceedings | 273 |
| 2. Conducting a Trial | 275 |
| *a. Jury Selection* | *276* |
| *b. Opening Statement* | *277* |
| *c. Direct Examination of Witnesses* | *278* |
| *d. Presentation of Exhibits* | *280* |
| *e. Cross Examination of Witnesses* | *281* |
| *f. Objections* | *284* |
| *g. Closing Argument* | *286* |
| *h. Jury Instructions; Verdict or Decision* | *289* |
| 3. Post-Judgment Proceedings | 290 |
| **C. Conclusion** | **291** |
| **GLOSSARY** | **293** |
| **UNITED STATES DISTRICT COURTS** | **301** |
| **LEGAL RESOURCES** | **313** |
| **INDEX** | **317** |



# *Please Support the Human Rights Defense Center!*



The Human Rights Defense Center (HRDC), which publishes Prison Legal News and Criminal Legal News, cannot fund its operations through subscriptions and book sales alone. We rely on donations from supporters!

HRDC conducts only one annual fundraiser; we don't bombard our readers with donation requests, we only ask that if you are able to contribute something to our vital work, then please do so. Every dollar counts and is greatly appreciated and will be put to good use. No donation is too small (or too big)!

## Where does your donation go? Here's some of what we do:

- We won censorship lawsuits against jails in Maryland, Minnesota and Colorado ensuring prisoners can receive books and magazines in the mail.

- We filed lawsuits against prison systems in Florida and continue litigating lawsuits against prison systems in Michigan, Illinois, Arizona and Indiana which have censored HRDC publications.

- We won public record lawsuits against private prison companies, Geo and Corizon and ICE, the US Marshalls Service and various other state and federal agencies.

- We advocated for lower prison phone rates before the Federal Communications Commission and the California Public Utilities Commission.

- We continue litigating and advocating for the elimination of fee laden debit cards in the criminal justice system.

- • We have brought timely and informative coverage of Covid-19 throughout the pandemic at a national level.

## We need your help to keep doing this and a lot more! Please send your donation to:

### Human Rights Defense Center, P.O. Box 1151, Lake Worth Beach, FL 33460
*Or* call HRDC's office at 561-360-2523 and use your credit card to donate.
Or visit our website at prisonlegalnews.org or criminallegalnews.org and click on the "Donate" link.

---

**Yes! I want to help support HRDC. Here is my special donation of:**

____ $25   ____ $50 ____ $100 ____ $250

____ $500 ____ $1,000 _____ Other

**Note**: For your donation of $100 or more, we'll send a free copy of *The Habeas Citebook, 2nd ed.* or the *Prison Education Guide* to a prison library on your behalf!

We protect the privacy of our donors, and their names are not reported in our publication or on our website.

*PLN is a project of the Human Rights Defense Center, a 501(c)(3) non-profit, and donations are tax deductible to the extent allowed by law.*

---

**Credit card donors please fill out the following form:**

I want to make a one-time contribution of $_____ to HRDC, charged to my credit card.

I want to contribute a fixed amount to HRDC each month! I authorize HRDC to charge $_____ on my credit card every month until I give notice to stop.

Name on Credit Card: _____

Card number:  _ _ _ _ - _ _ _ _ - _ _ _ _ - _ _ _ _

CCV number: _____   Expiration date: _____

Billing Zip Code: _____

Phone number _____

I authorize HRDC to charge a total of $_____ to my credit card, per the instructions indicated above.

Cardholder signature: _____

Date: _____

**EXHIBIT**

**1-H**

**PREORDER YOUR COPY OF THE PLRA HANDBOOK**

*The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act*

**John Boston** ☐ ***Prisoners $84.95*** ☐ ***Lawyers/Entities $224.95***



ISBN-13: 979-8-9854138-0-9 • Paperback, 698 pages

The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act is the best and most thorough guide to the PLRA provides a roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims.

### Prison Education Guide $49.95

**Christopher Zoukis**



ISBN: 978-0-9819385-3-0 • Paperback, 269 pages

Prison Education Guide is the most comprehensive guide to correspondence programs for prisoners available today. This exceptional book provides the reader with step by step instructions to find the right educational program, enroll in courses, and complete classes to meet their academic goals. This book is an invaluable reentry tool for prisoners who seek to further their education while incarcerated and to help them prepare for life and work following their release.

### The Habeas Citebook: Ineffective Assistance of Counsel, Second Edition $49.95

**Brandon Sample & Alissa Hull**



ISBN: 978-0-9819385-4-7 • Paperback, 275 pages

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.

### Disciplinary Self-Help Litigation Manual, Second Edition $49.95

**Dan Manville**



ISBN: 978-0-9819385-2-3 • Paperback, 355 pages

The Disciplinary Self-Help Litigation Manual, Second Edition, by Dan Manville, is the third in a series of books by Prison Legal News Publishing. It is designed to inform prisoners of their rights when faced with the consequences of a disciplinary hearing. This authoritative and comprehensive work educates prisoners about their rights throughout this process and helps guide them at all stages, from administrative hearing through litigation. The Manual is an invaluable how-to guide that offers step-by-step information for both state and federal prisoners, and includes a 50-state analysis of relevant case law and an extensive case law citation index.

### The Habeas Citebook: Prosecutorial Misconduct $59.95

**Alissa Hull**

ISBN-13: 978-0-9819385-5-4 • Paperback, 300 pages

The Habeas Citebook: Prosecutorial Misconduct is the second in PLN Publishing's citebook series. It's designed to help pro se prisoner litigants identify and raise viable claims for potential habeas corpus relief based on prosecutorial misconduct in their cases. This invaluable title contains several hundred case citations from all 50 states and on the federal level, saving readers many hours of research in identifying winning arguments to successfully challenge their convictions.

☐ The PLRA Handbook

☐ Prison Education Guide

☐ The Habeas Citebook

☐ Disciplinary Self-Help Litigation Manual

☐ The Habeas Citebook: Prosecutorial Misconduct

Order by mail, phone, or online.    Amount enclosed _____

By: ☐ check  ☐ credit card  ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State _____ Zip _____



**Human Rights Defense Center** PO Box 1151 • Lake Worth Beach, FL 33460

**Dedicated to Protecting Human Rights** Tel 561-360-2523 • www.prisonlegalnews.org

## Order Form

**Note: All purchases must be pre-paid.**

| Book Title/Number | Qty | Total Cost |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(attach another page if you are ordering more books)

Subtotal: _____

Add 7% sales tax for FL residents only: _____

Add $6.00 S/H to orders UNDER $50: _____

Total Order Amount: _____

**Send to:**

Name: _____

DOC #: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

MAIL PAYMENT AND THIS FORM TO:



Human Rights Defense Center
PO Box 1151
Lake Worth Beach, FL 33460

Purchase by phone with a Visa or Mastercard,
Amex or Discover Card: 561-360-2523
Or buy books and subscriptions online at
www.prisonlegalnews.org

---

**FREE SHIPPING**
**On book orders OVER $50.00!**
**A $6.00 shipping charge applies to all other book orders.**

(Free shipping policy in effect from 1-1-22 until further notice)

Note: All books sold by the Human Rights
Defense Center are soft cover/paperback

**The Habeas Citebook: Ineffective Assistance of Counsel, 2nd Ed. (2016)** by Brandon Sample, PLN Publishing, 275 pages. **$49.95**. This is an updated version of PLN's second book, by former federal prisoner Brandon Sample, which extensively covers ineffective assistance of counsel issues in federal habeas petitions. **2021**

**Prisoners' Self-Help Litigation Manual**, updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 928 pages. **$59.95**. The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Includes detailed instructions and thousands of case citations. Highly recommended! **1077**

**Prison Education Guide,** by Christopher Zoukis, PLN Publishing (2016), 269 pages. **$49.95**. This book includes up-to-date information on pursuing educational coursework by correspondence, including high school, college, paralegal and religious studies. **2019**

**Protecting Your Health and Safety**, by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00**. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation. **1060**

**Disciplinary Self-Help Litigation Manual**, by Daniel Manville, 355 pages. **$49.95**. By the co-author of the Prisoners' Self-Help Litigation Manual, this book provides detailed information about prisoners' rights in disciplinary hearings and how to enforce those rights in court. Includes state-by-state case law on prison disciplinary issues. This is the third book published by PLN Publishing. **2017**

**The Habeas Citebook: Prosecutorial Misconduct**, by Alissa Hull, 300 pages. **$59.95**. This book is designed to help pro se litigants identify and raise viable claims for habeas corpus relief based on prosecutorial misconduct. Contains hundreds of useful case citations from all 50 states and on the federal level. **2023**

**Prices effective as of 1-1-2022 and subject to change**
**\* No refunds after orders have been placed \***
**Not responsible for incorrect addresses or address changes after orders have been placed.**

---

# 2022 BOOKSTORE LIST



# Human Rights Defense Center
## Dedicated to Protecting Human Rights

**Prices Subject to Change Without Notice**

*Effective as of 1/1/2022*

**PO Box 1151 • Lake Worth Beach, FL 33460**
**561-360-2523**
**www.prisonlegalnews.org**
**www.criminallegalnews.org**

Use the Order Form on the other side of this brochure to add up the cost of your order, **FREE SHIPPING** for book orders **OVER $50**. There is a $6.00 shipping charge for all other book orders.

**The Celling of America, An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$24.95**. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system. **1001**

**Prison Nation: The Warehousing of America's Poor,** edited by Tara Herivel and Paul Wright, 332 pages. **$54.95**. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S. **1041**

**Prison Profiteers: Who Makes Money from Mass Incarceration,** edited by Paul Wright and Tara Herivel, 323 pages. **$24.95**. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. Prison Profiteers is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how. **1063**

**The Criminal Law Handbook: Know Your Rights, Survive the System**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, 16th Ed, Nolo Press, 648 pages. **$39.99**. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy-to-understand question-and-answer format. **1038**

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, 10th Ed, Nolo Press, 600 pages. **$39.99**. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. **1037**

**The Merriam-Webster Dictionary**, 2016 edition, 939 pages. **$9.95**. This paperback dictionary is a handy reference for the most common English words, with more than 75,000 entries. **2015**

**The Blue Book of Grammar and Punctuation**, by Jane Straus, 201 pages. **$19.99**. A guide to grammar and punctuation by an educator with experience teaching English to prisoners. **1046**

**Legal Research: How to Find and Understand the Law**, 19th Ed., by Stephen Elias and Susan Levinkind, 368 pages. **$49.99**. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises. **1059**

**All Alone in the World: Children of the Incarcerated**, by Nell Bernstein, 303 pages. **$19.99**. A moving condemnation of the U.S. penal system and its effect on families" (Parents' Press), award-winning journalist Nell Bernstein takes an intimate look at parents and children—over two million of them - torn apart by our current incarceration policy. **2016**

**Criminal Law: A Desk Reference**, by Paul Bergman, 5th Ed. Nolo Press, 456 pages. **$44.99**. The book offers clear, plain English explanations of the law accompanied by real-world illustrations. **1101**

**Arrested: What to Do When Your Loved One's in Jail,** by Wes Denham, 240 pages. **$16.95**. Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members or friends who are facing criminal charges. **1084**

**Deposition Handbook**, by Paul Bergman and Albert Moore, 7th Ed. Nolo Press, 440 pages. **$34.99**. How-to handbook for anyone who conducts a deposition or is going to be deposed. **1054**

**Spanish-English/English-Spanish Dictionary**, 2nd ed., Random House. 694 pages. **$15.95**. Has 145,000+ entries from A to Z; includes Western Hemisphere usage. **1034a**

**Writing to Win: The Legal Writer**, by Steven D. Stark, Broadway Books/Random House, 303 pages. **$19.95**. Explains the writing of effective complaints, responses, briefs, motions and other legal papers. **1035**

**Roget's Thesaurus**, 709 pages. **$9.95**. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words. **1045**

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits**, by Lewis Laska, 336 pages. **$39.95**. Written for victims of medical malpractice/neglect, to prepare for litigation. Note that this book addresses medical malpractice claims and issues in general, not specifically related to prisoners. **1079**

**Federal Prison Handbook**, by Christopher Zoukis, 493 pages. **$74.95**. This leading survival guide to the federal Bureau of Prisons teaches current and soon-to-be federal prisoners everything they need to know about BOP life, policies and operations. **2022**

**Win Your Case**, by Gerry Spence, 287 pages. **$21.95**. Relying on the successful methods he has developed over more than 50 years, Spence, an attorney who has never lost a criminal case, describes how to win through a step-by-step process. **1092**

**Locking Up Our Own, by James Forman Jr.**, 306 pages. **$19.95**. In Locking Up Our Own, he seeks to understand the war on crime that began in the 1970s and why it was supported by many African American leaders in the nation's urban centers. **2025**

**Encyclopedia of Everyday Law**, by Shae Irving, J.D., 11th Ed. Nolo Press, 544 pages. **$34.99**. This is a helpful glossary of legal terms and an appendix on how to do your own legal research. **1102**

**Everyday Letters for Busy People: Hundreds of Samples You Can Adapt at a Moment's Notice**, by Debra May, 287 pages. **$21.99**. Here are hundreds of tips, techniques, and samples that will help you create the perfect letter. **1048**

**The PLRA Handbook: Law and Practice under the Prison Litigation Reform Act,** by John Boston, 578 pages. **Prisoners - $84.95, Lawyers/Entities - $224.95**. This book is the best and most thorough guide to the PLRA provides a roadmap to all the complexities and absurdities it raises to keep prisoners from getting rulings and relief on the merits of their cases. The goal of this book is to provide the knowledge prisoners' lawyers – and prisoners, if they don't have a lawyer – need to quickly understand the relevant law and effectively argue their claims. **2041**

**Caught: The Prison State and the Lockdown of American Politics**, by Marie Gottschalk, 496 pages. **$27.99**. This book examines why the carceral state, with its growing number of outcasts, remains so tenacious in the United States. **2005**

**The Best 500+ Non-Profit Organizations for Prisoners and Their Families**, 5th edition, 170 pages. $19.99. The only comprehensive, up-to-date book of non-profit organizations specifically for prisoners and their families. Cross referenced by state, organization name and subject area. Find what you want fast! **2020**

**Merriam-Webster's Dictionary of Law**, 634 pages. **$19.95**. Includes definitions for more than 10,000 legal words and phrases, plus pronunciations, supplementary notes and special sections on the judicial system, historic laws and selected important cases. Great reference for jailhouse lawyers who need to learn legal terminology. **2018**

**Beyond Bars, Rejoining Society After Prison**, by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 224 pages. **$14.95**. Beyond Bars is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more. **1080**

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.**, by Mumia Abu-Jamal, 286 pages. **$16.95**. In Jailhouse Lawyers, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned advocates who have learned to use the court system to represent other prisoners—many uneducated or illiterate—and in some cases, to win their freedom. **1073**

**How to Win Your Personal Injury Claim**, by Atty. Joseph Matthews, 9th edition, NOLO Press, 411 pages. **$34.99**. While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents. **1075**

**Arrest-Proof Yourself,** Second Edition, by Dale C. Carson and Wes Denham, 376 pages. **$16.95**. What do you say if a cop pulls you s to search your car? What if he gets up in your face and uses a racial slur? What if there's a roach in the ashtray? And what if your hot-headed teenage son is at the wheel? If you read this book, you'll know exactly what to do and say. **1083**

**Directory of Federal Prisons: The Unofficial Guide to Bureau of Prisons Institutions**, by Christopher Zoukis, 764 pages. **$99.95**. A comprehensive guidebook to Federal Bureau of Prisons facilities. This book delves into the shadowy world of American federal prisoners and their experiences at each prison, whether governmental or private. **2024**

**Blue Collar Resume**, by Steven Provenzano, 210 pages. **$16.95**. The must have guide to expert resume writing for blue and gray-collar jobs. **1103**

Please Note: All book orders are mailed via the U.S. Postal Service with delivery confirmation. HRDC does not assume any responsibility to replace book orders once their delivery to the destination address (facility) is confirmed by the U.S. Postal Service. If you are incarcerated and placed a book order but did not receive it, please check with your facility's mailroom before checking with us. Thank you!

## Notes: All purchases must be pre-paid.

### PLN Subscriptions

6-Month Subscription (Prisoners Only) - $20 _____

1 yr Subscription (12 issues) _____

2 yr Subscription (24 issues + 2 Bonus issues) _____

3 yr Subscription (36 issues + 4 Bonus issues) _____

4 yr Subscription (48 issues + 6 Bonus issues) _____

### CLN Subscriptions

6-Month Subscription (Prisoners Only) - $28 _____

1 yr Subscription (12 issues) _____

2 yr Subscription (24 issues + 2 Bonus issues) _____

3 yr Subscription (36 issues + 4 Bonus issues) _____

4 yr Subscription (48 issues + 6 Bonus issues) _____

### PLN & CLN Combined Subscriptions

6-Month Subscription (Prisoners Only) - $43 _____

1 yr Subscription (12 issues) _____

2 yr Subscription (24 issues + 2 Bonus issues) _____

3 yr Subscription (36 issues + 4 Bonus issues) _____

4 yr Subscription (48 issues + 6 Bonus issues) _____

Back Issue (specific date) - $6.00 each _____

Sample Issue (random date) - $6.00 each _____

TOTAL Amount Enclosed: _____

### Send to:

Name: _____

DOC #: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

### MAIL PAYMENT AND THIS FORM TO:



Human Rights Defense Center
PO Box 1151
Lake Worth Beach, FL 33460

☐ **Check Here To Have Us Send You The HRDC Book List!**
You can buy dozens of legal, social commentary, self-help books as well as legal and regular dictionaries from HRDC's book store!.

## Magazine Subscription Rates

### Prison Legal News (PLN)

| Rates | 1 yr | 2 yrs | 3 yrs | 4 yrs |
|---|---|---|---|---|
| Prisoners/Individuals $36 | $72 | $108 | $144 |
| Professionals/Entities $96 | $192 | $288 | $384 |

(Attorneys, govt. & professional agencies, prison libraries, etc.)

Six-month subscription (*prisoners only*) - **$20.00**

### Criminal Legal News (CLN)

| Rates | 1 yr | 2 yrs | 3 yrs | 4 yrs |
|---|---|---|---|---|
| Prisoners/Individuals $48 | $96 | $144 | $192 |
| Professionals/Entities $96 | $192 | $288 | $384 |

(Attorneys, govt. & professional agencies, prison libraries, etc.)

Six-month subscription (*prisoners only*) - **$28.00**

### PLN & CLN Combined Subscription

| Rates | 1 yr | 2 yrs | 3 yrs | 4 yrs |
|---|---|---|---|---|
| Prisoners/Individuals $74 | $148 | $222 | $296 |
| Professionals/Entities $170 | $338 | $508 | $676 |

(Attorneys, govt. & professional agencies, prison libraries, etc.)

Six-month subscription (*prisoners only*) - **$43.00**

Sample Issue - PLN or CLN - (random date) - **$6.00** *each*

Back Issue - PLN or CLN - (specific issue) - **$6.00** *each*

### Multi-Year Subscription Bonuses

• **All 2 year subscription options include 2 extra issues**

• **All 3 year subscription options include 4 extra issues**

• **All 4 year subscription options include 6 extra issues**

To purchase with a credit card, call 561-360-2523
Or buy books and subscriptions online at:
**WWW.PRISONLEGALNEWS.ORG**
**WWW.CRIMINALLEGALNEWS.ORG**

All subscription rates & bonus offers are effective as of 1-1-2022.
No refunds after orders have been placed. HRDC is not responsible
for address changes after orders have been placed.

# Magazine Subscriptions

# PRISON LEGAL NEWS

# Criminal Legal News

*projects of the*



# HUMAN RIGHTS DEFENSE CENTER

*Dedicated to Protecting Human Rights*

**PO Box 1151 • Lake Worth Beach, FL 33460**
**561-360-2523**
**WWW.PRISONLEGALNEWS.ORG**
**WWW.CRIMINALLEGALNEWS.ORG**

Prison Legal News (PLN) is an independent, non-profit 72-page monthly publication that reports, reviews and analyzes court rulings and news related to prisoners' rights and criminal justice issues. PLN has a national (U.S.) focus on state, federal and private prison issues, with some international coverage.

PLN's many thousands of subscribers and readers include civil and criminal trial and appellate attorneys, judges, public defenders, journalists, academics, paralegals, prisoners' rights activists, students, family members of prisoners, concerned individuals, politicians, other government officials and numerous local, state and federal prisoners nationwide.

PLN's coverage of prison issues includes medical neglect, disciplinary hearings, nutrition, living conditions, excessive force, court access, censorship, jail litigation, visiting, telephones, religious freedoms, free speech, prison rape and sexual abuse, mental health, attorney/client access, retaliation, the PLRA, HIV and hepatitis C, control units, staff misconduct, the death penalty, attorney fees and much more.

Each monthly issue of PLN includes three different types of reporting:

- A cover story on a criminal justice-related topic.

- Articles about individual and class-action prison and jail-related lawsuits when they are filed, when a judgment is entered or the case settles, or when an appellate court decision is issued. We also have news articles about prison and criminal justice topics nationwide.

- A "News In Brief" section that summarizes interesting news stories across the U.S. and internationally.

Prison Legal News and Criminal Legal News are vital links for prisoners who otherwise don't have access to current legal and prison-related news and information.

> "Great Source of information, especially in states such as Arizona where the law libraries have been taken from the inmates and replaced with paralegals."
> ~ SB, Arizona prisoner

Donations: PLN and CLN are projects of the non-profit Human Rights Defense Center (HRDC). Your tax-deductible donations support our advocacy, free speech and First Amendment litigation efforts on behalf of prisoners, their families and publishers. PLN and CLN not only provides uncensored prison and criminal justice related news, but HRDC actively contests prison censorship that interferes with the delivery of our publication or any other HRDC materials sent to prisoners. All donations further our goal of advocating for people imprisoned in U.S. detention facilities.

## Don't Forget to Check Out our Websites!

**WWW.PRISONLEGALNEWS.ORG**

**WWW.CRIMINALLEGALNEWS.ORG**

Our websites includes every issue of PLN published since 1990, as well as thousands of other news articles, court rulings, a brief bank with pleadings in prison and jail cases, a collection of criminal justice reports and other pub-lications, and much more! Much of our online content is free, and access can be purchased to all our legal content, including verdicts and settlements.

NOTE: No refunds on PLN or CLN subscriptions after orders have been placed. We are not responsible for incorrect addresses or address changes after orders have been placed. Please send any address changes as soon as possible; we do not replace missing issues due to address changes

Criminal Legal News (CLN) is a 56-page monthly print publication published by the Human Rights Defense Center, a 501(c)(3) nonprofit human rights organization that zealously advocates, educates, and litigates on issues pertaining to prisoners' rights as well as individuals going through the criminal justice system.

CLN and its well-known companion publication Prison Legal News serve as vital links for prisoners who otherwise don't have access to current legal and prison-related news and information.

CLN's coverage of criminal justice issues includes, but is not limited to, criminal law and procedure, police brutality, prosecutorial misconduct, habeas corpus relief, ineffective counsel, sentencing errors, militarization of police, surveillance state, junk science, wrongful convictions, false confessions, witness misidentification, paid/incentivized informants, search and seizure, right to remain silent, right to counsel, right to speedy trial, due process rights, and much more.

Each monthly issue of CLN includes three different types of reporting:

- A cover story on a criminal justice-related topic.

- News and legal articles and appellate court decisions about criminal justice topics nationwide.

- A "News In Brief" section that summarizes interesting criminal justice related news stories across the U.S.

Our mission at CLN is to educate and inform readers about their constitutional rights and relevant developments in criminal law in an effort to provide practical knowledge that can be used at all stages within the criminal justice system prior to imprisonment and for post-conviction relief.



# Human Rights Defense Center

## DEDICATED TO PROTECTING HUMAN RIGHTS

### CONFIDENTIAL AND PRIVILEGED LEGAL MAIL

October 1, 2025

Charles Espinoza, IN202506516
Weld County North Jail
2110 "0" Street
Greeley, CO 80631

EXHIBIT

1-I

exhibitsticker.com

RE: Mail sent to you from Human Rights Defense Center

Greetings,

I am the Litigation Director for the Human Rights Defense Center (HRDC), a nonprofit organization that advocates on behalf of prisoners. HRDC publishes books and magazines containing analysis of court rulings, and other matters related to prisoners' rights and criminal justice issues. HRDC recently mailed you some reading material and I am writing to ensure that you have received everything.

The HRDC mailed the following to you, which you should have received by now:

1.  A sample copy of its 71-page monthly magazine, *Prison Legal News*;

2.  A sample copy of its 55-page monthly magazine, *Criminal Legal News*;

3.  A free copy of Protecting Your Health & Safety: A Litigation Guide for Inmates, which is a soft-cover, 325-page book about the rights of prisoners;

4. A free copy of Prisoners' Guerrilla Handbook, which is a soft-cover, 221-page book about correspondence courses available in the United States and Canada; and

5.  An envelope containing 3 brochures, including a HRDC book list.

Additionally, HRDC has given you a free six-month trial subscription to its monthly magazines *Prison Legal News* and *Criminal Legal News*. You should have received at least your first monthly issue by now. I would really appreciate it if you could write to me and let me know whether you have received any of the mail described above. If you have received some items, but not others, please let me know exactly what you did receive. Finally, if you know anyone else there who might be interested in these free legal materials, please ask them to write to the HRDC at PO Box 1151, Lake Worth, FL 33460 and request those items. Thanks in advance and I wish you the best of luck in all of your endeavors.

Very truly yours,

Jonathan Picard
Litigation Director
HUMAN RIGHTS DEFENSE CENTER